No. 24-12311-J

In the

# United States Court of Appeals
## For the Eleventh Circuit

———————————

UNITED STATES OF AMERICA,
Appellant,

v.

DONALD J. TRUMP, WALTINE NAUTA,
and CARLOS DE OLIVEIRA
Defendants-Appellees.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
District Court No. 9:23-CR-80101-AMC-1 (Cannon, J.)

———————

**APPENDIX FOR THE UNITED STATES**
**Volume 2 of 2**

———————

J.P. COONEY
Deputy Special Counsel

JAY I. BRATT
MICHAEL R. DREEBEN
RAYMOND N. HULSER
Counselors to the Special Counsel

JACK SMITH
Special Counsel

DAVID V. HARBACH II
JOHN M. PELLETTIERI
CECIL W. VANDEVENDER
JAMES I. PEARCE
Assistant Special Counsels
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. B-206
Washington, D.C. 20530

# TABLE OF CONTENTS

<u>Volume 1</u>                                                                                    **<u>Tab</u>**

Docket          ..............................................................................Dkt.

7/27/23    Superseding Indictment ..................................................... Dkt. 85

2/22/24    Defendant's Motion to Dismiss the Indictment.................Dkt. 326

6/23/24    Government's Supplemental Notice of Authorities ...........Dkt. 640


<u>Volume 2</u>

7/15/24    Order Granting Motion to Dismiss the Indictment ...........Dkt. 672

7/17/24    Notice of Appeal..............................................................Dkt. 673

Dkt. 672

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON**

**UNITED STATES OF AMERICA**,

     Plaintiff,

v.

**DONALD J. TRUMP**,
**WALTINE NAUTA**, and
**CARLOS DE OLIVEIRA**,

     Defendants.

_____/

**ORDER GRANTING MOTION TO DISMISS SUPERSEDING INDICTMENT**
**BASED ON APPOINTMENTS CLAUSE VIOLATION**

Former President Trump's Motion to Dismiss Indictment Based on the Unlawful Appointment and Funding of Special Counsel Jack Smith is **GRANTED** in accordance with this Order [ECF No. 326]. The Superseding Indictment is **DISMISSED** because Special Counsel Smith's appointment violates the Appointments Clause of the United States Constitution. U.S. Const., Art. II, § 2, cl. 2. Special Counsel Smith's use of a permanent indefinite appropriation also violates the Appropriations Clause, U.S. Const., Art. I, § 9, cl. 7, but the Court need not address the proper remedy for that funding violation given the dismissal on Appointments Clause grounds. The effect of this Order is confined to this proceeding.

**<u>INTRODUCTION</u>**

The Motion before the Court challenges the legality of Special Counsel Smith (hereinafter, "Special Counsel Smith" or "Special Counsel") in two consequential respects, both of which are matters of first impression in this Circuit, and both of which must be resolved before this

prosecution proceeds further [ECF No. 326]. The first is a challenge to his appointment under the Appointments Clause, which provides the exclusive means for appointing "Officers of the United States." Article II, § 2, cl. 2. The Appointments Clause sets as a default rule that all "Officers of the United States"—whether "inferior" or "principal"—must be appointed by the President and confirmed by the Senate. *Id.* It then goes on to direct that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in Heads of Departments." *Id.* For purposes of this Order, the Court accepts the Special Counsel's contested view that he qualifies as an "inferior Officer," not a "principal" one, although the Court expresses reservations about that proposition and addresses those arguments below. The Motion's second challenge is rooted in the Appropriations Clause, which prohibits any money from being "drawn from the Treasury" unless such funding has been appropriated by an act of Congress. Art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law. . . .").

Both the Appointments and Appropriations challenges as framed in the Motion raise the following threshold question: is there a statute in the United States Code that authorizes the appointment of Special Counsel Smith to conduct this prosecution? After careful study of this seminal issue, the answer is no. None of the statutes cited as legal authority for the appointment— 28 U.S.C. §§ 509, 510, 515, 533—gives the Attorney General broad inferior-officer appointing power or bestows upon him the right to appoint a federal officer with the kind of prosecutorial power wielded by Special Counsel Smith. Nor do the Special Counsel's strained statutory arguments, appeals to inconsistent history, or reliance on out-of-circuit authority persuade otherwise.

The bottom line is this: The Appointments Clause is a critical constitutional restriction stemming from the separation of powers, and it gives to Congress a considered role in determining the propriety of vesting appointment power for inferior officers.  The Special Counsel's position effectively usurps that important legislative authority, transferring it to a Head of Department, and in the process threatening the structural liberty inherent in the separation of powers.  If the political branches wish to grant the Attorney General power to appoint Special Counsel Smith to investigate and prosecute this action with the full powers of a United States Attorney, there is a valid means by which to do so.  He can be appointed and confirmed through the default method prescribed in the Appointments Clause, as Congress has directed for United States Attorneys throughout American history, *see* 28 U.S.C. § 541, or Congress can authorize his appointment through enactment of positive statutory law consistent with the Appointments Clause.

This Order proceeds as follows.  After laying forth pertinent factual and procedural background leading to the present Motion, the Court summarizes the legal principles underlying the Appointments Clause and the separation-of-powers doctrine on which it rests.  The Court then surveys the statutory structure of the Department of Justice, focusing on the provisions which grant the Attorney General appointment authority.  Following that contextual summary, the Court engages with the text, context, and structure of each of the statutes cited in the Appointment Order.  Finding no officer-appointing authority in the cited statutes—and seeing no reason in the mixed historical record to deviate from the absence of such authority—the Court addresses the Supreme Court's dictum with respect to those statutes in *United States v. Nixon*, 418 U.S. 683, 694 (1974).  As the *Nixon* decision and record bear out, the Attorney General's statutory appointment authority, or the matter of the Appointments Clause more generally, was not raised, argued, disputed, or analyzed; at most, the Supreme Court assumed without deciding that the Attorney General

possessed statutory appointment authority over the special prosecutor involved in that action. Following the discussion of *Nixon* and related out-of-circuit precedent, the Court turns to the question whether Special Counsel Smith is a principal officer requiring Presidential nomination and Senatorial consent. On that issue, although there are compelling arguments in favor of a principal-officer designation given the regulatory framework under which he operates, the Court rejects the position based on the available Supreme Court guidance. The Court then examines the question of remedy, concluding that dismissal of this action is the only appropriate solution for the Appointments Clause violation. Finally, the Court considers the Appropriations Clause challenge to the funding of Special Counsel Smith, concluding for many of the same reasons that Congress has not authorized the appropriation of money to be drawn for the expenses of his office. The Order concludes there, finding it unnecessary under the current posture to reach the remedy question for the Appropriations Clause violation.

## PROCEDURAL HISTORY AND OVERVIEW OF MOTION

On June 8, 2023, a grand jury in the Southern District of Florida returned an indictment, signed by the Special Counsel, charging former President Trump with thirty-one counts of willful retention of national defense information in his Mar-a-Lago residence, in violation of 18 U.S.C. § 793(e) [ECF No. 3]. The indictment also brought seven conspiracy and concealment charges against Trump and Waltine Nauta, collectively and/or individually [ECF No. 3 (charging 18 U.S.C. §§ 1512(k), 1512(b)(2)(A), 1512(c)(2), 1519, 1001(a)(2), 2)]. On July 27, 2023, the grand jury returned a Superseding Indictment, also signed by the Special Counsel, increasing the number of total charges to forty-two, and adding a third defendant, Carlos De Oliveira [ECF No. 85].

On February 22, 2024, Trump filed the instant Motion [ECF No. 326].[1]   The Special Counsel filed an Opposition on March 7, 2024 [ECF No. 374], and Trump filed a Reply on March 24, 2024 [ECF No. 414].[2]   Three sets of *amicus* parties filed briefs on the Appointments Clause question [ECF Nos. 364-1, 586–587, 618 ("Meese *amici*"); ECF No. 410-2 ("Landmark Legal *amici*"); ECF No. 429 ("Constitutional Lawyers *amici*")].   And the Court later ordered and received supplemental briefing addressing the need for factual development on the Motion [ECF No. 588; *see* ECF No. 617, 619–620].   Finally, on June 21 and 24, 2024, the Court heard lengthy oral argument on the Motion from the parties and the authorized *amici*.[3]

The Motion seeks dismissal of the Superseding Indictment "based on the unlawful appointment and funding of Special Counsel Jack Smith" [ECF No. 326].   The Motion argues that his appointment violates the Appointments Clause for two basic reasons: (1) Special Counsel Smith was not nominated by the President or confirmed by the Senate, as would be required for the appointment of a principal officer or for the appointment of an inferior officer as to which Congress has not authorized such appointment, and (2) even accepting the position that he qualifies as an inferior officer, none of the statutes cited in the Appointment Order, *see* 28 U.S.C. §§ 509, 510, 515, 533, vests the Attorney General with authority to appoint a special counsel "with the full power and authority to exercise all investigative and prosecutorial functions of any United States Attorney," as is the case with Special Counsel Smith, *see* 28 C.F.R. § 600.6.   The Motion

---

[1] Defendants De Oliveira and Nauta join the Motion [ECF Nos. 331, 611].

[2] Defendant Trump stood trial in New York state criminal court from April 15, 2024, through late May 2024 [ECF No. 421].

[3] The Appointments Clause challenge was argued on June 21, 2024; the Appropriations Clause challenge was argued on June 24, 2024.   Transcripts for these hearings can be located at ECF Nos. 647 and 648.

separately raises an Appropriations Clause challenge because (1) he is drawing on a permanent indefinite appropriation reserved for an "independent counsel" under a statutory appropriation that does not apply to him, *see* Department of Justice Appropriations Act of 1988, Pub. L. No. 100-202, 101 Stat. 1329 (Dec. 22, 1987) (hereinafter, "Indefinite Appropriation"); and (2) there is no "other Law" authorizing the appropriation as to him [ECF No. 326].

The Special Counsel opposes both challenges.  As to the Appointments Clause issue, he urges that the Attorney General exercised statutory authority in 28 U.S.C. §§ 515 and 533 to appoint him, citing the Supreme Court's decision in *United States v. Nixon*, 418 U.S. 683 (1974), D.C. Circuit authority, and historical practice [ECF No. 374 pp. 1–16].  As to the Appropriations Clause issue, Special Counsel Smith argues that he lawfully draws from the Indefinite Appropriation for independent counsels, because he retains substantial independence from the Attorney General and was appointed pursuant to "other law" in the form of the same statutes cited above—28 U.S.C. §§ 515 and 533.  In any case, Special Counsel Smith continues, any appropriations defect should not result in dismissal of the Superseding Indictment because the Department could lawfully have drawn funds from another source to investigate and prosecute this action [ECF No. 374 p. 25].

## FACTUAL BACKGROUND

### I.   Smith Appointment Order

On November 18, 2022, by Order Number 5559-2022, Attorney General Garland appointed John L. Smith, an attorney from outside the United States Government, to serve as

Special Counsel for the United States Department of Justice.[4]  Special Counsel Smith was not nominated by the President or confirmed by the Senate.

The Appointment Order states that Attorney General Garland is "vested" with appointment authority to issue the Appointment Order pursuant to 28 U.S.C. §§ 509, 510, 515, 533—statutes discussed further below.  The Appointment Order then authorizes the Special Counsel to conduct two specified "ongoing investigation[s]" and to "prosecute federal crimes arising from" those investigations.  Appointment Order at 1–2.  The first investigation relates to "efforts to interfere with the lawful transfer of power following the 2020 presidential election."  *Id.* at 1.  The second investigation is "referenced and described in the United States' Response to Motion for Judicial Oversight and Additional Relief, *Donald J. Trump v. United States*, No. 9:22-CV-81294-AMC (S.D. Fla. Aug. 30, 2022) (ECF No. 49 at 5–13), as well as any matters that arose or may arise directly from this investigation or that are within the scope of 28 C.F.R. § 600.4(a)."  *Id.* at 2.  The instant Superseding Indictment—and the only indictment at issue in this Order—arises from the latter investigation.

With respect to funding, all parties agree that Special Counsel Smith's office has been funded since its inception using "a permanent indefinite appropriation . . . established within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. § 591 et seq. [now expired] or other law."  101 Stat. 1329.  This is a limitless appropriation.  As of September 2023, Special

---

[4] The Appointment Order is made part of the record on this Motion and is referred to herein as the "Appointment Order."  *See* https://www.justice.gov/d9/press-releases/attachments/2022/11/18/2022.11.18_order_5559-2022.pdf.  The Department of Justice's main webpage contains an "Oversight" category with links to webpages for various Special Counsel's Offices, including that of Jack Smith.  https://www.justice.gov/agencies/chart/grid; https://www.justice.gov/sco-smith.

Counsel Smith's Statement of Expenditures reflects $12,807,668 in direct expenses drawn from the Indefinite Appropriation, plus an additional $11,096,601 in "component" expenses "attributable to this investigation," also drawn from the Indefinite Appropriation.[5]

## II.   Special Counsel Regulations

At the end of the Appointment Order, there is the following reference to Department of Justice regulations: "Sections 600.4 to 600.10 of title 28 of the Code of Federal Regulations are applicable to the Special Counsel."   Appointment Order at 2.   Those regulations, hereinafter referred to as the "Special Counsel Regulations" or "Regulations," are in force today, and they stem from a Final Rule promulgated by the Office of the Attorney General in July 1999 and later codified at 28 C.F.R. §§ 600.1 through 600.10.   *See* Office of Special Counsel, 64 Fed. Reg. 37038 (July 9, 1999).[6]   The Notice of Final Rule states that the regulations "replace the procedures for appointment of independent counsel pursuant to the Independent Counsel Reauthorization Act of 1994," and it cites as statutory authority the following seven statutes in Title 28, Chapter 31 of the United States Code: 28 U.S.C. §§ 509, 510, 515–519.[7]

The Special Counsel Regulations consist of ten sections spanning various topics, ranging from jurisdiction, power, staffing, conduct, and accountability, among others.   28 C.F.R. §§ 600.1– 600.10.   As most relevant here, and as explored more fully below, the Special Counsel Regulations

---

[5] Special Counsel's Office – Smith Statement of Expenditures, November 18, 2022 through March 31, 2023; Special Counsel's Office – Smith Statement of Expenditures, April 1, 2023 through September 30, 2023.   See https://www.justice.gov/sco-smith (last visited July 13, 2024).   No additional financial statements have been published yet.

[6] This rule was deemed exempted from the notice and comment requirements of the Administrative Procedure Act on the view that it "relate[d] to matters of agency management or personnel."   64 Fed Reg. at 37041.

[7] 28 U.S.C. § 533, cited in the Appointment Order, is not among the authorizing statutes listed in the Final Rule.

➢ declare the grounds for appointing a Special Counsel from "outside the United States Government," *id.* §§ 600.1, 600.3 (referencing "a conflict of interest for the Department or other extraordinary circumstance");

➢ direct the Attorney General to "establish[]" the "jurisdiction of a Special Counsel" through a "specific factual statement of the matter to be investigated," with any expansion of that jurisdiction to be determined by the Attorney General, *id.* § 600.4(a)–(b);

➢ authorize the Special Counsel to wield, "within the scope of his or her jurisdiction, the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney," *id.* § 600.6, and without being "subject to the day-to-day supervision of any official of the Department," *id.* § 600.7(b);

➢ permit the Attorney General to remove the Special Counsel but only "for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Departmental policies," *id.* § 600.7(d);

➢ give the Special Counsel discretion to "determine whether and to what extent to inform or consult with the Attorney General or others within the Department about the conduct of his or her duties and responsibilities," *id.* § 600.6;

➢ permit (but do not require) the Attorney General to seek explanations from the Special Counsel about "any investigative or prosecutorial step," *id.* § 600.7(b);

➢ dictate that the Special Counsel "shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice," *id.* § 600.7(a); and

➢ authorize the Attorney General, on a permissive basis, and after "review," to determine that a particular action of the Special Counsel should not be pursued because it is "so inappropriate or unwarranted under established Departmental practices," *id.* § 600.7(b)—except that if the Attorney General makes that determination, he must notify Congress of his decision to countermand the Special Counsel, *id.* § 600.9.

Distilled down for present purposes, the Special Counsel Regulations mandate that the Special Counsel be selected from outside the Department, and then they empower that outside attorney to exercise "all investigative and prosecutorial functions of any United States Attorney" within his jurisdiction. *Id.* § 600.6.

### III.    Independent Counsel Act, *Morrison v. Olson*, and Lapse of Independent Counsel Act

Prior to promulgation of the Special Counsel Regulations—specifically, from 1978 through 1999 (with a two-year gap between 1992 and 1994)—there was a statute that expressly authorized the appointment of independent counsels.   That statute was the now-expired Independent Counsel Act, passed as part of the Ethics in Government Act of 1978.   Pub. L. No. 95–521, §§ 601–04, 92 Stat. 1824, 1867–75, *as amended by* Pub. L. No. 97–409, 96 Stat. 2039 (1983), Pub. L. No. 100–191, 101 Stat. 1293 (1987), Pub. L. No. 103–270, 180 Stat. 732 (1994).

Under the now-expired Independent Counsel Act, Congress authorized the Attorney General—after finding "reasonable grounds to believe that further investigation [was] warranted"—to request that a three-judge panel (termed "division of the court") appoint an "independent counsel" to "fully investigate and prosecute" violations of federal criminal law by certain categories of executive persons, including Presidents and former Presidents for a year after leaving office. 28 U.S.C. § 591(a)–(b); *id.* § 592(c)(1)(A), (d).  Under that framework, the judicial division would "appoint an appropriate independent counsel" from outside the United States government and "define that independent counsel's prosecutorial jurisdiction." *Id.* § 593(b)(1)–(2); *see also id.* § 593(c) (authorizing judges to "expand the prosecutorial jurisdiction of an independent counsel").  Once appointed, the independent counsel would have the "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department of Justice." *Id.* § 594(a).

The legality of the Independent Counsel Act took center stage in *Morrison v. Olson*, 487 U.S. 654 (1988), a suit challenging and upholding the statute under the Appointments Clause and

other constitutional provisions and principles.[8]  In 1994, after *Morrison*, Congress reauthorized

the Independent Counsel Act in accordance with its five-year sunset provision.  28 U.S.C. § 599.[9]

But then in 1999, when the matter of reauthorization returned to the legislative table—and in the

wake of meaningful criticism of the Act[10]—Congress let the Act expire and has never reauthorized

it since.  At that time, then-Attorney General Janet Reno opposed reauthorization in a public

statement to Congress.[11]  Attorney General Reno expressed various criticisms of the Act[12] and

called for a return to what she described as a "non-statutory independent counsel" built on a set of

preexisting regulatory procedures that were premised on the Attorney General's "authority to

---

[8] The Supreme Court rejected related challenges to the appointment under Articles II and III of the Constitution.  *Id.* at 684, 678–696.

[9] Congress reauthorized the Act in 1983 and 1987 but then let it expire in 1992, ultimately reauthorizing it in 1994.  *See* Ethics in Government Act Amendments of 1982, Pub. L. No. 97-409, 96 Stat. 2039 (1983); Independent Counsel Reauthorization Act of 1987, P.L. 100-191, 101 Stat. 1293 (1987); Independent Counsel Reauthorization Act of 1994, P.L. 103-270, 108 Stat. 732 (1994).

[10] Brett M. Kavanaugh, *The President and the Independent Counsel*, 86 Geo. L.J. 2133, 2135–2137 (1998) (recommending that Congress enact an amended statute authorizing the President to appoint a special counsel, with advice and consent of Senate).

[11] *See* Statement of Attorney General Janet Reno Concerning the Independent Counsel Act, Committee on Governmental Affairs, United States Senate (Mar. 17, 1999), *available at* https://www.justice.gov/archive/ag/testimony/1999/aggovern031799.htm.

[12] Attorney General Reno observed that the Act "distort[ed]" the process of prosecutorial discretion by "creat[ing] a new category of prosecutors" with "no practical limits on their time or budgets," thus artificially incentivizing prosecution; vested an independent counsel "with the full gamut of prosecutorial powers, but with little of its accountability"; applied too broadly to various categories of public officials, most of whom could be prosecuted by the Department of Justice without conflicts; contained an unduly broad and malleable "triggering mechanism," resulting in appointments that ordinarily would not have been sought; created disputes about the independent prosecutor's jurisdiction; made removal of an independent counsel by the Attorney General politically difficult; and contained a final-report requirement that "created a forum for unfairly airing a target's dirty laundry," among other issues.  *Id.*

appoint a special prosecutor when the situation demands it." *Id.* Then, a day after the Independent Counsel Act expired, the same Special Counsel Regulations described above came into being to "replace the procedures for appointment" under the lapsed Act. *See* 64 Fed. Reg. 37038-01.

As noted, the Special Counsel Regulations have remained in place without change since their effective date in July 1999, with at least one unsuccessful legislative effort in 2019 to enact a special counsel statute.[13] No such special counsel statute exists today, and no such statute existed in November 2022 when Attorney General Garland issued the Appointment Order.

## APPOINTMENTS CLAUSE DISCUSSION

### I.    Background Legal Principles

Article II, Section 2, Clause 2:

> He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

Art. II, § 2, cl. 2.

The Appointments Clause "prescribes the exclusive means of appointing 'Officers of the United States.'" *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 244 (2018). An "Officer of the United States," as distinct from a non-officer employee, is any appointee who exercises "significant authority pursuant to the laws of the United States," *Buckley v. Valeo*, 424 U.S. 1, 126 (1976), and who occupies a "'continuing' position established by law," *Lucia*, 585 U.S. at 245 (quoting *United States v. Germaine*, 99 U.S. 508, 511–12 (1878)); *Edmond v. United States*, 520

---

[13] *See* S. 71, 116th Cong. (2019) (proposed legislation copying Special Counsel Regulations almost verbatim).

U.S. 651, 662 (1997) ("The exercise of 'significant authority pursuant to the laws of the United States; marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, as we said in *Buckley*, the line between officer and nonofficer." (quoting *Buckley*, 424 U.S. at 126)).

The Appointments Clause establishes "two classes" of Constitutional officers: "principal" officers and "inferior" officers. *Germaine*, 99 U.S. at 509–10.[14]  Principal officers must be appointed by the President, with the advice and consent of the Senate.  Art. II, § 2, cl. 2; *Edmond*, 520 U.S. at 659; *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021).  That mechanism—Presidential nomination and Senatorial confirmation—is the "default manner of appointment" for principal and inferior officers.  *Arthrex, Inc.*, 594 U.S. at 12.  But the Appointments Clause provides another means to facilitate inferior-officer appointments, and it does so through the so-called "Excepting Clause."  *Edmond*, 520 U.S. at 660.  That clause permits Congress—"by law," and as it "thinks proper"—to "vest" the appointment of such inferior officers in three places, and only three places: "in the president alone, in the Courts of Law, or in the Heads of Departments."  Art. II, § 2, cl. 2.  But "any decision to dispense with Presidential appointment and Senate confirmation *is Congress's to make*, not the President's."  *Weiss v. United States*, 510 U.S. 163, 187 (1994) (Souter, J., concurring) (emphasis added); *United States v. Perkins*, 116 U.S. 483, 485 (1886) ("The head of a department has no constitutional prerogative of appointment to offices independently of the legislation of congress, and by such legislation he must be governed, not only in making appointments, but in all that is incident thereto.").

Importantly, the Framers considered, and initially maintained, a proposal by which the President alone would have had the authority to "'appoint officers in all cases not otherwise

---

[14] The principles governing inferior versus principal officer are explored below.  *Infra* pp. 67–80.

provided for by this Constitution.'" *Morrison*, 487 U.S. at 675 (quoting 1 Records of the Federal Convention of 1787, pp. 183, 185 (M. Farrand ed. 1966)). That proposal, however, was replaced on September 15, 1787, when Gouverneur Morris moved to add the Excepting Clause to Article II, which was adopted shortly thereafter. That left Congress with an important—though circumscribed—role in vesting appointment authority for inferior officers. *Id.* The Framers' rejection of unilateral executive-appointment authority traces its roots to the American colonial experience with the English monarchy and to the Framers' desire to limit executive aggrandizement by requiring shared legislative and executive participation in the area of appointments. *See Edmond*, 520 U.S. at 559–660; *Freytag v. Comm'r*, 501 U.S. 868, 884 (1991) (examining historical sources on the subject of executive appointment-power abuses); *Weiss*, 510 U.S. at 184 (1994) (Souter, J., concurring) (discussing Framers' awareness of the English monarchy's pre-revolutionary "manipulation of official appointments" and corresponding recognition "that lodging the appointment power in the President alone would pose much the same risk as lodging it exclusively in Congress: the risk of an incautious or corrupt nomination." (internal quotation marks and brackets omitted)); *Trump v. United States*, 144 S. Ct. 2312, 2349 (2024) (Thomas, J., concurring).

For these and other reasons, and as the Supreme Court has emphasized, the Appointments Clause is "more than a matter of 'etiquette or protocol'; *it is among the significant structural safeguards of the constitutional scheme*." *Edmond*, 520 U.S. at 659 (quoting *Buckley*, 424 U.S. at 124 (emphasis added)); *see Buckley*, 424 U.S. at 132 (referring to the Appointments Clause as setting forth "well-established constitutional restrictions stemming from the separation of powers"). Indeed, it is rooted in the separation of powers fundamental to our system of government and to the limitations built into that structure—all of which aim to prevent one branch from

aggrandizing itself at the expense of another. *Freytag*, 501 U.S. at 878 ("The roots of the separation-of-powers concept embedded in the Appointments Clause are structural and political. Our separation-of-powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch."). The Appointments Clause also preserves "the Constitution's structural integrity by preventing the diffusion of the appointment power" and thus enhancing democratic accountability. *Id*. at 878; *id.* at 884–86 (explaining that the Appointments Clause protects democratic accountability by limiting "the distribution of the appointment power" to "ensure that those who wielded it were accountable to political force and the will of the people"); *Ryder v. United States*, 515 U.S. 177, 182 (1995).

Turning to the Excepting Clause more specifically, the Appointments Clause requires that any Congressional decision to vest inferior-officer appointment power must be made by "Law"— meaning statutory law, as all parties rightly agree [ECF Nos. 326 pp. 4–5; ECF No. 374 pp. 3–4]. Art. II, § 2 cl. 2. This "Law," it bears noting, is a means by which Congress, in the words of the Clause, can express its determination of whether it is "proper" to vest such appointment power in one of the three circumscribed repositories. *Id.* (providing that "Congress may *by Law* vest the Appointment of such inferior Officers, *as they think proper*, in the President alone, in the Courts of Law, or in the Heads of Departments") (emphasis added). Congress thus retains a critical role in determining which offices to create and whom to vest with inferior-officer appointment power. And that role cannot be usurped or minimized, for doing so would "'breach . . . the national fundamental law'" of separation of powers and violate the principle that "[a]ll Legislative power . . . shall be vested in . . . Congress." *Buckley*, 424 U.S. at 122 (quoting *Hampton & Co. v. United States*, 276 U.S. 394 (1928)); *see* Art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of

Representatives.").[15]  Put another way, there can be no expansion of the vesting power beyond what is permitted in the Clause, and there can be no usurpation of the appointment power "by indirection." *Buckley*, 424 U.S. at 135–36; *Myers v. United States*, 272 U.S. 52, 164 (1926) (stating that the Excepting Clause must be "strictly construed" and not "extended by implication").

Pausing for a moment to distill the key principles so far, the following points stand out:

➢ The Appointments Clause reflects a carefully crafted system, rooted in the separation of powers, by which the Executive and Legislative branches jointly participate in appointments, exerting limitations upon each other, ensuring "public accountability," and "curb[ing] Executive abuses." *Edmond*, 520 U.S. at 659.

➢ Congress retains a pivotal role in the appointment sphere, a role that cannot be usurped or expanded. *Freytag*, 501 U.S. at 878.

➢ The Appointments Clause imposes a mandatory and exclusive procedure that must be enforced according to its plain meaning, without exception. *Buckley*, 424 U.S. at 127, 132, 138–39 (rejecting effort to read Appointments Clause "contrary to its plain language" and insisting upon strict compliance with the Clause); *Myers*, 272 U.S. at 164 (stating that the Appointments Clause must be "strictly construed" and not "extended by implication").

There is an additional background legal topic, and it concerns the degree of clarity with which Congress must speak when expressing its intent to "vest" inferior-officer appointment power.  In other words, should courts apply a "clear statement rule" in this context?  The Meese *amicus* brief urges application of such a rule, arguing that requiring Congress to speak clearly before determining that a statute permits deviation from the default appointment method is warranted to preserve the structural separation-of-powers foundation and federalism features upon which the Appointments Clause is built [ECF No. 364-1 pp. 19–20 (advocating for clear-statement

---

[15] *See also Lucia*, 585 U.S. at 263–64 (Breyer, J., concurring) ("The use of the words 'by Law' to describe the establishment and means of appointment of 'Officers of the United States,' together with the fact that Article I of the Constitution vests the legislative power in Congress, suggests that (other than the officers the Constitution specifically lists) Congress, not the Judicial Branch alone, must play a major role in determining who is an 'Office[r] of the United States.'  And Congress' intent in this specific respect is often highly relevant.").

rule but defending position on the basis of ordinary statutory interpretation too)].  *See* Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment As Special Counsel Was Unlawful*, 95 Notre Dame L. Rev. 87, 115–16 (2019).  Trump appears to agree with these arguments, although not explicitly in "clear statement" terms.  And Special Counsel Smith seems to reject imposition of any rule of construction or presumption [ECF No. 374 pp. 11–14; *see* ECF No. 647 pp. 87–88].

Without purporting to survey the Supreme Court's "clear statement" jurisprudence, it is enough to say that clear statement rules have been applied as substantive canons of construction in various contexts to protect foundational constitutional guarantees, and usually to solve questions of ambiguity in statutory interpretation.  *See* Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 168 (2010); *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 735–36 (2022) (Gorsuch, J., concurring).[16]  Clear statement rules do not require Congress to "use magic words" or to "state its intent in any particular way," but they do require Congress to speak clearly—not merely "plausibly"—as discerned through traditional tools of statutory construction. *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 298 (2023)); *Spector v. Norwegian*

---

[16] These include attempted waivers of federal and state sovereign immunity, *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc*., 598 U.S. 339, 346 (2023), *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024), *Seminole Tribe of Fla. v. Fla*., 517 U.S. 44, 55 (1996); efforts to impose retroactive liability, *Landgraf v. USI Film Products*, 511 U.S. 244, 265–66 (1994); attempts to grant agencies powers of "vast economic and political significance," *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs*., 594 U.S. 758, 764 (2021); federal preemption of state law and federal efforts to regulate areas of traditional state responsibility, *Bond v. United States*, 572 U.S. 844, 859 (2014), *Nixon v. Missouri Municipal League*, 541 U.S. 125, 128 (2004), *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 544 (1994); jurisdictional time bars affecting a court's adjudicatory capacity, *Wilkins v. United States*, 598 U.S. 152, 159 (2023); *Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 206 (2022); and in cases that could be described as implicating the balance between the federal branches, *Kucana v. Holder*, 558 U.S. 233, 237 (2010); *I.N.S. v. St. Cyr*, 533 U.S. 289, 298 (2001); *Davis v. Passman*, 442 U.S. 228, 246–47.

*Cruise Line Ltd.*, 545 U.S. 119, 139 (2005) (plurality opinion).  When a clear statement rule does

apply, it can mean that a court chooses a lesser, though still tenable, interpretation of a statute as a

means to protect significant constitutional values.  *Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023)

(Barrett, J., concurring) (noting that "the hallmark of a true clear-statement rule" is where a court

"purports to depart from the best interpretation of the text").

There are reasons to believe that application of a clear statement rule would apply to the

interpretation of statutes affecting the separation-of-powers balance animating the Appointments

Clause.  Clear statement rules, as noted, generally apply "when a statute implicates historically or

constitutionally grounded norms that we would not expect Congress to unsettle lightly." *Jones v.

Hendrix*, 599 U.S. 465, 492 (2023).  And separation of powers norms ring strong here, where the

Special Counsel's proffered statutory interpretations would displace the Senate from its ordinary

and longstanding role of confirming United States Attorneys and give to the Executive seemingly

unchecked power to create offices for outside prosecutors beyond the scheme designed in Title 28

of the United States Code.  Additionally, there are indications in the language of the Appointments

Clause itself—specifically, its repeated reference to "Law" and to Congress's determination of

what it "think[s] proper" for vesting purposes—that support requiring Congress to make its intent

known with discernable clarity.   Article II, § 2, cl. 2.  And then there are cases specifically in the

Appointments Clause context—principally *Edmond* and *Weiss*, discussed later—where the

Supreme Court has insisted upon textual clarity when faced with more ambiguous language.[17]

---

[17] *Edmond*, 520 U.S. at 656–58 (recognizing clear statute granting appointment power and
declining to find appointment power in a separate statute lacking similarly clear language); *Weiss*,
510 U.S. at 757 (recognizing that Congress knows how to speak clearly in the appointment context
and then, on the basis of that Congressional know-how, declining to find appointment power in
statutes that lacked sufficient precision); *Germaine*, 99 U.S. at 509–10; *Lucia*, 585 U.S. at 257
(Breyer, J., concurring) (agreeing with majority that Commission did not properly appoint ALJs

In any case, despite the appeal of applying a clear statement rule in this constitutional setting, the Court finds it unnecessary to do so and would reach the same conclusion in this Order regardless.  Neither party presses hard for or against such a rule; the Supreme Court has not expressly addressed whether a clear statement rule applies in the context of the Appointments Clause; and in any case, the Court is satisfied that standard tools of statutory interpretation suffice to discern whether the "Law" at issue, 28 U.S.C. § 515, 533, evinces a Congressional intent to "vest the Appointment" of inferior Officers in the Attorney General as the Special Counsel suggests.  *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006) (finding resort to clear statement rule unnecessary because the text and structure of the statute at issue showed that Congress did not intend a substantial alteration in federal-state relations).

## II.     Statutory Structure of Justice Department and Attorney General's Appointment Authority

Before delving into the particular statutes cited in the Appointment Order, the Court surveys the statutory structure of the Department of Justice, focusing on provisions that authorize the Attorney General to appoint officers and/or employees, and also noting Congress's displayed legislative agility in prescribing appointment methods within that structure.  Some of this material features later in this Order, but the Court deems it helpful to provide initial structural context for the discussion to follow.

Title 28 of the United States Code governs the Department of Justice, an executive department of the United States, 28 U.S.C. § 501, and it contains various structural chapters.  For present purposes, the most important are Chapter 31 for the Attorney General, 28 U.S.C. § 501–530D; Chapter 33 for the Federal Bureau of Investigation, 28 U.S.C. §§ 531–540d; and Chapter

---

and then observing that "no other statutory provision . . . would permit the Commission to delegate the power to appoint its administrate law judges to its staff").

35 for United States Attorneys, 28 U.S.C. §§ 541–550.  Title 28 also includes chapters for the United States Marshals Service, 28 U.S.C. §§ 561–569; United States Trustees, 28 U.S.C. §§ 581–589b; the now-expired Independent Counsel, 28 U.S.C. §§ 591–599; and the Bureau of Alcohol, Tobacco, Firearms, and Explosives, 28 U.S.C. § 599a–599b.

In **Chapter 31**, Congress requires the President to "appoint, with the advice and consent of the Senate, an Attorney General of the United States" to serve as "head of the Department of Justice."  *Id.* § 503.  Congress then provides for the Presidential appointment of various officers within the Department, all expressly "by and with the advice and consent of the Senate."  *Id.* §§ 504, 504a, 505, 506.  These include a Deputy Attorney General, *id.* § 504; an Associate Attorney General, *id.* § 504a; a Solicitor General, *id.* § 505; and eleven Assistant Attorneys General, *id.* § 506; *see also* § 507.  In each of these statutes, Congress employs statutory language fully tracking the default manner of appointing principal officers in the Appointments Clause.  By contrast, in a separate section of the same chapter, Congress permits the Attorney General to appoint an Assistant Attorney General for Administration, a non-officer employee whom Congress expressly places in the competitive service.  *Id.* § 507.

**Chapter 33** governs the Federal Bureau of Investigation (FBI).  The FBI is headed by a director appointed by the President, by and with the advice and consent of the Senate, for a term of ten years, who is paid under the Federal Executive Salary Schedule.  P. L. 90-351, Title VI, § 1101, 82 Stat. 236 (1968).[18]  Chapter 33 also authorizes the Attorney General, within his control of the FBI, and as discussed later in connection with 28 U.S.C. § 533, to "appoint officials" to "detect and prosecute crimes against the United States," to "assist in the protection" of the

---

[18] Prior to 1976, Congress authorized the Attorney General to appoint the FBI director, but then it switched course to the default appointment method.  28 U.S.C. § 532; *see* Oct. 15, 1976, P. L. 94-503, Title II, § 203, 90 Stat. 2427.

President and the Attorney General, and to conduct investigations "regarding official matters under the control" of the Departments of Justice and State.  28 U.S.C. § 533.

**Chapter 35** relates to United States Attorneys, and it directs the President, in mandatory terms, to "appoint, by and with the advice and consent of the Senate, a United States attorney for each judicial district"—further specifying that such United States attorneys "shall be appointed for a term of four years" and shall be "subject to removal by the President."  28 U.S.C. § 541.  It is undisputed, and correct, that all United States Attorneys (93 currently) have been appointed by the President and confirmed by the Senate throughout our Nation's history, except that Congress has permitted the Attorney General to appoint interim United States Attorneys with specific restrictions.  28 U.S.C. § 546 (limiting duration of terms and prohibiting Attorney General from appointing an interim United States Attorney "whose appointment by the President to that office the Senate refused to give advice and consent").  It also bears noting, in the context of the Attorney General's appointment authority, that 28 U.S.C. § 543 (within Chapter 35 for United States Attorneys) allows the Attorney General to "appoint attorneys to assist United States attorneys when the public interest so requires, including the appointment of tribal prosecutors," further indicating that such special attorneys are "subject to removal by the Attorney General."  28 U.S.C. § 543(a)–(b).  As discussed further *infra*, Special Counsel Smith does not rely on 28 U.S.C. § 543 to provide authority for his appointment, and he disavows any notion that he is "assisting" a United States attorney.[19]

---

[19] Chapter 37 addresses the United States Marshals Service and provides for a Director of the Service who is "appointed by the President, by and with the advice and consent of the Senate," 28 U.S.C. § 561, along with individual United States marshals in each judicial district, all of whom also are appointed by the President and confirmed by the Senate.  *Id.*  Chapter 39 is designated for United States Trustees, who are appointed by the Attorney General for various specified judicial districts, and who are "subject to removal by the Attorney General."  28 U.S.C. § 581.  Chapter 40A establishes "the Bureau of Alcohol, Tobacco, Firearms, and Explosives [ATF]," which is

There is one last piece in the United States Code in which the Attorney General is given appointment authority, and it is codified at **18 U.S.C. § 4041**. That section, located within the Prisons and Prisoner Part of Title 18, and passed in 1948, authorizes the Attorney General to appoint the director of the Bureau of Prisons (BOP) who serves "directly under the Attorney General," and then also permits the Attorney General to "appoint such additional officers and employees as he deems necessary." 18 U.S.C. § 4041.

There are no other provisions in the United States Code of which the Court is aware that permit the Attorney General to appoint "officers" or employees.

### III. Analysis of Statutes Cited in Appointment Order

The Court now proceeds to evaluate the four statutes cited by the Special Counsel as purported authorization for his appointment—28 U.S.C. §§ 509, 510, 515, 533. The Court concludes that none vests the Attorney General with authority to appoint a Special Counsel like Smith, who does not assist a United States Attorney but who replaces the role of United States Attorney within his jurisdiction.

In considering each of these four provisions, the Court "begins where all such inquiries begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989). This requires the Court to interpret statutory language according to its ordinary meaning, and to read it within the specific context in which it appears and within the broader context of the statute as a whole. *See, e.g.*, *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (noting "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on

---

headed by a Director who "shall be appointed by the President, by and with the advice and consent of the Senate." 28 U.S.C. § 599A(a)(1)–(2).

context" (internal citation omitted)); *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019) ("The whole-text canon refers to the principle that a judicial interpreter should consider the entire text, in view of its structure and of the physical and logical relation of its many parts, when interpreting any particular part of the text." (internal quotation marks and brackets omitted)).

### A.  28 U.S.C. § 509

The first statute cited in the Appointment Order is 28 U.S.C. § 509, a generic provision vesting DOJ's functions in the Attorney General.  It is titled "Functions of the Attorney General," and it provides, in full, as follows:

> All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General except the functions—
>
>> (1) vested by subchapter II of chapter 5 of title 5 in administrative law judges employed by the Department of Justice;
>>
>> (2) of the Federal Prison Industries, Inc.; and
>>
>> (3) of the Board of Directors and officers of the Federal Prison Industries, Inc.

28 U.S.C. § 509.

Special Counsel Smith neither argues that Section 509 establishes an office, nor that it grants officer-appointing power to the Attorney General.  Indeed, it does neither of these.  It is a general statute simply declaring that the Attorney General is imbued with all functions of the Department and its agencies except in the limited instances of administrative law judges and private federal prisons.  No more discussion about Section 509 is necessary.

**B.  28 U.S.C. § 510**

The second statute cited in the Appointment Order is 28 U.S.C. § 510, a general provision allowing the Attorney General to delegate his functions to officers, employees, and agencies of DOJ.  The full text of Section 510, titled "Delegation of authority," provides as follows:

> The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency *of the Department of Justice* of any function of the Attorney General.

28 U.S.C. § 510 (emphasis added).

Special Counsel Smith does not classify or rely on Section 510 as an officer-appointing or office-creating statute, nor is it.  Using similarly general phrasing as Section 509, Section 510 merely gives the Attorney General flexibility to authorize *existing* DOJ officers, employees, or agencies to perform the functions of the Attorney General, consistent with the nature of those functions.  *See* Calabresi & Lawson, *supra* at 107 (noting the authority granted in Section 510 to delegate "*delegable* functions" (emphasis in original)).  Special Counsel Smith, as all agree, and as required by the extant Special Counsel Regulations, was "selected from outside the United States Government."  28 C.F.R. § 600.3(a).  No more discussion about Section 510 is necessary.

**C.  28 U.S.C. § 515**

The third statute cited in the Appointment Order is 28 U.S.C. § 515, titled "Authority for legal proceedings; commission, oath, and salary for special attorneys."  28 U.S.C. § 515.  It contains two subsections, quoted fully below:

> (a) The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.

(b) Each attorney specially retained under authority of the Department of Justice shall be commissioned as special assistant to the Attorney General or special attorney, and shall take the oath required by law. Foreign counsel employed in special cases are not required to take the oath. The Attorney General shall fix the annual salary of a special assistant or special attorney.

28 U.S.C. § 515.  Although Special Counsel Smith relies primarily on Section 515(b), the Court analyzes each subsection in turn.

### i.       Section 515(a)

Section 515(a) does not authorize the creation of any office and does not authorize the Attorney General to appoint anyone.  Nor does the Special Counsel meaningfully argue that it does.  As its text indicates, Section 515(a) simply declares that the Attorney General, any "officer of the Department of Justice," or any "attorney specially appointed by the Attorney General under law"—referring to previously existing special attorneys appointed under statutory law—are authorized to conduct legal proceedings "which United States attorneys are authorized by law to conduct," regardless of whether the litigating officer or special attorney resides in the district in which the proceeding is brought.  28 U.S.C. § 515(a).[20]  This is a provision conferring territorial flexibility to the Attorney General; it permits the Attorney General to use DOJ officers and previously appointed special attorneys to litigate on behalf of the United States, regardless of residency.  No more can be inferred from the text of Section 515(a), and again, Special Counsel Smith does not meaningfully rely on it as a source of officer-appointing power.

---

[20] To the extent Special Counsel Smith insinuates that "under law" in Section 515(a) does not require what it plainly says—that special attorneys must be appointed by the Attorney General under statutory law [ECF No. 374 p. 12]—no basis is provided for that atextual suggestion. *Trump*, 2024 WL 3237603, at *27 (Thomas, J., concurring).  The phrases "under law" in Section 515(a) and "under authority of the Department of Justice" in Section 515(b) plainly refer to statutory law *outside* of Section 515.  Any other reading would render these phrases surplusage. *See Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 621 (D.D.C. 2018) (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

ii.     **Section 515(b)**

The Court thus shifts to Section 515(b), where the Special Counsel devotes more attention. According to the Special Counsel, Section 515(b) "gives the Attorney General authority to appoint 'special attorneys' like the Special Counsel" [ECF No. 374 p. 11]. This is so, he contends, because (1) "'[s]pecially retained *under authority of the Department of Justice*' necessarily means specially retained by the Attorney General, who is head of the Department of Justice and vested with all of its functions and powers" [ECF No. 374 p. 11 (emphasis in original, quoting 28 U.S.C. § 515(b))]; (2) the terms "commissioned" and "specially retained" in the statute effectively mean "appoint" [ECF No. 374 pp. 11–12; *see* ECF No. 647 pp. 62–63]; and (3) the history of Section 515(b) "confirms that it provides appointment power" [ECF No. 374 p. 14; *see, e.g.*, ECF No. 647 p. 56]. These arguments cannot be squared with the statutory text, context, or history.

a. **Ordinary Meaning**

Section 515(b), read plainly, is a logistics-oriented statute that gives technical and procedural content to the position of already-"*retained*" "special attorneys" or "special assistants" within DOJ. It specifies that those attorneys—again already *retained* in the past sense—shall be "commissioned," that is, designated, or entrusted/tasked, to assist in litigation (more on "commissioned" below). Section 515(b) then provides that those already-retained special attorneys or special assistants (if not foreign counsel) must take an oath; and then it directs the Attorney General to fix their annual salary. Nowhere in this sequence does Section 515(b) give the Attorney General independent power to appoint officers like Special Counsel Smith—or anyone else, for that matter.

This understanding of Section 515(b) as a descriptive statute about already-retained attorneys—rather than as a source of new appointment power—is confirmed by additional textual features within the provision itself.

First, as the district court in *Concord Mgmt. & Consulting LLC*, observed in evaluating a similar challenge, and as alluded to above, the statute uses the past participle tense of the word *retain*. 317 F. Supp. 3d at 621. Congress's use of a verb tense can be significant in evaluating statutes. *See, e.g.*, *Carr v. United States*, 560 U.S. 438, 448 (2010) (describing that "varied" verb tenses communicate different meanings). And that is so here, where the text of Section 515(b) plainly does not announce or give anyone the active power to "retain" anyone afresh but simply notes specific requirements or features about attorneys already "specially retained" in the past "under the authority of the Department of Justice." *Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 621 (observing that regardless of whether Section 515(b) refers to past or present conditions, it "does not appear to convey the power to bring those conditions about").

Second, absent from Section 515(b) is any reference to the verb "appoint," an active verb used in the Appointments Clause itself. Art. II, § 2, cl. 2. To justify that void, the Special Counsel says the Court should read the terms "specially retained" and "commissioned" in Section 515(b) as the functional equivalent of "appoint." The Court declines to engage in such linguistic distortion, nor is it aware of any vesting statute that uses those verbs as replacements for the verb "appoint." For starters, the term "appoint," on the one hand, and the terms "retain" or "commission," on the other, are not invariably interchangeable. *See In re Walter Energy, Inc.*, 911 F.3d 1211, 1143 (11th Cir. 2018) ("When a statute does not define a term, we often look to dictionary definitions for guidance."). Definitions of the verb "appoint" describe the filling of a more enduring—and often formal or official role or office. Black's Law Dictionary (4th ed. 1951)

(defining "appoint" as "[t]o designate, ordain, prescribe, nominate," and explaining that "'appoint' is used where exclusive power and authority is given to one person, officer, or body to name person to hold certain offices"); *see* Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("to name officially"); Oxford American Dictionary (3d ed. 2010) ("assign a job or role (to someone)").  This differs from definitions of "retain" and "commission," which often connote a narrower, mission- or task-specific hiring or charge.  *Retain*, Webster's Third New International Dictionary (1961) ("to keep in pay or in one's services" or "to employ (a lawyer) by paying a preliminary fee that secures a prior claim upon services in case of need"); *commission*, *id.* ("to endow with effective right or power" or "to appoint to a certain task, mission, function, or duty"); *retain*, Black's Law Dictionary (4th ed. 1951) ("[t]o continue to hold, have, use, recognize, etc., and to keep," and "[t]o engage the services of an attorney or counsellor to manage a cause").[21]

In any case, even accepting some degree of overlap among some of these definitions, it remains the case that the Supreme Court has been apprehensive to accept other statutory terms as stand-ins for the word "appoint" in the Appointments Clause context, recognizing that Congress consistently uses the word "appoint" rather than "terms not found within the Appointments Clause."  *See Edmond*, 520 U.S. at 657–58 (holding that statute's use of "assign" did not vest

---

[21]  Many definitions of the transitive verb "commission" merely invoke the noun form of the word, "commission."  *E.g.*, Webster's Seventh New Collegiate Dictionary (1969) (defining the verb "commission" as "to furnish with a commission"); Webster's Third New International Dictionary (1961) (similar).  Notably, though, definitions of the noun "commission" convey the same task-specific—as opposed to role-oriented—meaning as the verb.  *See* Webster's Seventh New Collegiate Dictionary (1969) (defining noun "commission" as "a formal written warrant granting the power to perform various acts or duties" or "an authorization or command to act in a prescribed manner or to perform prescribed acts"); Webster's Third New International Dictionary (1961) (defining noun "commission" as "a formal written warrant or authority granting certain powers or privileges and authorizing or commanding the performance of certain acts or duties," referencing "an order to perform a particular task or carry out a work").

officer-appointing authority); *Weiss*, 510 U.S. at 171–72.[22]  Moreover—for the same verb-tense reasons as stated above—whatever possible linguistic overlap might exist between the present-tense formulations of the verbs "appoint," "retain," or "commission," Section 515(b) does not use them in that format, using instead the past participle adjective application.

All of this yields the following in terms of ordinary meaning for the terms "specially retained" and "commissioned as . . . special attorney" in Section 515(b): (1) "retained" essentially means employed or hired; (2) "commissioned" means designated, classified, or tasked in a role; and (3) together those phrases transmit the fairly mundane, descriptive point that already-hired attorneys within the Department shall be classified as special assistants or special attorneys and shall take an oath and have a fixed salary.  That is all that fairly can be extracted from Section 515(b).  There is no granting of appointment power in this language.

Nor, as the Special Counsel suggests, does the historical pedigree of Presidential "commissions" dating back to *Marbury v. Madison*, 5 U.S. 137 (1803), transform the adjective phrase "shall be commissioned . . . as special attorney" into an implicit grant of officer-appointment power for the Attorney General [ECF No. 374 p. 11].  True, as *Marbury* informs, the "last act to be done *by the President*" in making an appointment for a constitutional officer is "the signature of the commission," thus demonstrating his action "on the advice and consent of the senate to his own nomination."  *Id.* at 157 (emphasis added); *see* Art II, § 2, cl. 3 (Recess Appointment Clause).  But nothing in the language of Section 515(b) speaks in terms of a traditional Presidential appointment with Senate confirmation followed by the signing of an

---

[22] This is not to suggest, of course, that an appointment statute has to use "magic words" lest it fail the "appointment test."  *See Lucia*, 585 U.S. at 264 (Breyer, J., concurring).  But, as noted, the Supreme Court has demonstrated a preference for language that tracks the constitutional text, *see Edmond*, 520 U.S. at 657–58; *Weiss*, 510 U.S. at 171–72; *Germaine*, 99 U.S. at 510, and so has Congress, *see supra* pp. 47–50.

officer-level commission, as was the case in *Marbury*.  Far from it, for all of the reasons already stated.  Simply put, whatever historical relevance there is to take from the fact that Presidents—not Attorneys General—sign commissions for constitutional officers, it does nothing to alter the ordinary meaning of Section 515(b).

**b.  Statutory Context**

The broader statutory context of Title 28—and the use of the term "special attorney" within that context, in particular, in Section 543—also refutes the Special Counsel's untenable reading of Section 515(b).  It is an axiom of statutory interpretation that "'identical words used in different parts of the same act are intended to have the same meaning.'" *See, e.g.*, *Gustafson v. Alloyd Co*., 513 U.S. 561, 570 (1995) (citing *Dep't of Revenue of Oregon v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994)); *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 231 (2020) (consistent usage canon); *Deal v. United States*, 508 U.S. 129, 132 (1993) (noting that it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").  It is also well settled that statutory provisions should be interpreted harmoniously, not in contradictory fashion, after considering the whole statutory scheme and context holistically.  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 439 (1935) (Cardozo, J., dissenting).  These guideposts matter much here.

Section 515 was enacted in 1966 as part of a wide-scale government reorganization act across the Executive branch.  Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 378.  *See infra* pp. 34–36 (discussing predecessor statutory history of Section 515).  As relevant to Title 28, that legislation contained two other explicit references to "special attorneys" in the Department, both of which remain in force today: Section 543 and 519.  *Id.* §§ 515, 519, 543, 80 Stat. 378, 611–618.

Section 543—titled "Special attorneys"—gives the Attorney General authority to "appoint attorneys to assist United States attorneys when the public interest so requires." 28 U.S.C. § 543. And then Section 519 directs the Attorney General to supervise all litigation involving the United States or its officers by specifically providing that he "shall direct all United States attorneys, assistant United States attorneys, and *special attorneys appointed under section 543 of this title in the discharge of their duties*." 28 U.S.C. § 519 (emphasis added).

The term "special attorney" thus has a known meaning in Title 28 that coincides harmoniously with the broader statutory context. That meaning, per Section 543, consists of attorneys appointed by the Attorney General to *assist* United States Attorneys—a role Special Counsel Smith expressly disclaims [ECF No. 647 pp. 57–58]. This leaves Special Counsel Smith to offer a highly strained reading of "special attorney" in Section 515(b), which is that the term used in that provision somehow denotes a different category of "special attorney" than what Congress specifically created in Section 543 and then referenced again in Section 519—all within the same public law [*see* ECF No. 647 pp. 57–58]. Neither the statutory text of Section 515 nor its statutory context gives any reason to believe such discordancy matches congressional intent. *United States v. Castleman*, 134 S. Ct. 1405, 1417 (2014) ("[T]he presumption of consistent usage [is] the rule of thumb that a term generally means the same thing each time it is used [and] most commonly applie[s] to terms appearing *in the same enactment*.") (Scalia, J., concurring) (emphasis added). Nor is there any basis to believe that Congress, when it expressly designated the categories of attorneys within the Department whose duties the Attorney General must direct somehow omitted a separate fourth category of United States Attorney-like special counsels nowhere created

in the 1966 Act.  If Congress intended "special attorney" to mean something different in Section 515(b) than in Section 543, it could have used different language, but it did not.[23]

Zooming out beyond Sections 543 and 519 as contextual counterpoints, Congress repeatedly has demonstrated its ability to imbue the Attorney General with appointment power over officers and employees—yet Section 515 looks nothing like those examples.  In Section 546(a), for instance, codified in the same enactment as Section 515, Congress authorized the Attorney General to "appoint an [interim] United States attorney for the district in which the office of United States attorney is vacant."  *Id.* § 546(a).  Likewise, in 18 U.S.C. § 4041, Congress permitted the Attorney General to "appoint such additional officers and employees as he deems necessary [within BOP]." 18 U.S.C. § 4041.  And in Section 542(a), Congress authorized the Attorney General to "appoint one or more assistant United States attorneys."  28 U.S.C. § 542(a). Even more, Congress has shown its facility in vesting appointment power in Heads of Departments across the Executive Branch, ranging from the Secretary of Education, to Agriculture, to Transportation, and to Health and Human Services.  *See* 7 U.S.C. § 610(a) ("The Secretary of Agriculture may appoint such officers and employees . . . ."); 18 U.S.C. § 4041 ("The Attorney General may appoint such additional officers and employees as he deems necessary."); 49 U.S.C. § 323(a) ("The Secretary of Transportation may appoint and fix the pay of officers and employees of the Department of Transportation and may prescribe their duties and powers."); 20 U.S.C. § 3461(a) ("The Secretary is authorized to appoint and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out the functions of the Secretary and the Department."); 42 U.S.C. § 913 (The Secretary [of Health and Human Services] is

---

[23] It is true that Section 519 contains a cross-reference to Section 543 whereas Section 515(b) does not, but that technical omission in a numerical cross-reference simply cannot overcome the presumption of consistent usage of "special attorney" in the same enactment.

authorized to appoint and fix the compensation of such officers and employees. . . .").  None of those examples bears any resemblance to Section 515, and notably, all of the examples use the present tense, unlike Section 515.  *See Carr*, 560 U.S. at 449–451.

The Special Counsel has no response to this clear pattern of congressional appointment language, presumably on the general theory that Congress can avail itself of different legislative phrasing as it pleases [ECF No. 374].  But statutory context cannot be discounted, nor can clear statutory patterns be ignored.  Simply put, the Special Counsel's strained inferences about Section 515 do not make sense when viewed against the backdrop of Congress's clear and consistent ability to legislate in the appointments arena.

### c.  History:  Section 515's predecessor statutes, and the historical use of special-counsel-like figures.

Finding little support in the plain language of Section 515(b), the Special Counsel makes a series of unconvincing historical arguments that fail upon close scrutiny [ECF No. 374 p. 14 ("The history of Section 515 removes any question that it authorizes the Attorney General to appoint special attorneys such as the Special Counsel.")].  The relevant history, according to Special Counsel Smith, shows that Congress tacitly authorized—or silently acquiesced to—the use of Section 515 (or its predecessor statutes) to appoint "special attorneys" like himself [ECF No. 374 pp. 14–16; *see* ECF No. 647 pp. 58–62].  Upon review of the murky historical record, the Court determines that, whatever themes can be drawn from that background, they cannot supplant the plain language of the statute itself, which clearly does not vest the Attorney General with such authority.  *See In re BFW Liquidation, LLC*, 899 F.3d 1178, 1189–90 (11th Cir. 2018).

The Special Counsel's historical argument breaks into two parts: (1) Section 515's statutory history going back to 1870, and (2) the historical use of "special attorney"-like figures throughout American history.

### i.  Statutory History

The currently codified version of Section 515(b) can be traced back to the establishment of

the Department of Justice in 1870.  *See* An Act to Establish the Department of Justice, ch. 150, 16

Stat. 162, 164–65 (1870) (hereinafter, the "DOJ Act").  The relevant portion of that Act is provided

below:

> And be it further enacted, That it shall not be lawful for the Secretary of either of
> the executive Departments to employ attorneys or counsel at the expense of the
> United States; but such Departments, when in need of counsel or advice, shall call
> upon the Department of Justice, the officers of which shall attend to the same; and
> no counsel or attorney fees shall hereafter be allowed to any person or persons,
> besides the respective district attorneys and assistant district attorneys, for services
> in such capacity to the United States, or any branch or department of the
> government thereof, unless hereafter authorized by law, and then only on the
> certificate of the Attorney-General that such services were actually rendered, and
> that the same could not be performed by the Attorney-General, or solicitor-general,
> or the officers of the department of justice, or by the district attorneys.  And every
> attorney and counselor who shall be specially retained, under the authority of the
> Department of Justice, to assist in the trial of any case in which the government is
> interested, shall receive a commission from the head of said Department, as a
> special assistant to the Attorney General, or to some one of the district attorneys,
> as the nature of the appointment may require, and shall take the oath required by
> law to be taken by the district attorneys, and shall be subject to all the liabilities
> imposed upon such officers by law.

*Id.* at § 17.  The latter portion of this section, which largely mirrors the text of the current statute,

provides no new insights as to the meaning of Section 515 and contains no indication that any of

the "specially retained" attorneys "authorized by law" to be hired do anything other than assist the

Attorney General in a non-officer capacity.   Put another way, nothing in this language shows

Congress's intent that "special assistants"—personnel authorized to "assist in the trial of any case

in which the government is interested"—would function with the power of a United States

Attorney.

Subsequent enactments do not dictate otherwise.  In 1930, Congress added the term "special attorney."  Pub. L. No. 71-133, ch. 174, 46 Stat. 170.[24]  And in 1948, Congress made some non-substantive changes to simplify the provision's wording.  Pub. L. No. 80-773, ch. 646, § 62 Stat. 869, 985–86.  Again, and mindful that "changes in statutory language generally indicate an intent to change the meaning of the statute," *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1299 (11th Cir. 2010) (citation omitted), these revisions do not indicate that Congress (1) intended the DOJ Act to authorize the appointment of private citizens; or (2) envisioned "special attorneys" as possessing the power or autonomy of contemporary special counsels.  Put simply, these amendments offer nothing new from a textual-analysis standpoint.[25]

Nevertheless, as Special Counsel Smith sees it, these amendments—and Congress's failure to object to the use of special attorneys in the intervening years—suggest that Congress "ratified" the Executive branch's use of Section 515 for this purpose [ECF No. 647 pp. 58–62; *see* ECF No. 374 pp. 15–16 ("Despite widespread use of special counsels before these enactments . . . Congress never questioned the Attorney General's power of appointment.")].  For the reasons that follow,

---

[24] Although resort to legislative history is unnecessary and generally ill advised, the Court notes that a House Report accompanying the 1930 amendment suggests that the addition of the phrase "special attorney"—to accompany the already-present "special assistant"—did not effectuate a substantive change to the DOJ Act: "The bill does not provide authority for any new appointments but merely permits commissions to issue to attorneys as special attorneys in those cases where the Attorney General feels that it is undesirable to use the title of 'special assistant to the Attorney General.'"  H.R. Rep. No. 71-229 (1930).  As far as the Court can tell, the terms "special assistant" and "special attorney" in Section 515 have the same functional meaning except, potentially, in who they assist—special assistants assisting the Attorney General; special attorneys assisting United States Attorneys, *see* 28 U.S.C. § 543—but any technical daylight between those non-officer employees has not been explored in caselaw.

[25] Special Counsel Smith also describes the statutory history leading to Section 515(a) [ECF No. 374 p. 15].  Even if the Court were to accept the inferences drawn by Special Counsel Smith on this point, Section 515(a)'s predecessor statutes—much like the now-codified provision—have nothing to do with appointment power.

the Court declines to interpret Congress's silence on the intermittent, historical use of "special attorneys" as tantamount to acquiescence here. "Legislative silence is a poor beacon to follow in discerning the proper statutory route." *Zuber v. Allen*, 396 U.S. 168, 185 (1969); *id.* at n.21 (explaining that "[t]he verdict of quiescent years cannot be invoked to baptize a statutory gloss that is otherwise impermissible"); *cf. Rapanos v. United States*, 547 U.S. 715, 749–52 (2006) (discussing the limited utility of "congressional acquiescence"); *Regions Bank*, 936 F.3d at 1196 (same); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985) ("[W]e are chary of attributing significance to Congress' failure to act . . . ."); *Bob Jones Univ. v. United States*, 461 U.S. 574, 600 (1983) ("Nonaction by Congress is not often a useful guide . . . .").

### ii.  Historical Practice

Special Counsel Smith argues that the use of special attorneys throughout American history "amply confirms the Attorney General's authority to appoint the Special Counsel here" [ECF No. 374 p. 16]. The Court disagrees. At most, the history reflects an ad hoc, inconsistent practice of naming prosecutors from both inside and outside of government (typically in response to national scandal) who possessed wildly variant degrees of power and autonomy. The lack of consistency makes it near impossible to draw any meaningful conclusions about Congress's approval of modern special counsels like Special Counsel Smith—much less its acquiescence to Section 515 as a vehicle for such appointments.

Special Counsel Smith's broad historical argument proceeds from two mistaken premises. The first is rooted in the notion that "past Attorneys General have 'made extensive use of special attorneys'" by "drawing on the authority to retain counsel originally conferred in 1870" [ECF No. 374 p. 16 (quoting *In re Persico*, 522 F.2d 41, 45–46 (2d Cir. 1975))]. This incorrectly assumes that "special attorneys" have consistently been appointed pursuant to Section 515 or one of its

predecessor statutes [ECF No. 374 p. 16].  But a review of historical appointments shows a far spottier picture.  Some "special attorneys" were appointed by regulation.  *E.g.*, 38 Fed. Reg. 30,739, *amended by* 38 Fed. Reg. 32,805 (appointing Leon Jaworski to investigate and prosecute the Watergate scandal).[26]  Some were appointed by statute.  *E.g.*, ch. 16, 43 Stat. 6 (1924) (directing President Coolidge to appoint, with Senate confirmation, special prosecutors to investigate Teapot Dome scandal).  Some were appointed by both.  *See In re Sealed Case*, 829 F.2d 50, 51–54 (D.C. Cir. 1987) (explaining how Independent Counsel Lawrence Walsh was appointed under the Independent Counsel Act *and* by separate regulation).  And some—as far as this Court can tell— were appointed without any formal statutory or regulatory authority at all.  *See* Terry Eastland, *Ethics, Politics, and the Independent Counsel* 8–9 (1989).[27]  Thus, it can hardly be said that Attorneys General have drawn consistently on Section 515 or its predecessor statutes as a source of appointment authority [*see* ECF No. 374 p. 16].

Nor is it true that "past Attorneys General" were solely and exclusively responsible for the act of appointment [*see* ECF No. 374 p. 16].  Notable nineteenth- and twentieth-century special prosecutors were appointed directly by U.S. Presidents.  Logan, *supra* at 10, 13, 28–29 (describing appointments by President Grant (with Senate confirmation) and President Truman).[28]  Moreover,

---

[26] Appointing regulations themselves have cited an inconsistent patchwork of statutory authority. Crucially here, many such regulations did not cite Section 515 (or Section 533).  The regulation appointing Special Prosecutor Jaworski serves as an example.  38 Fed. Reg. 30,739, *amended by* 38 Fed. Reg. 32,805 (citing 28 U.S.C. §§ 509, 510 and 5 U.S.C. § 301).  So does the regulation appointing Special Counsel Ken Starr to investigate the Whitewater scandal, which (interestingly) cited Section 543.  28 C.F.R. § 603.1 (citing 28 U.S.C. §§ 509, 510, 543 and 5 U.S.C. § 301).

[27] *See also* David A. Logan, *Historical Uses of a Special Prosecutor: The Administrations of Presidents Grant, Coolidge and Truman* 7, 28–29 (Congressional Research Service Nov. 23, 1973); Andrew Coan, *Prosecuting the President* 23–40 (2019); [ECF No. 647 pp. 110–11].

[28] These appointments do not appear to have been made by formal order or regulation.

the practices and protocol for removing such officers varied considerably. Some were removable—and were, in fact, removed—at will by Presidents, *see id.* at 12–13, 33–34 (discussing President Grant and Truman firing special prosecutors), whereas others were largely insulated from removal by certain statutory or regulatory features, *e.g.*, 38 Fed. Reg. 30,739, *amended by* 38 Fed. Reg. 32,805 (dramatically limiting President Nixon's power to remove Special Prosecutor Jaworski, following Nixon's firing of former Special Prosecutor Archibald Cox).

The second mistaken premise is that Special Counsel Smith is just another in a long line of "special attorneys" of similar ilk. In fact, very few historic special attorneys resemble Special Counsel Smith. For starters, the title "special counsel" is of fairly recent vintage. Special-attorney-like figures bore many titles throughout the decades. Special attorneys. Special assistants. Special prosecutors. Independent counsels. And most recently, special counsels. In the Court's view, this is not an insignificant semantic detail. *See* Kavanaugh, *supra* at 2136 n.5. As discussed below, it is emblematic of the variant backgrounds, roles, and authorities possessed by these historical figures.

Moreover, the appointment of private citizens like Mr. Smith—as opposed to already-retained federal employees—appears much closer to the exception than the rule. The historic cases cited in Special Counsel Smith's Opposition demonstrate as much [ECF No. 374 pp. 14–15]; *compare United States v. Crosthwaite*, 168 U.S. 375, 376 (1897) (appointing "special assistant" from within DOJ to aid in prosecution), *and United States v. Winston*, 170 U.S. 522, 524–25 (1898) (designating federal district attorney to serve as "special counsel" in another district), *and In re Persico*, 522 F.2d at 45–46 (appointing internal DOJ attorney to act as "Special Attorney" on organized crime "strike force"), *with United States v. Rosenthal*, 121 F. 862 (S.D.N.Y. 1903) (seeming to appoint private citizen as "special assistant to the Attorney General").

And while the past half century has shown an uptick in private-citizen special counsels, that practice is far from uniform. *Compare* Order No. 3915-2017 (appointing private citizen Robert Mueller as Special Counsel), *with* Letter from Acting Attorney General James B. Comey to Patrick J. Fitzgerald (Dec. 30, 2003) (appointing U.S. Attorney Patrick Fitzgerald as Special Counsel), *and* Order No. 4878-2020 (appointing U.S. Attorney John Durham as Special Counsel), *and* Order No. 5730-2023 (appointing U.S. Attorney David Weiss as Special Counsel).

Nor is it true that special attorneys have operated with the same degree of power and autonomy as Special Counsel Smith. Consider again the historic cases cited in the Opposition [ECF No. 374 pp. 14–15]: those cases featured special attorneys with varying degrees of authority, most of whom were subject to greater oversight than Special Counsel Smith. *See Crosthwaite*, 168 U.S. at 376 (describing "special assistant" whose authority was largely limited to aiding the U.S. Attorney, to whom he reported); *In re Persico*, 522 F.2d at 51–52 (describing special attorney as existing in a "tight bureaucratic hierarchy controlled by the Attorney General" and "under virtually constant specific direction and control").[29][30] Additionally, on several occasions, Congress has helped define and indeed controlled the degree and scope of special counsels'

---

[29] The special attorney in *In re Persico* operated under the supervision of at least three separate higher-ranking members. 522 F.2d at 45. He functioned in an assisting capacity and lacked the independent authority to take various actions without approval. *See id.* at 45–46. "The situation here is quite unlike that we would face were the Attorney General to grant such a commission to a single person outside the bureaucratic structure who might take action and incur fiscal and other liabilities for the government without limit." *Id.* at 52.

[30] The "Special Assistant to the Attorney General" featured in *Rosenthal* bears closer resemblance to Special Counsel Smith. He "appeared before [a] grand jury, and chiefly conducted the proceedings that resulted in the indictments" of several individuals involved in fraudulent importations of Japanese silks. *Rosenthal*, 121 F. at 865. In that case, however, the court determined that the special assistant was not an "officer" under the relevant statutes, nor did those statutes authorize him to appear before grand juries. *Id.* at 866–69. *See also supra* p. 35 n.25.

authority.  *See* Logan, *supra* pp. 30–31 (describing Congress's denial of President Truman's request that special prosecutor be given subpoena and immunity-granting power); *id.* p. 22 (detailing Senate's role in "direct[ing] the President to appoint special counsel" to investigate Teapot Dome).

And perhaps most importantly, Congress—historically, and in the present moment—has shown that it knows how to create offices for special counsels.  In 1924, Congress did so in response to the Teapot Dome scandal.  Ch. 16, 43 Stat. 6 ("[T]he President is further authorized and directed to appoint . . . special counsel who shall have charge and control of the prosecution of such litigation.").  In 1978, Congress passed the much-discussed (and now-defunct) Independent Counsel Act.  28 U.S.C. §§ 591 *et seq*.  In fact, there are statutes on the books *right now* that create offices for "special counsels" with unique jurisdictions.  5 U.S.C. §§ 1211–19 (establishing an "Office of Special Counsel" to protect federal employees from "prohibited personnel practices"); 8 U.S.C. § 1324b(c)(1) (establishing a "Special Counsel for Immigration-Related Unfair Employment Practices" to investigate and prosecute immigration-related employment offenses).[31]  All this stands to demonstrate that Congress knows how to legislate in this space.  And when it does, it does so expressly and unequivocally.

\*\*\*

In the end, there does appear to be a "tradition" of appointing special-attorney-like figures in moments of political scandal throughout the country's history.  But very few, if any, of these

---

[31]   The Court expresses no opinion on whether these "special counsels" are truly constitutional officers.  Notably, however, in both cases, Congress required these special counsels to be nominated by the President and confirmed by the Senate.  5 U.S.C. § 1211(b) ("The Special Counsel shall be appointed by the President, by and with the advice and consent of the Senate, for a term of 5 years."); 8 U.S.C. § 1324b(c)(1) ("The President shall appoint, by and with the advice and consent of the Senate, a Special Counsel for Immigration-Related Unfair Employment Practices . . . within the Department of Justice to serve for a term of four years.").

figures actually resemble the position of Special Counsel Smith.  Mr. Smith is a private citizen exercising the full power of a United States Attorney, and with very little oversight or supervision. When scrutinized, this spotty historical backdrop does not "amply confirm[] the Attorney General's authority to appoint the Special Counsel here" [ECF No. 374 p. 16].  Whatever marginal support the history may lend to Special Counsel Smith's position, the inconsistent patchwork of practices detailed above does not show that Congress ratified—or acquiesced to—the Executive's use of Section 515 (or its predecessor statutes) to appoint special counsels like Mr. Smith.  And it is far from sufficient to overcome the plain language of Section 515, which, as covered above, does not confer upon the Attorney General officer-appointing power but merely establishes procedures (oath and commission) for already retained special attorneys who act in an assistant capacity.  Special Counsel Smith is not an assistant.

### D.  28 U.S.C. § 533

The last statute cited in the Appointment Order and relied upon by the Special Counsel is 28 U.S.C. § 533 [ECF No. 374 pp. 12–14; *see* ECF No. 429 pp. 22–23].  Section 533 is housed within a chapter (Chapter 33) devoted to the FBI.  28 U.S.C. §§ 531–540d.  *See infra* pp. 50–52. It is titled "Investigative and other officials; appointment," and it permits the Attorney General to appoint four different types of "officials" as specified below

The Attorney General may appoint officials—

(1)    to detect and prosecute crimes against the United States;

(2)    to assist in the protection of the person of the President; and

(3)    to assist in the protection of the person of the Attorney General.

(4)    to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General.

This section does not limit the authority of departments and agencies to investigate crimes against the United States when investigative jurisdiction has been assigned by law to such departments and agencies.

28 U.S.C. § 533.[32]

As a preliminary point, the Appointment Order issued in November 2022 is the first appointment order or regulation that has cited Section 533 as a source of special-counsel-appointing authority.  The Special Counsel Regulations promulgated in 1999, which replaced the Independent Counsel regime of the Independent Counsel Act, did not cite Section 533 as a source of authority.  28 C.F.R. §§ 600.1 *et seq.* (citing 5 U.S.C. § 301; 28 U.S.C. §§ 509, 510, 515–519).  Nor did the regulation appointing the Special Prosecutor in *United States v. Nixon*, 418 U.S. 683 (1974).  38 Fed. Reg. 30738, *as amended by* 38 Fed. Reg. 32805 (citing 5 U.S.C. § 301; 28 U.S.C. §§ 509, 510).  Nor did the Order appointing Special Counsel Robert Mueller, or any preceding special counsel appointing order.  Order No. 3915-2017 (citing 28 U.S.C. §§ 509, 510, 515).   In the Court's review, Section 533 was cited for the first time in 2022—in the Order appointing Special Counsel Smith—although it has twice been employed since then.[33]

Special Counsel Smith argues that Section 533(1) confers on the Attorney General the authority to appoint special counsels, specifically, constitutional officers wielding the "full power and independent authority . . . of any United States Attorney."  28 C.F.R. § 600.6.  After careful review, the Court is convinced that it does not.  Congress "does not . . . hide elephants in mouseholes."  *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).  Special Counsel

---

[32] The misplaced "and" following subsection (2)—which should properly follow subsection (3)—appears to stem from a 2002 amendment to Section 533.  *See* Pub. L. 107-273, § 204(e), 116 Stat. 1758, 1776 (2022).  This apparent drafting error does not impact the Court's statutory analysis.

[33] Order No. 5730-2023 (appointing David C. Weiss); Order No. 5588-2023 (appointing Robert K. Hur).

Smith's interpretation would shoehorn appointment authority for United States Attorney-equivalents into a statute that permits the hiring of FBI law enforcement personnel.  Such a reading is unsupported by Section 533's plain language and statutory context; inconsistent with Congress's usual legislative practice; and threatens to undermine the "basic separation-of-powers principles" that "give life and content" to the Appointments Clause.  *Morrison*, 487 U.S. at 715 (Scalia, J., dissenting).  The Court explains below.

### i.    The term "officials" is not synonymous with "officers."

Section 533(1) authorizes the Attorney General to "appoint officials . . . to detect and prosecute crimes against the United States."  28 U.S.C. § 533(1).  The parties dispute the proper interpretation of the term "officials."  Defendants argue that "officials" is most naturally read as "nonofficer employees" [ECF No. 326 pp. 7–8; *see* ECF No. 364-1 pp. 16–18].  Special Counsel Smith advances a broader interpretation, arguing that "'official[s]' is a generic term that covers both officers and employees" [ECF No. 374 p. 13].  The Court agrees with Defendants.

Courts interpreting statutes "look to the plain and ordinary meaning of the statutory language as it was understood at the time the law was enacted."  *United States v. Chinchilla*, 987 F.3d 1303, 1308 (11th Cir. 2021).  "One of the ways to figure out that meaning is by looking at dictionaries in existence around the time of enactment."  *Id.* (citation omitted).  Here, applicable dictionary definitions indicate that "officer" and "official," though overlapping in some areas, are not synonymous.  Definitions of "officer" emphasize the elevated degree of authority, responsibility, and duty that inheres in the position.  Webster's Third New International Dictionary (1961) (defining "officer" as "one who holds an office: one who is appointed or elected to serve in a position of trust, authority, or command esp. as spefic. provided for by law" and "distinguished

from employee and sometimes from official").[34]   These same characteristics are often absent from definitions of "official," which tend to describe a more general class of bureaucratic personnel. *Id.* (defining "official" as "a person authorized to act for a government . . . esp. in administering or directing in a subordinate capacity," but also referring to "one who holds or is invested with an office").[35]   To be sure, some definitions overlap, and the words share linguistic echoes and roots. *See* Random House Dictionary of the English Language (1967) (defining "official" as "a person appointed or elected to an office or charged with certain duties, esp. in the government").   But the terms are not synonymous, nor can they be superficially substituted.   *See Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 618–19.  Definitions indicate that "officers" are distinguished from "officials" by the "greater importance, dignity, and independence of [their] position[s]." *Officer*, Black's Law Dictionary (4th ed. 1951).  Put succinctly: while all officers may be officials, not all officials are officers.

It may be true that, in some circumstances, the broader term "officials" can operate as a "catch-all phrase that includes both officers and employees" [ECF No. 647 p. 53; *see* ECF No. 374 p. 12].   "But a statute's meaning does not always 'turn solely' on the broadest imaginable 'definitions of its component words.'   Linguistic and statutory context also matter."   *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (quoting *Yates v. United States*, 574 U.S. 528, 537

---

[34]   Webster's Seventh New Collegiate Dictionary (1971) (defining "officer" as one holding an "office of trust, authority, or command," not simply that of an unspecified "office"); Black's Law Dictionary (4th ed. 1951) (defining "officer" as "one who is lawfully invested with an office," and "one who is charged by a superior power (and particularly by government) with the power and duty of exercising certain functions"); *id.* (explaining that "'officer' is distinguished from an 'employee' in the greater importance, dignity, and independence of his position, in requirement of oath, bond, more enduring tenure, and fact of duties being prescribed by law").

[35]   Webster's Seventh New Collegiate Dictionary (1971) (defining "official" as one "invested with an office," but "esp. a subordinate one"); Black's Law Dictionary (4th ed. 1951) (defining "official" as "[a]n officer; a person invested with the authority of an office").

(2015)); *see Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071, 2082 (2024) ("When faced with a catchall phrase . . . courts do not necessarily afford it the broadest possible construction it can bear."). As discussed below, when read in context, "officials" is narrowed by what it describes.

ii.   **When read in its specific statutory context, Section 533(1) cannot bear the expansive meaning advanced by Special Counsel Smith.**

"When words have several plausible definitions, context differentiates among them." *United States v. Hansen*, 599 U.S. 762, 775 (2023). "[T]he meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal*, 508 U.S. at 132. Under the *noscitur a sociis* canon, "a word is known by the company it keeps." *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961). This canon "is often wisely applied where a word is capable of many meanings in order to avoid giving unintended breadth to the Acts of Congress." *Id*.

Like all statutory terms, "officials" as used in Section 533(1) "does not stand alone but gathers meaning from the words around it." *Id*. When "officials" is read in relation to the subsections it describes, it is evident that Section 533(1) does not afford the Attorney General broad power to appoint special counsels. Consider its fellow subsections. Subsections (2) through (4) describe security and investigative employees within the FBI—bureaucratic personnel making up the "broad swath of 'lesser functionaries' in the Government's workforce." *Lucia*, 585 U.S. at 245 (defining "employees"); *see* 28 U.S.C. § 533(2)–(4). While undoubtedly important, these individuals cannot fairly be characterized as constitutional officers who, by definition, exercise "significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 126; *see Edmond*, 520 U.S. at 662 (describing authority as "the line between officer and nonofficer"). It is implausible, then, that Congress intended to wedge appointment power for special counsels

possessing the "full power . . . of any United States Attorney" into a statute concerning low- and

mid-level law enforcement personnel in a statutory section governing the FBI.  28 C.F.R. § 600.6.[36]

Section 533(1)'s use of the phrase "detect and *prosecute* crimes" does not otherwise

transform the provision into a grant of special-counsel-appointing authority.  28 U.S.C. § 533(1)

(emphasis added).  In the context of this FBI provision, and drawing from applicable dictionary

definitions, the meaning of "prosecute" naturally encompasses FBI employees who are engaged

or involved in federal investigations and prosecutions.  *See, e.g.*, *Prosecute*, Black's Law

Dictionary (3d ed. 1933) ("To follow up; to carry on an action or other judicial proceeding; to

proceed against a person criminally.").[37] This could include FBI attorneys and other legal staff,

but it also naturally encompasses non-lawyer FBI personnel involved in prosecutorial efforts to

pursue and/or investigate a crime or claim, such as FBI agents, intelligence officials, and forensic

specialists.  At any rate, as Section 533(1)'s subsections clarify, it authorizes only the hiring of

---

[36]  This reading comports with how "officials" is used elsewhere in Chapter 33.  Section 534 uses
the term to describe positions that are far more consistent with an "employee" designation than an
"officer" designation.  *See* 28 U.S.C. § 534 (describing "officials" that the Attorney General "may
appoint . . . to perform the functions authorized by this section").  Moreover, Congress's uses the
express phrase "officers and employees" (not the umbrella term "officials") elsewhere in the same
chapter.  28 U.S.C. § 535(a) ("The Attorney General and the [FBI] may investigate any violation
of Federal criminal law involving Government officers and employees . . . ."); *see also* 28 U.S.C.
§§ 509, 510 (differentiating between "officers" and "employees").  Reading "officials" to mean
"officers and employees" would conflict with the meaningful variation canon.  *See In re Failla*,
838 F.3d 1170, 1176 (11th Cir. 2016) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law:
The Interpretation of Legal Texts* 170 (2012)).

[37]  Webster's Third New International Dictionary (1961) (providing various formulations,
including "to follow, follow after, pursue"; "to follow to the end: press to execution or completion:
pursue until finished"; "to develop in detail: go further into: INVESTIGATE"; "to engage in or
proceed with: carry on: PERFORM"; "to institute legal proceedings against, *esp*.: to accuse of
some crime or breach of law or to pursue for redress or punishment of a crime or violation of law
in due legal form before a legal tribunal"; "to institute legal proceedings with reference" to a
"claim," an "action," or a "prosecution" for "public offenses").

prosecutorial *employees*—not constitutional officers like Special Counsel Smith.   *See* 28 U.S.C. §§ 533(2)–(4).

Nor is the Court persuaded by the Special Counsel's suggestion that reading "officials" as "non-officer employees" would render superfluous the term "employees" as used in Section 533(1) [ECF No. 647 p. 53].   This posits an artificial binary.   It fails to consider the gradient of authority that exists between the lowest-level employees and constitutional "Officers" wielding "significant authority pursuant to the laws of the United States."   *Buckley*, 424 U.S. at 126.   Take the FBI as an example.   An FBI agent is an "employee."   The agent's supervisor—who possesses more responsibility and influence than the agent—may rightly be deemed an "official."   And the FBI Director at the top of the organizational chart is a constitutional "Officer" appointed by the President and confirmed by the Senate.   And among this sliding-scale of authority, context shows that "official" as used in Section 533(1) cannot be fairly read to mean constitutional officer.

### iii.   Congress tracks the language of the Appointments Clause when vesting officer-appointing power in department heads.

Reading "officials" as "officers and employees" would also be contrary to Congress's typical legislative practice.   As indicated above, when Congress "by Law vest[s] the Appointment of such inferior Officers . . . in the Heads of Departments," it does so in a particular way.   Art. II, § 2, cl. 2.   A survey of generalized vesting statutes throughout the United States Code shows that Congress routinely uses the term "officers," or the phrase "officers and employees" when vesting officer-appointing power in department heads.[38]   Consider the following examples, some of which were covered above:

---

[38]   The Court refers to "generalized" vesting statutes as those which concern the appointment of a largely undefined group of individuals.   *See* 49 U.S.C. § 323(a) ("The Secretary of Transportation may appoint and fix the pay of officers and employees of the Department of Transportation and may prescribe their duties and powers.").   These are distinct from position-specific statutes.   *See*

➢ "The Secretary of Agriculture may appoint such **officers and employees**, subject to the provisions of chapter 51 and subchapter III of chapter 53 of Title 5, and such experts, as are necessary to execute the functions vested in him by this chapter."  7 U.S.C. § 610(a) (emphasis added).

➢ "The Secretary [of Education] is authorized to appoint and fix the compensation of such **officers and employees**, including attorneys, as may be necessary to carry out the functions of the Secretary and the Department."  20 U.S.C. § 3461(a) (emphasis added).

➢ "The [HHS] Secretary is authorized to appoint and fix the compensation of such **officers and employees**, and to make such expenditures as may be necessary for carrying out the functions of the Secretary under this chapter."  42 U.S.C.A. § 913 (emphasis added).

➢ "The Secretary of Transportation may appoint and fix the pay of **officers and employees** of the Department of Transportation and may prescribe their duties and powers."  49 U.S.C. § 323(a) (emphasis added).

Congress employed this same formulation when vesting officer-appointing power in the Attorney General for the Bureau of Prisons: "The Attorney General may appoint such additional officers and employees as he deems necessary."  18 U.S.C. § 4041.

To be sure, there may be instances in which Congress uses "officials" to confer officer-appointing power [ECF No. 640 p. 3 (supplemental authority)], but in those instances, Congress *still* tracks the constitutional language of the Appointments Clause in a way that reflects officer status—that is, by appending some variation of "appointed by the President, by and with the advice and consent of the Senate" to make explicit that "officials" means "officers."[39]   10 U.S.C. § 137a(a) (authorizing the hiring of six "officials" who "shall be appointed from civilian life by the President, by and with the advice and consent of the Senate"); 22 U.S.C. § 285a(a)(1)(B) (describing "officials required by law to be appointed by and with the advice and consent of the Senate"); 22 U.S.C. § 290g-1(a)(2) (same); 22 U.S.C. § 2651a(d) (authorizing appointment of

---

28 U.S.C. § 542(a) ("The Attorney General may appoint one or more assistant United States attorneys in any district when the public interest so requires.").

[39]  The term "officials" appears nowhere in the Appointments Clause or in the Constitution.

officials "who are otherwise authorized to be appointed by the President, by and with the advice and consent of the Senate"); 28 U.S.C. § 561(c) (describing U.S. marshals as "officials" appointed by the President "by and with the advice and consent of the Senate"); 50 U.S.C. § 3369d(c)(1)(A) (authorizing appointment of "officials of such agency or department who occupy a position that is required to be appointed by the President, with the advice and consent of the Senate").[40] [41]

Congress regularly intends certain words and phrases "to be read as terms of art connecting the congressional exercise of legislative authority with the constitutional provision . . . that grants Congress that authority." *Scheidler v. Nat'l Org. for Women, Inc.*, 547 U.S. 9, 17–18 (2006) (collecting cases); *see Hansen*, 599 U.S. at 775 ("Here, the context of these words—the water in which they swim—indicates that Congress used them as terms of art."); *F.A.A. v. Cooper*, 566 U.S. 284, 292–93 (2012). That seems to be the case in the appointments context, where Congress adheres closely to the constitutional text, and it would be consistent with the Supreme Court's

---

[40]   The remaining statutes cited in the Special Counsel's notice of supplemental authority are inapplicable for one of two reasons. First are those which do not confer officer-appointing power at all. 10 U.S.C. § 397 (providing that the Secretary "shall designate" an official to serve as principal advisor from "among officials appointed . . . by and with the advice and consent of the Senate")), 10 U.S.C. § 988(c) (definitions section imbedded in statute that does not confer appointing power), 16 U.S.C. § 831e (mandating that appointments of "employees or officials"— which are provided for elsewhere in Chapter 12A (Tennessee Valley Authority)—be nonpolitical). Second are those in which, as best the Court can tell, the term "official" describes a position that lacks the "significant authority" commensurate with a constitutional officer, *Buckley*, 424 U.S. at 126, such that the Appointments Clause is not implicated. 6 U.S.C. § 142(a) (providing for appointment of "senior official" to "assume primary responsibility for privacy policy" at DHS, and requiring said official to obtain approval from Secretary for subpoenas); 50 U.S.C. § 4306 (authorizing "[t]he President to appoint . . . an official to be known as the alien property custodian"). To the extent the "officials" in the second category of examples are deemed somehow to veer into "officer" territory—a proposition untested in caselaw—those statutes would be clear outliers against the weight of contrary statutory language described above.

[41]   The Constitutional Lawyers' *amicus* brief includes a lengthy string citation to provisions in which "official" subsumes "officer" [ECF No. 429 p. 22 n.4]. These provisions, mostly definitional, do not confer officer-appointing power.

demonstrated preference in this realm. *See Edmond*, 520 U.S. at 657–58; *Weiss*, 510 U.S. at 171–72; *Germaine*, 99 U.S. at 510.[42]

In sum, this consistent legislative practice shows that Section 533(1)'s unspecified use of "officials"—as opposed to "officers," or "officers and employees"—"is not merely stylistic." *Edmond*, 520 U.S. at 657. Rather, it is telling of Congress' intent. As the collection of statutes above shows, "had Congress meant to confer 'officer'-appointing power via § 533 or any other provision, 'it easily could have done so.'" *Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 619 (quoting *Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 129 (2015)).

### iv. Section 533's placement in the statutory scheme compels a more circumscribed reading.

As noted above, Section 533 is housed in a chapter concerning the "Federal Bureau of Investigation." 28 U.S.C. §§ 531–540d.[43] It is sandwiched between 28 U.S.C. § 532, a statute

---

[42] The Special Counsel invokes *Edmond* to argue that the Supreme Court found officer-appointing authority in a "default statute" with language more general than that of Section 533 [ECF No. 374 p. 12]. *Edmond* did find statutory appointment authority for Coast Guard judges in 49 U.S.C. § 323(a). 520 U.S. at 656. But merely comparing the statutes' generality ignores a critical, distinguishing feature: unlike Section 533, the statute in *Edmond* expressly uses the word "officer." 49 U.S.C. § 323(a) (authorizing appointment of "officers and employees of the Department of Transportation"). *Edmond* held that a vesting statute need "not specifically mention" a particular officer, so long as the statute's "plain language . . . appears to give the Secretary power to appoint them." *Edmond*, 520 U.S. at 656. The text of 49 U.S.C. § 323(a) passed that test. Section 533 does not.

[43] Special Counsel Smith insists that consideration of Chapter 33's title, "Federal Bureau of Investigation," cannot be considered unless the Court finds that Section 533 is ambiguous [ECF No. 374 p. 13]. It is true that "the title of a statute cannot limit the plain meaning of the text" and should be used "[f]or interpretive purposes . . . only when it sheds light on some ambiguous word or phrase." *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (internal brackets and quotations omitted). Still, however, there can be no dispute that evaluation of a statute's placement in its statutory scheme is a permissible tool of statutory construction. In any event, with respect to consideration of Section 533's "title," the Court sees no legal barrier to consulting the title here given the parties' arguments—although such consideration merely confirms the conclusion that the use of the word "officials" in Section 533(1) does not confer officer-appointing power in the manner claimed by the Special Counsel.

about the appointment of the FBI Director, and 28 U.S.C. § 534, which concerns the acquisition, preservation, and exchange of evidence in criminal cases. Given Section 533's location, it is exceedingly unlikely that Congress intended to tuck special-counsel-appointing power into a chapter devoted to the FBI.[44] Several of the surrounding chapters are clearly more natural homes for such a statute. *See* 28 U.S.C. §§ 501–530D (Attorney General); 28 U.S.C. §§ 561–575 (U.S. Attorneys). And as mentioned at length above, until 1999, there was an entire chapter in the DOJ Section of Title 28 devoted to such independent counsel figures. 28 U.S.C. §§ 591–599 (Independent Counsel Act).

Section 533's heading, "Investigative and other officials; appointment," provides an additional indicator that the provision is cabined to low- or mid-level FBI personnel. While "headings are not commanding, they supply clues" of congressional intent. *Yates*, 574 U.S. at 540. Unlike prior statutes concerning independent counsels, Section 533's heading lacks any indication that it concerns a "Special Counsel," or deals with prosecutorial power at all. *Compare* 28 U.S.C. § 533 *with* 28 U.S.C. § 592 ("Preliminary investigation and application for appointment of an independent counsel"), *and* 28 U.S.C. § 594 ("Authority and duties of an independent counsel"), *and* 28 U.S.C. § 594 (United States attorneys); *cf.* Pub. L. No. 95–521, § 601, ch. 39 (Special Prosecutor), 92 Stat. 1824 (Oct. 26, 1978). It would be odd indeed if lawmakers—in establishing an office with the prosecutorial might of a United States Attorney—made no such mention in the

---

[44] In response, Special Counsel Smith cites two out-of-circuit cases in which courts—both in footnotes—extended Section 533 beyond the FBI context [ECF No. 374 p. 14 (citing *United States v. Hasan*, 846 F. Supp. 2d 541, 546 n.7 (E.D. Va. 2012) and *United States v. Fortuna*, No. 12-cr-636 2013 WL 1737215, at *2 n.8 (D.N.J. Apr. 22, 2013))]. These cases did not involve Appointments Clause challenges. They did not engage with the text of 28 U.S.C. § 533 or its location in the United States Code. And they did not authorize appointment of constitutional "officers" with the power of the Special Counsel; rather, they approved appointment of ATF officials (*i.e.*, agents). Accordingly, the Court does not find them persuasive in this context.

statute's heading.  If Congress had intended to create such a powerful and significant office in Section 533, it would not have obscurely buried the lede and omitted any such reference from the statute's heading, or more importantly, from the text of the provision itself.

***

For the reasons stated above, as a matter of plain text, statutory context, and legislative practice, Section 533—cited in an appointment order for the first time in November 2022 as purported authority—does not provide a basis in "Law" for the appointment of Special Counsel Smith.  Art. II, § 2, cl. 2.

### E. Special Counsel Smith's interpretation undermines the separation-of-powers principles that animate the Appointments Clause and destabilizes Congress's carefully crafted statutory structure for the DOJ.

On a more fundamental level, adopting the Special Counsel's untenable interpretation of Sections 515(b) and 533 erodes the "basic separation-of-powers principles" that "give life and content" to the Appointments Clause by wresting from Congress its constitutionally prescribed role in the officer-appointing process.  *Morrison*, 487 U.S. at 715 (Scalia, J., dissenting).  It also destabilizes Congress's carefully crafted statutory structure for DOJ.

As the discussion in this Order demonstrates, Congress has carefully enacted a statutory scheme, consistent with the Appointments Clause, governing the appointment of high-level federal prosecutors.  *See* Calabresi & Lawson, *supra* pp. 113–115.  Most relevant here, United States Attorneys, the officers most closely resembling Special Counsel Smith, *see* 28 C.F.R. § 600.6, must be nominated by the President and confirmed by the Senate.  28 U.S.C. § 541.  Adopting the position of the Special Counsel allows any Attorney General, without Congressional input, to circumvent this statutory scheme and appoint one-off special counsels to wield the immense power of a United States Attorney.  This strips from Congress its role in the appointments process, and it

does so, moreover, in a highly sensitive area involving "life, liberty, and reputation."  Robert H.

Jackson, U.S. Att'y Gen., Address at the Second Annual Conference of United States Attorneys:

The Federal Prosecutor 1 (Apr. 1, 1940) (describing immense power of federal prosecutors over

citizenry).

 Absent a statute vesting appointing power elsewhere, the "default manner of appointment

for inferior officers" is Presidential nomination and Senate confirmation.  *Edmond*, 520 U.S. at

660.  And while Congress may "vest the Appointment of such inferior Officers, as they see proper,

in . . . Heads of Departments," Art. II, § 2, cl. 2, it did not do so in the cited statutes.  Such a broad

reading results in precisely the type of diffusion and encroachment that concerned the Framers in

drafting the Appointments Clause.  *Freytag*, 501 U.S. at 883–86; *Weiss*, 510 U.S. at 187–89

(Souter, J., concurring) ("If the structural benefits the Appointments Clause was designed to

provide are to be preserved . . . no branch may aggrandize its own appointment power at the

expense of another."). The Court thus declines to dilute the appointment power by reading Sections

515(b) and 533(1) as ceding a core legislative function to another branch.  *See Freytag*, 501 U.S.

at 885 ("The Framers recognized the dangers posed by an excessively diffuse appointment power

and rejected efforts to expand that power.  So do we.") (internal citation omitted); *id*. at 884–86.

## IV. *United States v. Nixon*

 The parties disagree about the precedential value of a passage from *United States v. Nixon*,

418 U.S. 683 (1974) [ECF No. 326 pp. 8–9; ECF No. 374 pp. 8–10; ECF No. 414 pp. 3–4;

ECF No. 364-1 pp. 22–23].  That passage is reproduced below.  The Court emphasizes the

statement that serves as the focal point of the parties' dispute.

> Under the authority of Art. II, § 2, Congress has vested in the Attorney General the
> power to conduct the criminal litigation of the United States Government. 28 U.S.C.
> § 516.  *It has also vested in him the power to appoint subordinate officers to assist*
> *him in the discharge of his duties. 28 U.S.C. §§ 509, 510, 515, 533.*  Acting pursuant

to those statutes, the Attorney General has delegated the authority to represent the United States in these particular matters to a Special Prosecutor with unique authority and tenure. The regulation gives the Special Prosecutor explicit power to contest the invocation of executive privilege in the process of seeking evidence deemed relevant to the performance of these specially delegated duties.

*Id*. at 694–95 (emphasis added and footnote omitted).[45]  Defendants argue that *Nixon*'s statement about the Attorney General's statutory authority is non-binding dictum and thus should not control the Court's statutory analysis (as done above) [ECF No. 326 pp. 8–9; ECF No. 414 pp. 3–4]. The Special Counsel argues that this statement "formed a necessary element of [*Nixon*'s] holding," and therefore constitutes binding precedent [ECF No. 374 p. 9].

Following a comprehensive review of the Supreme Court record,[46] the Court concludes that the disputed statement from *Nixon* is dictum. The issue of the Attorney General's appointment authority was not raised, briefed, argued, or disputed before the *Nixon* Court. *Nixon* is undoubtedly precedential in several areas—for example, in its pronouncements on the justiciability of an intra-branch controversy; the test for issuing Rule 17(c) subpoenas; and application of executive privilege in the face of a valid subpoena. Those issues were presented, argued, and carefully considered. The same is not true of the Attorney General's statutory appointment authority. At most, *Nixon* assumed that antecedent proposition, without deciding it. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990). Thus, *Nixon*'s passing remarks on that point are not binding

---

[45]  For the sake of completeness, the omitted footnote provides, in relevant part, that "[t]he regulation issued by the Attorney General pursuant to his statutory authority, vests in the Special Prosecutor plenary authority to control the course of investigations and litigation related to" Watergate. *Id*. at 694 n.8.

[46]  The Court collected and reviewed all available filings in *United States v. Nixon*, 418 U.S. 683 (1974) (No. 73-1766), and *Nixon v. United States*, 418 U.S. 683 (1974) (No. 73-1834). This includes the applicable cert petitions and merits briefing, along with *amicus* briefs, the full appendix, and the consolidated oral argument transcript. Oral Argument, *United States v. Nixon*, 418 U.S. 683 (1974) (Nos. 73-1766, 73-1834).

precedent in "future cases," as here, "that directly raise the question[]." *Id*. Giving these remarks

precedential weight runs the risk that "stray language" from the *Nixon* opinion "will take on

importance in a new context that its drafters could not have anticipated." *Rudolph v. United States*,

92 F.4th 1038, 1045 (11th Cir. 2024).

This section proceeds in four parts. The Court (1) reviews the terms "holding" and "dicta";

(2) provides context to situate the controversy in *Nixon*; (3) analyzes the disputed passage from

*Nixon*; and (4) discusses the proper weight that nevertheless should be accorded to the *Nixon*

dictum. This section is lengthy because the *Nixon* dictum has taken on significance in related

cases, and a full explication of the record is necessary. *See In re Sealed Case*, 829 F.2d 50 (D.C.

Cir. 1987); *In re Grand Jury Investigation*, 916 F.3d 1047 (D.C. Cir. 2019).

### A. Legal Standards

"Not all text within a judicial decision serves as precedent." Bryan A. Garner et al., The

Law of Judicial Precedent § 4, at 44 (2016). Thus, distinguishing between precedential "holdings"

and non-binding "dicta" is crucially important. *See Fresh Results, LLC v. ASF Holland, B.V.*, 921

F.3d 1043, 1049 (11th Cir. 2019). A holding "comprises both the result of the case and those

portions of the opinion necessary to that result." *United States v. Caraballo-Martinez*, 866 F.3d

1233, 1244 (11th Cir. 2019) (internal quotation marks and citations omitted); *see* Black's Law

Dictionary (11th ed. 2019) (defining "holding" as "[a] court's determination of a matter of law

pivotal to its decision; a principle drawn from such a decision."). Dictum, on the other hand, is "a

statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is

necessary to the holding of the case." *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019)

(quotation marks omitted). While courts must dutifully follow precedential holdings, "dicta is not

binding on anyone for any purpose," *Edwards*, 602 F.3d at 1298, although Supreme Court dicta does merit consideration as discussed below.

Statements in an opinion that extend beyond the scope of the issues presented, briefed, and argued generally constitute dicta. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *United States v. Jackson*, 55 F.4th 846, 853 (11th Cir. 2022) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)); *United States v. L. A. Tucker Truck Lines, Inc*., 344 U.S. 33, 38 (1952) ("The effect of the omission was not there raised in briefs or argument nor discussed in the opinion of the Court. Therefore, the case is not a binding precedent on this point.").

The same is generally true of assumptions that are peripheral to the issues presented. "The Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions—even on jurisdictional issues—are not binding in future cases that directly raise the questions." *Verdugo-Urquidez*, 494 U.S. at 272 (internal citations omitted); Garner et al., *supra* at 84 ("Judicial opinions are always premised on a series of assumptions about what the law is. Yet those assumptions—whether implicit or explicit—aren't generally considered precedential."). As explained by Chief Justice John Marshall:

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Cohens v. State of Virginia*, 19 U.S. 264, 399–400 (1821).

Lastly, "not all dicta are created equal." *Farah v. U.S. Att'y Gen.*, 12 F.4th 1312, 1323 (11th Cir. 2021) (Pryor, C.J.) (quoting Garner et al., *supra* at 69). Dicta from the Supreme Court are entitled to considerable—and in some cases, even precedential—weight. *Schwab v. Crosby*, 451 F.3d 1308, 1325–26 (11th Cir. 2006) (collecting cases); *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997) (emphasizing that "dicta from the Supreme Court is not something to be lightly cast aside"). Inferior courts must accord Supreme Court dicta appropriate respect and deference. *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980).

### B. Decisional Context

To discern whether the disputed passage from *Nixon* constitutes part of its holding, it helps to situate it in context, including by ascertaining the precise action taken by the trial court. *Rudolph*, 92 F.4th at 1045 (advising lower courts to "consider opinions in their context, including the questions presented and the facts of the case" in evaluating the precedential value of statements therein); *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) (emphasizing that Supreme Court opinions "dispose of discrete cases and controversies and they must be read with a careful eye to context"); Garner et al., *supra* at 52.

*Nixon* involved Special Prosecutor Leon Jaworski's investigation and prosecution of those involved in the Watergate scandal. The Special Prosecutor issued a subpoena to President Nixon— an unindicted co-conspirator—requiring the production of certain tapes and documents relevant to the investigation. *Nixon*, 418 U.S. at 686. Counsel for President Nixon moved to quash the subpoena, raising three principal arguments. *United States v. Mitchell*, 377 F. Supp. 1326, 1328–29 (D.C.C. 1974).

First, President Nixon argued that "courts are without authority to rule on the scope or applicability of executive privilege." *Id*. at 1329. The district court found this jurisdictional

argument to be foreclosed by circuit precedent.  *Id*. (citing *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973)).  Second—and most important to Defendants' Motion at issue here—President Nixon argued that the intra-branch dispute presented a nonjusticiable political question.  *Id*.  Referencing the appointing regulation, which carried "the force of law," the district court found that the Special Prosecutor possessed sufficient independence to create a justiciable controversy.  *Id*. at 1329 & n.7 (citing 38 Fed. Reg. 30,738).  Third, President Nixon argued on the merits that the requirements for issuance of a Rule 17(c) subpoena had not been satisfied, also asserting a confidentiality privilege.  *Id*. at 1329.  The district court disagreed.  *Id*. at 1330–31.  Notably, none of these arguments (or the district court's resolution thereof) had anything to do with the Attorney General's statutory appointment authority or the Appointments Clause more generally.

At the Supreme Court, President Nixon re-raised the same challenges.[47]  *Nixon*, 418 U.S. at 686.  On the justiciability question, President Nixon again asserted that the intra-branch nature of the dispute presented a nonjusticiable political question outside the purview of the judiciary.  *Id*. at 691–92.[48]  The Supreme Court ultimately rejected this argument.  *Id*. at 697.  Before doing so, however, the court offered a prefatory paragraph to contextualize "the nature of the proceeding for which the evidence is sought."  *Id*. at 694.  The relevant portion of that paragraph—which was also reproduced above, *supra* pp. 53–54—provides:

---

[47]  There was no intermediate appellate review in *Nixon*; the Supreme Court granted certiorari before judgment.  *Nixon*, 418 U.S. at 686–87.

[48]  *See* Brief for the Respondent, Cross-Petitioner at 27–48; *id*. at 16–17 ("Under the standards set forth in *Baker v. Carr*, 369 U.S. 186 (1962), this intra-branch dispute raises a political question which the federal courts lack jurisdiction to decide.  The district court does not have the power to substitute its judgement for that of the President on matters exclusively within the President's discretion."); *id*. at 29–30 (challenging the "authority of the court or any branch of the government to intervene in a solely intra-branch dispute"); *id*. at 41 (same); Reply Brief for the Respondent, Cross-Petitioner at 4–13.

Under the authority of Art. II, § 2, Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government. 28 U.S.C. § 516.  It has also vested in him the power to appoint subordinate officers to assist him in the discharge of his duties. 28 U.S.C. §§ 509, 510, 515, 533.  Acting pursuant to those statutes, the Attorney General has delegated the authority to represent the United States in these particular matters to a Special Prosecutor with unique authority and tenure.  The regulation gives the Special Prosecutor explicit power to contest the invocation of executive privilege in the process of seeking evidence deemed relevant to the performance of these specially delegated duties.

*Id*. at 694–95 (footnote omitted).

Following this stage-setting paragraph, the Supreme Court determined that the extant regulation's delegation of authority—both in the independence it created in Special Prosecutor Jaworksi and in the limitations it placed on his removal—established a justiciable case or controversy.  *Id*. at 694–98; *see id*. at 696 (explaining that "[s]o long as this regulation remains in force the Executive Branch is bound by it").  "In light of the uniqueness of the setting in which the conflict arises, the fact that both parties are officers of the Executive Branch cannot be viewed as a barrier to justiciability."  *Id*. at 697.

### C.  Analysis

With this context in mind, the Court proceeds to analyze the disputed statement from *Nixon*, ultimately concluding that it is dictum.

> #### i.    The Attorney General's appointment authority was not an issue before the Supreme Court in *Nixon*.

In *Nixon*, the Supreme Court granted certiorari to decide six questions: five from the Special Prosecutor's petition, and one from President Nixon's cross-petition.[49]  *See* Petition and

---

[49]   The *Nixon* Court also ordered the parties to file supplemental briefs on the following two questions: (1) "Is the District Court order of May 20, 1974, an appealable order?" and (2) "Does this Court have jurisdiction to entertain and decide the petition for mandamus transmitted by the Court of Appeals to this Court?"  Docket Sheets (Nos. 73-1766, 73-1834), Neither of those questions—nor the briefing submitted in response—concerned the validity of the Special

Cross-Petition for Writ of Certiorari Before Judgment, *United States v. Nixon*, 418 U.S. 683 (1974)

(Nos. 73-1766, 73-1834).   Those questions are copied verbatim below:

Special Prosecutor's Petition

1. Whether the President, when he has assumed sole personal and physical control over evidence demonstrably material to the trial of charges of obstruction of justice in a federal court, is subject to a judicial order directing compliance with a subpoena *duces tecum* issued on the application of the Special Prosecutor in the name of the United States.

2. Whether a federal court is bound by the assertion by the President of an absolute "executive privilege" to withhold demonstrably material evidence from the trial of charges of obstruction of justice by his own White House aides and party leaders, upon the ground that he deems production to be against the public interest.

3. Whether a claim of executive privilege based on the generalized interest in the confidentiality of government deliberations can block the prosecution's access to evidence material and important to the trial of charges of criminal misconduct by high government officials who participated in those deliberations, particularly where there is a *prima facie* showing that the deliberation occurred in the course of the criminal conspiracy.

4. Whether any executive privilege that otherwise might have been applicable to discussions in the offices of the President concerning the Watergate matter has been waived by previous testimony pursuant to the President's approval and by the President's public release of 1,216 pages of edited transcript of forty-three Presidential conversations related to Watergate.

5. Whether the district court properly determined that a subpoena *duces tecum* issued to the President satisfies the standards of Rule 17(c) of the Federal Rules of Criminal Procedure because an adequate showing has been made that the subpoenaed items are relevant to issues to be tried and will be admissible in evidence.

President Nixon's Cross-Petition

1. Whether, under the Constitution, a grand jury has the authority to charge an incumbent President as an unindicted co-conspirator in a criminal proceeding.

As the *Nixon* opinion reflects, the questions presented—that is, "[t]he questions actually

before the Court"—were "investigated with care, and considered in their fullest extent." *Cohens*,

_____

Prosecutor.  *See* Supplement Brief for the Petitioner, No. 73-1766; Brief for Respondent, Cross-Petitioner, No. 73-1766.

19 U.S. at 399.  The same is not true of the Attorney General's statutory appointment authority, a peripheral subject that was not raised in the case.  To reiterate, "[t]he Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions—even on jurisdictional issues—are not binding in future cases that directly raise the questions."  *Verdugo-Urquidez*, 494 U.S. at 272; *see Becton*, 632 F.2d at 1296 n.3; *Caraballo-Martinez*, 866 F.3d at 1245; *see also United States v. Manafort*, 321 F. Supp. 3d 640 (E.D. Va. 2018).[50]  Because the statutory-authority question was not before the Supreme Court, the opinion's single prefatory sentence does not amount to a precedential holding.

### ii.     The Special Prosecutor's validity was uncontested.

A case is not "'binding precedent' on points that were not there raised in briefs or argument nor discussed in the opinion."  *Bourdon v. United States Dep't of Homeland Sec*., 940 F.3d 537, 548–49 (11th Cir. 2019) (internal quotation marks omitted); Garner et al., *supra* at 84–85.  The rationale behind such a rule is sensible.  Where "the issue addressed in the passage was not presented as an issue, [and] hence was not refined by the fires of adversary presentation," it is far less likely to constitute a carefully reasoned, essential part of the court's opinion.  *United States v. Crawley*, 837 F.2d 291, 293 (7th Cir. 1988) (Posner, J.) (defining "dictum").

Across hundreds of pages of briefing (and hours of oral argument) in *Nixon*, neither party challenged the Special Prosecutor's validity or the Attorney General's appointment authority.  In fact, on numerous occasions, President Nixon expressly stated that he did *not* contest these points.  Brief for the Respondent at 42 (stating, in reference to the regulation, that "the President has not

---

[50]  In *United States v. Manafort*, 321 F. Supp. 3d 640 (E.D. Va. 2018), the court determined that *Nixon's* line "[s]o long as this regulation is extant it has the force of law," was dictum.  *Id*. at 659 (quoting *Nixon*, 418 U.S. at 695); *see also id*. ("*Nixon* is inapposite inasmuch as the holding there did not adjudicate the legal authority of a special prosecutor.").

in the past nor does he here challenge those powers that were given to the Special Prosecutor in Watergate-related matters"); Reply Brief for the Respondent at 8 (emphasizing that "[w]e do not contest the Special Prosecutor's assertion that his authority is derived from the Attorney General"); *see* Tr. of Oral Argument, Nos. 73-1766, 73-1834. The Special Counsel acknowledges as much [ECF No. 374 p. 9 (accepting that "President Nixon did not contest that statutory analysis")]. This absence of argument on the appointment-authority point further cements the disputed passage's status as dictum. The parties themselves litigated the entire case without touching the issue.

      iii.    **The Court's statement on the Attorney General's statutory authority was not "necessary" to its resolution of the justiciability issue.**

Even though the statutory-authorization question was not at issue, and despite its absence from the record, Special Counsel Smith still contends that *Nixon*'s comment on this point "formed a necessary element of its holding" [ECF No. 374 p. 9]. He argues that "finding statutory authority for the appointment was thus central to the Court's conclusion that '[s]o long as this regulation [setting forth the Special Prosecutor's authority] is extant it has the force of law'" [ECF No. 374 p. 9 (quoting *Nixon*, 418 U.S. at 695) (alterations in Opposition)]. This "read[s] too much into too little." *Nat'l Pork Producers Council*, 598 U.S. at 373 (stressing that opinions must "be read with a careful eye to context").

The disputed passage is located within a prefatory, stage-setting paragraph which merely served to tee up the case-or-controversy analysis that followed. As recap, President Nixon argued that the case presented a nonjusticiable political question by virtue of the intra-branch nature of the dispute. *See supra* p. 58 n.48. The *Nixon* Court disagreed. "[J]usticiability does not depend on such a surface inquiry." 418 U.S. at 693. Instead, *Nixon* stated that "courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented." *Id.* (citation omitted). In doing so, *Nixon* zoomed out and provided a high-level

background paragraph explaining how the case landed at the Supreme Court.  *Id*. at 694 ("Our starting point is the nature of the proceeding for which the evidence is sought—here a pending criminal prosecution.").  It is within this overview paragraph that the disputed dictum is located.

Properly situated in this context, therefore, *Nixon*'s remark on the Attorney General's statutory authority is more akin to an "aside like statement" or digression, *United States v. Files*, 63 F.4th 920, 929 & n.7 (collecting similar examples), than a "determination of a matter of law pivotal to its decision," *Holding*, Black's Law Dictionary (11th ed. 2019).  *See Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1119–20 (11th Cir. 2022) (determining an earlier case's "prefatory statement" about a statute's operation was dictum because it wasn't germane to resolving the issues presented).

To be sure, that President Nixon delegated to the Special Prosecutor (via the regulation) the power to "determin[e] whether or not to contest the assertion of 'Executive Privilege' or any other testimonial privilege," 38 Fed. Reg. 30,739, *amended by* 38 Fed. Reg. 32,805, was integral to *Nixon*'s justiciability holding.  418 U.S. at 694–97.  This delegation assured the Supreme Court that "concrete adverseness" existed between the parties.  *Id*. at 697 (quoting *Baker v. Carr*, 369 U.S. at 204); *see id.* at 696 (explaining that "[s]o long as this regulation remains in force the Executive Branch is bound by it").  In other words, two features were essential to the justiciability holding: (1) the nature of the parties' relationship as defined in the very broad delegation of authority in the regulation; and (2) the fact that the regulation had not been revoked.  But *Nixon*'s passing reference to statutory authority was not essential to the analysis, and nothing in the remainder of the decision suggests that the Supreme Court was reasoning from its earlier passing

remark.[51]  *See Sarnoff v. Am. Home Prod. Corp*., 798 F.2d 1075, 1084 (7th Cir. 1986) (Posner, J.) (defining as "dictum" a "statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it").

### D.  As dictum, *Nixon*'s statement is unpersuasive.

Having determined that the disputed passage from *Nixon* is dictum, the Court considers the appropriate weight to accord it.   In this circuit, Supreme Court dictum which is "well thought out, thoroughly reasoned, and carefully articulated" is due near-precedential weight.  *Schwab*, 451 F.3d at 1325–26 (collecting cases); *Peterson*, 124 F.3d at 1392 n.4.  Additionally, courts are bound by Supreme Court dictum where it "is of recent vintage and not enfeebled by any subsequent statement."  *Id*. at 1326 (quoting *McCoy v. Mass. Inst. of Tech*., 950 F.2d 13, 19 (1st Cir. 1991)).  The *Nixon* dictum is neither "thoroughly reasoned" nor "of recent vintage."  *Id*. at 1325–26.  For these reasons, the Court concludes it is not entitled to considerable weight.

### i.  *Nixon* did not analyze the relevant statutes.

First, *Nixon* does not engage in any statutory analysis of the cited provisions.  Although *Nixon* "gave passing reference to the cited statutes," the opinion "provided no analysis of those provisions' text."  *Trump*, 144 S. Ct. at 2351 (Thomas, J., concurring).  Indeed, the extent of *Nixon*'s discussion of the statutes comes in a single sentence: "[Congress] vested in [the Attorney General] the power to appoint subordinate officers to assist him in the discharge of his duties.  28 U.S.C. §§ 509, 510, 515, 533."  418 U.S. at 694.  No more is provided.  Thus, giving *Nixon*'s dictum near-precedential weight in resolving the Motion—which calls for a thorough analysis of

---

[51]  Nor can it be said that the *Nixon* Court's own language—"acting *pursuant* to [statutes]"— contains any substantive commentary on the validity of the cited statutes for appointment purposes [ECF No. 647 pp. 116–117 (Meese *amici* argument)].

the statutory text—runs the risk that the Supreme Court's "language will take on importance in a new context that its drafters could not have anticipated." *Rudolph*, 92 F.4th at 1045.

### ii.    *Nixon* **was decided prior to the development of recent Appointments Clause jurisprudence.**

Second, *Nixon* was decided in 1974.  In the subsequent half century, the Supreme Court has placed a renewed emphasis on structural principles underpinning the Appointments Clause, beginning with *Buckley v. Valeo*, 424 U.S. 1 (1976), and continuing through various other important cases.  *See generally* Calabresi & Lawson, *supra* at 124–25 (examining the "rebirth of the Appointments Clause"); *Freytag*, 501 U.S. at 878; *Edmond*, 520 U.S. at 659–60; *Weiss*, 510 U.S. at 182–189 (Souter, J., concurring); *Arthrex*, 594 U.S. at 12–14.  These post-*Nixon* developments in Appointments Clause jurisprudence, and the Supreme Court's corresponding emphasis on structural principles behind that provision, lessen the force of the disputed dictum.

### iii.    **The out-of-circuit cases cited by the Special Counsel are equally unpersuasive.**

Special Counsel Smith cites two out-of-circuit appellate cases in support of his position that *Nixon*'s statutory-authority statement is binding [ECF No. 374 pp. 9–10].  Both decisions determined that *Nixon* was dispositive on the statutory-authority question.  Respectfully, the Court disagrees.  Like *Nixon*, neither engaged with the text of the statutes at issue.

The Court starts with *In re Sealed Case*, 829 F.2d 50 (D.C. Cir. 1987), which concerned a challenge to Independent Counsel Lawrence Walsh's prosecution of the Iran-Contra scandal.  As authority for creation of the "Office of Independent Counsel: Iran/Contra," the Attorney General cited 28 U.S.C. §§ 509, 510, 515, and 5 U.S.C. § 301.  829 F.2d at 55; *see* 28 C.F.R. § 601.  Despite expressly stating that "these provisions"—that is, 28 U.S.C. §§ 509, 510, 515, and 5 U.S.C. § 301—"*do not explicitly authorize* the Attorney General to create an Office of Independent

Counsel virtually free of ongoing oversight," the circuit court nevertheless "read them as *accommodating* the delegation at issue here." *Id*. at 55 (emphasis added). And then the court stated, in an attached footnote, that *Nixon* "*presupposed* the validity of a regulation appointing the Special Prosecutor." *Id*. at 55 n.30 (emphasis added). No analysis of the statutes was provided.[52]

More recently, in *In re Grand Jury Investigation*, 916 F.3d 1047 (D.C. Cir. 2019), the same circuit court addressed a challenge to the authority of Special Counsel Robert Mueller, a contemporary special counsel serving in a role akin to that of Special Counsel Smith. The court characterized the abbreviated statutory-authority remarks from *Nixon* and *In re Sealed Case* as binding, viewing them as necessary "antecedents" to those cases' holdings. *Id*. at 1053–54. And then, relying on those remarks, the court found no further analysis of the statutes to be necessary. *Id*. at 1054 ("Because binding precedent establishes that Congress has 'by law' vested authority in the Attorney General to appoint the Special Counsel as an inferior officer, this court has no need to go further to identify the specific sources of this authority.").

As the foregoing discussion demonstrates, the decisions in *In re Sealed Case* and *In re Grand Jury Investigation* relied on "presuppositions" and "antecedents" to determine that *Nixon*—which *itself* did not engage with the applicable statutory text—was dispositive and foreclosed any statutory challenge. But as explained above, the Supreme Court has cautioned that "presuppositions" and "antecedents" of this sort "are not binding in future cases that directly raise the questions." *Verdugo-Urquidez*, 494 U.S. at 272. Unlike *Nixon*, this case *does* "directly raise"

---

[52] There may be other reasons to doubt the persuasive force of *In re Sealed Case*'s holding. *See* Calabresi & Lawson, *supra* at 125–27 (arguing that the appellant in that case, Lt. Col. Oliver North, focused on the preemptive effect of the Independent Counsel Act, without raising a frontal challenge to the Attorney General's appointment authority under the relied-upon statutes).

the statutory-authority question.  And because neither of the out-of-circuit cases considered this question in a meaningful way, the Court does not find them persuasive here.

In sum, the prefatory, passing remark in *Nixon* about 28 U.S.C. §§ 509, 510, 515, 533, does not stand as binding precedent for a point that was not raised, argued, disputed, or analyzed in that case, even if possibly assumed.  *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J., dissenting) (collecting cases); *Webster*, 266 U.S. at 511.  Nor would such a treatment accord with the tailored manner in which the Supreme Court has defined and described its own Appointments Clause holdings in reference to the questions actually before it in those decisions.[53]

## V.    Principal versus Inferior Officer Designation

This brings the Court to its final point on the Appointments Clause challenge, prior to addressing remedy.  Up to this juncture, the Court has proceeded under the premise, advanced by Special Counsel Smith, that he is an "inferior Officer," not a principal officer requiring Presidential nomination and Senatorial consent [ECF No. 405 pp. 6–12].  Defendants and the Meese *amici* contest this assertion, and it is a point worthy of consideration given the virtually unchecked power given to Special Counsel Smith under the Special Counsel Regulations.  Ultimately, however, after examining the broad language in Supreme Court cases on the subject—and seeing a mixed picture,

---

[53]   *Freytag*, 501 U.S. at 890 ("The appointment authority of the 'Courts of Law' was not before this Court in *Buckley*.  Instead, we were concerned with whether the appointment of Federal Elections Commissioners by Congress was constitutional under the Appointments Clause."); *Weiss*, 510 U.S. at 173 (distinguishing prior cases that "simply do not speak to the issue" before the Court); *Edmond*, 520 U.S. at 665–66 (holding that the implied principal-officer designation in *Freytag* "does not control our decision here" where the question was squarely presented).  The Supreme Court made this very point in a recently decided case, albeit not in the Appointments Clause context.  *See Campos-Chaves v. Garland*, 144 S. Ct. 1637, 1651 (2024) (explaining that a prior opinion's statement on the meaning of a statutory provision was dicta because that point "was not at issue," and the Court "did not reach out to decide today's question in that case").

even if a compelling one in favor of a principal designation—the Court elects, with reservations, to reject the principal-officer submission and to leave the matter for review by higher courts.

### A. Arguments of Parties

The arguments on the Motion, developed further during argument, are as follows.  Special Counsel Smith contends that he is an inferior officer because he is "subject to supervision and oversight by other officers appointed by the President with Senate consent" [ECF No. 405 p. 6]. He cites to *Morrison* and *Edmond* for this proposition, stressing the following factors: (1) he is subject to removal by a higher Executive branch official for good cause, as was the case for the now-defunct independent counsel; (2) he is empowered to perform "limited duties" within a "limited" jurisdiction that is temporary and expires when his charge is over; (3) he "reports to and is supervised by the Attorney General" based on the terms of the Special Counsel Regulations; and (4) when all else fails, the Attorney General can remove the extant regulation and create at-will removal by amending or eliminating the regulation, or amending the Appointment Order itself [ECF No. 405 pp. 6–8].

Defendants and the Meese *amici* take the principal-officer view, urging that Special Counsel Smith wields the same authority as a United States Attorney per the Regulations, without a functional superior supervising or directing him, and without the important tool of at-will removal [ECF No. 326 p. 9 ("The authority he attempts to employ as Special Counsel far exceeds the power exercisable by a non-superior officer, authority that Congress has not cloaked him with."); ECF No. 647 p. 7 (adopting Meese principal-officer argument); ECF No. 611 p. 3 ("At bottom, former President Trump and amici argue the appointment of Special Counsel Jack Smith was unconstitutional insofar as Smith is a "principal officer," whose appointment must come from

the President alone with the advice and consent of the Senate."); ECF No. 364-1 pp. 20–22 (citing Calabresi & Lawson, *supra* at 128–134); ECF No. 647 pp. 25–32].

### B. Legal Standards

The Supreme Court has "not purport[ed] to set forth a definitive test" for distinguishing between principal and inferior officers, although the relevant cases, principally *Morrison* and *Edmond*, provide informative markers.  *Edmond*, 520 U.S. at 661; *Morrison*, 487 U.S. at 671.

In *Morrison v. Olson*, 487 U.S. 654 (1988), the Court considered the status of the now-defunct independent counsel under the former Independent Counsel Act.  The Court was careful "not [to] attempt to decide exactly where the line falls between the two types of officers," but it enumerated the following four factors in route to "clearly" determining that the independent counsel fell on the inferior side of that line: (1) she was "subject to removal by a higher Executive Branch official," even though she was not "subordinate" to the Attorney General given her "independent discretion"; (2) she was "empowered by the Act to perform only certain, limited duties," which did not include formulation of policy; (3) her office was "limited in jurisdiction" as determined by the judicial division; and (4) her office was "limited in tenure" insofar as she was "appointed essentially to accomplish a single task."  *Id.* at 671–672.  Justice Scalia criticized this view in dissent, arguing that the independent counsel was not "subordinate to another officer" and was removable only for good cause.  *Id.* at 723 (Scalia, J., dissenting).

Almost ten years later in *Edmond v. United States*, 520 U.S. 651 (1997), the Supreme Court fleshed out the principal versus inferior officer inquiry in a case involving judges of the Coast Guard Court of Criminal Appeals.  The bulk of the majority's analysis is contained in the passage quoted below, although further important considerations—removability at will and power to render final decisions—feature in the decision too:

> Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an "inferior" officer depends on whether he has a superior. It is not enough that other officers may be identified who formally maintain a higher rank, or possess responsibilities of a greater magnitude.  If that were the intention, the Constitution might have used the phrase "lesser officer."  Rather, in the context of a Clause designed to preserve political accountability relative to important Government assignments, we think it evident that "inferior officers" are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.

*Id.* at 662–63.  Continuing forward, the decision stressed that "[t]he power to remove officers . . . is a powerful tool for control," noting the parties' concession that the judicial officer at issue was removable without cause.  *Id.* at 664 (citing *Bowsher v. Synar*, 478 U.S. 714, 727 (1986), and *Myers v. United States*, 272 U.S. 52 (1926)).  And then, the Supreme Court commented on the degree to which an officer's decisions can be "reverse[d]" or countermanded by a higher entity or officer, ultimately concluding that the judges at issue remained inferior, because their decisions still were reviewed by a higher court, and because they lacked "power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers."  *Id.* at 665.

From these two decisions, courts have distilled three key factors in evaluating the inferior-principal question: (1) whether an officer is subject to substantial supervision and direction of a principal officer; (2) whether an officer is removable without cause—perhaps the weightiest factor; and (3) whether an officer's decisions are subject to reversal by a supervisor in the executive branch.  *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1338 (D.C. Cir. 2012); *Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 613.  Again, however, the Supreme Court "has been careful not to create a rigid test" for discerning between the two types

of officers, instead employing what appears to be a "case-by-case analysis." *Arthrex*, 594 U.S. at 47 (Thomas, J., dissenting).[54]

## C.  Discussion

Against this backdrop, the Court examines whether Special Counsel Smith is a principal or inferior officer under the operative regulatory framework and available Supreme Court standards.[55]

### i.      Factual Development

As a preliminary matter, the parties agree that the Court should evaluate the principal versus inferior question, and indeed the entire Appointments Clause dispute, as a matter of law in accordance with the powers and authority delineated in the operative Special Counsel Regulations and applicable statutes [ECF No. 619 p. 1; ECF No. 620 pp. 8–12; *see* ECF No. 617 pp. 7–13]. The Court expresses some hesitation in this regard and lacks a detailed understanding of the actual extent and mechanics of supervision and control over Special Counsel Smith.[56]   Nevertheless,

---

[54]  Post-*Edmond*, the viability of *Morrison* has been called into question.  *See, e.g.*, *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 315 (2017) (Thomas, J., concurring) ("Although we did not explicitly overrule *Morrison* in *Edmond*, it is difficult to see how *Morrison*'s nebulous approach survived our opinion in *Edmond*.  *Edmond* is also consistent with the Constitution's original meaning and therefore should guide our view of the principal-inferior distinction."); *Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 617 & n.8 (citing cases and scholarship).  Nonetheless, because it has not been overruled, the Court proceeds to apply the *Morrison* test alongside *Edmond*. *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) (stressing the Supreme Court's "prerogative of overruling its own decisions").  Defendants have not argued for the overruling of *Morrison* in this court, although the matter was raised at argument by the Landmark Legal *amici* [ECF No. 647 p. 112; ECF No. 364-1 (criticizing *Morrison*)].

[55]  The Court notes that neither party raises a direct challenge to the validity of the Special Counsel Regulations, which have remained in effect without change since their promulgation in 1999.

[56]  *Cf. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 610–612 (appearing to express a similar lack of clarity on degree of Attorney General's countermanding authority and extent to which Department's policies shaped special counsel's actions).

neither party pressed for an evidentiary hearing on the Appointments Clause issue; the Special

Counsel appears to have taken the questionable position that such inquiries intrude upon privileged

Department deliberations; and the Court generally agrees that judicial treatment of Appointments

Clause challenges has tracked the level of supervision and direction by reference to statutes and/or

regulations only.[57]   The Court thus proceeds accordingly, referencing the regulatory framework in

effect at the time of the subject Appointment Order and in force today.   *Nixon*, 418 U.S. at 695

("So long as this regulation is extant it has the force of law.") (citing *United States ex rel. Accardi*

*v. Shaughnessy*, 347 U.S. 260, 265 (1954)); *see Serv. v. Dulles*, 354 U.S. 363, 372 (1957).

> ii.   **The Special Counsel Regulations impose almost no supervision or
> direction over the Special Counsel and give him broad power to render
> final decisions on behalf of the United States.**

The Special Counsel Regulations give to the special counsel an exceedingly broad

charge—to "exercise, within the scope of his or her jurisdiction, the full power and independent

authority to exercise all investigative and prosecutorial functions of any United States attorney,"

28 C.F.R. § 600.6—and then impose virtually no mechanism for supervision or control by the

Attorney General.   Several key features inform this view, tracking the regulations on the subjects

of consultation, supervision, and countermanding (with removal to follow later):

*First*, a special counsel is under no regulatory obligation to consult with the Attorney

General "about the conduct of his or her duties and responsibilities."  28 C.F.R. § 600.6.  Quite the

---

[57] What is more, during the hearing, and specifically during questioning about the Special Counsel's degree of direction and supervision vis-à-vis the Attorney General, counsel for the Special Counsel refused to answer the Court's questions regarding whether the Attorney General had played any actual role in seeking or approving the indictment in this case [ECF No. 647 pp. 147–151].   In doing so, counsel appeared to invoke a deliberative process privilege or other "standard Justice Department [policy]," although none of the Court's questions solicited the substance of any internal deliberations [ECF No. 647 pp. 147–151].   Ultimately, counsel for the Special Counsel appeared to acknowledge some degree of actual oversight consistent with the Regulations, but again resisted any further representation [ECF No. 647 p. 148].

opposite, it is up to the special counsel to determine whether to "inform or consult with the Attorney General or others within the Department about the conduct of his or her duties and responsibilities." *Id*.

*Second*, a special counsel must "comply with the rules, regulations, procedures, and practices and policies of the Department," and he shall "consult with appropriate offices within the Department for guidance with respect to [those] established practices." 28 C.F.R. § 600.7(a). But nothing in that general policy-consultation directive—a directive that applies only to consultation with "appropriate offices within the Department" about general Department-wide policies— appears to limit a special counsel's specific decision-making in conducting his investigation and prosecution.

*Third*, still on the subject of consultation, the Regulations give full discretion to the special counsel whether to "consult directly with the Attorney General"—even when the special counsel "conclude[s] that the extraordinary circumstances of any particular decision would render compliance with required review and approval procedures by the designated Departmental component inappropriate." *Id*. § 600.7(a). So even in those difficult circumstances, the special counsel is the one to decide "whether to consult directly with the Attorney General," again leaving no mandatory consultation in the regulations themselves. *Id.*

*Fourth*, turning to mechanisms for "notification" between the special counsel and the Attorney General, the Regulations require the special counsel to "notify the Attorney General of events in the course of his or her investigation in conformity with the Departmental guidelines with respect to Urgent Reports." *Id*. § 600.8. But nothing in that provision actually requires the special counsel to do anything other than to "notify" the Attorney General of certain developments. *See* Justice Manual 1-13.000 (providing non-exhaustive list of "major developments," but

explaining that Urgent Reports impose only a "reporting," "notice requirement" that "should not interrupt, alter, or delay the normal conduct and pursuit of any matter or case").  And nothing in that provision provides the Attorney General with any authority to actually countermand, direct, or supervise those significant decisions.

*Fifth*, and finally, the Regulations expressly remove day-to-day supervision and provide almost no countermanding authority for the Attorney General.  *Edmond*, 520 U.S. at 665 (focusing on judges' power to "render a final decision on behalf of the United States unless permitted to do so by other Executive officers").  The pertinent regulation in this area is the "conduct and accountability" section in 28 C.F.R. § 600.7(b), quoted in full below:

> The Special Counsel shall not be subject to the day-to-day supervision of any official of the Department.  However, the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued.  In conducting that review, the Attorney General will give great weight to the views of the Special Counsel.  If the Attorney General concludes that a proposed action by a Special Counsel should not be pursued, the Attorney General shall notify Congress as specified in § 600.9(a)(3).

*Id.* § 600.7(b).  This provision, reduced to its essence, leaves the Attorney General a very slim route to countermand a decision by the special counsel, but only when the decision is "so inappropriate or unwarranted under established Departmental policies"; only after the Attorney General has given—as a mandatory matter—"great weight to the views of the Special Counsel"; and subject to a strict congressional notification requirement that mandates the Attorney General notify Congress of his "countermanding" decision at the conclusion of the investigation.  *Id.* § 600.7(b); *id.* § 600.9(a)(3) (requiring Attorney General to *describe* and *explain* to Congress "instances" in which he concluded "that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be

pursued").  It is hard to see how this amounts to any meaningful direction or supervision.  And it certainly does not mean that the Special Counsel lacks the power to render final decisions on behalf of the United States.  *Edmond*, 520 U.S. at 652.

In sum, this framework does not lend itself to a finding that Special Counsel Smith's "work is directed and supervised at some level" by the Attorney General—unless the "at some level" qualifier in *Edmond* is read in an exceedingly broad way.  520 U.S. at 663.

> ### iii. The limitations on the Attorney General's power to remove the Special Counsel support principal status under *Edmond* but maybe not under *Morrison*.

The Court now turns to the Attorney General's power to remove Special Counsel Smith.  "The power to remove officers at will and without cause is a powerful tool for control."  *Edmond*, 520 U.S. at 663.  This element features prominently in *Edmond*, which relied heavily on at-will removal in finding inferior-officer status, but it also appears in *Morrison*, where the Supreme Court classified an independent counsel as an inferior officer even without at-will removal.  *Morrison*, 487 U.S. at 671, 691–92 (referring to 28 U.S.C. § 596(a)(1), and concluding that the Act's "good cause" removal provision did not "impermissibly burden[] the President's power to control or supervise the independent counsel").

The particular removal provision in the Special Counsel Regulations reads as follows:

> The Special Counsel may be disciplined or removed from office only by the personal action of the Attorney General. The Attorney General may remove a Special Counsel for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Departmental policies. The Attorney General shall inform the Special Counsel in writing of the specific reason for his or her removal.

28 C.F.R. § 600.7(d).  "Good cause" is a far-reaching term that is difficult to define.  *See Concord*

*Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 613.  What is clear, however, is that the Regulations

do not afford the Attorney General "at will" removal power.[58]

So what to make about the removal limitations in this case?  On this point, the Court agrees

with the United States District Court in *Concord Management* that the Special Counsel

Regulations afford "more substantial protection against removal, and thus risk rendering him a

principal officer," for the reasons stated in that decision and also referenced above.  *Concord*

*Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 613–14 (citing cases).  The Court need not expound

on the analysis further except to underscore the Supreme Court's strong emphasis on at-will

removal as a "powerful tool for control."  *Edmond*, 520 U.S. at 664 (citing *Bowsher*, 478 U.S. at

727; *Myers*, 272 U.S. 52 (1926)).  But of course, *Morrison* deemed the independent counsel an

inferior officer despite a good-cause removal restriction—albeit in the context of a multi-factored

approach that did not purport to delineate the "line" between principal and inferior officers.  487

U.S. at 671.  And so, while it seems the absence of at-will removal is a key feature that—when

combined with the absence of any meaningful supervision or countermanding authority—likely

could transform Special Counsel Smith into a principal officer, the Court holds off on that view to

allow whatever evaluation of this topic may be conducted by higher courts.

> ### iv.    The possibility of a future rescission of the Special Counsel Regulations to create at-will removal does not change the Appointments Clause inquiry under current law.

There is one final issue to discuss as relates to removal.  It concerns the Special Counsel's

fall-back position that none of the removal limitations in the Regulations pose an impediment to

inferior-officer status, because the Attorney General can rescind or amend the Regulations at will

---

[58] United States Attorneys are removable at will.  28 U.S.C. § 541(c).

(and without notice-and-comment), or can amend or revoke the Appointment Order. In a nutshell, the submission is as follows: evaluate the constitutional status of the Special Counsel's position in accordance with the extant regulatory framework, as a matter of law, but if the removal issue gets too sticky, customize that framework and consider the matter under a hypothetical future scenario where the regulation as it stands today (with its removal restrictions) does not exist [*see* ECF No. 405 pp. 11–12; ECF No. 647 pp. 151–52]. In other words, rely on the Regulations for some things, but discard or amend them at least partially should they cast into doubt the Special Counsel's inferior-officer status.

This regulatory cherry-picking seems questionable as a means to resolve the inferior-principal Appointments Clause question, although the Court admits of uncertainty in this regard, and some courts have accepted the revocability piece as "crucial" in permitting an inferior-officer designation in similar contexts. *Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 615 (quoting *In re Sealed Case*, 829 F.2d at 56)). Of course, regulations can be amended subject to ordinary legal principles and any applicable restraints. But regulations have the force of law so long as they remain operative, which they are here. *Nixon*, 418 U.S. at 695 ("So long as this regulation is extant it has the force of law.") (citing *Accardi*, 347 U.S. at 265); *see Dulles*, 354 U.S. at 372 (describing *Accardi* as supporting notion that "regulations validly prescribed by a government administrator are binding upon him as well as the citizen . . . even when the administrative action under review is discretionary in nature"). The question, then, is not whether regulations can be rescinded or amended; they can be. Rather, the question is whether Special Counsel Smith is a principal or inferior officer under the Appointments Clause. And that inquiry, it seems to this Court, must operate on the basis of extant law (a point on which the Special Counsel otherwise agrees)—not on some possible future material change to the removal limitations that

has not happened (and that frankly has not happened since the Regulations came into existence in 1999). If the matter were otherwise, the practical result becomes one of "regulatory shielding" almost, in a figurative sense; an officer without authority to act as a principal officer exercises a principal-officer role, but no means exist to judicially test that constitutional noncompliance because the reviewing court—despite finding principal status in the present tense—must suspend reality and reject the challenge on the basis of something other than the operative regulations. Such slipperiness would not be permitted if the officer were acting pursuant to statute; the court would review the extant law in a fixed manner, as is normally the case in Appointments Clause challenges with statutory law, not through shifting regulations or appointment orders untied to statutory authority. All of this simply underscores the need for Congress to enact "Law" in conformity with the Appointments Clause. Art. II, § 2, cl. 2.

> **v.** **The Special Counsel's defined jurisdiction and tenure present a mixed and candidly unhelpful picture**.

The final component of the Court's inferior-officer analysis concerns Special Counsel Smith's jurisdiction and tenure. While *Edmond* did not stress these features, the *Morrison* court considered them in reaching its inferior-officer conclusion. *Morrison*, 487 U.S. at 672 (finding the Independent Counsel's office was "limited in jurisdiction" and "limited in tenure"). What they yield here is muddled and likely not dispositive.

Special Counsel Smith's jurisdiction is described in a factual statement in the Appointment Order.[59] His jurisdiction is thus "limited" in the manner described by the Attorney General—as

---

[59] Order No. 5559-2022 ("The Special Counsel is further authorized to conduct the ongoing investigation referenced and described in the United States' Response to Motion for Judicial Oversight and Additional Relief, *Donald J. Trump v. United States*, No. 9:22-CV-81294-AMC (S.D. Fla. Aug. 30, 2022) (ECF No. 48 at 5–13), as well as any matters that arose or may arise directly from this investigation or that are within the scope of 28 C.F.R. § 600.4."). 28 C.F.R. § 600.4(a) (adding authority to investigate and prosecute perjury, obstruction of justice, destruction

compared, for example, to a United States Attorney with jurisdiction to investigate any violation of federal criminal law throughout a designated federal district.  But the Special Counsel's powers within his jurisdiction are exceedingly broad, indeed as broad as those possessed by a United States Attorney.  *See* Robert H. Jackson, U.S. Att'y Gen., Address at the Second Annual Conference of United States Attorneys: The Federal Prosecutor 2 (Apr. 1, 1940) (referencing the might and discretion of prosecutors and their ability to "strike at citizens, not with mere individual strength, but with all the force of government itself").  And in some degree, the Special Counsel's powers are arguably broader than a traditional United States Attorney, as he is permitted to exercise his investigatory powers across multiple districts within the same investigation.  So is he really exercising "limited" jurisdiction?  And what is the "unlimited" jurisdictional benchmark to which his work ought to be compared?  The answers are hazy.  In any event, an officer's scope of work, even if limited, is not dispositive of the jurisdictional inquiry.  As Justice Scalia said of the independent counsel in *Morrison*:

> As to the scope of her jurisdiction, there can be no doubt that is small (though far from unimportant). But within it she exercises more than the full power of the Attorney General. The Ambassador to Luxembourg is not anything less than a principal officer, simply because Luxembourg is small. And the federal judge who sits in a small district is not for that reason "inferior in rank and authority." If the mere fragmentation of executive responsibilities into small compartments suffices to render the heads of each of those compartments inferior officers, then Congress could deprive the President of the right to appoint his chief law enforcement officer by dividing up the Attorney General's responsibilities among a number of "lesser" functionaries.

*Morrison*, 487, U.S. at 718 (Scalia, J., dissenting).

---

of evidence, and intimidation of witnesses, along with authority to conduct appeals out of matters "investigated and/or prosecuted").  As noted *supra*, the Appointment Order also authorizes Special Counsel Smith to investigate and prosecute federal crimes arising from an unrelated electoral matter.  Order No. 5559-2022.  That prosecution is the subject of a separate proceeding in the U.S. District Court for the District of Columbia.

As to tenure, while it is true that Special Counsel Smith's position will end "[a]t the conclusion" of his "work," *see* 28 C.F.R. § 600.8(c), whenever that happens, that circumstance does not equate to a "limited tenure" in a meaningful sense.  Nor is it clear what the "unlimited tenure" benchmark is, or how to measure it in real terms.  What is known, however, is that the Special Counsel has been operating since November 2022; he has established a very significant operation in terms of staffing and resources; his direct expenditures exceeded $12.8 million as of close to a year ago (September 2023); and nothing in the Regulations, the Appointment Order, or the record more generally provides a concrete sunset provision for the cessation of his work.

Bringing these factors together—jurisdiction and tenure—the Court attempts to surmise the following: (1) the Special Counsel's jurisdiction is "limited" if "limited jurisdiction" means something less than the general jurisdiction exercised by a United States Attorney to prosecute any federal crime in one district (*but see* unlimited geographical reach in Appointment Order), and (2) the Special Counsel's tenure is "limited" if "limited in tenure" requires an open-ended appointment, perhaps with a fixed number of years.  28 U.S.C. § 541 (United States Attorneys serving four-term terms).  The disposition of these factors is unclear, but they remain in the amalgam of considerations in Supreme Court caselaw.

\*\*\*

For the above reasons, the Court sees compelling reasons to reach a principal-officer designation.  But because the answer under current Supreme Court precedent is not self-evident, and because this Court need not rely on this ground to dispose of the Appointments Clause challenge in the Motion, the Court elects to leave the matter for future review.  Of course, however,

should it be determined that Special Counsel Smith is a principal officer, his appointment would violate the Appointments Clause without question.  Art. II. § 2, cl. 2.[60]

## VI.    Remedy for Appointments Clause Violation

The Court turns lastly to the remedial question: what to do about the absence of "Law" authorizing Special Counsel Smith's appointment?  Defendants seek dismissal of the Superseding Indictment, arguing that "Jack Smith lacks the authority to prosecute this action," and that "any actions [thus] taken by Smith are *ultra vires*" [ECF No. 326 pp. 1, 9, 13; *see* ECF No. 414 p. 10; *see* ECF No. 364-1 (Meese *amici*)].  Special Counsel Smith opposes Defendants' request on the merits but fails to propose any alternative form of relief or to respond on the substance of the remedial question [*see* ECF No. 374; ECF No. 432 p. 9 n.5 ("Because the Special Counsel is an officer authorized to carry out the prosecution in this case, the Court has no reason to consider

---

[60] The Landmark Legal *amici* argue that Special Counsel Smith is merely an "employee" not subject to the Appointments Clause [ECF No. 410-2].  This position is based primarily on the view that the Special Counsel's position is not sufficiently "continuous" to warrant treatment as an officer [ECF No. 410-2 pp. 11–15].  Neither party advances this contention, and the Court disagrees with it.  By any measure, Special Counsel Smith is "exercis[ing] significant authority pursuant to the laws of the United States."  *Buckley*, 424 U.S. at 126.  This is clear from the operative regulations, 28 C.F.R. § 600.6, which empower him to act with the full scope and power of a United States Attorney within his jurisdiction.  Although the Supreme Court's decision in *Lucia* does emphasize continuity as a factor distinguishing officers from employees, it does so in the context of a comparison to "occasional" and "temporary duties," and it does not purport to establish bright lines on the degree of continuity.  585 U.S. at 245 (comparing continuing and permanent offices as distinct from temporary and episodic duties).  Moreover, *Lucia* supports the continued vitality of the *Buckley* test, which no one disputes is satisfied by Special Counsel Smith.  For these reasons, although Special Counsel Smith is not "permanent" in the forever sense because his jurisdiction will conclude at whatever unspecified time it concludes, his role clearly is not the sort of episodic, transient position that would make someone an employee under *Germaine*, 99 U.S. at 511–512 (holding that civil surgeons who were hired to perform exams intermittently were employees only).  The Court notes that neither the Regulations nor the Appointment Order sets a time limit on Special Counsel Smith's appointment, which is approaching two years in duration.  And United States Attorneys serve four-year terms, 28 U.S.C. § 541(b), which are continuing even if not permanent.

whether the Special Counsel action's to date are 'salvageable' under the De Factor [sic] Officer doctrine.")].[61]   Because Special Counsel Smith's exercise of prosecutorial power has not been authorized by law, the Court sees no way forward aside from dismissal of the Superseding Indictment.  And the Special Counsel does not propose an alternative course.

"'[O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer . . .' is entitled to relief."  *Lucia*, 585 U.S. at 251 (2018) (quoting *Ryder*, 515 U.S. at 182–83).  In such cases, which necessarily involve a "Government actor's exercise of power that the actor did not lawfully possess," the proper remedy is invalidation of the *ultra vires* action. *Collins v. Yellen*, 594 U.S. 220, 258 (2021) (collecting cases); *see id*. at 276–83 (Gorsuch, J., concurring).  Invalidation "follows directly from the government actor's lack of authority to take the challenged action in the first place.  That is, winning the merits of the constitutional challenge is enough."  *Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc*., 33 F.4th 218, 241 (5th

---

[61] Insofar as the Special Counsel may argue that additional briefing on remedy is warranted, the Court explains the record and notes the Special Counsel's full and fair opportunity to brief the matter of remedy.  This action presents a challenging array of issues, almost all of which are resolutely contested; the parties require no prompting before objecting, opposing, and otherwise engaging in "spirited" exchanges.  With respect to the instant Motion itself, both the Special Counsel and Defendant Trump submitted briefing; *amicus* briefs were received; and a lengthy hearing occurred.  Yet startlingly, the Special Counsel submitted nothing on the topic of the proper remedy for the Appointments Clause issue, despite challenging dismissal as a remedy in the Appropriations Clause context [ECF No. 374 pp. 22–23 (disputing dismissal and referencing alternative sources of funding); *see* ECF No. 671 (response to supplemental authority agreeing to supplemental briefing "on the immunity issue" and nothing more)].  Instead, counsel for the Special Counsel remarked at the hearing, in response to a question about remedy in the Appropriations Clause context, that: "to the extent that the Court is seriously entertaining the notion that there is a constitutional or funding problem, I actually think it would behoove the Court and the parties to have some additional briefing" [ECF No. 648 p. 44].  This last-minute reference to conditional supplemental briefing at the hearing—only if the Court disagreed with the Special Counsel on the merits—in no way signals a lack of a full and fair opportunity given to all parties to brief their positions.  Nor does it establish any prejudice from an alleged deprivation of a chance to respond on the plainly important issue of the proper remedy for the Appointments Clause matter.

Cir. 2022) (Jones, J., concurring).[62]  In light of these remedial principles—and because the Court concludes that Special Counsel Smith's appointment violates the Appointments Clause—the actions of Special Counsel Smith in connection with this proceeding must be set aside.

The Supreme Court's decision in *Lucia v. SEC*, 585 U.S. 237 (2018), serves as the best comparator for remedy purposes.  In *Lucia*, the petitioner—a business owner who had been sanctioned by an administrative law judge for securities violations—raised a timely challenge to the validity of the judge's appointment.  *Id*. at 243–44.  The Supreme Court sided with the petitioner, concluding that the judge's appointment was constitutionally defective under the Appointments Clause.  *Id*. at 251.  Because the judge "heard and decided [the petitioner's] case without the kind of appointment the Clause requires," the Court ruled that "the 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official."  *Id*. at 251 (quoting *Ryder*, 515 U.S. at 183, 188).  In other words, *Lucia* undid the unlawful action by granting petitioner a new hearing before a constitutionally appointed officer.

Here, as in *Lucia*, the appropriate remedy is invalidation of the officer's *ultra vires* acts.  Since November 2022, Special Counsel Smith has been exercising "power that [he] did not lawfully possess."  *Collins*, 594 U.S. at 258.  All actions that flowed from his defective appointment—including his seeking of the Superseding Indictment on which this proceeding

---

[62]  *Collins* distinguished these situations from other separation-of-powers cases involving laws containing improper removal provisions.  594 U.S. at 257–59.  In those cases, the proper remedy is often to sever the violative removal provision from the rest of the law.  *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 232–38 (2020); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*., 561 U.S. 477, 508–10 (2010).  Full-scale invalidation is not necessary to rectify the harm in such cases because "the unlawfulness of the removal provision does not strip" a lawfully appointed government actor "of the power to undertake the responsibilities of his office."  *Collins*, 594 U.S. at 258 n.23.  That is not the case here, where the matter goes to the core of appointment.

currently hinges [ECF No. 85]—were unlawful exercises of executive power.  Because Special

Counsel Smith "cannot wield executive power except as Article II provides," his "[a]ttempts to do

so are void" and must be unwound.  *Id*. at 283 (Gorsuch, J., concurring).  Defendants advance this

very argument: "any actions taken by Smith are *ultra vires* and the Superseding Indictment must

be dismissed" [ECF No. 326 p. 9].  And the Court sees no alternative course to cure the

unconstitutional problem.

It bears noting that Special Counsel Smith's work cannot be salvaged by the *de facto* officer

doctrine, which, in some circumstances, "confers validity upon acts performed by a person acting

under the color of official title even though it is later discovered that the legality of that person's

appointment or election to office is deficient."  *Ryder*, 518 U.S. at 180 (citing *Norton v. Shelby

County*, 118 U.S. 425, 440 (1886)).

For two reasons, that doctrine does not apply here.[63]  First, the doctrine is designed to

address "technical defects in title to office."  *Ryder*, 518 U.S. at 180 (internal quotations marks

omitted); *see Nguyen v. United States*, 539 U.S. 69, 77–78 (2003).  Here, the problem is no mere

"technical defect"—instead, the problem is the absence of a statutorily created office to fill in the

first place.  As the Supreme Court has made clear, "there can be no officer, either *de jure* or *de

facto*, if there is no office to fill."  *Norton*, 118 U.S. at 441.  Second, the *de facto* officer doctrine

has not been applied in cases, like this one, where a litigant raises a timely constitutional challenge

to an officer's appointment.  *See Ryder*, 539 U.S. at 182–83 ("We think that one who makes a

---

[63] The *de facto* officer doctrine was covered noncommittally in the Landmark Legal *amici*'s brief
[ECF No. 410-2 pp. 23–24].  The Special Counsel offered a non-response in a footnote: "Because
the Special Counsel is an officer authorized to carry out the prosecution in this case, the Court has
no reason to consider whether the Special Counsel's actions to date are 'salvageable' under the De
Factor [stet] Officer doctrine" [ECF No. 432 p. 9 n.5].

timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred."); *Lucia*, 585 U.S. at 251.  "Any other rule would create a disincentive to raise Appointments Clause challenges" in the face of questionable appointments. *Ryder*, 539 U.S. at 183; *see Lucia*, 585 U.S. at 251 n.5.  Because Defendants timely raised their constitutional challenge to Special Counsel Smith's appointment, and because there can be no valid officer without a valid office, the Court sees no basis to resort to the *de facto* officer doctrine.[64]

## APPROPRIATIONS CLAUSE DISCUSSION

The Court turns next to Defendants' Appropriations Clause challenge [ECF No. 326 pp. 9–14].[65]  Since its inception, Special Counsel Smith's office has been funded by "a permanent

---

[64] The Supreme Court's decision in *Off. of United States Tr. v. John Q. Hammons Fall 2006, LLC*, 144 S. Ct. 1588, 1595 (2024), is not to the contrary [*See* ECF No. 648 pp. 42–43].  That case involved how to remedy a "limited" Bankruptcy Clause problem flowing from a federal bankruptcy statute—not the constitutionality of an officer's appointment under the Appointments Clause. *Id.* (focusing on the "short lived and small" nature of the "constitutional problem").  More fundamentally, that case does not detract from the principle that "the nature of the violation determines the scope of the remedy." *Id.* (quoting *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971)).  Here, for all of the reasons stated, the only appropriate remedy for the preserved constitutional challenge under the Appointments Clause—a challenge that implicates separation of powers—is invalidation of the proceeding.

[65] Defendants have Article III standing to raise their Appropriations Clause challenge.  The Supreme Court has recognized that standing exists in "cases in which individuals sustain discrete, justiciable injury from actions that transgress separation-of-powers limitations."  *Bond v. United States*, 564 U.S. 211, 224 (2011); *Collins*, 594 U.S. at 245.  Violations of the Appropriations Clause are one such example.  *See United States v. McIntosh*, 833 F.3d 1163, 1173–74 (9th Cir. 2016) (holding that appellants "ha[d] standing to invoke separation-of-powers provisions of the Constitution"—there, the Appropriations Clause—"to challenge their criminal prosecutions" prior to conviction; *see United States v. Stone*, 394 F. Supp. 3d 1, 19 n.13 (D.D.C. 2019).  To the extent that Special Counsel Smith challenged Defendants' standing to raise this argument in his Opposition or attempted to cast the challenge as a non-constitutional claim, he declined to stand by those contentions at the hearing [ECF No. 648 pp. 46–48].

indefinite appropriation . . . established within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. 591 et seq. or other law." 101 Stat. 1329. But as discussed above, *supra* pp. 22–52, Special Counsel Smith was not lawfully "appointed pursuant to . . . other law." 101 Stat. 1329. This means that Special Counsel Smith's office—since November 2022—has been drawing funds from the Treasury without statutory authorization, in violation of the Appropriations Clause.

## I.    Background Legal Principles

The Appropriations Clause dictates that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. Art. I, § 9, cl. 7. This "straightforward and explicit command . . . means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (citation omitted). To pass constitutional muster, an appropriation "need only identify a source of public funds and authorize the expenditure of those funds for designated purposes." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 426 (2024) ("CFPB").[66]

---

[66] Defendants do not challenge the Indefinite Appropriation itself—only its applicability to Special Counsel Smith [ECF No. 326 pp. 12–14]. The Court expresses some uncertainty, however, about the legality of the purely "indefinite" nature of the appropriation, which by all accounts is uncapped and includes no monetary threshold or other formulaic limitation. It is not clear whether that feature, on its own, presents a constitutional defect under the Appropriations Clause. *See CFPB*, 601 U.S. at 425–41 (emphasizing repeatedly the "capped" nature of the CFPB's funding scheme in determining it complied with the Appropriations Clause); *but see id*. at 444 (Kagan, J., concurring) (identifying certain statutes that do not "designate specific sums of money"). All that said, the limitless nature of the appropriation, standing alone, was not squarely raised in this proceeding.

The Appropriations Clause plays a critical role in our constitutional scheme of separated powers. It is Congress—not the executive or judicial branches—that controls government spending. "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id*. at 425. As a historical matter, "Congress's 'power over the purse' has been its 'most complete and effectual weapon' to ensure that the other branches do not exceed or abuse their authority." *CFPB*, 601 U.S. at 448 (Alito, J., concurring) (quoting The Federalist No. 58, p. 359 (C. Rossiter ed. 1961) (J. Madison)). *See also Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc*., 33 F.4th 218, 225–232 (5th Cir. 2022) (Jones, J., concurring) (discussing in detail the historical origins, and separation-of-powers underpinnings of the Appropriations Clause).

## II.   Analysis

By its terms, the Indefinite Appropriation is available only to "independent counsel[s] appointed pursuant to the provisions of 28 U.S.C. § 591 et seq. or other law." 101 Stat. 1329. The Independent Counsel Act expired in 1999, meaning that Special Counsel Smith must identify "other law" authorizing his appointment to access the Indefinite Appropriation. Both sides agree that "other law," for present purposes, is the collection of statutes cited in the Appointment Order [ECF No. 648 pp. 5, 31]. For all of the reasons the Court found no statutory authority for the appointment, *supra* pp. 22–52, Special Counsel Smith's investigation has unlawfully drawn funds from the Indefinite Appropriation.[67]

---

[67]   Nor do the Special Counsel Regulations serve as "other law" for purposes of access to the Indefinite Appropriation [ECF No. 374 p. 18 (arguing that 28 C.F.R. § 600 has "the force of law" for purposes of the Indefinite Appropriation); *but see* ECF No. 648 p. 31 (agreeing that "other law" in the Independent Appropriation refers to statutory law only)].

Having found no "other law," the Court need not determine whether Special Counsel Smith is the type of "independent counsel" referenced in the Indefinite Appropriation [ECF No. 326 pp. 13–14 (arguing Smith is not sufficiently "independent" to access funds)].[68]   Nevertheless, the Court notes the inherent tension in the Special Counsel's position on this issue.   In the Appointments Clause context—specifically, in arguing that he is an inferior (as opposed to principal) officer—Special Counsel Smith emphasizes the Attorney General's supervision and control over his work [ECF No. 374 p. 7 n.1; ECF No. 405].   Yet in the Appropriations Clause context, he asserts that he is sufficiently independent to draw funds from the Indefinite Appropriation [ECF No. 374 pp. 17–18].   In other words, Special Counsel Smith contends he is *independent enough* to access the funds, but not *so* independent to constitute a principal officer.

Perhaps he threads that needle.  But at least one source suggests otherwise.  In 2004, the Government Accountability Office (GAO) approved of Special Counsel Patrick Fitzgerald's use of funds from the Indefinite Appropriation.   Special Counsel and Permanent Indefinite Appropriation, B-302582, 2004 WL 2213560 (Sept. 30, 2024).   The GAO's determination was grounded in Fitzgerald's "express exclusion . . . from the application of 28 C.F.R. Part 600 [*i.e.*, the Special Counsel Regulations]," which allowed him to operate "independent of the supervision or control of any officer of the Department." *Id*. at 3.[69]  Contrast Fitzgerald with Special Counsel

---

[68]  Were the Court required to conduct that analysis, it is unclear precisely how "independent" an "independent counsel" must be to draw from the Indefinite Appropriation. The Court accepts, however, that independent counsels need not be strictly equivalent to the "Independent Counsels" authorized by the now-defunct EGA. *See Stone*, 394 F. Supp. 3d at 20–22.

[69]  Then-Acting Attorney General James Comey directed Special Counsel Fitzgerald to exercise his authority "independent of the supervision or control of any officer of the Department."  Letter from Acting Attorney General James B. Comey to Patrick J. Fitzgerald (Dec. 30, 2003).  In a later letter, Comey clarified that Fitzgerald's position as "Special Counsel" "should not be misunderstood to suggest that [his] position and authorities are defined and limited by 28 CFR Part 600."  Letter from Acting Attorney General James B. Comey to Patrick J. Fitzgerald (Feb. 6, 2004).

Smith, who—by the express terms of the Appointment Order and by his own admission—is subject to the Special Counsel Regulations, and subject to the supervision and control of the Attorney General.

As mentioned above, the Court need not decide the "independence" issue given the absence of statutory law authorizing the appointment. But at the very least, the "independence" question raises doubts.

## III.   Remedy

This leaves remedy for the Appropriations Clause violation. Defendants argue that dismissal is the only way to cure the funding violation [ECF No. 326 p. 12; ECF No. 414 p. 9]. Special Counsel Smith opposes dismissal, asserting—without any specificity or even willingness to engage in factfinding [*see* ECF No. 620 p. 3]—that "the Department could readily have funded the Special Counsel from other appropriations that were available" [ECF No. 374 p. 25]. At the hearing, Special Counsel Smith represented, "at a relatively high level of generality," that DOJ "has appropriated, at least in the 2023 appropriation cycle, over a billion dollars," which it is prepared to use to fund the Special Counsel's office [ECF No. 648 pp. 41–42]. The Court need not reach the question of remedy here, having found the Appointments Clause violation to warrant dismissal. *Supra* pp. 81–85. But as discussed below, there is good reason to believe that the Appropriation Clause violation serves as a separate, independent basis to dismiss.

"Across remedial contexts, the nature of the violation determines the scope of the remedy." *John Q. Hammons Fall 2006, LLC*, 144 S. Ct. at 1594 (internal quotation marks omitted). As far as the Court can tell, there is no Supreme Court or Eleventh Circuit precedent that speaks directly to this point. Given the absence of binding precedent on the issue, the Court finds instructive

Judge Edith Jones's concurrence in *Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc*., 33 F.4th 218 (5th Cir. 2022) (Jones, J., concurring), a case involving a civil enforcement action brought by the CFPB. *Id.* at 220–42.[70] *All American* concerned whether the CFPB's structure violated the Constitution's separation of powers. *Id*. at 220. In a per curiam opinion, the court vacated and remanded the district court's order in light of the Supreme Court's decision in *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020). *Id*. Judge Jones concurred, writing separately to make the case that the CFPB's funding mechanism violated the Appropriations Clause. *Id*. at 220–42 (Jones, J., concurring). Likening an unlawfully funded enforcement action to unauthorized government action, Judge Jones advanced that dismissal was the proper remedy:

> Just as a government actor cannot exercise power that the actor does not lawfully possess, so, too, a government actor cannot exercise even its lawful authority using money the actor cannot lawfully spend. Indeed, a constitutionally proper appropriation is as much a precondition to every exercise of executive authority by an administrative agency as a constitutionally proper appointment or delegation of authority.

*Id*. at 242. Surveying cases in which a government actor took action without constitutional authority, Judge Jones concluded that the appropriate remedial course was to "disregard the government action." *Id*. "[B]ecause the CFPB funds the instant prosecution using unconstitutional self-funding, I would dismiss the lawsuit." *Id*.

There is a strong, intuitive appeal to applying Judge Jones's logic here. The Special Counsel's office has spent tens of millions of dollars since November 2022, all drawn unconstitutionally from the Indefinite Appropriation. That funding has served as "the very lifeblood that empower[ed] it to act." *Id*. at 241. Perhaps, as suggested generally at the hearing,

---

[70] *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*, 51 F.4th 616, 642–43 (5th Cir. 2022), is a related case (overruled on other grounds in *CFPB*), that provides helpful analysis on remedies in the Appropriations Clause context.

DOJ could reallocate funds to finance the continued operation of Special Counsel Smith's office [ECF No. 648 pp. 41–42]. This would require further development of the record. But even if this were prospectively possible, what to make of the prior action? For more than 18 months, Special Counsel Smith's investigation and prosecution has been financed by substantial funds drawn from the Treasury without statutory authorization, and to try to rewrite history at this point seems near impossible. The Court has difficulty seeing how a remedy short of dismissal would cure this substantial separation-of-powers violation, but the answers are not entirely self-evident, and the caselaw is not well developed. For that reason, and given the disposition of this Order on Appointments Clause grounds, the Court leaves the matter of funding remedy for any applicable future review.[71]

## CONCLUSION

Upon careful study of the foundational challenges raised in the Motion, the Court is convinced that Special Counsel's Smith's prosecution of this action breaches two structural cornerstones of our constitutional scheme—the role of Congress in the appointment of constitutional officers, and the role of Congress in authorizing expenditures by law.

The Framers gave Congress a pivotal role in the appointment of principal and inferior officers. That role cannot be usurped by the Executive Branch or diffused elsewhere—whether in this case or in another case, whether in times of heightened national need or not. In the case of inferior officers, that means that Congress is empowered to decide if it wishes to vest appointment power in a Head of Department, and indeed, Congress has proven itself quite capable of doing so in many other statutory contexts. But it plainly did not do so here, despite the Special Counsel's

---

[71] As in the Appointments Clause context, the *de facto* officer doctrine does not apply here. *See supra* pp. 84–85.

strained statutory readings.  Nor does his appeal to inconsistent "historical practice" supplant the absence of textual authorization for his appointment.  The same structural emphases resonate in the context of the Appropriation Clause, which "embodies a fundamental separation of powers principle—subjugating the executive branch to the legislatures power of the purse." *All American*, 33 F.4th at 221 (Jones, J., concurring).

In the end, it seems the Executive's growing comfort in appointing "regulatory" special counsels in the more recent era has followed an ad hoc pattern with little judicial scrutiny.  Perhaps this can be traced back to reliance on stray dictum in *Nixon* that perpetuated in subsequent cases.  Perhaps it can be justified practically by the urgency of national crises.  Or perhaps it can be explained by the relative infrequency of these types of investigations, by congressional inattention, or by the important roles that special-counsel-like figures have played in our country's history.  Regardless of the explanation, the present Motion requires careful analysis of the statutory landscape to ensure compliance with the Constitution, and the Court has endeavored to do so with care.

The Court thus returns to where it started.  The Appointments Clause is "among the significant structural safeguards of the constitutional scheme." *Edmond*, 520 U.S. at 659.  So too is the Appropriations Clause, which carefully separates Congressional control of the "purse" from Executive control of the "sword."  The Federalist No. 78 (Alexander Hamilton).  The consequences of relaxing either of those critical provisions are serious, both in this case and beyond.  As Justice Frankfurter explained in his opinion in *Youngstown*, "[t]he accretion of dangerous power does not come in a day.  It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594 (1952) (Frankfurter, J., concurring).  "[I]llegitimate

and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure." *Boyd v. United States*, 116 U.S. 616, 635 (1886).

***

For the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Dismiss Superseding Indictment Based on Unlawful Appointment and Funding of Special Counsel Jack Smith is **GRANTED** in accordance with this Order [ECF No. 326].

2. The Superseding Indictment [ECF No. 85] is **DISMISSED**.

3. This Order is confined to this proceeding. The Court decides no other legal rights or claims.

4. This Order shall not affect or weaken any of the protections for classified information imposed in this case or any protective orders pertaining to classified information.

5. The Clerk is directed to **CLOSE** this case. Any scheduled hearings are **CANCELLED**. Any pending motions are **DENIED AS MOOT**, and any pending deadlines are **TERMINATED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 15th day of July 2024.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

Dkt. 673

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

**UNITED STATES OF AMERICA**,

       Plaintiff,

v.

**DONALD J. TRUMP,**
**WALTINE NAUTA**, **and**
**CARLOS DE OLIVEIRA,**

       Defendants.

_____/

**NOTICE OF APPEAL**

     The United States of America hereby gives notice that it appeals to the United States Court

of Appeals for the Eleventh Circuit from the order of the District Court entered on July 15, 2024,

Docket Entry 672.

                     Respectfully submitted,

                     JACK SMITH
                     Special Counsel
                     N.Y. Bar No. 2678084

         By:    */s/ Jay I. Bratt*
                     Jay I. Bratt
                     Counselor to the Special Counsel
                     Special Bar ID #A5502946
                     950 Pennsylvania Avenue, N.W.
                     Washington, D.C. 20530

                     David V. Harbach, II
                     Assistant Special Counsel
                     Special Bar ID #A5503068

July 17, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which in turn serves counsel of record via transmission of Notices of Electronic Filing.

/s/ *Jay I. Bratt*
Jay I. Bratt

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I further certify that appellees' counsel are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/James I. Pearce
James I. Pearce
Assistant Special Counsel