# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Appellant,*

v.

DONALD J. TRUMP, WALTINE NAUTA, and CARLOS OLIVEIRA
*Defendants-Appellees*

On appeal from the United States District Court
for the Southern District of Florida
Case No. 23-80101-CR-CANNON

## BRIEF OF AMICI CURIAE CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, NANCY GERTNER, STEPHEN GILLERS, AND JAMES J. SAMPLE, SUPPORTING APPELLANT UNITED STATES OF AMERICA AND REVERSAL OF JUDGMENT

STEVEN A. HIRSCH
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile:  415 397 7188

*Attorneys for Amici Curiae*
*Citizens for Responsibility and Ethics in Washington, Nancy Gertner,*
*Stephen Gillers, and James J. Sample*

## CORPORATE DISCLOSURE STATEMENT

Citizens for Responsibility and Ethics in Washington ("CREW") submits this corporate disclosure statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29 and Eleventh Circuit Rule 26.1-2.

CREW has no parent company or other identifiable related legal entities, and no trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, or any publicly held corporation, has a ten percent or greater ownership interest in CREW.

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 26.1-2, and based on the Certificate of Interested Persons set forth on pages C-1 to C-7 of the Brief of the United States filed on August 26, 2024 [Doc. 18], the undersigned hereby certifies that the following is a list of persons and entities who have an interest in the outcome of this case:

1. Advance Publications, Inc.

2. Alonso, Cristina

3. America First Legal Foundation

2746660

4. American Broadcasting Companies, Inc., d/b/a ABC News

5. Ayer, Donald

6. Blackman, Joshua

7. Blanche, Todd

8. Bloomberg, L.P.

9. Bove, Emil

10. Bowman, Chad

11. Bratt, Jay

12. Cable News Network, Inc.

13. Calabresi, Steven

14. Caldera, Louis

15. Cannon, Hon. Aileen

16. Cate, Matthew

17. CBS Broadcasting, Inc. o/b/o CBS News

18. Citizens United

19. Citizens United Foundation

20. CMG Media Corporation

21. Coleman, Tom

22. Conway, George

2746660

23. Cooney, J.P.

24. Cox Enterprises, Inc. (COX) d/b/a The Atlanta Journal-

Constitution

25. Dadan, Sasha

26. De Oliveira, Carlos

27. Dow Jones & Company, Inc., publisher of The Wall Street

Journal

28. Dreeben, Michael

29. Edelstein, Julie

30. Fields, Lazaro

31. Fitzgerald, Patrick

32. Fort Myers Broadcasting Company

33. Gerson, Stuart

34. Goodman, Hon. Jonathan

35. Gray Media Group, Inc. (GTN)

36. Guardian News & Media Limited

37. Harbach, David

38. Hulser, Raymond

39. Insider, Inc.

2746660

40. Irving, John

41. Kise, Christopher

42. Lacovara, Philip Allen

43. Landmark Legal Foundation

44. Lawson, Gary

45. Los Angeles Times Communications LLC, publisher of The Los Angeles Times

46. Maynard, Hon. Shaniek Mills

47. McKay, John

48. McNamara, Anne

49. Meese, Edwin

50. Mishkin, Maxwell

51. Mukasey, Hon. Michael B.

52. Murrell, Larry Donald

53. National Cable Satellite Corporation d/b/a C-SPAN

54. National Public Radio, Inc.

55. Nauta, Waltine

56. NBCUniversal Media, LLC d/b/a NBC News, a subsidiary of Comcast Corporation (CMCSA)

2746660

57. Orlando Sentinel Media Group, publisher of the Orlando Sentinel

58. Pearce, James

59. Pellettieri, John

60. POLITICO LLC

61. Potter, Trevor

62. Radio Television Digital News Association

63. Raul, Alan Charles

64. Reinhart, Hon. Bruce E.

65. Reuters News & Media, Inc.

66. Russell, Lauren

67. Salario, Samuel

68. Sasso, Michael

69. Schaerr, Gene

70. Seligman, Matthew

71. Smith, Abbe

72. Smith, Fern

73. Smith, Jack

74. State Democracy Defenders Action

2746660

75. Sun-Sentinel Company, LLC, publisher of the South Florida Sun Sentinel

76. TEGNA, Inc. (TGNA)

77. Telemundo Network Group, LLC d/b/a Noticias Telemundo

78. Thakur, Michael

79. The Associated Press

80. The E.W. Scripps Company (SSP)

81. The McClatchy Company, LLC (MNI) d/b/a the Miami Herald

82. The New York Times Company (NYT)

83. The Palm Beach Post and USA TODAY, publications operated by subsidiaries of Gannett Co., Inc. (GCI)

84. Thompson, Larry

85. Tillman, Seth Barrett

86. Tobin, Charles

87. Torres, Hon. Edwin

88. Trent, Edward H.

89. Tribe, Laurence

90. Troye, Olivia

91. Trump, Donald J.

2746660

92. Trusty, James

93. Twardy, Stanley

94. United States of America

95. Univision Networks & Studios, Inc.

96. VanDevender, Cecil

97. Weiss, Stephen

98. Weld, William

99. Wharton, Kendra

100. Whitman, Christine Todd

101. Woodward, Stanley

102. WP Company LLC d/b/a The Washington Post

103. WPLG, Inc.

Respectfully submitted,

Dated: September 3, 2024     KEKER, VAN NEST & PETERS LLP


*/s/Steven A. Hirsch*
STEVEN A. HIRSCH
Eleventh Circuit Bar No: 022032412
California Bar No.: 171825
*Attorneys for Amici*

2746660

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT....................................C-1

CERTIFICATE OF INTERESTED PERSONS...............................C-1

TABLE OF CONTENTS .............................................................. I

TABLE OF CITATIONS ............................................................. III

I.    INTRODUCTION ...........................................................1

II.   STATEMENT OF AMICI'S IDENTITY, INTERESTS
      IN CASE, AND SOURCE OF AUTHORITY TO FILE ..............4

III.  STATEMENT OF THE ISSUE .....................................5

IV.   FACTS BEARING ON REASSIGNMENT ...............................6

      A.    The special-master controversy .........................6

      B.    The jury-instruction controversy .....................12

      C.    The undue-delay controversy. ........................16

V.    SUMMARY OF THE ARGUMENT .........................................21

VI.   ARGUMENT .................................................................23

      A.    Judge Cannon would have difficulty putting
            aside her previous views and findings............................27

      B.    Reassignment is appropriate to preserve the

2746660

appearance of justice. .......................................................31

C.  The gains realized from reassignment would far

   outweigh any waste and duplication caused by

   reassignment...................................................................33

VII.  CONCLUSION..........................................................................34

CERTIFICATE OF COMPLIANCE (FRAP 32(G)) ..............................36

CERTIFICATE OF SERVICE.............................................................37

2746660

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*Brooks v. Central Bank of Birmingham,*
    717 F.2d 1340 (11th Cir. 1983) .................................................... 26, 32

*Chudasama v. Mazda Motor Corp.,*
    123 F.3d 1353 (11th Cir. 1997) .......................................................... 34

*CSX Transp., Inc. v. State Bd. of Equalization,*
    521 F.3d 1300 (11th Cir. 2008) .......................................................... 33

*Liteky v. United States,*
    510 U.S. 540 (1994) ........................................................................ 23

*Richey v. Smith,*
    515 F.2d 1239 (5th Cir. 1975) ...................................................... 10, 28

*Trump v. United States,*
    144 S. Ct. 2312 (2024) ..................................................................... 20

*Trump v. United States,*
    2022 WL 4291119 (S.D. Fla. Sept. 15, 2022) .................................. 8, 9

*Trump v. United States,*
    2022 WL 4366684 (11th Cir. Sept. 21, 2022) (per curiam) ........... 9, 14

2746660

*Trump v. United States,*
54 F.4th 689 (11th Cir. 2022) (per curiam)
.......................................................... 2, 6, 7, 10, 11, 12, 28, 29

*Trump v. United States,*
625 F. Supp. 3d 1257 (S.D. Fla. 2022) ................................. 2, 7, 8, 9, 30

*United States v. Bergrin,*
682 F.3d 261 (3d Cir. 2012) ........................................................... 25, 28

*United States v. Gupta,*
572 F.3d 878 (11th Cir. 2009) ................................................... 25, 29, 34

*United States v. Nixon,*
418 U.S. 683 (1974) ................................................................................ 28

*United States v. Remillong,*
55 F.3d 572 (11th Cir. 1995) ............................................................ 26, 32

*United States v. Shaw,*
426 Fed. App'x 810 (11th Cir. 2011) (per curiam) ............................... 24

*United States v. Spears,*
827 F.2d 705 (11th Cir. 1987) ............................................................... 25

*United States v. Taylor,*
972 F.2d 1247 (11th Cir. 1992) ............................................................. 25

**United States v. Torkington,*
874 F.2d 1441 (11th Cir. 1989)
.......................................................... 3, 21, 23, 24, 26, 27, 29, 31, 32, 33

iv

*United States v. Trump,*

    2024 WL 1456090 (S.D. Fla. Apr. 4, 2024) ......................................... 16

*United States v. Trump,*

    2024 WL 2032996 (S.D. Fla. May 7, 2024) ......................................... 20

*United States v. White,*

    846 F.2d 678 (11th Cir. 1988) .................................... 24, 25, 30, 33, 35

**Statutes**

28 U.S.C. § 509 ................................................................................. 28

28 U.S.C. § 510 ................................................................................. 28

28 U.S.C. § 515 ................................................................................. 28

28 U.S.C. § 533 ................................................................................. 28

28 U.S.C. § 2106 ................................................................... 1, 5, 21, 23

**Other Authorities**

Alan Feuer & Maggie Haberman, *Jack Smith Gets a Bit of*

    *What He Wanted*, N.Y. TIMES, Apr. 4, 2024,

    https://www.nytimes.com/2024/04/04/us/politics/trump-

    trial-documents-case-cannon-smith.html ......................................... 16

Alan Feuer, *Emerging Portrait of Judge in Trump*

    *Documents Case: Prepared, Prickly and Slow*, N.Y. TIMES,

    July 15, 2024,

    https://www.nytimes.com/2024/05/29/us/politics/trump-

    documents-judge-aileen-cannon.html ......................................... 18, 20

2746660

Alan Feuer, *Frustrated Prosecutors Ask Trump Documents Judge to Act on Key Claim*, N.Y. TIMES, Apr. 4, 2024, https://www.nytimes.com/2024/04/03/us/politics/trump-documents-case-judge-cannon.html .................................................... 16

Alan Feuer, *Judge in Trump Documents Case Draws Attention for Slow Pace*, N.Y. TIMES, Mar. 19, 2024, https://www.nytimes.com/2024/03/19/us/politics/aileen-cannon-trump-documents.html ........................................................... 14

Alan Feuer, *Judge Postpones Start of Trump Documents Trial Without New Date*, N.Y. TIMES, May 7, 2024, https://www.nytimes.com/2024/05/07/us/politics/trump-documents-trial-postponed.html ........................................................ 20

Alan Feuer, *Judge Rejects Trump Dismissal Effort in Classified Documents Case*, N.Y. TIMES, Apr. 4, 2024, https://www.nytimes.com/2024/04/04/us/politics/judge-trump-dismissal-classified-documents.html ....................................... 13

Alan Feuer, *Trump Seeks to Dismiss Classified Documents Case*, N.Y. TIMES, Feb. 23, 2024, https://www.nytimes.com/2024/02/23/us/politics/trump-classified-documents-case.html .................................................... 12, 13

Brian Greer, *It Is Inexcusable How Judge Cannon Is Delaying the Trump Documents Case*, N.Y. TIMES, May 18, 2024, https://www.nytimes.com/2024/05/18/opinion/judge-cannon-trump-documents-case.html ............................................ 18, 19

vi

Charlie Savage & Alan Feuer, *Judge in Trump Documents Case Rejected Suggestions to Step Aside*, N.Y. TIMES, June 20, 2024, https://www.nytimes.com/2024/06/20/us/politics/aileen-cannon-trump-classified-documents.html ................................. 7, 8, 19

Charlie Savage, *A Trump-Appointed Judge Who Showed Him Favor Gets the Documents Case*, N.Y. TIMES, June 13, 2023, https://www.nytimes.com/2023/06/09/us/politics/trump-documents-judge-aileen-cannon.html ................................................ 12

Charlie Savage, *'Deeply Problematic': Experts Question Judge's Intervention in Trump Inquiry*, N.Y. TIMES, Sept. 5, 2022, https://www.nytimes.com/2022/09/05/us/trump-special-master-aileen-cannon.html ..................................................... 31

Rebecca Beitsch, *Cannon Comes Under Scrutiny for Plodding Pace of Trump Documents Case*, THE HILL, June 27, 2024, https://thehill.com/regulation/court-battles/4741226-cannon-trump-mar-a-lago-case-delay/ .................... 31

Stephen Gillers & Nancy Gertner, *Judge Aileen Cannon Is Slow-Walking the Trump Documents Case*, BOSTON GLOBE, June 29, 2024, https://www.bostonglobe.com/2024/06/29/opinion/judge-aileen-cannon-trump-documents-case/ ............................................. 18

2746660

Tierney Sneed & Hannah Rabinowitz, *How Legal Fights and Stalling by Judge Could Push Trump Documents Trial After Election*, https://www.cnn.com/2024/04/03/politics/legal-fights-judge-trump-documents-trial/index.html ..........................................31

U.S. News Staff, *All of Trump's Legal Woes, Explained*, U.S. News, Aug. 28, 2024, https://www.usnews.com/news/national-news/articles/2024-08-28/explainer-the-cases-against-trump-and-why-they-matter ...............................................17

William K. Rashbaum et al., *Donald Trump's Time-Tested Legal Strategy: Attack and Delay*, N.Y. TIMES, Apr. 2, 2023, https://www.nytimes.com/2023/04/01/nyregion/trump-bragg-legal-defense-strategy.html ....................................................16

2746660

# I.   INTRODUCTION[1]

Amici urge the Court, if it reverses the judgment in this case, to order the case reassigned to another district judge on remand, pursuant to the Court's supervisory authority under 28 U.S.C. § 2106.

If the Court reverses Judge Aileen M. Cannon's ruling in this matter, it will be the third time in under three years that it has had to do so in a seemingly straightforward case about a former president's unauthorized possession of government documents.

But citing the mere number and frequency of reversals does not fully capture the problem; for some of Judge Cannon's rulings have been so unprecedented that affirming them would, in this Court's words, "violate bedrock separation-of-powers limitations" and require "a

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the amici curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

Throughout this brief, unless otherwise indicated, emphases were added to quotations while internal quotation marks, citations, footnotes, ellipses, and the like were omitted from them. The URLs of articles cited herein are shown in the Table of Citations.

2746660

radical reordering of our caselaw limiting the federal courts'
involvement in criminal investigations."[2]

A third reversal now will come after Judge Cannon dismissed this
case in a decision that hinged on ignoring the plain text of four federal
statutes and dismissing as "dicta" a landmark Supreme Court opinion
confirming the Attorney General's power to appoint a Special Counsel.
A reasonable member of the public could conclude, as many have, that
the dismissal was the culmination of Judge Cannon's many efforts to
undermine and derail the prosecution of this case.

Early on, Judge Cannon expressed her belief that the criminal
prosecution of a former president entails "stigma . . . in a league of its
own" and "reputational harm of a decidedly different order of
magnitude"[3]—a belief at odds with "our Nation's foundational principle
that our law applies to all, without regard to numbers, wealth, or
rank."[4] A reasonable observer could conclude that she has acted in
accordance with a conviction that prosecuting a former president for

---

[2] *Trump v. United States*, 54 F.4th 689, 701 (11th Cir. 2022) (per curiam) [hereinafter *Trump II*].

[3] *Trump v. United States*, 625 F. Supp. 3d 1257, 1266 (S.D. Fla. 2022).

[4] *Trump II*, 54 F.4th at 701.

retaining official documents—over 100 of which are marked classified—
is an intolerable affront to his dignity.

Here, we focus on three controversies that, considered together,
afford the Court more-than-adequate grounds to reassign the case upon
remand: **(1)** Judge Cannon's unprecedented assertion of "equitable
jurisdiction" to block the Government from using or even viewing
documents seized at Mar-a-Lago pursuant to a lawful search warrant;
**(2)** Judge Cannon's inexplicable call for jury instructions on a spurious
legal defense that would have gutted the Government's case had it ever
gone to trial; and **(3)** Judge Cannon's failure over the course of one year
to move the case forward in any significant way—until a one-Justice
concurrence in the Supreme Court's presidential-immunity opinion
expressed approval of the novel constitutional theory that allowed her
to end the case.

Viewed together, these events confirm that Judge Cannon "has
engaged in conduct that gives rise to the appearance of . . . a lack of
impartiality in the mind of a reasonable member of the public." *United
States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989). They also
confirm that a reasonable member of the public would believe that she

cannot be counted on to put aside her negative views of the case, if and when it returns to her courtroom.

Accordingly, as discussed below, the Court should order this case reassigned to another district judge on remand.

## II.    STATEMENT OF AMICI'S IDENTITY, INTERESTS IN CASE, AND SOURCE OF AUTHORITY TO FILE

Citizens for Responsibility and Ethics in Washington ("CREW") is a nonpartisan, nonprofit organization that advocates for ethical, accountable, and open government. CREW has an interest in ensuring that our legal system enforces the ethics laws, rules, and canons applicable to federal judges so that our justice system treats all parties impartially. CREW has substantial expertise on matters related to judicial ethics, including testifying before the House and Senate at hearings on the topic, providing public analysis of judicial-ethics rules, and filing ethics complaints when federal judges violate those rules.

Nancy Gertner is a retired United States District Court Judge and a Senior Lecturer at Harvard Law School, where she teaches various subjects, including criminal law, criminal procedure, and forensic science and sentencing.

2746660

Stephen Gillers is emeritus professor of law at the New York University School of Law. He has written widely on legal and judicial ethics in law reviews and in the legal and popular press.

James J. Sample is Professor of Civil Procedure, Constitutional Law, and Federal Courts at the Maurice A. Deane School of Law at Hofstra University; is the author or numerous articles and reports on judicial conduct and ethics; and is the co-author of *Judicial Conduct and Ethics* (6th ed.), the leading desk-reference treatise on that subject.

Federal Rule of Appellate Procedure 29(a)(3) and Eleventh Circuit Rule 29-1 are the source of amici's authority to file this brief.

## III.  STATEMENT OF THE ISSUE

If the Court reverses the district court's judgment in this case and remands the case for further proceedings, should it also exercise its supervisory authority under 28 U.S.C. § 2106 to instruct the Chief Judge of the Southern District of Florida to reassign the case to a different district judge?

2746660

## IV.   FACTS BEARING ON REASSIGNMENT

### A.   The special-master controversy

FBI agents searched former President Donald J. Trump's Mar-a-Lago resort on August 8, 2022 as part of an investigation into whether, after leaving office, he had illegally retained national-defense documents and other government documents and had obstructed the National Archives' efforts to recover them. The search resulted in the seizure of approximately 13,000 documents totaling more than 22,000 pages of material. More than 100 documents were marked confidential, secret, or top secret.[5]

Soon after the search, Trump filed a lawsuit against the government in the form of a motion seeking, inter alia, appointment of a special master and an injunction against the Government's review of the seized materials until that appointment was made.[6] Judge Aileen M. Cannon was assigned to the case. Because she "could not identify a sufficient jurisdictional basis for [Trump's] filing," she requested jurisdictional briefing.[7] Trump's response contained just one paragraph

---

[5] *Trump II*, 54 F.4th at 696.

[6] *Id*. at 696.

[7] *Id.*

2746660

applying the relevant legal factors for invoking the court's "equitable jurisdiction."[8]

On September 5, 2022, Judge Cannon "[s]hock[ed] legal experts across ideological lines"[9] by ordering the appointment of a special master to review the massive trove of seized records. Judge Cannon wrote that she was issuing the order "mindful of the need to ensure at least the appearance of fairness and integrity under the extraordinary circumstances presented" and "[p]ursuant to the Court's equitable jurisdiction and inherent supervisory authority."[10]

The order granted the special master broad powers to evaluate claims of both attorney-client and executive privilege.[11] A subsequent clarifying order expressly barred the Government, pending issuance of the Special Master's recommendations, from further use of the content of the seized materials for criminal investigative purposes, including

---

[8] *Id.* at 697–98.

[9] Charlie Savage & Alan Feuer, *Judge in Trump Documents Case Rejected Suggestions to Step Aside*, N.Y. TIMES, June 20, 2024 [hereinafter *Step Aside*].

[10] *Trump v. United States*, 625 F. Supp. 3d 1257, 1261 (S.D. Fla. 2022) [hereinafter *Special-Master Order*]; *accord Trump II*, 54 F.4th at 697.

[11] *Special-Master Order* at 1268–71.

2746660

presenting those materials to a grand jury or using their contents to conduct witness interviews.[12] Particularly noteworthy was Judge Cannon's suggestion that some White House files could be permanently withheld from federal investigators under executive privilege,[13] a notion "widely seen as dubious since it ha[d] never successfully been made in a criminal case."[14]

Equally noteworthy was Judge Cannon's assertion that a former president's unique reputational interests call for extraordinary procedural protections in the context of a criminal prosecution: "As a function of Plaintiff's former position as President of the United States, the stigma associated with the subject seizure is in a league of its own. A future indictment, based to any degree on property that ought to be returned, would result in reputational harm of a decidedly different order of magnitude."[15] She likewise wrote that her decision to exercise equitable jurisdiction "[took] into account the undeniably

---

[12] *Trump v. United States*, 2022 WL 4291119, at *3 (S.D. Fla. Sept. 15, 2022).

[13] *See Special-Master Order* at 1270.

[14] *Step Aside.*

[15] *Special-Master Order* at 1266.

2746660

unprecedented nature of the search of a former President's residence[.]"[16] Again, while acknowledging that special-master review for attorney-client privilege ordinarily is reserved for materials seized from law offices, Judge Cannon "[did] not see why these concerns would not apply . . . to the office and home of a former president."[17] And yet again, when justifying her injunction against the Government's use of the seized documents, Judge Cannon opined that "these unprecedented circumstances call for a brief pause to allow for neutral, third-party review[.]"[18]

On September 15, 2022, Judge Cannon denied the Government's motion for a stay pending appeal of her order.[19] But in a 29-page opinion issued on September 21, 2022, this Court granted the Government's request for a partial stay, finding that the Government had established a substantial likelihood of success on the merits.[20]

---

[16] *Id.* at 1267.

[17] *Id.* at 1270 n.14.

[18] *Id.* at 1274.

[19] *Trump v. United States*, 2022 WL 4291119 (S.D. Fla. Sept. 15, 2022).

[20] *Trump v. United States*, 2022 WL 4366684, at *2 (11th Cir. Sept. 21, 2022) (per curiam) [hereinafter *Trump I*].

2746660

On December 1, 2022, this Court issued a decision holding that the district court had lacked "equitable jurisdiction" to block the United States from using lawfully seized records in a criminal investigation. *Trump v. United States*, 54 F.4th 689, 693 (11th Cir. 2022) (per curiam) [hereinafter *Trump II*].

This Court's decision marked the wholesale repudiation of Judge Cannon's view that former Presidents are entitled to extraordinary protections in criminal investigations. Creating a "special" form of equitable jurisdiction to benefit former presidents, this Court explained, "would defy our Nation's foundational principle that our law applies to all, without regard to numbers, wealth, or rank." *Id*. at 701.

Emphasizing the narrow and exceptional scope of "equitable jurisdiction," *id*. at 697, the Court found that none of the four stringent equitable-jurisdiction factors laid down in *Richey v. Smith*[21] had been met. The first factor—indispensable to any invocation of equitable jurisdiction—is that the government displayed a "callous disregard" for the plaintiff's constitutional rights. *Trump II*, 54 F.4th at 697. As to this factor, "[t]he district court's entire reasoning . . . was that it 'agrees with

---

[21] *See Richey v. Smith*, 515 F.2d 1239, 1243–44 (5th Cir. 1975).

the Government that . . . there has ***not*** been a compelling showing[.]'"
*Id*. at 698. As to the second factor—whether the plaintiff has an
individual interest in and need for the material seized—Trump had
failed to make any specific showing; yet "[t]he district court was
undeterred by this lack of information" and had ruled erroneously that
the factor was met "based on the volume and nature of the seized
material." *Id*. at 698–99. As to the third factor—whether the plaintiff
would be irreparably injured if the property were not returned—Trump
again had made no adequate showing, "[a]nd again, the district court
stepped in with its own reasoning," which the Court found overbroad as
it "would apply to nearly every subject of a search warrant." *Id*. at 699–
700. And as to the fourth factor—whether the plaintiff has an adequate
remedy at law—"the district court's [negative] answer was . . . not a
sufficient justification," *id*. at 700, for "[i]f there has been no
constitutional violation—much less a serious one—then there is no
harm to be remediated in the first place." *Id*. at 701.

The Court concluded that affirming Judge Cannon's order would
require either allowing *any* subject of a search warrant to block
government investigations, or the creation of a special rule for former

11

presidents. Either approach would "violate bedrock separation-of-powers limitations" and require "a radical reordering of our caselaw limiting the federal courts' involvement in criminal investigations." *Trump II*, 54 F.4th at 701. Accordingly, the Court "agree[d] with the government that the district court [had] improperly exercised equitable jurisdiction" and that dismissal of Trump's action was required. *Id.* at 701–02.

## B. The jury-instruction controversy

On June 8, 2023, the Government unsealed a 37-count indictment of Trump, alleging, inter alia, 31 violations of the Espionage Act as well as charges of obstruction and making false statements. By random assignment, Judge Cannon was selected from a pool of ten judges to preside over the case.[22]

On February 22, 2024, Trump's lawyers filed four motions to dismiss a case that "many legal experts consider[ed] the most ironclad of the four against him."[23] One motion argued that, under the

---

[22] Charlie Savage, *A Trump-Appointed Judge Who Showed Him Favor Gets the Documents Case*, N.Y. TIMES, June 13, 2023.

[23] Alan Feuer, *Trump Seeks to Dismiss Classified Documents Case*, N.Y. TIMES, Feb. 23, 2024.

Presidential Records Act ("PRA"), Trump possessed "unreviewable discretion" to "designate the records at issue as personal."[24]

At a hearing on March 14, 2024, Judge Cannon appeared to reject the PRA defense, noting that the Special Counsel had cited case law that the purported defense "would effectively gut the PRA altogether" by "permit[ting] unfettered classification of, clearly, presidential records as personal without any possibility for judicial review."[25]

But four days later, on March 18, 2024, Judge Cannon ordered the defense and the Government to submit competing drafts of jury instructions on the very PRA defense that she had seemed to reject at the hearing. And she further ordered that the draft instructions must assume that the following "scenarios" were "correct formulations of the law."[26] Scenario (a) posited that the jury in an Espionage Act prosecution may "make a factual finding as to whether the government has proven beyond a reasonable doubt that [a record retained by a former president] is personal or presidential using the definitions set

---

[24] *Id.*; ECF 327 at 1.

[25] ECF 404 at 97:1–7; Alan Feuer, *Judge Rejects Trump Dismissal Effort in Classified Documents Case*, N.Y. TIMES, Apr. 4, 2024.

[26] ECF 407 at 2.

13

forth in the [PRA]."[27] Scenario (b) posited that a president has "sole authority under the PRA to categorize records as personal or presidential during his/her presidency"; that "[n]either a court nor a jury is permitted to make or review such a categorization decision"; and that an outgoing president's decision to withhold records from the National Archives must be deemed to be his "categorization of those records as personal under the PRA."[28]

The *New York Times* reported that the May 18 order "seemed to embrace one of Mr. Trump's most brazen defenses, leaving open the possibility that [Judge Cannon] could let the charges go to trial and then move to acquit the former president near the end of the proceeding by declaring that the government had failed to prove its case."[29] The order also appeared to flout this Court's finding, set forth in its order partially staying the special-master order, that Trump "neither owns nor has a personal interest in" the classified documents.[30]

---

[27] *Id.*

[28] *Id.*

[29] Alan Feuer, *Judge in Trump Documents Case Draws Attention for Slow Pace*, N.Y. TIMES, Mar. 19, 2024 [hereinafter *Slow Pace*].

[30] *Trump I*, at *12.

14

Realizing that instructions embodying these "scenarios" would torpedo its case, the Government filed a sharply worded response informing Judge Cannon that both of her scenarios rested on the "fundamentally flawed legal premise" that the PRA's distinction between "personal" and "Presidential" records determines whether a former president is "authorized" under the Espionage Act to possess and improperly store highly classified documents.[31] In truth, the Government asserted, "based on the current record, the PRA should not play any role at trial at all."[32] The Government demanded that Judge Cannon determine well in advance of trial whether this flawed premise was correct as a matter of law so as to leave time for the Government to seek mandamus relief from this Court before jeopardy attached.[33] And the Government pointed out that Trump's resort to the PRA was an ad hoc rationalization with no basis in the facts of the case, as Trump had never represented to the court that he had in fact designated any documents as "personal" under the PRA—and he never had.[34]

---

[31] ECF 428 at 1.

[32] *Id*. at p. 2

[33] *Id*. at p. 2.

[34] *Id*. at p. 4.

2746660

Following a heated and contentious hearing,[35] Judge Cannon issued an order rejecting Trump's motion to dismiss based on the PRA defense but suggesting that she might allow something similar to be raised in front of the jury during trial. She called the Government's demand that she settle the PRA-defense issue once and for all, "prior to the presentation of trial defenses and evidence," "unprecedented and unjust."[36] And she defended her decision to request the jury instructions as "a genuine attempt" to "better understand the parties' competing positions and the questions to be submitted to the jury in this complex case of first impression."[37]

## C.    The undue-delay controversy.

Two things were known to the entire world in 2023–2024: Donald Trump historically had pursued a strategy of obstruction and delay in legal cases brought against him;[38] and if he won reelection, he was

---

[35] Alan Feuer, *Frustrated Prosecutors Ask Trump Documents Judge to Act on Key Claim*, N.Y. TIMES, Apr. 4, 2024.

[36] *United States v. Trump*, 2024 WL 1456090, at *1 (S.D. Fla. Apr. 4, 2024).

[37] *Id.*; *see also* Alan Feuer & Maggie Haberman, *Jack Smith Gets a Bit of What He Wanted*, N.Y. TIMES, Apr. 4, 2024.

[38] William K. Rashbaum et al., *Donald Trump's Time-Tested Legal Strategy: Attack and Delay*, N.Y. TIMES, Apr. 2, 2023.

2746660

likely to pardon himself and/or instruct his attorney general to drop the federal cases pending against him.[39]

That is the context for evaluating the undeniable fact that, before administering the coup de grâce that ended the case, Judge Cannon failed to resolve numerous pretrial motions and issues, leading many to suspect—rightly or wrongly—that she hoped the case would meet its doom in a second Trump administration.

By March of 2024, a strong pattern of delay had emerged. Although both the Government and the defense initially had agreed that the trial could begin in the summer of 2023,[40] Judge Cannon still had not set a trial date and had "allow[ed] a logjam of unresolved issues to build up on her docket."[41] The proceedings were characterized by "days of hearings on long-settled issues" and "baseless motions that inexplicably remain[ed] pending, like the claim that the case should be

---

[39] U.S. News Staff, *All of Trump's Legal Woes, Explained*, U.S. News, Aug. 28, 2024.

[40] *See* ECF 28 (setting August 14, 2023 trial date). The Government later moved the court to continue the trial date to December 11, 2023. ECF 34. Defendants responded that no new date should be set. ECF 66. Judge Cannon then set a trial date of May 24, 2024, ECF 83, which she vacated on May 7, 2024.

[41] *Slow Pace*.

2746660

dismissed because Joe Biden, Mike Pence, and Hillary Clinton were not prosecuted for similar conduct. Nor ha[d] Cannon addressed Trump's presidential immunity claim even though the allegedly illegal conduct—the wrongful retention of national security documents—occurred after Trump's presidency ended."[42]

Judge Cannon's delays were not entirely attributable to the complexity of the case. Indeed, a former CIA lawyer experienced in Espionage Act prosecutions wrote in May 2024 that "if the defendant were not Donald Trump, this would be a relatively routine Espionage Act prosecution for unlawful retention of classified records."[43] Yet, over the course of eleven months, Judge Cannon had made "almost no progress" to achieve any of what the author described as the three main purposes of criminal pretrial litigation: ensuring that the defense gets

---

[42] Stephen Gillers & Nancy Gertner, *Judge Aileen Cannon Is Slow-Walking the Trump Documents Case*, BOSTON GLOBE, June 29, 2024.

[43] Brian Greer, *It Is Inexcusable How Judge Cannon Is Delaying the Trump Documents Case*, N.Y. TIMES, May 18, 2024 [hereinafter *Inexcusable*]; *see also* Alan Feuer, *Emerging Portrait of Judge in Trump Documents Case: Prepared, Prickly and Slow*, N.Y. TIMES, July 15, 2024 [hereinafter *Emerging Portrait*].

2746660

access to all discoverable material; resolving potentially dispositive motions; and determining the trial's structure.[44]

As to the scope of discovery, Judge Cannon had failed for four months to rule on Trump's motion to compel more discovery from the government.[45] As to dispositive motions, Judge Cannon had ruled on only two of the seven that Trump had filed, while insisting on extensive hearings for each one.[46] And as to trial's structure, Judge Cannon had "not yet addressed a single substantive issue."[47] Still ahead lay decisions about presidential immunity, attorney-client privilege, and protection of classified information under the Classified Information Protection Act ("CIPA").[48] Judge Cannon's delays were partly attributable to her refusal to delegate pretrial motions to a magistrate judge—a departure from normal practice that maximized her control over the case.[49]

---

[44] *Inexcusable.*

[45] *Id.*

[46] *See Inexcusable.*

[47] *Id.*

[48] *Id.*

[49] *Step Aside.*

2746660

On May 7, 2024, Judge Cannon effectively took the case off calendar, vacating the May 20, 2024 trial date that she had previously set and writing that it would be "imprudent and inconsistent with the Court's duty" to set a new trial date before she had finished resolving "the myriad and interconnected pre-trial and CIPA issues remaining and forthcoming."[50] "Regardless of her motives," the *Times* observed, "Judge Cannon has effectively imperiled the future of a criminal prosecution that once seemed the most straightforward of the four Mr. Trump is facing."[51]

On July 1, 2024, the U.S. Supreme Court issued its landmark decision on presidential immunity from prosecution. *See Trump v. United States*, 144 S. Ct. 2312, 2328, 2331–32 (2024). Justice Thomas wrote separately to question whether the Special Counsel's office had been created and filled in accordance with the Constitution's Appointments Clause. *Id.* at 2347–52 (Thomas, J., concurring). No other justice joined his concurrence.

---

[50] *United States v. Trump*, 2024 WL 2032996, at *1 (S.D. Fla. May 7, 2024); Alan Feuer, *Judge Postpones Start of Trump Documents Trial Without New Date*, N.Y. TIMES, May 7, 2024.

[51] *Emerging Portrait*.

Although Judge Cannon had resolved dispositive motions at a glacial pace (if at all) up to that point, she now moved with alacrity to end the case. Only two weeks elapsed between Justice Thomas's concurrence and her issuance of a 93-page opinion dismissing the case based on the unconstitutional-appointment theory, augmented by an additional unconstitutional-spending theory.

## V. SUMMARY OF THE ARGUMENT

If this Court reverses the judgment, it also should order the case reassigned to another district judge pursuant to 28 U.S.C. § 2106 because the case satisfies all three *Torkington* factors for reassignment.

**A.     Judge Cannon would have difficulty putting her previous views and findings aside on remand.** A reversal here would mean that the Court has had to reverse Judge Cannon three times—each time because she reached out to adopt pro-defense practices and theories that directly contradicted longstanding law. Her rulings and other conduct create the appearance of an unshakeable conviction that subjecting a former president to ordinary criminal procedures represents an intolerable affront to his dignity.

2746660

Judge Cannon's unprecedented ruling blocking the Government from using or viewing lawfully seized evidence, coupled with her demand that the parties draft jury instructions embodying Trump's baseless PRA defense, would suggest to a reasonable member of the public that her biases will infect and distort a trial on remand.

**B.    Reassignment is appropriate to preserve the appearance of justice.** Even before she dismissed the case on novel grounds that ignored both statutory authority and Supreme Court precedent, Judge Cannon's other extraordinary rulings and sluggish case administration had provoked well-founded concerns that she might be biased against the Government's case and unable to manage that case impartially.

**C.    The gains realized from reassignment would outweigh any waste or duplication.** Reassignment will not cause undue waste or duplication, as the case has yet to be tried—indeed, much of the district court's pretrial work remains unfinished. And prior published opinions will help the next district judge master the essential facts and issues in the case.

2746660

# VI.  ARGUMENT

The federal statute governing reassignment on remand, 28 U.S.C. § 2106, provides in part that any appellate court "may remand the cause and . . . require such further proceedings to be had as may be just under the circumstances." This language authorizes appellate courts to reassign a case on remand to a different district-court judge where the original judge "has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public." *United States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989); *see also Liteky v. United States*, 510 U.S. 540, 554 (1994) (citing § 2106 as a basis for appellate courts' reassignment power).

Reassignment recognizes that "the judicial system has the obligation of preserving public confidence in the impartial and fair administration of justice. If a district judge's continued participation in a case presents a significant risk of undermining this public confidence, this Court has the authority *and the duty* to order the case reassigned to a different district judge." *Id*. When reassigning a case, this Court "act[s] with the sensitivity that it is . . . of *fundamental* importance that

2746660

justice should not only be done, but should manifestly and undoubtedly *be seen* to be done." *United States v. White*, 846 F.2d 678, 696 (11th Cir. 1988) (emphases in original).

Reassignment may be ordered "even if there is no evidence that the judge is vindictive or biased." *United States v. Shaw*, 426 Fed. App'x 810, 815 (11th Cir. 2011) (per curiam). In such cases, this Court considers "at least" three elements when determining whether to reassign a case: "**(1)** whether the original judge would have difficulty putting [her] previous views and findings aside; **(2)** whether reassignment is appropriate to preserve the appearance of justice; [and] **(3)** whether reassignment would entail waste and duplication out of proportion to gains realized from reassignment." *Torkington*, 874 F.2d at 1447.

Under the *Torkington* test, "[r]eassignment may be appropriate, for example, if a judge conducts a trial in a manner that creates the appearance that he is or may be unable to perform his role in an unbiased manner, or if the judge has demonstrated that he is unwilling to carry out the law in a particular case." *Id.* at 1446. Examples of unwillingness to carry out the law include "when a district judge

adheres to erroneous views after multiple remands, . . . or when a judge questions the wisdom of the substantive law he has to apply and challenges the government's decision to prosecute the defendant." *United States v. Gupta*, 572 F.3d 878, 891 (11th Cir. 2009). Reassignment also is necessary where the district judge's position "has become hardened against the Government, and he has evidenced a commitment that clearly reflects that he is no longer able to view [the case] impartially." *White*, 846 F.2d at 696.

For example, a case was reassigned on remand where the district judge's rulings appeared to stem from his belief that the defendant could not "get a fair trial on the RICO counts due to the very nature of RICO." *United States v. Bergrin*, 682 F.3d 261, 283 (3d Cir. 2012). And this Court has reassigned cases where the district judge, without authority or adequate explanation, dismissed a criminal case that was obviously at least sufficient to go to a jury. *See United States v. Taylor*, 972 F.2d 1247, 1252 (11th Cir. 1992); *United States v. Spears*, 827 F.2d 705, 709 (11th Cir. 1987).

In addition, this Court has held that cases that have remained in "a 'stalemated posture' because of the district judge's intransigence

*require reassignment* to another judge." *United States v. Remillong*, 55 F.3d 572, 577 n.12 (11th Cir. 1995) (emphasis in original). A case is "stalemated" if the judge persists in taking erroneous positions that prevent the case from moving forward on its merits. For example, in *Brooks v. Central Bank of Birmingham*, 717 F.2d 1340 (11th Cir. 1983), this Court reassigned a case where the court's improper sua sponte constitutional objections to the appointment of counsel had prevented it from reaching the merits of an attorney's withdrawal motion. The Court concluded that, "[i]n this stalemated posture, we have *no alternative* except to direct that the case be transferred to another district judge for a determination on the merits of the motion to withdraw." *Id.* at 1343.

Because reassignment under the *Torkington* test seeks to preserve public confidence in the judicial system even where no evidence exists of "actual bias," a *Torkington* reassignment need not reflect poorly on the district judge's "actual ability, integrity, [or] impartiality." *Torkington*, 874 F.2d at 1447. Instead, it may represent a "respon[se] to the *appearance* of a lack of neutrality," requiring the appellate court to "act to preserve in the public mind the image of absolute impartiality and fairness of the judiciary." *Id.* at 1447. Reassignment thus "preserve[s]

not only the reality but the appearance of the proper functioning of the judiciary as a neutral, impartial administrator of justice." *Id.*

As discussed below, all three *Torkington* factors favor reassignment here.

## A. Judge Cannon would have difficulty putting aside her previous views and findings.

The Court should have little difficulty in finding the first *Torkington* factor met on the facts of this case. Although this is not a case in which the district judge flagrantly ignored this Court's mandate, the fact remains that a reversal here will mean that this Court has had to reverse her three times—the first time regarding her denial of a stay pending appeal from her special-master order, the second time regarding her improper invocation of "equitable jurisdiction" to enter that order, and now regarding her order dismissing the case on novel constitutional grounds.

In each instance, Judge Cannon adopted theories that directly contradicted longstanding law, whether it be *Richey*'s stringent limitations on the exercise of "equitable jurisdiction" or the Attorney

General's explicit statutory power to appoint special counsel,[52] as confirmed by the unanimous Supreme Court decision in *United States v. Nixon.*[53] Her rulings also evince a belief that ordinary legal procedures and protections, by their "very nature,"[54] cannot result in a fair trial where the defendant is a former president.

At the time of this writing, briefing is not yet complete in this third appeal and the Court has not yet issued a decision. But even the Court's opinion in the second appeal depicts a district judge who ignored Trump's inability to meet the *Richey* factors and repeatedly "stepped in with [her] own reasoning"[55] to block the government's access to lawfully seized evidence. Judge Cannon's conduct—including her solicitation of legally baseless jury instructions—has repeatedly appeared to cross the line from mere legal error to active judicial intervention and advocacy on behalf of the former president. This degree of non-neutral involvement does not bode well for her ability to

---

[52] *See* 28 U.S.C. §§ 509, 510, 515, 533.

[53] *See United States v. Nixon*, 418 U.S. 683, 694 (1974). Judge Cannon preferred to follow the lead of Justice Thomas's *Trump* concurrence—an opinion joined by no other justice.

[54] *Bergrin*, 682 F.3d at 283.

[55] *Trump II*, 54 F.4th at 699.

2746660

set aside her views on remand, as it suggests that she "questions the wisdom of the substantive law [s]he has to apply," *Gupta*, 572 F.3d at 891, and may be "unwilling to carry out the law in [this] particular case," *Torkington*, 874 F.2d at 1446. After all, it's not every day that this Court holds that affirming a district court's ruling would require "a radical reordering of our caselaw" and "violate bedrock separation-of-powers limitations." *Trump II*, 54 F.4th at 701.

Judge Cannon's acknowledgement that Trump's PRA defense is baseless, followed by her insistence that the parties prepare jury instructions assuming that the defense is proper, could cause a reasonable member of the public to question her likely aims and conduct at a future trial on remand. Although Judge Cannon acknowledged in open court that Trump's PRA defense would "gut" the PRA, she nevertheless deferred the issue to trial, where her loaded jury instructions embodying the PRA defense were likely to produce an acquittal. And she pursued this course of action despite the Government's urgent plea that she settle the PRA-defense issue well in advance of trial so that the defense's validity could be tested in this Court before jeopardy attached.

2746660

Judge Cannon's apparent creation of path to acquittal at trial suggests to a reasonable member of the public that she "has become hardened against the Government" and "has evidenced a commitment that clearly reflects that [she] is no longer able to view [the case] impartially." *White*, 846 F.2d at 696. An observer reasonably could conclude that Judge Cannon has no intention or ability to put aside her negative view of the case. She gives every appearance of continuing to believe that that the criminal prosecution of a former president entails "stigma . . . in a league of its own" and "reputational harm of a decidedly different order of magnitude,"[56] and that subjecting a former president to ordinary criminal procedures therefore represents an intolerable affront to his dignity.

A member of the public thus would have reason to believe that on remand, Judge Cannon will prove unable to put aside the views that led her to take so many dramatic and unusual steps that undermined the prosecution of this case.

---

[56] *Trump*, 625 F. Supp. 3d at 1266.

2746660

**B.    Reassignment is appropriate to preserve the appearance of justice.**

The second *Torkington* factor is met here as well. Judge Cannon's conduct of the case has provoked astonishment and concern across the political spectrum.[57] As noted, the substance of her rulings alone has created an appearance of bias and partiality. But so has her administration of the case, which, even prior to the dismissal, made it clear to the public that this relatively straightforward matter could not be tried without protracted legal struggles.

First, Judge Cannon tried to block the government from seeing or using lawfully seized evidence until a special master could review it—a step never before taken in a federal criminal case. Then, over the course of nearly a year, the case went nowhere while Judge Cannon granted

---

[57] *See, e.g.*, Charlie Savage, *'Deeply Problematic': Experts Question Judge's Intervention in Trump Inquiry*, N.Y. TIMES, Sept. 5, 2022 (former prosecutor in independent-counsel investigation of Bill Clinton called special-master order "egregious", "genuinely unprecedented," and "simply untenable."); Tierney Sneed & Hannah Rabinowitz, *How Legal Fights and Stalling by Judge Could Push Trump Documents Trial After Election*, CNN, Apr. 4, 2024 (former Trump White House lawyer said Cannon's delays "clearly create[] the perception . . . of partiality and her attempt to put her thumb on the scale"); Rebecca Beitsch, *Cannon Comes Under Scrutiny for Plodding Pace of Trump Documents Case*, THE HILL, June 27, 2024 (former Trump impeachment-defense counsel said Cannon's delays were "playing right into the defense's hands").

2746660

hearing time to nearly every theory that Trump's counsel could conjure up. During this period of stalling and theory-testing, the litigation became "stalemated" in a way that has, itself, been held to require reassignment in other cases. *See Remillong*, 55 F.3d at 577 n.12; *Brooks*, 717 F.2d at 1343. But as soon as a one-Justice concurrence in the Supreme Court's immunity decision pointed toward a possible exit, the "stalemate" suddenly became a cavalry charge: In just two weeks, Judge Cannon had penned a 93-page decision abruptly dismissing the case based on the reasoning of that lone concurrence.

No one can know what was in Judge Cannon's mind as she repeatedly delayed the Government's case. But it seems virtually indisputable that her conduct could suggest—and indeed *has* suggested—"a lack of impartiality" to the minds of many "reasonable member[s] of the public." *Torkington*, 874 F.2d at 1446. Under these circumstances, reassignment need not reflect badly on Judge Cannon's "actual ability, integrity, [or] impartiality," *id.* at 1447; instead, it represents an appropriate "respon[se] to the *appearance* of a lack of neutrality," requiring the appellate court to "act to preserve in the

public mind the image of absolute impartiality and fairness of the judiciary." *Id.* at 1447.

Judge Cannon's extraordinary legal and administrative interventions in this case have raised an unavoidable inference of bias in the public mind. The case therefore should be reassigned to preserve the appearance of justice.

## C. The gains realized from reassignment would far outweigh any waste and duplication caused by reassignment.

The third *Torkington* factor is easily satisfied here.

The cost-benefit analysis embodied in the third factor usually favors reassignment where—as here—the case has yet to be tried. *See White*, 846 F.2d at 696 n.29 ("There will not be unnecessary duplication because five of these [six] cases have yet to be tried . . . ."); *cf. CSX Transp., Inc. v. State Bd. of Equalization*, 521 F.3d 1300, 1301 (11th Cir. 2008) (finding third *Torkington* factor *not* satisfied where the district judge had "presided over an eight-day trial that concerned a complicated subject and drafted a thorough 27-page opinion").

The fact that the judge already has spent "significant time" on the case is not dispositive where—as here—the case is straightforward and the judge has failed to manage it adequately or to determine key issues

2746660

in the case despite having presided over it for many months. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1374 (11th Cir. 1997). Judge Cannon's May 7, 2024 order taking the case off calendar was itself an admission that much of the pretrial work in the case remained to be done—because Judge Cannon had accomplished so little during the preceding year.

Finally, concerns about waste and duplication are assuaged where—as here—prior published opinions in the case "provide much of the essential information." *Gupta*, 572 F.3d at 892.

Accordingly, in this case, reassignment's power to restore public trust in the fairness and evenhandedness of the judicial system plainly outweighs any inefficiencies.

## VII. CONCLUSION

Although Judge Cannon sometimes has appeared to be forging a parallel legal universe for former presidents, there is one respect in which Trump's unique status and global visibility ought to influence the reassignment analysis: Those factors arguably make it more important than in any prior case that "justice should not only be done, but should

2746660

manifestly and undoubtedly *be seen* to be done." *White*, 846 F.2d at 696 (emphasis in original).

Accordingly, if the Court reverses the district court's judgment, it also should order the case reassigned to a different district judge on remand.

Dated:  September 3, 2024      Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

*/s/ Steven A. Hirsch*
STEVEN A. HIRSCH
California Bar No.: 171825

*Attorneys for Amici Curiae*

2746660

**CERTIFICATE OF COMPLIANCE (FRAP 32(g))**

1. This brief contains 6,474 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced, 14-point serif typeface using Microsoft Office Word.


Dated: September 3, 2024                   KEKER, VAN NEST & PETERS LLP


                                           */s/Steven A. Hirsch*
                                           STEVEN A. HIRSCH
                                           California Bar No.: 171825

                                           *Attorneys for Amici Curiae*

2746660

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 3, 2024, a true and correct copy of the foregoing document was electronically filed through CM/ECF. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

Dated: September 3, 2024          KEKER, VAN NEST & PETERS LLP


/s/ Steven A. Hirsch
STEVEN A. HIRSCH
California Bar No.: 171825

*Attorneys for Amici Curiae*

2746660