No. 24-12311-J

# United States Court of Appeals
## for the Eleventh Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

— v. —

DONALD J. TRUMP, WALTINE NAUTA,
and CARLOS DE OLIVEIRA,

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA, CASE NO: 9:23-CR-80101-AMC
(Aileen Cannon, U.S. District Judge; Bruce E. Reinhart, U.S. Magistrate Judge)

# BRIEF OF APPELLEE
# PRESIDENT DONALD J. TRUMP

Christopher M. Kise
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, FL 33134
(305) 677-2707

Emil Bove
Todd Blanche
Kendra Wharton
BLANCHE LAW PLLC
99 Wall Street, Suite 4460
New York, NY 10005
(212) 716-1250

*Counsel for Appellee*
*President Donald J. Trump*

*United States v. Trump, et al.*, No. 24-12311-J

## Certificate Of Interested Persons

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 26.1-2, the undersigned hereby certifies that, in addition to the persons and entities identified in the Certificate of Interested Persons filed by Appellant on August 26, 2024 (ECF No. 18), the following persons and entities have an interest in the outcome of this case or appeal:

1.  Citizens for Responsibility and Ethics in Washington

2.  Couzo, Amber Aurora

3.  Fugate, Rachel Elise

4.  Garland, Merrick B.

5.  Gertner, Nancy

6.  Gilbert, Karen E.

7.  Gillers, Stephen

8.  Hirsch, Steven A.

9.  Klugh, Richard C.

10. McElroy, Dana Jane

11. Raskin, David

12. Reeder, L. Martin Jr.

*United States v. Trump, et al.*, No. 24-12311-J

13.    Reynolds, Brett

14.    Sample, James J.

15.    XiXi, Li

Dated:  October 25, 2024

Respectfully submitted,

/s/ Emil Bove
Emil Bove
Blanche Law PLLC
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250
Emil.Bove@blanchelaw.com

*Attorney for President Donald J. Trump*

## Statement Regarding Oral Argument

Appellees believe that oral argument would assist the Court's decisional process.

# Table of Contents

Certificate Of Interested Persons ......................................................... C-1

Statement Regarding Oral Argument ......................................................i

Table Of Citations ................................................................................iv

Introduction ........................................................................................... 1

Statement Of The Case ......................................................................... 4

    I.    Appointment Order .................................................................... 4

    II.   The District Court's Dismissal ................................................... 5

Summary Of Argument .......................................................................... 6

Argument ............................................................................................. 10

    I.    Smith Was Not Appointed "By Law" ..................................... 10

        A.  Congress Has Not Provided The Required Clear Statement .. 11

        B.  Congress Provided For Many Appointments, But Not Smith's…................................................................................ 13

        C.  Section 515 Did Not Authorize Smith's Appointment ............. 13

            1.  Section 515(a) Concerns Territory, Not Appointments ........ 14

            2.  Section 515(a)'s Predecessors Did Not Establish Appointment Authority ....................................................... 15

            3.  Section 515(b) Is Not A Source Of Appointment Power ....... 17

            4.  Smith Is Not A § 515(b) "Special Attorney" .......................... 22

            5.  Section 515(b)'s Predecessor Statutes Were Not Used As A Source Of Appointment Authority ....................................... 24

        D.  Section 533(1) Did Not Authorize Smith's Appointment ......... 28

E.   Sections 509 And 510 Did Not Authorize Smith's Appointment.. ........................................................ 36

F.   SCO's Remaining Historical Arguments Fail ......................... 42

1.  Pre-Watergate Cases .............................................. 44

2.  Watergate ............................................................ 48

G.  No Binding Or Persuasive Authority Supports SCO's Position…........................................................... 51

1.  The *Nixon* Dictum Is Not Controlling Or Persuasive .......... 52

2.  Opinions Following *Nixon* Are Not Persuasive ................... 57

II.    Smith Operates As An Unlawfully Appointed Principal Officer 60

III.   Smith's Expenditures Violated The Appropriations Clause ....... 63

Conclusion ................................................................. 66

# Table of Citations

**Page(s)**

**Cases:**

*Armstrong v. Bush*,
  924 F.2d 282 (D.C. Cir. 1991) ............................................................... 11

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) ......................................................................... 12

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) ............................................................................. 40

*Boyd v. United States*,
  116 U.S. 616 (1886) ............................................................................. 51

*Brown v. United States*,
  602 U.S. 101 (2024) ............................................................................. 21

*Central Green Co. v. United States*,
  531 U.S. 425 (2001) ............................................................................. 57

*CFPB v. All Am. Check Cashing, Inc.*,
  33 F.4th 218 (5th Cir. 2022) ......................................................... 63, 64

*Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024) ............................................................................. 63

*Davis v. United States*,
  417 U.S. 333 (1974) ............................................................................. 52

*Dep't of Transp. v. Ass'n of Am. R.R.*,
  575 U.S. 43 (2015) ............................................................................... 26

*Edmond v. United States*,
  520 U.S. 651 (1997) ....................................................................... 11, 18

*Edwards v. Prime, Inc.*,
  602 F.3d 1276 (11th Cir. 2010) ........................................................... 56

*Fischer v. United States*,
  144 S. Ct. 2176 (2024) ......................................................................... 31

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
  554 U.S. 33 (2008) ......................................................................... 20, 32

iv

*FMC v. Seatrain Lines, Inc.*,
   411 U.S. 726 (1973) ............................................................... 42

*Freytag v. Comm'r*,
   501 U.S. 868 (1991) ............................................................... 12

*Garcia v. Vanguard Car Rental USA, Inc.*,
   540 F.3d 1242 (11th Cir. 2008) ........................................... 31

*Georgia v. President of the United States*,
   46 F.4th 1283 (11th Cir. 2022) ...................................... 11, 58

*Greene v. McElroy*,
   360 U.S. 474 (1959) ............................................................... 42

*In re Grand Jury Investigation*,
   916 F.3d 1047 (D.C. Cir. 2019) ........................................... 59

*In re Olson*,
   818 F.2d 34 (D.C. Cir. 1987) ............................................... 48

*In re Persico*,
   522 F.2d 41 (2d Cir. 1975) ................................... 16, 17, 47,

*In re Sealed Case*,
   829 F.2d 50 (D.C. Cir. 1987) ................................. 52, 58, 59

*INS v. Lopez-Mendoza*,
   468 U.S. 1032 (1984) ............................................................ 54

*Johnson v. United States*,
   576 U.S. 591 (2015) ............................................................... 53

*Jones v. Hendrix*,
   599 U.S. 465 (2023) ............................................................... 11

*Kucana v. Holder*,
   558 U.S. 233 (2010) ............................................................... 12

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ......................................................... 40

*Lucia v. SEC*,
   585 U.S. 237 (2018) ....................................................... 30, 37

*Maine v. Thiboutot,*
    448 U.S. 1 (1980) ................................................................ 55

*Mickens v. Taylor,*
    535 U.S. 162 (2002) ............................................................ 57

*Morrison v. Olson,*
    487 U.S. 654 (1988) ...................................................... 2, 8, 43, 60

*N. Carolina Dep't of Transp. v. Crest St. Cmty. Council, Inc.,*
    479 U.S. 6 (1986) ............................................................... 42

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
    595 U.S. 109 (2022) ............................................................ 12

*New York v. United States,*
    505 U.S. 144 (1992) ............................................................ 44

*Nixon v. United States,*
    418 U.S. 683 (1974) ................................... 3, 5, 8, 50, 52, 53, 55, 58, 59

*Pa. Dep't of Corr. v. Yeskey,*
    524 U.S. 206 (1998) ............................................................ 32

*Paresky v. United States,*
    995 F.3d 1281 (11th Cir. 2021) ............................................... 57

*Pulsifer v. United States,*
    601 U.S. 124 (2024) ............................................................ 21

*Regions Bank v. Legal Outsource PA,*
    936 F.3d 1184 (11th Cir. 2019) ............................................... 44

*Rudolph v. United States,*
    92 F.4th 1038 (11th Cir. 2024) ............................................... 52

*Schwab v. Crosby,*
    451 F.3d 1308 (11th Cir. 2006) ........................................... 56, 57

*SEC v. Sloan,*
    436 U.S. 103 (1978) ............................................................ 41

*Seed v. EPA,*
    100 F.4th 257 (D.C. Cir. 2024) ............................................... 57

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ............................................................ 18

*Tennessee Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ............................................................ 41

*Trump v. United States*,
    144 S. Ct. 2312 (2024) ............. 3, 7, 10, 11, 12, 14, 21, 30, 36, 43, 60, 61

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ...................................................... 22, 27

*United States v. Concord Mgmt. & Consulting LLC*,
    317 F. Supp. 3d 598 (D.D.C. 2018)........13, 15, 18, 21, 29, 30, 36, 59, 62

*United States v. Crosthwaite*,
    168 U.S. 375 (1897) ...................................................... 45, 46

*United States v. Garcon*,
    54 F.4th 1274 (11th Cir. 2022) ............................................ 29

*United States v. Janssen*,
    73 M.J. 221 (C.A.A.F. 2014) ........................................... 37, 38

*United States v. Kaley*,
    579 F.3d 1246 (11th Cir. 2009) ........................................... 56

*United States v. Manafort*,
    321 F. Supp. 3d 640 (E.D. Va. 2018).................................... 52

*United States v. McIntosh*,
    833 F.3d 1163 (9th Cir. 2016) ............................................ 64

*United States v. Rochell*,
    852 F. App'x 446 (11th Cir. 2021) ...................................... 60

*United States v. Rosenthal*,
    121 F. 862 (S.D.N.Y. 1903)............................................ 15, 16, 17, 26

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ................................................... 54, 55

*United States v. Virginia-Carolina Chem. Co.*,
    163 F. 66 (M.D. Tenn. 1908)........................................... 27, 28

vii

*United States v. Ward,*
  448 U.S. 242 (1980) ....................................................... 54

*United States v. Winston,*
  170 U.S. 522 (1898) ....................................................... 47

*Verdugo-Urquidez, INS v. Lopez-Mendoza,*
  468 U.S. 1032 (1984) ............................................... 54, 55

*Weiss v. United States,*
  510 U.S. 163 (1994) ....................................................... 13

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ................................................. 11, 12

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ....................................................... 31

*Yates v. United States,*
  574 U.S. 528 (2015) ....................................................... 32

**Statutes & Rules:**

5 U.S.C. § 296 (1925 ed.) ................................................. 24

5 U.S.C. § 298 (1925 ed.) ................................................. 24

5 U.S.C. § 300 (1925 ed.) ................................................. 34

5 U.S.C. § 301 ........................................................... 36, 50

5 U.S.C. § 310 ............................................................... 27

5 U.S.C. § 312 (1925 ed.) ................................................. 24

5 U.S.C. § 315 (1925 ed.) ............................................. 24, 27

5 U.S.C. § 340 (1934 ed.) ................................................. 34

5 U.S.C. § 3101 ......................................................... 37, 38

5 U.S.C. § 3105 ............................................................. 37

7 U.S.C. § 610(a) ......................................................... 6, 29

18 U.S.C. § 1519 ........................................................... 32

18 U.S.C. § 201(a)(1) ..................................................... 29

18 U.S.C. § 4041 ............................................................... 29

20 U.S.C. § 3461 ................................................................. 6

20 U.S.C. § 3461(a) .......................................................... 29

28 U.S.C. § 503 ........................................... 6, 13, 21, 28

28 U.S.C. § 504 ........................................... 6, 13, 21, 28

28 U.S.C. § 505 ........................................... 6, 13, 21, 28

28 U.S.C. § 506 ........................................... 6, 13, 21, 28

28 U.S.C. § 507 ............................................................... 13

28 U.S.C. § 509 ............................ 4, 21, 37, 44, 55, 56, 58

28 U.S.C. § 510 ................................. 4, 37, 44, 55, 56, 59

28 U.S.C. § 515 ....................... 4, 6, 14, 21, 27, 44, 56, 58, 59

28 U.S.C. § 515(a) ......................... 14, 15, 17, 18, 28, 50

28 U.S.C. § 515(b) ................. 18, 19, 20, 21, 22, 24, 26, 27, 28

28 U.S.C. § 516 ............................................................... 29

28 U.S.C. § 532 ........................................................ 12, 30

28 U.S.C. § 533 ........................ 4, 13, 30, 31, 34, 35, 44, 56

28 U.S.C. § 533(1) .............................. 7, 29, 30, 36, 55

28 U.S.C. § 533(2) .......................................................... 34

28 U.S.C. § 533(4) .......................................................... 34

28 U.S.C. § 535 ............................................................... 29

28 U.S.C. § 541 ............................................................... 13

28 U.S.C. § 542 ............................................................... 14

28 U.S.C. § 543 ................. 6, 7, 13, 15, 19, 22, 23, 25, 30, 45, 51

28 U.S.C. § 543(a) ...................................................... 15, 22

28 U.S.C. § 546(a) .......................................................... 13

28 U.S.C. § 591 ............................................................... 64

42 U.S.C. § 913 ...................................................................... 6, 29

49 U.S.C. § 323(a) ..................................................................... 29

28 C.F.R. § 600.6 ...................................................................... 61

28 C.F.R. § 600.7(b) .................................................................. 62

28 C.F.R. § 600.8(c) .................................................................. 63

28 C.F.R. §§ 600.4-600.10 .......................................................... 4

15 Fed. Reg. 3173 ..................................................................... 39

38 Fed. Reg. 14,688 ................................................................... 50

38 Fed. Reg. 30,738 ................................................................... 50

38 Fed. Reg. 32,805 ................................................................... 50

10 Stat. 161 ............................................................................. 45

12 Stat. 285 .............................................................. 23, 25, 45

16 Stat. 497 ............................................................................. 33

34 Stat. 816 ............................................................................. 17

35 Stat. 317 ............................................................................. 33

36 Stat. 108 ............................................................................. 23

41 Stat. 1156 ........................................................................... 34

43 Stat. 5 ................................................................................ 43

44 Stat. 777 ............................................................................. 27

46 Stat. 170 ............................................................................. 27

46 Stat. 554 ............................................................................. 34

49 Stat. 77 .............................................................................. 34

62 Stat. 862 ............................................................................. 32

63 Stat. 203 ............................................................................. 38

64 Stat. 1261 ........................................................................... 39

64 Stat. 1262 ........................................................................... 39

65 Stat. 268...................................................................................48

80 Stat. 378...................................................................................27

80 Stat. 631...................................................................................32

82 Stat. 1367.................................................................................39

101 Stat. 1329...............................................................................64

Executive Order 6166....................................................................34

Executive Order 10327...........................................................47, 48

Revised Statutes § 359 (1874).......................................................16

Revised Statutes § 363 (1874)........................... 16, 19, 23, 45, 47

Revised Statutes § 366 (1874)........................................ 19, 26, 27

Revised Statutes § 367 (1874).................................................15, 16

Revised Statutes § 385 (1874).......................................................23

**Legislative Sources:**

15 Cong. Rec. 5593 (1884) ...........................................................19

44 Cong. Rec. 4541 (1909) ...........................................................46

98 Cong. Reg. 1020 (1952).............................................................48

98 Cong. Rec. A1093 (1952)..........................................................48

119 Cong. Rec. 16750-51 (1973) ...................................................49

Cong. Globe, 41st Cong., 2d Sess. 3035 (1870) ..........................38

Cong. Globe, 41st Cong., 2d Sess. 3036 (1870) ..........................24

H.R. Doc. No. 58-383 (1904) ........................................................46

H.R. Doc. No. 81-504 (1950) ........................................................39

H.R. Rep. No. 59-2901 (1906).......................................................17

H.R. Rep. No. 60-2320 (1909).......................................................33

H.R. Rep. No. 71-229 (1930).........................................................27

H.R. Rep. No. 100-316 (1987)......................................................65

Hearings Before the Senate Comm. on the Judiciary, 93rd Cong., 1st Sess. (1973) ................................................................. 49

S. Rep. No. 89-1380 (1966) ............................... 21, 27, 28, 35, 39

**Other Authorities:**

8 Op. O.L.C. 175 (1984) ................................................... 34

13 Op. O.L.C. 163 (1989) ................................................. 36

13 Op. O.L.C. 54 (1989) ................................................... 35

17 U.S. Op. Att'y Gen. 504 (1883) ..................................... 19

19 Op. O.L.C. 33 (1995) ................................................... 36

20 Op. O.L.C. 242 (1996) ................................................. 36

21 Op. Att'y Gen. 195 (1895) ........................................... 45

1919 Att'y Gen. Rep. 427-32 ............................................ 23

Att'y Gen. Order No. 518-73 ....................................... 49, 50

Att'y Gen. Order No. 5559-2022 .......................................... 4

Brief Amicus Curiae of Former Attorney General Edwin Meese III, et al., *Trump v. United States*, No. 23A745 (Feb. 20, 2024) ...................... 2

Brief for United States, *Nixon v. United States*, Nos. 73-1766, 73-1834, 1974 WL 174854 ....................................... 55, 56

Bryan A. Garner et al., The Law of Judicial Precedent (2016) ............. 54

ECF No. 191, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Dec. 27, 2023) ........................................................ 62

FBI, Frequently Asked Questions: Where is the FBI's authority written down? ............................................................. 35

Hanna Panreck, *Biden's 'lock him up' remark about Trump was 'profoundly stupid thing' to say: CNN analyst*, Fox News (Oct. 23, 2024) ......................................................... 1

Jed Handelsman Shugerman, *The Creation Of The Department Of Justice: Professionalization Without Civil Rights Or Civil Service*, 66 Stan. L. Rev. 121 (2014) ......................................... 44, 49

*Justice Kagan and Judges Srinivasan and Kethledge Offer Views from the Bench*, Stanford Lawyer (May 30, 2015)........................................61

O.L.C. Mem. Oct. 26, 1993 ........................................................40

Press Release, DOJ, Appointment of a Special Counsel (Nov. 18, 2022)....................................................................................62

*Special Counsel and Permanent Indefinite Appropriation,* B-302582, 2004 WL 2213560 (Sept. 30, 2004) .....................................................65

Statements of Expenditures, Special Counsel's Office, DOJ ..................5

Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment as Special Counsel Was Unlawful*, 95 Notre Dame L. Rev. 87 (2019)..2

Transcript of Oral Argument, *Trump v. United States*, No. 23-939 ......61

**Introduction**

There is not, and never has been, a basis for Jack Smith's unlawful crusade against President Trump.[1]  For almost two years, Smith has operated unlawfully, backed by a largely unscrutinized blank check drawn on taxpayer dollars.  More than $36 million has been spent unjustly targeting the leading candidate in the 2024 Presidential election, President Trump, through unprecedented encroachments on Executive power, with President Biden wrongly and inappropriately urging to "lock him up" only days before the filing of this brief as part of the election-interference strategy.[2]

In the most thorough judicial treatment of these issues that exists, the district court explained why Smith's actions violated the Constitution's Appointments and Appropriations Clauses and dismissed this case.  At least one Supreme Court Justice, two former Attorneys

---

[1] President Trump respectfully submits this brief jointly on behalf of himself and Appellees Waltine Nauta and Carlos De Oliveira, who join the brief in its entirety.

[2] Hanna Panreck, *Biden's 'lock him up' remark about Trump was 'profoundly stupid thing' to say: CNN analyst*, Fox News (Oct. 23, 2024), https://www.foxnews.com/media/bidens-lock-him-up-remark-about-trump-profoundly-stupid-thing-say-cnn-analyst.

General who administered the laws at issue, and several prominent legal scholars, among others, support the same, correct conclusions.[3]

"Frequently an issue of this sort will come before the Court clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis. But this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).[4] Smith's unlawful appointment and conduct perpetuate all the evils that Justice Scalia's prophetic *Morrison* dissent predicted. *See id.* at 727-34. Like Presidential immunity, this appeal concerns issues that present risks to the "institution of the Presidency" and will have "enduring consequences upon the balanced power structure

---

[3] *See, e.g.*, Br. Amicus Curiae of Former Attorney General Edwin Meese III, et al., *Trump v. United States*, No. 23A745 (Feb. 20, 2024); Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment as Special Counsel Was Unlawful*, 95 Notre Dame L. Rev. 87, 124 (2019); Dkt. 586.

[4] Unless otherwise indicated, all case citations omit internal quotations and internal citations. "Br." refers to Appellant's opening brief on appeal. "Op." refers to the district court's opinion (Dkt. 672) as paginated in Appellant's appendix. "Tr." refers to the transcript of the district court's June 21, 2024 motions hearing (Dkt. 647), as paginated in Appellee's supplemental appendix.

of our Republic." *Trump v. United States*, 144 S. Ct. 2312, 2326, 2341 (2024).

While presenting little more than a regurgitation of arguments that the district court thoughtfully rejected, the brief of the Special Counsel's Office ("SCO") offers casual and dismissive treatment of the serious separation-of-powers problems arising from Smith's unlawful appointment and funding. Br. 41-42. They do so notwithstanding Justice Thomas's explicit concerns about the appointment, and his warning that "[w]e must respect the Constitution's separation of powers in all its forms, else we risk rendering its protection of liberty a parchment guarantee." *Trump*, 144 S. Ct. at 2352 (Thomas, J., concurring).

In order to prevent that danger from coming to fruition, this Court should affirm. The Appointments Clause requires that officers be appointed "by Law." No statute supports Smith's appointment. That is why SCO's brief starts by emphasizing a sentence from *Nixon v. United States*, 418 U.S. 683 (1974), that, respectfully, cannot qualify as anything but unreasoned and unpersuasive dictum. Moreover, even if Smith is a valid officer—which he is not—he is a principal rather than an inferior officer in light of his lack of supervision and nearly unlimited jurisdiction

3

and tenure. However, he has not received the required Presidential appointment followed by advice and consent from the Senate. Finally, the terms of the permanent indefinite appropriation do not apply, so Smith's expenditure of tens of millions of dollars of public funds is unconstitutional. Accordingly, this Court should affirm.

## Statement Of The Case

### I. Appointment Order

On November 18, 2022—just three days after President Trump announced his candidacy in the 2024 Presidential election—Attorney General ("AG") Garland purported to appoint Smith as a "Special Counsel" to "prosecute federal crimes arising from the investigation[s]" targeting President Trump. AG Order No. 5559-2022 at 2 (the "Appointment Order"). In the Appointment Order, AG Garland cited 28 U.S.C. §§ 509, 510, 515, and 533, and directed that Smith is subject to 28 C.F.R. §§ 600.4-600.10 (the "Special Counsel Regulations").

According to publicly available Statements of Expenditures, for the period from November 2022 through March 2024, only, Smith's "Office"

has spent $19.44 million.[5]  The Statements of Expenditures disclose an additional $16.31 million in "DOJ component expenses" that are "attributable to this investigation."  SCO has not disclosed expenditures during the last seven months for either of the above categories.

## II.    The District Court's Dismissal

After approximately a year of costly and time-consuming litigation over SCO's discovery failures, unprecedented disregard of the Presidential Records Act, and related motion practice over Constitutional violations by Jack Smith and his team, the district court held that "Smith's prosecution of this action breaches two structural cornerstones of our constitutional scheme"—the Appointments Clause and the Appropriations Clause.  Op. 91.

The district court concluded that "[n]one of the statutes cited as legal authority for the appointment" complied with the Appointments Clause.  Op. 2.  "Nor do the Special Counsel's strained statutory arguments, appeals to inconsistent history, or reliance on out-of-circuit authority persuade otherwise."  *Id.*

---

[5] Statements of Expenditures, Special Counsel's Office, DOJ, https://www.justice.gov/sco-smith.

Separately, the court identified "compelling reasons" to conclude that Smith is a principal officer, which would also "violate the Appointments Clause without question." Op. 80-81.

As to the Appropriations Clause, the district court held that "Smith's investigation has unlawfully drawn funds from" the 1987 permanent indefinite appropriation relating to the Independent Counsel Act. Op. 87.

## Summary Of Argument

Smith was not appointed "by Law" under the Appointments Clause. A grant of inferior-officer appointment authority requires explicit authorization from Congress, and nothing short of that will suffice under the major questions doctrine and related clear-statement rules. Congress has satisfied these requirements, intentionally, by explicitly providing for the appointment of principal and inferior officers in Title 28 and elsewhere. *See, e.g.*, 28 U.S.C. §§ 503-506, 542-543; 7 U.S.C. § 610(a); 20 U.S.C. § 3461; 42 U.S.C. § 913. However, none of those provisions authorized the AG to appoint a private citizen as special counsel in order to target a former President, and leading Presidential candidate, by using

power that exceeds the authority granted to Presidentially-appointed and Senate-confirmed U.S. Attorneys.

The statutes cited in the Appointment Order are "of a general nature" and do not pass muster. *Trump*, 144 S. Ct. at 2350 (Thomas, J., concurring). 28 U.S.C. §§ 509-510 are "generic provisions concerning the functions of the Attorney General . . . ." *Id.* Both paragraphs of 28 U.S.C. § 515 refer to attorneys from offices "created by some other law." *Id.* at 2351. 28 U.S.C. § 533(1) relates to FBI personnel, only, and "would be a curious place for Congress to hide the creation of an office for a Special Counsel." *Id.* None of these statutes creates an independent source of appointment authority, much less clearly so.

The enactment histories of these and related provisions confirm the district court's conclusions. Dating back to the Civil War, AG appointments of outside counsel focused on providing assistance to local federal prosecutors. Today, that authority is set forth in a statute not relied upon by SCO, 28 U.S.C. § 543. There are several instances where Congress expressly provided for special counsel-type appointments. In 1924, during a period that SCO falsely mischaracterizes as involving widespread appointment practices consistent with the Appointment

7

Order, Congress passed a specific law calling for the appointment of a special counsel to investigate the Teapot Dome Scandal. SCO confines that episode to a footnote. Br. 52 n.23. In 1978, Congress passed the Independent Counsel Act, which led to the statutorily authorized appointment of several special counsel until the Act expired in 1999.

To the extent SCO has identified exceptions, they are outliers where "[p]olitical pressures produced special prosecutors . . . ." *Morrison*, 487 U.S. at 711 (Scalia, J., dissenting). Watergate investigations are one example, but heavy congressional involvement in those appointments, which did not occur here, mitigated separation-of-powers concerns. Watergate spawned *United States v. Nixon*, where the Supreme Court assumed in a single sentence, without analysis, on an uncontested issue—which mischaracterized the statutes actually cited in the relevant appointment order—that the same provisions the AG cited to appoint Smith were adequate for the task. The *Nixon* dictum is unpersuasive and non-binding, as are the out-of-circuit cases that applied it.

Congress cannot acquiesce in Appointments Clause violations. The Constitution does not allow it. But Congress did not acquiesce. They focused on a different issue. Beginning with Watergate and for more

than 20 years, Congress prioritized independence of special counsel from the Executive branch. That priority, along with the explicit appointment mechanism provided for in the Independent Counsel Act, diminished focus on other statutory authority for inferior-officer appointments. Although no explanation is necessary, this contextualizes Congress's failure to expend political capital on potentially unpopular actions to rein in criminal investigations in the manner accomplished by the district court's absolutely correct decision.

The dismissal should also be affirmed on the basis that Smith's role violates the Appointments Clause because he operates as a principal officer without Presidential nomination and Senate confirmation. Smith has operated without the type of oversight and accountability that are hallmarks of inferior officers. Unless and until removed, the duration of Smith's tenure is largely up to him. His expansive jurisdiction exceeds that granted to U.S. Attorneys, who are principal officers, including his ability to operate in multiple districts as well as his ability to use Senate-confirmed U.S. Attorneys as force multipliers by making referrals under the unlawful Appointment Order.

Finally, Smith violated the Appropriations Clause.  In addition to relying on more than $16 million in funds from unspecified "DOJ components," Smith has taken more than $20 million from a 1987 DOJ permanent indefinite appropriation that requires an appointment pursuant to the lapsed Independent Counsel Act or some "other law."  He meets neither requirement.  The appropriation also requires that Smith be "independent," in the particular, rigorous sense that attorneys appointed pursuant to the Act were meant to be independent.  He fails that standard too.  For this additional reason, this Court should affirm.

**Argument**

## I.    Smith Was Not Appointed "By Law"

Smith was not appointed "by Law" under the Appointments Clause. Consistent with the original public meaning and historical understanding of the Clause, it is undisputed that a statute from Congress is required.  Op. 15; *see also Trump*, 144 S. Ct. at 2348-50. Other recent decisions from the Supreme Court establish that, because the division of labor mandated by the Appointments Clause implicates the separation of powers, only a *clear statement* from Congress will

10

suffice.  Because there is no such clear statement in the text of the statutes at issue, the Appointment Order is unconstitutional and invalid.

## A. Congress Has Not Provided The Required Clear Statement

This appeal fails based on "a well-established principle of statutory interpretation: we expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Georgia v. President of the United States*, 46 F.4th 1283, 1295 (11th Cir. 2022); *see also West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022) (major-questions doctrine); Op. 18 & n.17.

"None of the statutes cited by the Attorney General appears to create an office for the Special Counsel, and especially not with the clarity typical of past statutes used for that purpose." *Trump*, 144 S. Ct. at 2350 (Thomas, J., concurring).  Clear-statement rules apply "when a statute implicates historically or constitutionally grounded norms that we would not expect Congress to unsettle lightly." *Jones v. Hendrix*, 599 U.S. 465, 492 (2023); *see also Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991).  This appeal implicates such norms because the Appointments Clause "is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659

(1997); *see also Freytag v. Comm'r*, 501 U.S. 868, 878 (1991). These concerns "caution . . . against reading legislation, absent clear statement, to place in executive hands" the authority to appoint officers and establish offices like the one Smith occupies. *Kucana v. Holder*, 558 U.S. 233, 237 (2010). As there is no statutory authority for the Appointment Order, this is an instance of "the Executive seizing the power of the Legislature." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023).

The Appointment Order was "no everyday exercise of federal power." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "A private citizen cannot criminally prosecute anyone, let alone a former President," unless "duly authorized to do so by the American people." *Trump*, 144 S. Ct. at 2348 (Thomas, J., concurring). The AG named a private citizen to target a former President and leading Presidential candidate, based on official acts pursuant to exclusive Executive power, at a time when that former President was campaigning to take the White House back from the AG's boss. "[S]omething more than a merely plausible textual basis for the agency action is necessary." *West Virginia v. EPA*, 597 U.S. at 723. Therefore, this Court should affirm because there is no such clear statement from Congress.

## B. Congress Provided For Many Appointments, But Not Smith's

SCO's efforts to concoct a statutory basis for Smith's appointment "contrast[] sharply with the numerous other statutes that do confer the power to appoint in a straightforward manner." *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 621 (D.D.C. 2018).

Several provisions of Title 28 track the principal-officer language of the Appointments Clause by requiring Presidential appointment as well as advice and consent from the Senate. *See* 28 U.S.C. §§ 503, 504, 504a, 505, 506, 541. "Congress repeatedly has demonstrated its ability to imbue the Attorney General with appointment power over officers and employees." Op. 32; *see* 28 U.S.C. §§ 507, 532, 542, 543, 546(a).

SCO does not rely on any of these provisions. Instead, in violation of the separation of powers, SCO asks this Court to authorize an appointment that Congress did not provide for. These explicit officer-appointment statutes—coupled with the clear-statement rule—"negate[] any permissible inference that Congress intended" a more general source of authority for Smith's appointment, "but in a fit of absentmindedness forgot to say so." *Weiss v. United States*, 510 U.S. 163, 172 (1994).

## C. Section 515 Did Not Authorize Smith's Appointment

Neither of § 515's two paragraphs authorized Smith's appointment. SCO's alternative invitation to read § 515 "as a whole" also fails.  Br. 10, 21.  SCO's arguments stray from the statutory text and are inconsistent with the separate enactment histories of the two paragraphs.

### 1. Section 515(a) Concerns Territory, Not Appointments

Section 515(a) is not an independent source of appointment power. SCO concedes, as the district court explained, that the "primary purpose" of § 515(a) is to create territorial flexibility.  Br. 22; Op. 25.  Specifically, the provision provides the AG and two other categories of DOJ attorneys with authority to conduct proceedings around the country.

The first category, "officer[s] of the Department of Justice," refers to the officers whose appointments Congress explicitly authorized in other provisions.  *See, e.g.*, 28 U.S.C. § 542.  The second category of DOJ attorneys referenced in § 515(a) also refers to an external source of appointment authority—attorneys who are "specially appointed by the Attorney General under law."  *See* Op. 25 n.20; *Trump*, 144 S. Ct. at 2350-51 (Thomas, J., concurring) (reasoning that language of § 515(a) "suggest[s] that such an attorney's office must have already been created

by some other law"); *Concord Mgmt.*, 317 F. Supp. 3d at 621 (reasoning that a contrary interpretation of "under law" would render the phrase "surplusage" and "superfluous"). "[U]nder law," 28 U.S.C. § 515(a), is a refence to 28 U.S.C. § 543, which is titled "Special attorneys" and authorizes the AG to "appoint attorneys to assist United States attorneys." 28 U.S.C. § 543(a); *see also id.* § 519. The Appointment Order does not reference § 543 and SCO has not relied on it. *See* Op. 21, 31.

### 2. Section 515(a)'s Predecessors Did Not Establish Appointment Authority

Section 515(a) is derived from DOJ Act § 5, which authorized the AG to "sen[d]" the Solicitor General or other DOJ "officer[s]" to represent the United States in state or federal court. In 1874, this authority was moved to Revised Statutes § 367. Neither DOJ Act § 5 nor Revised Statutes § 367 provided appointment authority.

In 1903, a federal district court held that the Revised Statutes, including § 367, did not authorize an attorney to participate in grand jury proceedings. *See United States v. Rosenthal*, 121 F. 862, 867 (S.D.N.Y. 1903). *Rosenthal* is not, as SCO claims, evidence of a widespread historical practice similar to Smith's appointment. Br. 44. The decision reflects a lack of clarity about the statutory basis for the attorney's

retention,[6] and the court held that the attorney at issue was "not an 'officer' within the meaning of [Revised Statutes §§ 359, 367]." 121 F. at 867.

Similar to the district court's reasoning here, Op. 19-22, the *Rosenthal* court pointed to the provisions of the Revised Statutes that specifically authorized the appointment of DOJ officers, 121 F. at 867. Far from relying on an established practice under existing statutes, the government resorted to the argument that the attorney was a "de facto officer." *Id.* at 869; *see* Op. 84-85 (rejecting de facto officer doctrine). The court rejected that contention. 121 F. at 869. SCO's analogy between the prosecutor in *Rosenthal* and Smith is unconvincing for the additional reason that the Second Circuit later observed that the facts of *Rosenthal* were "peculiar." *In re Persico*, 522 F.2d 41, 58 (2d Cir. 1975). The prosecutor had "obtain[ed] indictments against competitors" of the merchants who initiated the attorney's retention, and the case illustrated

---

[6] Although the court asserted that the attorney had not been appointed pursuant to Revised Statutes § 363, as someone assisting the U.S. Attorney, there were indications to the contrary. *See* 121 F. at 869. The U.S. Attorney appeared on behalf of the United States in *Rosenthal*. *Id.* at 862; *see also id.* at 865 (noting that the attorney operated "with the sanction and co-operation of the District Attorney").

16

the "danger" of "permitting private persons to use the grand jury for their own purposes." *Id.*

Three years after *Rosenthal*, Congress passed a responsive law that largely tracked the current version of § 515(a). *See* 34 Stat. 816. SCO points to language in the accompanying 1906 House Report affirming the "advisability of permitting the Attorney-General to employ special counsel in special cases." Br. 45 (quoting H.R. Rep. No. 59-2901, at 2). However, that was clearly not a reference to a "special counsel" like Smith. The legislation was directed at "any attorney specially employed" by the AG "to assist district attorneys." H.R. Rep. No. 59-2901, at 1. At the time, the AG's ability to employ such attorneys was provided for in Revised Statutes § 363—the predecessor to current 28 U.S.C. § 543— which referred to attorneys "employ[ed] and retain[ed]" by the AG to "assist the district attorneys in the discharge of their duties." No language in the Report or the corresponding legislation suggests that the enactment was intended to provide an independent source of appointment authority.

17

### 3. Section 515(b) Is Not A Source Of Appointment Power

Section 515(b) does not establish appointment authority for Special Counsels.  According to its plain language, the provision sets forth requirements relating to titles for commissions, oath, and salary for attorneys who are "specially retained" pursuant to a separate "authority of the Department of Justice."  Op. 27; *Concord Mgmt.*, 317 F. Supp. 3d at 621.

In the context of a chapter of the U.S. Code that repeatedly uses the operative word, the term "appoint" is "[c]onspicuously absent" from § 515(b).  *Edmond*, 520 U.S. at 657.  In a weak effort to overcome that omission, SCO argues that "retained" in § 515(b) is "synonymous[]" with "appointed" in § 515(a).  Br. 22.  There is no textual basis for that claim.  "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004).

The only authority SCO offers is an 1883 opinion from AG Benjamin Brewster asserting that the difference between "appoint" and a third word, "employ," is "unimportant."  Br. 22.  Whereas SCO elsewhere forecasts that calamity will follow from the district court's correct

18

interpretations, *see* Br. 33-41, here SCO endorses an untenable view that would subject every government "employ[ee]" to the Appointments Clause, Br. 22. Brewster's opinion was not that broad, and it does not support SCO. He cited Revised Statute § 363 (predecessor to 28 U.S.C. § 543), and he did not suggest that any of the existing versions of the statutes relied upon by SCO provided for appointments. Brewster also conceded that his opinion was only "sometimes" accurate. 17 U.S. Op. Att'y Gen. 504 (1883). In fact, there was disagreement on that point during a congressional debate the year after Brewster issued the opinion. *See* 15 Cong. Rec. 5593 (1884).[7]

Section 515(b) does not create the "power to issue a commission," much less an appointment. Br. 20. The statute identifies the titles that a "specially retained" attorney "shall" be "commissioned as": "special assistant to the Attorney General" or "special attorney." 28 U.S.C.

---

[7] Describing Revised Statutes § 363 (predecessor to 28 U.S.C. § 543), Representative Mortimer Elliott argued: "This section says 'shall employ and retain.' Now, to employ does not mean to appoint to an office, any more than to retain a lawyer means to appoint him to fill an office." 15 Cong. Rec. 5595. Although Elliott's point was disputed, the other side conceded that "[t]he appointment or employment is provided by section 363 of the Revised Statutes, and his duties are prescribed by section 366 [predecessor to 28 U.S.C. § 515(b)]." *Id.* at 5598.

19

§ 515(b). SCO's citation of *Marbury v. Madison* does not suggest otherwise. Br. 20. The case addressed the President's obligations under the Commissions Clause, art. II, § 3, and has no bearing on the plain meaning of § 515(b). Op. 29-30. SCO seeks to build on their meritless commission "power" argument to contend that the language of § 515(b) contemplates that an appointment has already "been made." Br. 20. But that argument does not establish the source of the alleged appointment authority and does not undercut the district court's reasoning that the authority for such an appointment must come from elsewhere.

Despite making these concessions about the sequence contemplated by § 515(b)—appointment followed by issuance of a commission, oath, and salary determination—SCO later takes the opposite approach by criticizing the district court's finding that "retained" in § 515(b) is past-tense. Br. 26 & n.3. The district court's interpretation, however, reflects the plain and ordinary meaning of the statute—that it refers to attorneys who have *already* been "retained" pursuant to some *other* source of "authority." The fact that "retained" is a past participle does not establish its tense. *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39, 41 (2008) (holding that "Florida has the better"

interpretation based on assertion that "past participle indicates past or completed action").

Even a present-tense formulation of retained would not establish error. "Regardless whether § 515 refers to past or present conditions, it does not appear to convey the power to bring those conditions about." *Concord Mgmt.*, 317 F. Supp. 3d at 621; *see also Pulsifer v. United States*, 601 U.S. 124, 133 (2024) (reasoning that "[t]he choice between" competing interpretations "is not a matter of grammatical rules"). To the extent "retained" is viewed in present-tense, "[u]se of the present tense, as opposed to the past, was likely a stylistic rather than a substantive choice." *Brown v. United States*, 602 U.S. 101, 120 (2024); *see also* S. Rep. No. 89-1380, at 19 (1966) (explaining that, "[a]s far as possible," Congress used "present tense" in connection with the legislation that moved the language in § 515(b) to Title 28).

Finally, SCO argues that the phrase "under authority of the Department of Justice" in § 515(b) is "necessarily" a reference to 28 U.S.C. §§ 503, 509. Br. 20. Section 503 simply makes the AG the "head" of DOJ, and § 509 is one of the "generic provisions concerning the functions of the Attorney General." *Trump*, 144 S. Ct. at 2350 (Thomas,

J., concurring).  It goes without saying that the procedural steps in § 515(b) relating to commission-title, oath, and salary cannot exceed the boundaries of DOJ's "functions and powers."  Br. 20.  Every provision in chapter 31 is subject to those generic limitations.  Therefore, SCO's flawed interpretation must be rejected because it would render the phrase "superfluous, void, [and] insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 449 (2001).

### 4. Smith Is Not A § 515(b) "Special Attorney"

Section 515(b) does not create appointment authority, and Smith has not played the role of either of the titles referenced in the provision. SCO does not argue that he is a "special assistant to the Attorney General" under § 515(b), and SCO is wrong that Smith is "like" the second available § 515(b) title, "special attorney."  Br. 20.

The term "special attorney," as used in § 515(b), is a specific reference to 28 U.S.C. § 543, titled "Special attorneys."  Section 543(a) authorizes the AG to appoint such attorneys, but only for a specific, limited purpose: "to assist United States attorneys when the public interest so requires."  SCO has conceded that Smith does not qualify.  He "was not appointed to assist a United States attorney."  Tr. 57.

The "special attorney" concept embodied in current § 543 dates back to at least 1861, when Congress "empowered" the AG to "employ and retain" attorneys "he may think necessary to assist the district-attorneys." 12 Stat. 285. In 1874, this language was transferred to Revised Statutes § 363. AGs relied extensively on this authority. For example, the 1919 AG Report cited by SCO, Br. 36 n.7, included six pages of disclosures pursuant to Revised Statutes § 385 naming special attorneys employed under § 363 to assist district attorneys. *See* 1919 AG Ann. Rep. 427-32. The report is an illustration of the fact that the "widespread" practice at the time, Br. 46, was for DOJ to rely on outside attorneys for a role that Smith and SCO never filled—assisting local federal prosecutors.

Over time, Congress provided for other types of special attorneys who also carried out functions far different from Smith's. DOJ Act § 7 transferred to DOJ the position of a "specially designated" attorney, "under the direction of the Attorney-General," responsible for postal matters. In 1909, Congress added a law permitting the AG to "employ and retain . . . special attorneys and counselors at law" to work on customs cases. 36 Stat. 108. These "special attorney" provisions were

transferred to the U.S. Code.  *See* 5 U.S.C. § 296 (1925 ed.) (customs cases); *id.* § 298 (postal cases).  The separate provision relating to "employ[ing]" lawyers to assist district attorneys was located at 5 U.S.C. § 312 (1925 ed.).  Therefore, in the very first edition of the U.S. Code, the phrase "specially retained" attorneys in the predecessor version of § 515(b)—5 U.S.C. § 315 (1925 ed.)—was a reference to 5 U.S.C. §§ 296, 298, 312 (1925 ed.) and not a source of appointment power for the AG. That has never changed, and SCO's argument to the contrary fails.

### 5. Section 515(b)'s Predecessor Statutes Were Not Used As A Source Of Appointment Authority

The enactment history of § 515(b) further supports the district court's conclusion.

Section 515(b) is derived from DOJ Act § 17.  When the DOJ Act was passed in 1870, there was no interest in expanding government employment of private prosecutors like Smith.  During congressional debate relating to the Act that he introduced, Representative Thomas Jenckes explained that one purpose of the law was to "do[] away with the employment of outside counsel."  Cong. Globe, 41st Cong., 2d Sess. 3036 (1870).  He described "going outside of the proper law force of the

Government"—and the related "unnecessary" expenditures—as an "evil" that the DOJ Act was intended to address. *Id.* at 3035, 3065.

Jenckes also confirmed that DOJ Act § 17 (predecessor to § 515(b)) addressed titles and referred to an external source of appointment power:

> [I]f the Attorney General, under the authority given him by *existing law*, shall employ assistant counsel in any district he *shall designate those counsel as* assistant district attorneys or assistants to the Attorney General, and give them commissions as such in the special business with which they are charged.

*Id.* at 3035 (emphasis added). By referencing "existing law," Jenckes was pointing to the above-described 1861 statute that today serves as the basis for appointment of "special attorneys." *See* 12 Stat. 285; 28 U.S.C. § 543. Jenckes' description of how an attorney should be "designate[d]" demonstrates, consistent with the text's plain meaning, that the instruction in § 515(b) regarding what "specially retained" attorneys "shall be commissioned as" concerns titles and not appointment power. Similarly, the text of the 1870 statute provided that attorneys "*shall receive* a commission." DOJ Act § 17 (emphasis added). This language contemplated a piece of paper reflecting the attorney's title and the scope of their work, which the attorney could "'possess'" and use as needed. Br.

21 (quoting *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 58 (2015) (Alito, J., concurring)).

Jenckes' comments during the debate on the DOJ Act also illustrate that Congress was focused on a particular role—attorneys helping local federal prosecutors—and did not see a meaningful distinction between giving those attorneys titles as assistants to the "district attorneys" or to the "Attorney General." This further undercuts SCO's argument that the reference to the title of "special attorney" in § 515(b) is some kind of freestanding role not elsewhere defined, which it is not. In fact, that role is a specific reference to the "special attorney" job of assisting federal prosecutors, now defined in 28 U.S.C. § 543.

Section 17 of the DOJ Act, as the precursor to current 28 U.S.C. § 515(b), was next moved to Revised Statutes § 366 in 1874. The 1903 decision in *Rosenthal* did not recognize Revised Statutes § 366 as a source of appointment authority. The court noted that § 366 only "mention[ed] a 'special assistant to the Attorney General'" in a way that "simply recognize[d] the contemplated special retainer" and included "direct[ions] concerning his commission, oath, and liabilities." 121 F. at 868. Five years later, a different judge reasoned more succinctly that Revised

26

Statutes § 366 "does not authorize the appointment of any one." *United States v. Virginia-Carolina Chem. Co.*, 163 F. 66, 73 (M.D. Tenn. 1908).

The predecessor to § 515(b) was located at 5 U.S.C. § 310 in connection with the 1925 edition of the U.S. Code. *See* 44 Stat. 777. In 1930, Congress added the "special attorney" title to 5 U.S.C. § 315 (1925 ed.). *See* 46 Stat. 170. The accompanying House Report made clear that the language did "not provide authority for any new appointments." H.R. Rep. No. 71-229, at 1 (1930); *see also* Op. 35 n.24. The AG "recommended" the "special attorney" language because he was concerned about "undesirable" limitations on what he could "designate"—*i.e.*, the title he could assign to—attorneys he specially retained pursuant to separate "special attorney" authorities such as those in 5 U.S.C. §§ 296, 298, 312 (1925 ed.). H.R. Rep. No. 71-229, at 1.

As part of the 1966 codification of Title 5, Congress transferred certain sections from Title 5 to Title 28 and combined the two paragraphs that now comprise § 515. 80 Stat. 378, 611-19. "[P]recautions" were "taken against making substantive changes in any statute." S. Rep. No. 89-1380, at 19; *see also id.* at 21. This codification practice contradicts SCO's efforts to stretch the meaning of § 515(b), by reading it "as a whole"

with the term "appointed" in § 515(a), because the provisions are not as related as their proximity suggests.

However, the Senate Report also demonstrates that Congress was attentive to the Appointments Clause and use of the term "appointment." S. Rep. No. 89-1380, at 201. Language was added to 28 U.S.C. § 503 "to conform the section with the Constitution," and language in the new 28 U.S.C. § 504 was changed from "may appoint" to "is authorized to appoint." *Id.* Thus, the absence of the word "appoint" in § 515(b) is not inadvertent. Congress did not view the paragraph as creating appointment power. And, in light of their separate enactment histories, interpreting § 515(a)-(b) "as a whole" does not lend support to SCO's flawed position. Br. 10, 21.

## D. Section 533(1) Did Not Authorize Smith's Appointment

Section 533(1) did not provide a basis for the Appointment Order. The statute allows the appointment of "officials" to "detect and prosecute crimes against the United States." This language applies to FBI personnel, not Smith. Smith's Office is mainly a group of lawyers. They do not "combine[] the typical roles of law enforcement and prosecutors by both investigating and prosecuting crimes." Br. 29. They rely on the FBI.

The plain text of § 533(1) does not cover Smith's appointment. The term "officials," as used in § 533(1), does not include "officers" like Smith. "Officer" is used elsewhere in the same chapter of the U.S. Code, and in chapter 31. *See, e.g.*, 28 U.S.C. §§ 516, 535; *Concord Mgmt.*, 317 F. Supp. 3d at 619-20. The choice of a different word in § 533(1) cannot be overlooked because, "ordinarily, a material variation in terms suggests a variation in meaning." *United States v. Garcon*, 54 F.4th 1274, 1279 (11th Cir. 2022). The distinction is supported by the fact that "Congress routinely uses the term 'officers,' or the phrase 'officers and employees' when vesting officer-appointing power in department heads" outside of Title 28. Op. 47; *see also, e.g.*, 7 U.S.C. § 610(a); 18 U.S.C. § 4041; 20 U.S.C. § 3461(a); 42 U.S.C. § 913; 49 U.S.C. § 323(a).

In response, SCO largely regurgitates the inapposite statutory citations that the district court already distinguished persuasively. *Compare* Br. 31 n.4, *with*, Op. 48-49 & n.40. In most instances where Congress has used "'officials' to confer officer-appointing power," "Congress *still* tracks the constitutional language of the Appointments Clause in a way that reflects officer status." Op. 48. SCO cites only one contrary example directly, 18 U.S.C. § 201(a)(1). Br. 30-31. But §

201(a)(1) is a definitional provision, which supports the district court's point. Congress elected to define "public official" to include "an officer or employee" because the plain meaning of the term "official" does not otherwise have the scope SCO prefers. *See Trump*, 144 S. Ct. at 2351 (Thomas, J., concurring) ("It is unclear whether an 'official' is equivalent to an 'officer' as used by the Constitution.").

The immediate context of § 533(1) demonstrates that the provision is not a valid basis for Smith's appointment. The other numbered paragraphs of § 533 plainly relate, not to officers, but instead to "security and investigative employees within the FBI—bureaucratic personnel making up the 'broad swath of lesser functionaries in the Government's workforce.'" Op. 45 (quoting *Lucia v. SEC*, 585 U.S. 237, 245 (2018)); *Concord Mgmt.*, 317 F. Supp. 3d at 620. SCO's efforts to wrongly assign unique breadth to § 533(1) among its neighbors would render superfluous the officer-specific provisions relating to the FBI and the rest of DOJ. *E.g.*, 28 U.S.C. §§ 532 (FBI Director), 542(a) (AUSAs), 543(a) (Special attorneys). As Justice Thomas observed, § 533(1) "would be a curious place for Congress to hide the creation of an office for a Special Counsel." *Trump*, 144 S. Ct. at 2351 (Thomas, J., concurring); *see also* Op. 42

30

("Congress 'does not . . . hide elephants in mouseholes.'" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001))).

All of the numbered paragraphs of § 533 are modified by language that prevents the FBI from "limit[ing] the authority of [other] departments and agencies to investigate crimes against the United States."[8]  The inclusion of language clarifying what § 533 "does not limit" demonstrates what § 533 affirmatively provides: investigative jurisdiction to the FBI, but not AG appointment authority under the Constitution for a special counsel with more power than a U.S. Attorney.

Another of the many reasons that § 533(1) is a curious place to stretch statutory language to invent appointment authority is that the provision is entitled "Investigative and other officials; appointment" and located in chapter 33—relating to the FBI—rather than in chapter 31 with the other DOJ-specific statutes that SCO cites.  SCO protests the district court's discussion of § 533's title and placement, Op. 50-52, but

---

[8] The district court properly relied on the *noscitur a sociis* canon, which is not limited to lists as SCO claims.  Br. 31; *see also Fischer v. United States*, 144 S. Ct. 2176, 2183-84 (2024) (distinguishing between *noscitur a sociis* and the "related canon of *ejusdem generis*"); *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1246-47 (11th Cir. 2008) (applying *noscitur a sociis* to non-list savings clause).

31

the case they cite supports such inferences "when [placement] sheds light on some ambiguous word or phrase" such as, in this instance, the term "official" in § 533.  Br. 32 (quoting *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)).  The district court's reasoning was therefore consistent with *Yeskey*, and the Supreme Court precedent the court cited.  Op. 51 (citing *Yates v. United States*, 574 U.S. 528, 540 (2015)); *Concord Mgmt.*, 317 F. Supp. 3d at 620 (citing *Piccadilly Cafeterias*).[9]

The district court's interpretation is also consistent with history. SCO does not quarrel with the court's observation that no appointment order prior to Smith's cited § 533.  Op. 42.  That is not an accident.  Long before the 1921 appropriations bill cited by SCO, Br. 32, the phrase "detect and prosecute crimes against the United States," 28 U.S.C. § 533(1), addressed the hiring and payment of investigative agents—not special counsel.

In 1871, after the passage of the DOJ Act, Congress used language that tracks current § 533(1) to appropriate funds to the Treasury

---

[9] In *Yates*, the Supreme Court relied on the heading of 18 U.S.C. § 1519 despite the fact that, like Title 28, Congress codified Title 18 with an instruction that no "inference of legislative construction" should be drawn from placement or title.  *Compare* Br. 33 (citing 80 Stat. 631), *with* 62 Stat. 862.

Department "to be expended under the direction of the Attorney General in the *detection and prosecution of crimes* against the United States."  16 Stat. 497 (emphasis added).  For decades after that, DOJ relied on Secret Service personnel from the Treasury Department to assist with investigations.  *See, e.g.*, H.R. Rep. No. 60-2320, at XXIII (1909) ("What are designated as 'special agents' in [DOJ] are secret-service men.").  In 1907, the AG argued to Congress that DOJ needed a "force of permanent police . . . for its work."  *Id.* at XXIV.  As this "New Special-Agent Force" was being developed in 1908, *id.*, Congress restricted DOJ's access to Secret Service agents by prohibiting payments to agents who had been "detailed or transferred" from the Treasury Department, 35 Stat. 317, 328.

In 1909, a House Select Committee reviewed these developments and pointed out that the investigative bodies of the Treasury Department and DOJ "exist[ed] without permanent authority of law."  H.R. Rep. No. 60-2320, at XXVII.  However, Congress made a specific appropriation for DOJ's agents in 1921 following the expansion of federal investigative jurisdiction under, *inter alia*, the Mann Act in 1910, the Espionage Act in 1917, and federal prohibition under the Eighteenth Amendment and

the Volstead Act beginning in 1919. The appropriation included funds for the "detection and prosecution of crimes," as well as the protective function now located at 28 U.S.C. § 533(2), and the "official matters" investigations currently at § 533(4). 41 Stat. 1156, 1175. Appointment authority for such "officials" was included in the 1925 edition of the U.S. Code, which also included the above-described provisions relating to specific types of special attorneys all unlike Smith. *See* 5 U.S.C. § 300 (1925 ed.); *see also id.* §§ 296, 298, 312.

In 1933, pursuant to Executive Order 6166, President Roosevelt reorganized and renamed DOJ's Bureau of Investigation the "Division of Investigation." Just as 28 U.S.C. § 533 is an FBI statute today, the Division was authorized to draw "from the appropriation 'Detection and prosecution of crimes' . . . ." 46 Stat. 554; 5 U.S.C. § 340 (1934 ed.). By that time, at least, the predecessor to § 533(1), was understood to be the source of "the Attorney General's authority to appoint 'investigative officials' . . . ." 8 Op. O.L.C. 175, 180 (1984).

In a 1935 appropriation of funds for the "[d]etection and prosecution of crimes," Congress gave the Division its modern name, the FBI. 49 Stat. 77. Congress moved the "detection and prosecution of crimes"

34

language to its current location in FBI-specific chapter 33, at 28 U.S.C. § 533, in connection with the 1966 codification of Title 5. S. Rep. No. 89-1380, at 208-09. In addition to naming chapter 33 "Federal Bureau of Investigation," the Senate Report described the history of the FBI and confirmed that the last sentence of 28 U.S.C. § 533 concerns jurisdictional division of labor between the FBI and "other departments and agencies." S. Rep. No. 89-1380, at 209.

Numerous other sources support the district court's interpretation of § 533 as an FBI-specific statute that cannot support Smith's appointment. Under a heading "Where is the FBI's authority written down?," the FBI website explains that "[f]ederal law gives the FBI authority to investigate all federal crime not assigned exclusively to another federal agency (28, Section 533 of the U.S. Code)."[10] Similarly, citing § 533, Justice Manual § 9-66.010 explains that, "[b]y statute and by regulation the FBI has broad jurisdiction over offenses involving government property." Several OLC opinions are in accord. *See, e.g.*, 13 Op. O.L.C. 54, 58 n.7 (1989) (explaining that the FBI "has general

---

[10] FBI, Frequently Asked Questions: Where is the FBI's authority written down?, https://www.fbi.gov/about/faqs/where-is-the-fbis-authority-written-down.

criminal investigative authority over all violations of federal law. 28 U.S.C § 533(1)").[11]

Based on the text, related interpretations by DOJ and FBI, and history, the district court correctly held that § 533(1) cannot justify the Appointment Order.

### E. Sections 509 And 510 Did Not Authorize Smith's Appointment

Congress has not vested the AG with a "general power to appoint inferior officers" under 28 U.S.C. §§ 509, 510. SCO's argument is inconsistent with the statutory text and stretches these provisions past their breaking point. Br. 33-42.

SCO did not make this "general appointment authority" argument below. *See* Dkt. 374 at 9-14. SCO now cites 5 U.S.C. § 301, Br. 33, but Smith's Appointment Order does not. In any event, the argument is meritless. These are "generic provisions." *Trump*, 144 S. Ct. at 2350 (Thomas, J., concurring). Section 509 vests functions of *existing* DOJ "officers," "agencies and employees" in the AG. Section 510 authorizes

---

[11] *See also* 20 Op. O.L.C. 242 (1996); 19 Op. O.L.C. 33 (1995); 13 Op. O.L.C. 163 (1989).

36

the AG to delegate "any" of his functions to *existing* "other officer[s]" and "employee[s]."

"[T]he Attorney General's general power to delegate duties to an existing officer is not the same as the power to appoint the officer in the first place." *Concord Mgmt.*, 317 F. Supp. 3d at 622. The district court was not alone in following this aspect of *Concord Management* by interpreting §§ 509-510 as "bestowing authority on . . . existing [DOJ] personnel." Br. 34. At the motion hearing below, SCO described § 510 as only providing "statutory authority" for an officer appointment by the Attorney General if the appointee was "already within the government." Tr. 68.

SCO's new argument relies on a series of inferential leaps with no legal basis. The AG was not free to hire Smith as a non-officer employee under 5 U.S.C. § 3101, and then elevate him to inferior-officer status without violating the Appointments Clause. Br. 34. "[T]he argument makes no sense in the face of the statutory structure that Congress has enacted for the [DOJ]." *United States v. Janssen*, 73 M.J. 221, 225 (C.A.A.F. 2014); *see also Lucia v. SEC*, 585 U.S. 237, 245-46 (2018). In addition to the appointment-specific provisions in Titles 28 and 18, 5

37

U.S.C. § 3105 authorizes "[e]ach agency" to make appointments of administrative law judges.  There would be no need for that language, just four sections away, if Congress believed § 3101 could be used as an end-run around the Appointments Clause.  *See Janssen*, 73 M.J. at 225.

SCO's historical discussion of §§ 509-510 is, yet again, inaccurate.  SCO starts with DOJ Act § 14, but that provision did not provide for appointments.  Br. 35.  Similar to the reference to an existing "other officer" in 28 U.S.C. § 510, DOJ Act § 14 authorized delegation to an existing "officer thereof" the DOJ.  SCO's claim that this language established a "general power of delegation" that conferred boundless inferior-officer appointment authority on the AG is entirely divorced from context and the purpose of the Act: "to cut off all this outside work."  Cong. Globe, 41st Cong., 2d Sess. 3035 (1870).

SCO next turns to President Truman's reorganization plan for DOJ, but they elide a key aspect of that process.  Br. 35.  Section 4 of the Reorganization Act of 1949 allowed the President to propose "provisions for the appointment" of "officers," but only if the President "declare[d]" that "such provisions are necessary."  63 Stat. 203, 204.  President Truman's 1950 reorganization plan for DOJ included language that is

substantially similar to §§ 509-510, but no such declarations or requests for more appointment authority. *See* 15 Fed. Reg. 3173. President Truman's message to Congress transmitting the DOJ plan lacked any suggestion that he thought it necessary for the AG to have the broad, unstated appointment power SCO now claims exists. *See* H.R. Doc. No. 81-504 (1950). Congress adopted the plan and added the language to Title 28, including §§ 509-510, without any suggestion of such power. 64 Stat. 1261-62; *see also* S. Rep. No. 89-1380, at 203.

If President Truman or anyone at DOJ was under the impression that §§ 509-510 had increased the AG's appointment power, as SCO wrongly claims, they forgot to tell President Johnson. We know this because President Johnson's Reorganization Plan No. 1 of 1968 sought approval for the establishment within DOJ of the Bureau of Narcotics and Dangerous Drugs, and for statutory AG authority to appoint additional officers. 82 Stat. 1367. There would have been no need for that request if SCO's position was consistent with the contemporaneous understanding of §§ 509-510.

Facing this decidedly unhelpful historical context for dispositive statutory text that does not authorize Smith's appointment, SCO

39

endeavors to distract from the matter at hand through a lengthy discussion of other types of personnel at DOJ and other agencies. Br. 35-41. It does not help their case. *See Bostock v. Clayton Cnty.,* 590 U.S. 644, 653 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest."). For example, SCO cites an OLC memorandum regarding the "Creation of an Office of Investigative Agency Policies," Br. 37, but fails to note that the proposal is distinguishable because the AG planned to make the Senate-confirmed FBI Director the head of the Agency. *See* O.L.C. Mem. Oct. 26, 1993, at 1. Instances where Senate-confirmed officers were transitioned to new, or dual, roles do not provide any support for the AG using these statutes to try to appoint a non-officer private citizen to wield the full prosecutorial power of the United States against a former President.

The district court also properly rejected SCO's related arguments about Congressional acquiescence. Op. 35-36. Congress has not "confirmed" through inaction SCO's belief about the "lawfulness" of non-Smith appointments at DOJ or elsewhere. Br. 37. That is a distinctly Article III task. "Congress expects courts to handle technical statutory questions." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2267

(2024); *see also SEC v. Sloan*, 436 U.S. 103, 118 (1978) ("Nor does the existence of a prior administrative practice, even a well-explained one, relieve us of our responsibility to determine whether that practice is consistent with the agency's statutory authority.").  Even if Congress had a significant role to play, SCO asks the Court to infer far too much from the two examples they cite in support of their claim that "Congress routinely enacts statutes premised on the lawful existence of offices and officers created or appointed by the Attorney General."  Br. 37.  The statutes cited have no substantive import for purposes of this appeal. They merely acknowledge the existence of the Antitrust Division and the Criminal Division, which are both led by Senate-confirmed Assistant Attorneys General.

SCO then argues that uncited annual appropriations for unspecified officers somehow "confirm" and "indeed ratify" their new argument that §§ 509-510 are bases for the Appointment Order.  Br. 37-38.  Not so.  "When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978).  Those

appropriations mean nothing for purposes of the questions presented here.

More broadly, the Court must reject SCO's reliance on inapposite examples arising under differing circumstances. "[A]n agency may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate." *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 745 (1973); *see also Greene v. McElroy*, 360 U.S. 474, 507 (1959) ("Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them."). "[I]f one must ignore the plain language of a statute to avoid a possibly anomalous result, the short answer is that Congress did not write the statute that way." *N. Carolina Dep't of Transp. v. Crest St. Cmty. Council, Inc.*, 479 U.S. 6, 14 (1986).

## F.  SCO's Remaining Historical Arguments Fail

For similar reasons, SCO's selective historical survey of prior special counsel-types does not "confirm[]" the legality of Smith's appointment. Br. 42.

The unsettled and turbulent history of special counsels began with heavy reliance on existing—inapposite—provisions authorizing outside-attorney appointments to assist local federal prosecutors. Over time, "[p]olitical pressures produced special prosecutors—for Teapot Dome and for Watergate, for example." *Morrison*, 487 U.S. at 711 (Scalia, J., dissenting). The Teapot Dome Scandal is also an example of an instance where, unlike here, Congress "expressly created offices similar to the position now occupied by the Special Counsel." *Trump*, 144 S. Ct. at 2350 (Thomas, J., concurring). In 1924, Congress went so far as to require advice-and-consent under the Appointments Clause. 43 Stat. 5, 6. Justice Thomas pointed out that the Independent Counsel Act, from 1978, is another example where Congress expressly provided for special counsel appointments. *See Trump*, 144 S. Ct. at 2350 (Thomas, J., concurring). In that law, Congress provided for procedures that would have been largely duplicative, at best, if the provisions of Title 28 cited by SCO were as broad as the meritless interpretations SCO assigns to them.

Consequently, as discussed in more detail below, the spotty historical record relied upon by SCO is insufficient to warrant an

43

inference that Congress has acquiesced in their interpretations of §§ 509, 510, 515, and 533. "The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment." *New York v. United States*, 505 U.S. 144, 182 (1992). "[L]egislative silence is a poor beacon to follow in construing a statute, [and the Supreme Court] has repeatedly warned that congressional silence alone is ordinarily not enough to infer acquiescence." *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1196 (11th Cir. 2019); *see also* Op. 36 (citing additional cases). That axiom holds here.

### 1. Pre-Watergate Cases

Although SCO refers nostalgically to Civil War-era prosecutions, Br. 42, 53, the "DOJ Act eliminated the primary tool of the federal government for keeping up with a surge in postwar litigation: outside counsel."[12] The examples SCO cites from this period fall far short of establishing error.

---

[12] Jed Handelsman Shugerman, *The Creation Of The Department Of Justice: Professionalization Without Civil Rights Or Civil Service*, 66 Stan. L. Rev. 121, 123 (2014).

For context, in 1853, Congress provided "[f]or the services of counsel, rendered at the request of the head of a department . . . ." 10 Stat. 161, 162. At the time, this law was consistent with "the traditional practice of the Government." 21 Op. Att'y Gen. 195, 196 (1895). Congress dispensed with that practice in 1870. DOJ Act § 17 prohibited payments to outside counsel "except in cases specially authorized by law." The AG had interpreted this provision to mean that department heads lacked "authority to employ counsel, without the consent of the Attorney General," who would otherwise use DOJ attorneys to assist the other agencies. 21 Op. Att'y Gen. 195, 197. At that point, the AG's authority to hire outside counsel was the 1861 law providing for the retention of special attorneys to assist local federal prosecutors. 12 Stat. 285. As noted above, the 1861 law was transferred to Revised Statutes § 363 (predecessor to 28 U.S.C. § 543) in 1874.

The pre-Watergate cases cited by SCO are largely consistent with these developments. Br. 43-44. *United States v. Crosthwaite* involved the appointment of a "special assistant to the attorney of the United States for the district of Idaho" under Revised Statutes § 363. 168 U.S. 375, 376 (1897); Br. 43. SCO refers to appointments in cases arising from

postal corruption, Br. 44, but the document they cite makes clear that, similar to *Crosthwaite*, President Roosevelt asked the AG to appoint special counsel to assist ongoing matters led by a U.S. Attorney. *See* H.R. Doc. No. 58-383, at 197 (1904).

SCO cites Francis Heney's role in Oregon land fraud prosecutions, Br. 44, but Heney was not an outside attorney like Smith. Heney had worn several hats at DOJ, including the principal-officer role of Assistant Attorney General under Revised Statute § 348. 44 Cong. Rec. 4541 (1909). SCO later acknowledges that Heney "initially" acted as an "assistant" to the local federal prosecutor, which is consistent with an appointment pursuant to Revised Statutes § 363. Br. 54; 44 Cong. Rec. 4544 (stating that Heney was appointed to, *inter alia*, "assist United States Attorney, Oregon").

SCO's citation to the Congressional debate regarding Heney's compensation reveals that issues relating to the use of special counsel remained divisive. At least some of those present believed that there were instances in which DOJ had paid Heney for "no service rendered." 44 Cong. Rec. 4541. There was also concern "that the habit of employing special counsel and assistant attorneys-general to help out incompetent

prosecuting attorneys is increasing." *Id*. These remarks contradict SCO's claim that Congress stood ready to "quickly intervene[]" in response to "doubts about the authority of these special counsels." Br. 44.

Outliers cited by SCO are not indicative of a widespread practice, which could not, in any event, overcome the plain meaning of the current statutory text. For example, as already explained, the "peculiar" facts in *Rosenthal* cannot be generalized. *In re Persico*, 522 F.2d at 58; Br. 44. In *United States v. Winston*, a district attorney—already an officer—sought "extra compensation" for work on a case outside his district. 170 U.S. 522, 523 (1898). When the *Winston* Court reasoned that the AG may "employ special counsel" where he "deems it essential," *id*. at 525, the Court was paraphrasing inapposite language from Revised Statutes § 363. *See* Br. 44.

SCO also refers to the 1952 appointment of Newbold Morris during the Truman Administration. Br. 45-46. This is another unexplained anecdote arising from political tumult, accompanied by features that support the district court's conclusion. President Truman appointed Morris in Executive Order 10327. According to the Order, Morris's work

47

was funded pursuant to an appropriation for "emergencies affecting the national interest, security, or defense." Executive Order 10327; *see also* 65 Stat. 268, 286-87. Morris claimed to be "completely independent" of DOJ. *In re Olson*, 818 F.2d 34, 40 (D.C. Cir. 1987). Because President Truman and Morris were apparently under the impression that Morris lacked DOJ authority, President Truman asked Congress to pass temporary legislation giving Morris subpoena power. 98 Cong. Reg. 1020 (1952); *see also* 98 Cong. Rec. A1093 (1952) (referring to the request as "extraordinary," "amazing and unprecedented"). Therefore, SCO's reference to Morris is another citation that does not suggest error and, instead, supports the district court's observation about the widely varied practices associated with special counsel.

### 2. Watergate

Watergate kicked off a period where Congress focused almost exclusively on securing independence for attorneys appointed to special counsel roles, which continued through the Independent Counsel Act in 1978. The emphasis on prosecutorial independence in connection with politically sensitive prosecutions took priority over largely un-litigated questions relating to the Appointments Clause.

This focus began in May 1972, when the Senate Judiciary Committee conditioned the confirmation of AG Elliot Richardson on his agreement to appoint Archibald Cox to investigate Watergate matters. *See* Hearings Before the Senate Comm. on the Judiciary, 93rd Cong., 1st Sess. 12 (1973); *see also id.* at 67. The record of the confirmation hearing reflects near-singular focus on securing Cox's independence from the AG, to such an extent that the Senate considered legislation similar to the approach taken in response to the Teapot Dome Scandal. *See, e.g., id.* at 5, 73. To alleviate that concern, Richardson shared draft guidelines governing Cox's proposed appointment, and Committee members provided "suggestions for revision." *Id.* at 144; *see also* 119 Cong. Rec. 16750-51 (1973). The guidelines did not cite any statutory provisions.

AG Richardson's guidelines for the Cox appointment were made part of the committee hearing record, and they were added to the record a second time in connection with his full-Senate confirmation vote. *See* Hearings Before the Senate Comm. on the Judiciary, 93rd Cong., 1st Sess. 144-46 (1973). Following the confirmation, AG Richardson issued an order, as promised, in which he appointed Cox as the Director of the Office of Watergate Special Prosecution Force. AG Order 518-73; *see also*

38 Fed. Reg. 14,688. Richardson relied on "the authority vested in me by 28 U.S.C. 509, 510, and 5 U.S.C. 301." AG Order 518-73; *see also* 38 Fed. Reg. 14,688; 38 Fed. Reg. 30,738; 38 Fed. Reg. 32,805. Hoping to wrongly add § 515 to the mix, SCO argues that Acting AG Robert Bork cited that provision in connection with his appointment of Cox's successor, Leon Jaworski. Br. 47. However, consistent with the district court's interpretation of § 515(a), Acting AG Bork indicated that § 515(a) concerned Jaworski's "specific functions," rather than the separate "authority" cited in the regulation as the basis for the appointment. 38 Fed. Reg. 30,738.

Practices with special counsel, and the authorities cited for their use, have varied widely since Watergate. Most of the appointments were made either pursuant to the now-extinct Independent Counsel Act or, prior to 1999, in anticipation of the Act's renewal. Much of the time, beginning with *Nixon* as discussed in the next section, very little attention was paid to AGs' limited inferior-officer appointment authority. This history also includes, as mentioned above, several inapposite examples where AGs turned to *existing* DOJ officers for special counsels, such as Patrick Fitzgerald, John Durham, and David Weiss. *See* Op. 38-

39.    Relying on these statutes to transition existing officers to new positions lends no support to the Appointment Order.  DOJ's track record also includes a regulation concerning the Whitewater investigation with a dubious citation to 28 U.S.C. § 543 that SCO has not defended.  *See* Op. 37 n.26.  The Appointment Order is the first one to cite § 533.  *See* Op. 42.  Thus, "[i]n fact, very few historic special attorneys resemble Special Counsel Smith."  Op. 38.  Even myriad examples could not justify the Appointment Order in light of the statutory text, but the lack of uniformity—involving "silent approaches and slight deviations from legal modes of procedure"—is another reason that the district court made the right call.  *Boyd v. United States*, 116 U.S. 616, 635 (1886).

## G. No Binding Or Persuasive Authority Supports SCO's Position

SCO hopes to avoid the foregoing analysis by relying on a single sentence from *Nixon*.  The sentence in question concerned an issue that was not contested, was not necessary to the Court's holding, and is thus pure dictum.  As far as dicta go, this one is weak at best.  The *Nixon* Court offered no reasoning and parroted an inaccurate assertion from Jaworski about the basis for the appointment at issue.  Therefore, the Court should

51

reject the *Nixon* dictum for its lack of persuasive value and treat the opinions purporting to be bound by *Nixon* in the same fashion.

## 1. The *Nixon* Dictum Is Not Controlling Or Persuasive

*Nixon* contains only a "passing" reference that is even arguably relevant to this case. *Trump*, 144 S. Ct. at 2351 (Thomas, J., concurring). The *Nixon* Court "presupposed" the validity of the statutory authorization for the regulation appointing Cox. *In re Sealed Case*, 829 F.2d 50, 55 n.30 (D.C. Cir. 1987); *see also United States v. Manafort*, 321 F. Supp. 3d 640, 659 (E.D. Va. 2018) (reasoning that the "holding" in *Nixon* "did not adjudicate the legal authority of a special prosecutor"). The district court thoroughly explained, over the course of 15 pages, that the passing reference is non-binding and unpersuasive dictum. Op. 53-67.

In *Rudolph v. United States*, Br. 17, this Court rejected an appellant's reliance on a similar stray sentence from *Davis v. United States*, 417 U.S. 333 (1974), which "ha[d] little to do with the Court's holding." 92 F.4th 1038, 1045 (11th Cir. 2024). Similarly, the *Nixon* Court's justiciability holding did not turn on "statutory appointment authority," which was "a peripheral subject that was not raised in the

case" and went unchallenged "[a]cross hundreds of pages of briefing (and hours of oral argument)."  Op. 61; *cf. Johnson v. United States*, 576 U.S. 591, 606 (2015) (reasoning that decisions rendered "without full briefing or argument on that issue" result in "a circumstance that leaves us less constrained to follow precedent").  The situation in *Nixon* "present[ed] an obvious controversy" for justiciability purposes, and the applicability of the decision to future cases was greatly limited by the "uniqueness of the setting."  418 U.S. at 696-97.  Those caveats make the district court's decision not to apply the *Nixon* dictum even more reasonable.

The *Nixon* Court's actual analysis focused on the "very broad delegation of authority in the regulation," and "the fact that the regulation had not been revoked."  Op. 63.  The *Nixon* Court pointed out that the regulation was not "ordinary" because it could not have been validly revoked without consulting Congress, which provided Cox with "unique authority and tenure."  418 U.S. at 694-96.  Insofar as justiciability was concerned, what mattered in *Nixon* was that the regulation was "extant," Cox's subpoena was "within the scope of his express authority" under that regulation, and President Nixon had invoked the Executive Privilege in response to Cox's subpoena.  *Id.* at

695-97.  How the regulation came to be "extant," *i.e.*, the source of the appointment authority, was of no moment.

As such, the district court correctly pointed out that the *Nixon* dictum reflects an instance where the Supreme Court made non-binding "'assumptions about what the law is.'"  Op. 56 (quoting Bryan A. Garner et al., *The Law of Judicial Precedent* 84 (2016)).  The Supreme Court has "declined . . . to give full scope to the reasoning and dicta" in prior decisions, particularly where "express or implicit declarations have not stood the test of time."  *United States v. Ward*, 448 U.S. 242, 253 (1980).

The district court's citation to *Verdugo-Urquidez* also illustrates, contrary to SCO's claim, that the Supreme Court has no categorical rule of "specifically us[ing] such qualifying language" when the Court assumes propositions in dicta.  Br. 17.  There was no specific "qualifying language" in the decision at issue in *Verdugo-Urquidez*, *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984).  The *Verdugo-Urquidez* Court acknowledged that "[w]e cannot fault the Court of Appeals for placing some reliance" on *Lopez-Mendoza*, but characterized the relevant language from that opinion as an undecided "antecedent proposition[]."  494 U.S. 259, 272 (1990).  As an example of the Supreme Court

"grant[ing] certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions," the *Verdugo-Urquidez* Court cited *Maine v. Thiboutot*, 448 U.S. 1 (1980). 494 U.S. at 272. Similar to *Lopez-Mendoza*, the *Thiboutot* Court did not make the assumption explicitly, and the dissent discussed instances where the Court had "assumed" a proposition "*sub silentio*." 448 U.S. at 30 (Powell, J., dissenting).

SCO's purported fealty to "vertical stare decisis" for the *Nixon* dictum is as unmoving as their flawed historical account. Br. 14. Earlier in their brief, SCO quickly casts aside the *Yates* Court's inferences based on statutory placement in response to the district court's rejection of their arguments concerning 28 U.S.C. § 533(1). Br. 32-33; Op. 50-52. With respect to *Nixon*, however, they demand blind adherence to an unreasoned statement that was not even consistent with the "unique facts of this case." 418 U.S. at 697. Specifically, the *Nixon* dictum appears to have been lifted, nearly verbatim, from a conclusory assertion in Jaworski's brief.[13] Jaworski's assertion that §§ 509-510, 515, and 533

---

[13] *See* U.S. Br., *Nixon*, Nos. 73-1766, 73-1834, 1974 WL 174854, at *27-28 ("Under Article II, Section 2, Congress has vested in him alone the

generally provided for the appointment of "subordinate officers"—disputed here—did not establish that any of those statutes authorized the appointment of an officer like Cox.  AG Richardson had not even relied on §§ 515 and 533 in the appointment order, and that was not the argument Jaworski was making at that point in the brief.  *See* Br. 46 (arguing that Cox's appointment order "cit[ed] Sections 509 and 510").

This overreach is an additional consideration, consistent with the conclusory nature of the language at issue, demonstrating that the sentence from *Nixon* does not present a situation where a court "deliberately and carefully offered" a conclusion.  *United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009), *cited in* Br. 18.  This Court has "pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010).

Finally, the district court was well aware, as SCO points out, that "there is dicta . . . , and then there is Supreme Court dicta."  *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006); Br. 19; Op. 56-57.  Yet,

---

power to appoint subordinate officers to discharge his powers.  28 U.S.C. 509, 510, 515, 533.").

*Schwab* does not help SCO. There, this Court addressed dictum from *Mickens v. Taylor*, 535 U.S. 162 (2002), which was "well thought out," "thoroughly reasoned," and presented through a "carefully articulated analysis." 451 F.3d at 1325. Here, the district court addressed a single sentence in *Nixon*, which was not contested, unnecessary to the Supreme Court's holding, and misstated the underlying record. *See Paresky v. United States*, 995 F.3d 1281, 1288 (11th Cir. 2021) (declining to follow, "[w]hen read properly," "the Supreme Court's dicta"); *see also Central Green Co. v. United States*, 531 U.S. 425, 430-31 (2001) (identifying "admittedly confusing dicta" and acknowledging that "more than one court has pointed out that, if read literally, the sentence sweeps so broadly as to make little sense"); *Seed v. EPA*, 100 F.4th 257, 266 (D.C. Cir. 2024) (relegating Supreme Court reasoning to dictum status and declining to apply it). The court did not err by declining to rely on that sentence to prop up a basis for Smith's existence that does not otherwise exist in Title 28.

## 2. Opinions Following *Nixon* Are Not Persuasive

In the few previous challenges to an AG's statutory appointment authority under the Appointments Clause, courts—mostly in

57

Washington, D.C.—have cited the *Nixon* dictum with little or no analysis. This Court has previously declined to follow non-binding, unpersuasive opinions from the D.C. Circuit. *See Georgia v. President of the United States*, 46 F.4th 1283, 1299 (11th Cir. 2022). The Court should do so here as well.

In *In re Sealed Case*, the D.C. Circuit acknowledged that the *Nixon* Court "presupposed" a statutory basis for Cox's appointment, and that the statutes cited in that case did not "explicitly" authorize the AG to appoint Lawrence Walsh to lead Iran/Contra prosecutions. 829 F.2d at 55 & n.30. That should have ended the matter. However, the D.C. Circuit "read" §§ 509, 510, and 515 as "accommodating" Walsh's appointment. *Id.* In light of the Supreme Court's subsequent clear-statement jurisprudence discussed above, that conclusion is no longer remotely tenable. As in *Nixon*, the court offered no reasoning, perhaps because Walsh had a "parallel" appointment pursuant to the Independent Counsel Act, *id.* at 54, or because Oliver North had not directly challenged the statutory authority for Walsh's appointment, *see* Op. 66 n.52. Either way, the limited reasoning in *In re Sealed Case*, if anything, supports the district court's findings. Particularly in light of

58

the clear-statement rule that must be applied to Appointments Clause analysis, the court's recognition of the lack of an explicit basis for the appointment is dispositive.

Nevertheless, the decision in *In re Sealed Case* led to a series of similar district court opinions by courts within the D.C. Circuit, including by courts considering challenges to the appointment of Robert Mueller. *E.g.*, *Concord Mgmt.*, 317 F. Supp. 3d at 622-23. The D.C. Circuit addressed Mueller's appointment in *In re Grand Jury Investigation*, where the court treated *In re Sealed Case* as "binding." 916 F.3d 1047, 1054 (D.C. Cir. 2019). In the 2019 opinion, the D.C. Circuit also incorrectly suggested that *Nixon* was an example of "carefully considered" language that "must be treated as authoritative." *Id.* at 1053. Thus, neither of the federal appellate decisions from outside this Circuit engaged with the statutory interpretation questions that the district court addressed, and this Court should not follow those courts' undue deference to the *Nixon* dictum.

\*      \*      \*

For all of the foregoing reasons, based on the text, structure, history, and practices under the statutes at issue, the district court

correctly held that Smith was not appointed "by Law" under the Appointments Clause.

## II.    Smith Operates As An Unlawfully Appointed Principal Officer

Even if it could be said that there was a statutory basis for Smith's appointment—and there is not—dismissal was also appropriate because Smith operates as a principal officer, without Senate confirmation, in violation of the Appointments Clause.[14]

In *Morrison*, the Supreme Court held that an attorney appointed pursuant to the now-lapsed Independent Counsel Act was an inferior officer.  487 U.S. at 671-72.  Justice Scalia warned that the *Morrison* ruling would "weaken[]" and "enfeeble[]" the Presidency, which is a theme that resonates throughout the Presidential immunity ruling condemning Smith's actions in *Trump v. United States*.  487 U.S. at 713 (Scalia, J., dissenting); *see also* 144 S. Ct. at 2346.  Using language that aptly predicted the lawfare against President Trump, Justice Scalia also observed that "[n]othing is so politically effective as the ability to charge that one's opponent and his associates are . . . 'crooks.'  And nothing so

---

[14] The Court can affirm on any basis supported by the record.  *See, e.g.*, *United States v. Rochell*, 852 F. App'x 446, 447 (11th Cir. 2021).

effectively gives an appearance of validity to such charges as a Justice Department investigation and, even better, prosecution." *Morrison*, 487 U.S. at 713. Consistent with that prescience, at the argument in *Trump*, Justice Kavanaugh described *Morrison* as "one of the Court's biggest mistakes."[15] *See* Op. 71 n.54 (noting that "the viability of *Morrison* has been called into question" by the Supreme Court). Justice Kagan has argued that Justice Scalia's *Morrison* opinion is "one of the greatest dissents ever written and every year it gets better."[16]

Smith is not subject to sufficient oversight, and his jurisdiction and tenure are too broad, for him to qualify as an inferior officer. The district court discussed these considerations at length and correctly found them to be "compelling." *See* Op. 71-80.

First, the Special Counsel Regulations purportedly grant Smith "the full power and independent authority to exercise all investigative

---

[15] Tr. 142, *Trump v. United States*, No. 23-939, www.supremecourt.gov/oral_arguments/argument_transcripts/2023/23-939_f2qg.pdf.

[16] *Justice Kagan and Judges Srinivasan and Kethledge Offer Views from the Bench*, Stanford Lawyer (May 30, 2015), https://law.stanford.edu/stanford-lawyer/articles/justice-kagan-and-judges-srinivasan-and-kethledge-offer-views-from-the-bench.

and prosecutorial functions of any United States Attorney," 28 C.F.R. § 600.6, all of whom are principal officers. Further, the Regulations "expressly remove day-to-day supervision and provide almost no countermanding authority for the Attorney General." Op. 74 (citing 28 C.F.R. § 600.7(b)). AG Garland declared that Smith "will not be subject to the day-to-day supervision of any official of the Department." SCO failed to provide a concrete example of oversight at the motion hearing, *see* Tr. 147-50, and they insisted previously that "coordination with the Biden Administration" is "non-existent."[17]

Second, "the Regulations do not afford the Attorney General 'at will' removal power." Op. 76; *see also Concord Mgmt.*, 317 F. Supp. 3d at 613 ("There is reason to think . . . that the Special Counsel regulations afford the Special Counsel more substantial protection against removal, and thus risk rendering him a principal officer.").

Third, there are no meaningful limitations on Smith's jurisdiction and tenure. *See* Op. 78-80. Unlike Senate-confirmed U.S. Attorneys, who are limited to particular districts, Smith has operated without geographic

---

[17] Press Release, DOJ, Appointment of a Special Counsel (Nov. 18, 2022), https://www.justice.gov/opa/pr/appointment-special-counsel-0; ECF No. 191 at 6, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Dec. 27, 2023).

limitations. The Appointment Order conveyed expansive jurisdiction relating to two broad investigations, as well as all derivative investigations, and exponentially multiplied that scope and power by giving Smith the power to refer matters to other U.S. Attorneys. Absent removal, Smith's tenure is limited only by his subjective decision about the "conclusion" of his "work." 28 C.F.R. § 600.8(c).

For all of these reasons, Smith's status as a principal officer is an independent basis to affirm the district court's judgment.

## III.    Smith's Expenditures Violated The Appropriations Clause

The district court also correctly held that Smith's operations and expenditures of public funds violated the Appropriations Clause, art. I, § 9, cl. 7. Op. 87. Smith has been relying on a blank check from an inapplicable permanent indefinite appropriation without adequate oversight.

The Appropriations Clause requires that, in order to be valid, an appropriation must "identify a source of public funds and authorize the expenditure of those funds for designated purposes . . . ." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 426 (2024). "The Appropriations Clause embodies a fundamental separation of powers

principle—subjugating the executive branch to the legislature's power of the purse." *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 221 (5th Cir. 2022) (Jones, J., concurring); *see also United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

Since the Appointment Order, in addition to more than $16 million from unspecified "DOJ components," Smith has drawn more than $20 million from a permanent indefinite appropriation that authorizes "all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. 591 et seq. or other law." 101 Stat. 1329. The citation to 28 U.S.C. § 591 is inapplicable because it is a reference to the lapsed Independent Counsel Act. Nor, as discussed above and in the district court's opinion, is there some "other law" that authorized appointment. Op. 88.

The district court expressed concern about the "limitless nature of the appropriation." Op. 86 n.66. The court also had "doubts," and rightly so, that Smith is "independen[t]" as that term is used in the appropriation. Op. 86 88. He is not. The appropriation was established in 1987, at a time when Congress was reauthorizing the Independent Counsel Act. During that timeframe, when Congress used the term

64

"independent," they expected the prosecutor to be "completely independent of the Department of Justice." H.R. Rep. No. 100-316, at 32 (1987). The Special Counsel Regulations impose restrictions on Smith that are not consistent with that standard. That is why there is unresolvable "inherent tension" in SCO's position that Smith is not so independent to qualify as a principal officer but independent enough to rely on the appropriation. Op. 88; *see also* Dkt. 405 at 6 (SCO arguing that Smith is *not* independent under the Special Counsel Regulations).

Smith's lack of sufficient independence for purposes of the appropriation is supported by the GAO's 2004 analysis relating to the appointment of Patrick Fitgerald. *See Special Counsel and Permanent Indefinite Appropriation*, B-302582, 2004 WL 2213560 (Sept. 30, 2004). The GAO found Fitzgerald to possess the level of independence necessary to access the same appropriation because Fitzgerald had been exempted from the Special Counsel Regulations. *Id.* at *3. Fitzgerald operated "independent of the supervision or control of any officer of the Department." *Id.* By comparison, Smith's lack of independence for purposes of the appropriation is another basis to affirm the district court's dismissal.

65

## Conclusion

The Court should affirm.

Dated:      October 25, 2024

/s/ Todd Blanche / Emil Bove
Todd Blanche
toddblanche@blanchelaw.com
Emil Bove
emil.bove@blanchelaw.com
Kendra L. Wharton
Fla. Bar No. 1048540
k.wharton@whartonlawpllc.com
BLANCHE LAW PLLC
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

/s/ Christopher M. Kise
Christopher M. Kise
Fla. Bar No. 855545
ckise@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
(305) 677-2707

*Counsel for Defendant-Appellee*
*President Donald J. Trump*

/s/ Stanley E. Woodward, Jr.
Stanley E. Woodward, Jr.
BRAND WOODWARD LAW, LP
400 Fifth Street NW, Ste 350
Washington, DC 20001
(202) 996-7447 (telephone)
(202) 996-0113 (facsimile)
stanley@brandwoodwardlaw.com

/s/ Richard C. Klugh
Richard C. Klugh
Fla. Bar No. 109069
LAW OFFICE OF RICHARD C.
KLUGH
40 N.W. 3rd Street, PH1
Miami, FL 33128
(305) 536-1191 (telephone)
(305) 536-2170 (facsimile)
rickklu@aol.com

*Counsel for Defendant-Appellee
Waltine Nauta*

/s/ John S. Irving, IV
John S. Irving, IV
E&W LAW, LLC
1455 Pennsylvania Ave NW
Ste 400
Washington, DC 20004
(301) 807-5670
john.irving@earthandwatergroup.com

/s/ Larry Donald Murrell, Jr.
Larry Donald Murrell, Jr.
Fla. Bar No. 326641
L.D. MURRELL, P.A.
400 Executive Center Drive, Ste 201
West Palm Beach, FL 33401
(561) 686-2700 (telephone)
(561) 686-4567 (facsimile)
ldmpa@bellsouth.net

*Counsel for Defendant-Appellee
Carlos De Oliveira*

67

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPESTYLE REQUIREMENTS

I, Emil Bove, counsel for Defendant-Appellant President Donald J. Trump and a member of the Bar of this Court, certify, pursuant to Federal Rules of Appellate Procedure 28(b), 32(a), and 32(g), that the foregoing motion is proportionately spaced, has a typeface of 14 points, and contains 12,971 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

October 25, 2024

By:    /s/ Emil Bove
       Emil Bove

## CERTIFICATE OF SERVICE

I, Emil Bove, counsel for Defendant-Appellant President Donald J. Trump and a member of the Bar of this Court, certify, that, on October 25, 2024, the attached brief was filed through the Court's electronic filing system.  I certify that all participants in the case are registered users with the electronic filing system and that service will be accomplished by that system.

October 25, 2024

By:  <u>/s/ Emil Bove</u>
Emil Bove