# 24-12311-J

# United States Court of Appeals

## *for the*

# Eleventh Circuit

UNITED STATES OF AMERICA,

*Plaintiff/Appellant,*

— v. —

DONALD J. TRUMP, WALTINE NAUTA, CARLOS DE OLIVEIRA,

*Defendants/Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:23-cr-80101-AMC
(Hon. Aileen Cannon)

## BRIEF OF *AMICI CURIAE* ROBERT W. RAY, PROFESSOR SETH BARRETT TILLMAN, AND LANDMARK LEGAL FOUNDATION, SUPPORTING DEFENDANTS-APPELLEES DONALD J. TRUMP, WALTINE NAUTA, AND CARLOS De OLIVEIRA

JOSH BLACKMAN
JOSH BLACKMAN LLC
1303 San Jacinto Street
Houston, Texas 77002
(202) 294-9003
josh@joshblackman.com

MICHAEL A. SASSO
COUNSEL OF RECORD
SASSO & SASSO P.A.
1031 West Morse Boulevard, Suite 120
Winter Park, Florida 32789
(407) 644-7161
masasso@sasso-law.com

Attorneys for *Amici Curiae*
*Robert W. Ray, Professor Seth Barrett Tillman, and Landmark Legal Foundation*

CP COUNSEL PRESS    (800) 4-APPEAL • (JOB 130514)

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 26.1-2, *Amici Curiae* hereby certifies that the following is a list of persons and entities who have an interest in the outcome of this case:

1. Advance Publications, Inc.
2. Alonso, Cristina
3. America First Legal Foundation
4. American Broadcasting Companies, Inc., d/b/a/ABC News
5. Ayer, Donald
6. Blackman, Joshua
7. Blanche, Todd
8. Bloomberg, L.P.
9. Bove, Emil
10. Bowman, Chad
11. Bratt, Jay
12. Cable News Network, Inc.
13. Calabresi, Steven
14. Caldera, Louis
15. Cannon, Hon. Aileen
16. Cate, Matthew
17. CBS Broadcasting, Inc. o/b/o CBS News
18. Citizens for Responsibility and Ethics in Washington
19. Citizens United

20.     CMG Media Corporation

21.     Citizens United Foundation

22.     Coleman, Tom

23.     Conway, George

24.     Cooney, J.P.

25.     Couzo, Amber Aurora

26.     Cox Enterprises, Inc. (COX) d/b/a/ The Atlanta Journal Constitution

27.     Dadan, Sasha

28.     De Oliveira, Carlos

29.     Dow Jones & Company, Inc., publisher of The Wall Street Journal

30.     Dreeben, Michael

31.     Edelstein, Julie

32.     Fields, Lazaro

33.     Fitzgerald, Patrick

34.     Fort Myers Broadcasting Company

35.     Fugate, Rachel Elise

36.     Garland, Merrick B.

37.     Gerson, Stuart

38.     Gertner, Nancy

39.     Gilbert, Karen E.

40.     Gillers, Stephen

41.     Goodman, Hon. Jonathan

42.     Gray Media Group, Inc. (GTN)

43.     Guardian News & Media Limited

44.     Harbach, David

45.     Hirsch, Steven A.

46.     Hullser, Raymond

47.     Insider, Inc.

48.     Irving, John

49.     Kise, Christopher

50.     Klugh, Richard C.

51.     Lacovara, Philip Allen

52.     Landmark Legal Foundation

53.     Lawson, Gary

54.     Los Angeles Times Communications LLC, publisher of The Los Angeles Times

55.     Maynard, Hon. Shaniek Mills

56.     McElory, Dana Jane

57.     McKay, John

58.     McNamara, Anne

59.     Meese, Edwin

60.     Mishkin, Maxwell

61.     Mukasey, Hon. Michael B.

62.     Murrell, Larry Donald

63.     National Cable Satellite Corporation d/b/a/ C-SPAN

64.     National Public Radio, Inc.

65.     Nauta, Waltine

66.     NBCUniversal Media, LLC d/b/a/ NBC News, a subsidiary of Comcast Corporation (CMCSA)

67.     Orlando Sentinel Media Group, publisher of the Orlando Sentinel

68.     Pearce James

69.     Pellettieri, John

70.     POLITICO, LLC

71.     Potter, Trevor

72.     Radio Television Digital News Association

73.     Rakin, David

74.     Raul, Alan Charles

75.     Ray, Robert W.

76.     Reeder, L. Martin Jr.

77.     Reinhart, Hon. Bruce E.

78.     Reuters News & Media, Inc.

79.     Reynolds, Brett

80.     Russell, Lauren

81.     Salario, Samuel

82.     Sample, James J.

83.     Sasso, Michael

84.     Schaerr, Gene

85.     Seligman, Matthew A.

86.     Smith, Abe

87.     Smith, Fern

88.     Smith, Jack

89.     State Democracy Defenders Action

90.     Sun-Sentinel Company, LLC, publisher of the South Florida Sun Sentinel

91.     TEGNA, Inc. (TGNA)

92.     Telemundo Network Group, LLC d/b/a/ Noticias Telemundo

93.     Thakur, Michael

94.     The Associated Press

95.     The E.W. Scripps Company (SSP)

96.     The McClatchy Company, LLC (MNI) d/b/a/ the Miami Herald

97.     The New York Times Company (NYT)

98.     The Palm Beach Post and USA TODAY, publications operated
        by subsidiaries of Gannett Co., Inc. (GCI)

99.     Thompson, Larry

100.    Tillman, Seth Barrett

101.    Tobin, Charles

102.    Torres, Hon. Edwin

103.    Trent, Edward H.

104.    Tribe, Laurence

105.    Troye, Olivia

106.    Trump, President Donald J.

107.    Trusty, James

108.    Twardy, Stanley

109.    United States of America

110.    Univision Networks & Studios, Inc.

111.    VanDevender, Cecil

112.    Weiss, Stephen

113.    Weld, William

114.    Wharton, Kendra

115.    Whitman, Christine Todd

116.    Woodward, Stanley

117.    WP Company LLC d/b/a/ The Washington Post

118.    WPLG, Inc.

## CORPORATE DISCLOSURE STATEMENT

Landmark Legal Foundation ("Landmark") submits this corporate disclosure statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29 and Eleventh Circuit Rule 26.1-2.

Landmark has no parent company or other identifiable related legal entities, and no trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case of appeal, including subsidiaries, conglomerates, affiliates, parent corporations or any publicly held corporation, has a ten percent or greater ownership interest in Landmark.

Respectfully submitted,

Dated:    10/1/2024

*/s/ Michael A. Sasso*
MICHAEL A. SASSO
Sasso & Sasso P.A.
1031 West Morse Boulevard, Suite 120
Winter Park, FL 32789
Phone: 407-644-7161
masasso@sasso-law.com
Counsel for *Amici*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..................................... C-1

TABLE OF AUTHORITIES.....................................................................iii

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................... 1

SUMMARY OF THE ARGUMENT ......................................................... 2

ARGUMENT ............................................................................................ 4

    I.    The Watergate Special Prosecutor's "unique" statutory and regulatory framework was a departure from a century of Special Counsels and would be inconsistent with modern Supreme Court precedent ............ 4

        A.    From the 1850s through the 1950s, during six presidential administrations, Attorneys General retained outside lawyers as Special Counsels either: to assist a U.S. Attorney with prosecutions, or to assist the Attorney General with an investigation ...................................................... 6

        B.    *United States v. Nixon* expressly and repeatedly recognized that the Watergate Special Prosecutor position, which possessed sweeping powers, had "unique authority and tenure" ............... 11

        C.    The Acting Attorney General's grant to the Watergate Special Prosecutor of unsurpassed insulation would be inconsistent with modern Supreme Court precedent ............................................. 13

        D.    Whatever the holding of *Nixon*, it should not be extended to today's context under today's statutory and regulatory framework ........................... 15

II.  In this case, Smith cannot rely on a permanent appropriation to fund the "prosecut[ion] [of] high ranking government officials," because all of the charged conduct arose after Trump left office ...................... 18

    A.  The traditional purpose of the permanent appropriation for funding the independent counsels was to avoid internal conflicts of interest associated with the DOJ investigating itself, the President, or the President's confidants and family .................................... 19

    B.  The Special Counsel has waived any opportunity to identify an additional funding source .......................................................... 21

III.  Smith does not hold a continuous "Officer of the United States" position, and Smith has repeatedly and expressly disclaimed that his position can be construed as an "employee" ................................. 22

    A.  Under *Buckley* and *Lucia*, only an "Officer of the United States" position, whose duration is continuous, can exercise "significant authority" ......... 23

    B.  Under *Morrison v. Olson*, Smith's position lacks duration because it is not continuous .......................... 25

    C.  Even if Smith's *duties* are regular, his position is not *continuous* .......................................... 28

    D.  In the proceedings below, Smith repeatedly and expressly disclaimed that he is an "employee" and he has waived the right to change his position on appeal ....................................... 31

IV.  The issue of whether *Morrison v. Olson* should be overruled has been properly preserved for review by the Supreme Court ............................................. 33

CONCLUSION ........................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allapattah Services, Inc. v. Exxon Corp.,*
  362 F.3d 739 (11th Cir. 2004) ............................................. 16

*Auffmordt v. Hedden,*
  137 U.S. 310 (1890) ........................................................... 29

*Bowsher v. Merck & Co.,*
  460 U.S. 824 (1983) ........................................................... 19

*Bowsher v. Synar,*
  478 U.S. 714 (1986) ................................................... 2, 5, 15

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ............................................ 23, 24, 28, 32

*Bush v. Gore,*
  531 U.S. 98 (2000) ............................................................. 12

*In re Grand Jury Investigation,*
  916 F.3d 1047 (D.C. Cir. 2019) ........................................ 12

*In re Persico,*
  522 F.2d 41 (2d Cir. 1975) ................................................. 9

*In re Sealed Case,*
  829 F.2d 50 (D.C. Cir. 1987) ............................................ 12

*Jefferson County v. Acker,*
  210 F.3d 1317 (11th Cir. 2000) ........................................ 16

*Lucia v. SEC,*
  585 U.S. 237 (2018) .............................. 22, 23, 24, 28, 29, 30

*Mapp v. Ohio,*
  367 U.S. 643 (1961) ........................................................... 33

*Morrison v. Olson,*
  487 U.S. 654 (1988) ................... 3, 4, 19, 25, 26, 27, 28, 29, 33

*Nader v. Bork,*
  366 F. Supp. 104 (D.D.C. 1973) ................................. 13, 14

iii

*Ohler v. United States,*
    529 U.S. 753 (2000) .......................................................21, 32

*Rodriguez de Quijas v. Shearson/Am. Exp.,*
    490 U.S. 477 (1989) ...............................................................17

*Teague v. Lane,*
    489 U.S. 288 (1989) ...............................................................33

*Trump v. United States,*
    144 S. Ct. 2312 (2024) ....................................................10, 16

*Trump v. U.S.,*
    2024 WL 3404555 (S.D. Fla. 2024) ......................................33

*United States v. Germaine,*
    99 U.S. 508 (1879) .............................................22, 24, 25, 29, 30

*United States v. Hartwell,*
    73 U.S. 385 (1868) ..........................................................29, 30

*United States v. Johnson,*
    921 F.3d 991 (11th Cir. 2019) .............................................15

*United States v. Maurice,*
    26 F. Cas. 1211 (C.C.D. Va. 1823) ......................................22

*United States v. Nixon,*
    418 U.S. 683 (1974) ..............................2, 4, 5, 11, 12, 13, 14, 15, 16, 17

*United States. v. Stone,*
    394 F. Supp. 3d 1 (D.D.C. 2019) .........................................20

**Statutes & Other Authorities:**

U.S. Const. art. II, §2, cl. 2 .............................................22, 24

5 U.S.C. § 3101 .....................................................................32

28 U.S.C. § 591 ...........................................2, 3, 18, 20, 21

28 U.S.C. § 593(e) ................................................................27

28 U.S.C. § 596(b)(l) ............................................................27

28 C.F.R. § 600.6 ................................................................ 6

28 C.F.R. § 600.7(d) ......................................................... 14

43 Stat. 5 ........................................................................... 10

Antonin Scalia, A Matter of Interpretation (1997) ............... 15

David Logan, Cong. Res. Serv., *Historical Uses of a Special Prosecutor* (1973) .......................................................... 10

*In the Matter of Judicial Complaints Against Judge Aileen M. Cannon* (2024) ............................................ 11

Josh Blackman, *A Historical Record of Special Counsels Before Watergate* (2024), https://papers.ssrn.com/abstract=4970972 ............... 6

*Officers of the United States Within the Meaning the Appointments Clause*, 31 O.L.C. 73 (2007) .................... 26

# STATEMENT OF INTEREST OF *AMICI CURIAE**

Robert W. Ray is a former federal prosecutor and served as one of the last Independent Counsels, replacing Kenneth W. Starr in October 1999, in charge of the Whitewater and Monica Lewinsky investigations. He concluded the investigations by March 2002 with the decision not to prosecute President Clinton once he left office. Ray represented President Trump before the U.S. Senate during his 2020 impeachment trial.

Professor Tillman, an American national, is a faculty member in the Maynooth University School of Law and Criminology, Ireland. Professor Tillman is one of the few academics who has written extensively on the Constitution's "office"- and "officer"-language.

Landmark Legal Foundation is a national public interest legal organization dedicated to preserving the principles of limited government and advancing an originalist approach to the Constitution.

* No party's counsel authored this brief in whole or in part, and no person other than the *Amici* and their counsel—including any party or party's counsel—contributed money that was intended to fund the preparation or submission of this brief.

## SUMMARY OF THE ARGUMENT

The District Court correctly dismissed the indictment. *Amici* advance four rationales to support the judgment below.

*First*, from the 1850s through the 1950s, during six presidential administrations, Attorneys General retained outside lawyers as Special Counsels either: to assist a U.S. Attorney with prosecutions, or to assist the Attorney General with an investigation. And the Watergate Special Prosecutor is a thin reed to stand on. *United States v. Nixon* expressly and repeatedly recognized that the Watergate Special Prosecutor had "unique authority and tenure." 418 U.S. 683, 694 (1974). Further, in 1973, the Acting Attorney General, with the acquiescence of the President, granted the Special Prosecutor unsurpassed insulation against removal. Apart from those compromises, this insulation would be inconsistent with *Bowsher v. Synar*. 478 U.S. 714 (1986). Whether the *Nixon* analysis is holding or dicta, it is not controlling, and it should not be extended to today's context under today's statutory and regulatory framework.

*Second*, Special Counsel Jack Smith ("Smith") cannot rely on the permanent indefinite appropriation found in a "note" to 28 U.S.C. §591.

In 2004, the Government Accountability Office determined that this appropriation can be used for "investigat[ing] and prosecut[ing] high ranking government officials."[1] But Trump was not a "high ranking" official when he was indicted, and *all* the alleged conduct took place after he was out of office. In these circumstances, the funding mechanism in Section 591's note cannot be used to pay Smith.

*Third*, Supreme Court precedent distinguishes between officers and employees. An "Officer of the United States" position must have a duration that is continuous. Though Smith's prosecution has already continued for several years, and his duties are regular, his position is not continuous, because his extant position would not continue to a successor. *Morrison v. Olson*, 487 U.S. 654, 672 (1988). At most, Smith is a mere "employee" who cannot exercise the sweeping powers of a Senate-confirmed U.S. Attorney.

*Finally*, *Amici* have properly preserved for review by the Supreme Court the question of whether *Morrison v. Olson* should be overruled.

---

[1] GAO, *Special Counsel and Permanent Indefinite Appropriation*, B-302582, 2004 WL 2213560, at *4 (Comp. Gen. Sept. 30, 2004).

The Special Counsel, like the Independent Counsel, still comes as a wolf.

*Id.* at 699 (Scalia, J., dissenting).

## ARGUMENT

**I. The Watergate Special Prosecutor's "unique" statutory and regulatory framework was a departure from a century of Special Counsels and would be inconsistent with modern Supreme Court precedent**

Smith insists that this case begins and ends with *U.S. v. Nixon*. 418 U.S. 683 (1974). As Smith tells it, the Supreme Court upheld the lawfulness of the Watergate Special Prosecutor position, which he claims is "comparable" to his Special Counsel position. Moreover, Smith claims that *Nixon* is supported by a "long history" dating back to Reconstruction of Special Counsels who had the same sweeping powers he claims. But history does not support Smith's claims.

*First*, Smith relies almost exclusively on scattered *secondary* sources and case reports that do not fully describe how past Special Counsels were retained. However, *Amici* rely on a corpus of *primary* sources. From the 1850s through the 1950s, during six presidential administrations, Attorneys General retained outside lawyers as Special Counsels either: to assist a U.S. Attorney with prosecutions, or to assist the Attorney General with an investigation. Before Watergate, these

particular Special Counsels did not have the broad powers that Smith purports to exercise.

*Second*, Smith misreads *Nixon*. The *Nixon* Court expressly and repeatedly recognized that the Watergate Special Prosecutor, which possessed sweeping powers and unsurpassed insulation against removal, had "unique authority and tenure." 418 U.S. at 691, 694. *Nixon*, by its own terms, was the proverbial ticket good for one "unique" ride—or perhaps, one president.

*Third*, Smith fails to address the constitutional infirmities of the Watergate regulations. The Acting Attorney General, with the acquiescence of the President, provided that the Special Prosecutor could only be removed for "extraordinary improprieties" after the President sought a consensus from eight high-ranking members of Congress. Apart from those compromises, this insulation would be inconsistent with *Bowsher v. Synar*. 478 U.S. 714 (1986).

Whether the analysis from *Nixon* is holding or dicta, it cannot be extended to today's context under today's statutory and regulatory framework.

**A. From the 1850s through the 1950s, during six presidential administrations, Attorneys General retained outside lawyers as Special Counsels either: to assist a U.S. Attorney with prosecutions, or to assist the Attorney General with an investigation**

The now in-force Special Counsel regulations vest the Special Counsel with "the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney." 28 C.F.R. §600.6. Smith asserts that the "long history of Attorney General appointments of Special Counsels confirms the lawfulness of the Special Counsel's appointment." Smith-Appellant's Br. at 12. But history does not "confirm[] the lawfulness" of Smith's position's possessing the broad powers he purports to hold. In support of his history-based argument, Smith relies almost exclusively on scattered secondary sources and case reports that do not fully describe how these Special Counsels were retained from a legal perspective.

*Amici* rely on a corpus of primary sources that were written by Presidents, Attorneys General, U.S. Attorneys, Special Counsels, and others between the 1850s and the 1950s.[2] This corpus reproduces

---

[2] Josh Blackman, *A Historical Record of Special Counsels Before Watergate* (2024), https://papers.ssrn.com/abstract=4970972 (hereinafter "*A Historical Record*").

6

primary sources from more than a dozen archives to present a fuller legal account showing how Special Counsels were retained by Attorneys General under Presidents Buchanan, Andrew Johnson, Grant, Garfield, Theodore Roosevelt, and Truman.

Contrary to Smith's incomplete account, this documentary record shows that during these six presidential administrations, Attorneys General retained outside lawyers as Special Counsels either: (1) to assist a U.S. Attorney with prosecutions, or (2) to assist the Attorney General with an investigation. In none of these matters did the Attorney General appoint an outside lawyer as a Special Counsel, and then delegate to him the powers now claimed by Smith: *all* of the powers of a Senate-confirmed U.S. Attorney.

- During the Buchanan Administration, in 1858, there were longstanding disputes about land in California.[3] A.G. Jeremiah Black retained Edwin Stanton to serve as a "special counsel" to assist Peter Della Torre, the United States District Attorney for the Northern District of California.
- During the Andrew Johnson Administration, in 1865, Lucius Chandler was the U.S. Attorney for the Eastern District of Virginia. Chandler was leading the prosecution of Jefferson

---

[3] *A Historical Record*, *supra* note 2, at Part I (citing Jeremiah Black Archives, LOC; Peter Della Torre Archives, S.C. Historical Society).

Davis for treason in Virginia.[4] To assist Chandler, A.G. James Speed retained three attorneys. Speed retained: Lovell Rousseau, William Evarts, and John Clifford. Chandler had the "whole onus" for making important decisions, such as whether to oppose Davis' motion for bail. Chandler was the final decision-maker on these matters.[5]

- During the Grant Administration, in 1875, the "Whiskey Ring" scandal arose.[6] At the time, David Dwyer was the U.S. Attorney in Missouri. A.G. Edwards Pierrepont retained two Special Assistants to assist Dwyer. Pierrepont retained: John Henderson and Lucien Eaton. Henderson and Eaton held non-continuous positions that terminated when their responsibilities concluded.

- During the Garfield Administration, in 1881, the "Star Routes" postal scandal arose.[7] A.G. Wayne MacVeagh retained two "Special Assistants" to assist the U.S. Attorney for the Eastern District of Missouri with the prosecutions. MacVeagh retained: Albert Gibson and William Cook.

---

[4] *A Historical Record*, *supra* note 2, at Part II (citing James Speed Archives, Filson Historical Society; William Evarts Archives, Harvard University; John Clifford Archives, Massachusetts Historical Society; Lovell Rousseau Archives, Filson Historical Society).

[5] Smith asserted that Evarts and Clifford were "'hired to direct the [Jefferson] Davis prosecution,'" and were not "merely … assistants to a local [United States] District Attorney." Smith-Appellant's Br. at 54–55 (quoting Cynthia Nicoletti, Secession on Trial 126 (2017)). Smith is incorrect. Evarts and Clifford did not "direct" the prosecution; they were mere assistants to the Senate-confirmed federal prosecutor.

[6] *A Historical Record*, *supra* note 2, at Part III (citing General Records of DOJ, NARA; John Henderson Archives, State Historical Society of Missouri; Lucien Eaton Archives, Missouri Historical Society).

[7] *A Historical Record*, *supra* note 2, at Part IV (citing Wayne MacVeagh Archives, Historical Society of Pennsylvania).

- During the Theodore Roosevelt Administration, in 1903, another scandal arose concerning the Postal Service.[8] A.G. Philander Knox retained two "Special Assistants." Knox retained Holmes Conrad and Charles Bonaparte to assist with the post office cases. However, Knox did not actually assign the Special Assistants to prosecute any cases. Instead, their role appears limited to investigating the cases and to preparing a report.[9]
- During the Truman Administration, in 1951, a scandal arose at the Internal Revenue Bureau.[10] A.G. Howard McGrath retained Newbold Morris as an "employee" to investigate alleged corruption. Morris attempted to issue a questionnaire to members of the Executive Branch about their finances. McGrath promptly fired Morris.

As far as *Amici* can discern, the most well-known, and perhaps the only, pre-Watergate Special Counsels that possessed powers akin to what Smith claims to possess were established during the Coolidge Administration. In 1924, Congress enacted legislation that established Special Counsels, who would be nominated by the President and

---

[8] *A Historical Record*, *supra* note 2, at Part V (citing Theodore Roosevelt Archives, LOC; Charles Bonaparte Archives, LOC).

[9] Smith asserted that during the Theodore Roosevelt Administration, Congress purported to grant "'specially-retained outside counsel' all of the powers of a U.S. Attorney." Smith-Appellant's Br. at 45 (quoting *In re Persico*, 522 F.2d 41, 59 (2d Cir. 1975)). Smith's assertion is not correct. Rather, the statute was revised to allow a special counsel to present before a grand jury, which is but one of many powers that a U.S. Attorney has. *Persico*, 522 F.2d at 59.

[10] *A Historical Record*, *supra* note 2, at Part VII (citing DOJ Record Slips Index, NARA).

confirmed by the Senate, to prosecute Teapot Dome Scandal defendants. 43 Stat. 5. President Coolidge nominated, and the Senate confirmed, Atlee Pomerene and Owen Roberts.[11] These Special Counsels were afforded "total independence."[12]

It is doubtful that these positions would be consistent with the Supreme Court's modern separation of powers jurisprudence. *Trump v. U.S.*, 144 S. Ct. 2312, 2350 n.2 (2024) (Thomas, J., concurring). In any event, at least the Teapot Dome Special Counsels were expressly authorized by a federal statute, nominated by the President, and confirmed by the Senate. The history of the positions held by these Coolidge-era Special Counsels do not confirm the lawfulness of Smith's appointment or the powers Smith claims to possess.

The District Court described the "historical backdrop" supporting Smith's case as "spotty." The record here is not spotty—it is near-empty.

---

[11] *A Historical Record*, *supra* note 2, at Part VI.

[12] David Logan, Cong. Res. Serv., *Historical Uses of a Special Prosecutor* 26–35 (1973), https://perma.cc/L4R7-SG5C.

The District Court understated how weak the historical record is for Smith.[13]

## B. *United States v. Nixon* expressly and repeatedly recognized that the Watergate Special Prosecutor position, which possessed sweeping powers, had "unique authority and tenure"

In the proceedings below, Smith expressly and repeatedly relied on *U.S. v. Nixon*. 418 U.S. 683 (1974). In *Nixon*, Special Prosecutor Jaworski sought to enforce a subpoena against President Nixon. The Supreme Court, with certain limitations, upheld the lawfulness of the subpoena. Even if not expressly stated, the Court's opinion arguably implied, to some extent, that the Special Prosecutor was lawfully appointed. Smith analogized the position he (purportedly) holds to that held by Jaworski. Smith argued that *Nixon* was on-point, controlling, and remains good law. But Smith overlooked an essential element of *Nixon*.

---

[13] Contrary to the CREW amicus brief, Judge Cannon carefully parsed the historical record, and read it in a *charitable* manner towards Smith. This effort to reassign the case, which Smith wisely did not support, is as meritless as the "orchestrated campaign" of frivolous complaints filed against Judge Cannon. *In the Matter of Judicial Complaints Against Judge Aileen M. Cannon* (2024) (Pryor, C.J.), https://perma.cc/SA4P-7FNS.

The *Nixon* Court expressly and repeatedly described the circumstances giving rise to the conflict between Nixon and Jaworski as *unique*. Indeed, the justiciability analysis was expressly limited to the "the uniqueness of the setting in which the conflict arises" and "the unique facts of this case." *Id.* at 697. The case arose in a "unique setting" and, most importantly, the Special Prosecutor had "unique authority and tenure." *Id.* at 691, 694. Here, the unanimous Supreme Court, in a high profile case, told the parties, the legal community, and the country multiple times that the facts and legal framework were "unique."

The clear implication is that the nexus of facts and operative law involving pre-*Nixon* Special Counsels, were, in fact, *dis*similar, and that the Court's analysis should not be extended to different facts concerning future Special Counsels. *Nixon* was the proverbial ticket good for one ride—or perhaps, one president. *Bush v. Gore* could be characterized in a similar fashion. 531 U.S. 98, 109 (2000). Smith, and the D.C. Circuit, failed to even acknowledge this "unique" ticket. *In re Sealed Case*, 829 F.2d 50, 55 n.30 (D.C. Cir. 1987); *In re Grand Jury Investigation*, 916 F.3d 1047, 1053–54 (D.C. Cir. 2019).

## C. The Acting Attorney General's grant to the Watergate Special Prosecutor of unsurpassed insulation would be inconsistent with modern Supreme Court precedent

The holding of *Nixon* should be cabined because of the Watergate Special Prosecutor's "unique" insulation against removal. The *Nixon* Court quoted the underlying regulations:

> The Attorney General will not countermand or interfere with the Special Prosecutor's decisions or actions. The Special Prosecutor will determine whether and to what extent he will inform or consult with the Attorney General about the conduct of his duties and responsibilities. In accordance with assurances given by the President to the Attorney General that the President will not exercise his Constitutional powers to effect the discharge of the Special Prosecutor or to limit the independence that he is hereby given, the Special Prosecutor will not be removed from his duties except for extraordinary improprieties on his part and without the President's first consulting the *Majority and the Minority Leaders and Chairmen and ranking Minority Members of the Judiciary Committees of the Senate and House of Representatives* and ascertaining that their consensus is in accord with his proposed action.

*Nixon*, 418 U.S. at 694 n.8 (quoting 38 Fed. Reg. 30739) (emphasis added). The Court described this particular "delegation of authority to the Special Prosecutor" as "not an ordinary delegation by the Attorney General to a subordinate officer." *Id.* at 696.

Acting Attorney General Bork was serving under unusual circumstances in "times of stress." *Nader v. Bork*, 366 F. Supp. 104, 109

13

(D.D.C. 1973). Bork, with the acquiescence of President Nixon, granted the Special Prosecutor a new and unsurpassed protection against removal. *Id*. at 109 n.13. Under pressure from Congress, Bork shared the removal power with Congress.[14] The Special Prosecutor could only be removed for "extraordinary improprieties." This level of independence is far beyond that granted in the Reno regulations, which permit removal for "good cause." 28 C.F.R. §600.7(d).

Smith's brief focuses almost entirely on the statutory authorities supporting Jaworski's appointment. But Smith relegates the critical regulation to a parenthetical. Smith-Appellant's Br. at 15. The statutes cannot be read in isolation from the regulations. Whatever the holding of *Nixon* is, it is limited to the unique statutory *and* regulatory framework at issue, as indicated by the Court's quoting the regulations.

Again, the 1973 regulations permitted removal of the Special Prosecutor *only* after the President had consulted and sought consensus from eight high-ranking members of Congress. Modern Special Counsels, and even the defunct Independent Counsel, enjoyed no such protections against removal—with good reason. Apart from the unique context in

---

[14] Robert Bork, Saving Justice 102–03 (2013).

which the regulations arose, a future effort in this manner to insulate Special Counsels against removal is inconsistent with *Bowsher v. Synar*. 478 U.S. 714 (1986). *Amici* doubt the lawfulness of a regulation, promulgated by the Attorney General, that would require the President to consult with members of Congress to effect a removal.

To the extent *Nixon* validated the Special Prosecutor's appointment, the Court did so based on a statutory and regulatory framework that is no longer in force and which could not be put into effect today, even by statute. *Id.*

### D. Whatever the holding of *Nixon*, it should not be extended to today's context under today's statutory and regulatory framework

Whether *Nixon*'s analysis is holding or dicta, there are three reasons why it should not be extended to today's context under today's statutory and regulatory framework.

*First*, a Supreme Court precedent must be applied "neither narrowly nor liberally—only faithfully." *U.S. v. Johnson*, 921 F.3d 991, 1001 (11th Cir. 2019) (en banc). And as many "good common-law judges have held" the "rationale [of a precedent] does not extend to [a] *new* fact situation." Antonin Scalia, A Matter of Interpretation 8 (1997). Smith

argues that his position is "comparable" to the Watergate Special Prosecutor. Smith-Appellant's Br. at 14. But you do not need to "squint narrowly" at *Nixon* to see that Smith is incorrect. Scalia, *supra* at 7.

The Watergate-era Bork regulations for Special Prosecutors and the modern, now-in-force Reno regulations for Special Counsels are not "comparable." The facts of *Nixon* "do not line up closely with the facts" of *Trump. See Jefferson County v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000). For that reason alone, *Nixon* is not and cannot be controlling: *Nixon* relied upon federal regulations that are no longer in effect.

*Second*, a Supreme Court holding should no longer be controlling "where specific statutory language that had previously been interpreted by the Court is amended ...." *See Allapattah Services, Inc. v. Exxon Corp.*, 362 F.3d 739, 765 (11th Cir. 2004) (Tjoflat, J., dissenting from denial of rehearing en banc). The same principle should apply in this case where all three branches of government have responded to *Nixon* during the five-decade aftermath of Watergate: Congress enacted new legislation and then let it lapse; the Executive Branch rescinded old regulations and issued new regulations; and the Supreme Court has developed new separation of powers jurisprudence.

*Third*, the Supreme Court has directed lower courts to continue following a precedent that "directly controls." *Rodriguez de Quijas v. Shearson/Am. Exp.*, 490 U.S. 477, 484 (1989). But there is a "difference between following a precedent and extending a precedent." *See Acker*, 210 F.3d at 1320. There is no justification to extend *Nixon*'s drive-by analysis of its unique statutory and regulatory framework to today's context, especially where doing so would present severe constitutional problems.

To be clear, the Reno regulations provide *less* protections for Smith than the Watergate Special Prosecutor enjoyed. And Smith may argue that the Reno regulations are more defensible than the Bork regulations. But before reaching that merits question there is the threshold precedential question: *Does the holding of* Nixon*, whatever it is, "directly control" this case?* Read faithfully, the answer is no. *Nixon* was premised on a different statutory and regulatory framework.

All members of the *Nixon* Court insisted that this case was "unique." We should take them at their word.

## II. In this case, Smith cannot rely on a permanent appropriation to fund the "prosecut[ion] [of] high ranking government officials," because all of the charged conduct arose after Trump left office

Smith has invoked *only* one funding source: a permanent indefinite appropriation from 1987: a "note" to 28 U.S.C. §591. The Government Accountability Office determined that this appropriation can be used for "investigat[ing] and prosecut[ing] high ranking government officials." GAO, *supra* note 1, at *4. This rule is consistent with the traditional purpose of independent counsels: to prevent a particular type of *internal* conflict of interest where DOJ would investigate itself, the President, or the President's close confidants and family. But Trump was not a high-ranking official at the time he was indicted, and *all* the alleged conduct took place after he was out of office. In these circumstances, the funding mechanism in Section 591's note cannot be used to pay Smith. And at this juncture, Smith has waived any opportunity to identify alternative funding sources.

**A. The traditional purpose of the permanent appropriation for funding the independent counsels was to avoid internal conflicts of interest associated with the DOJ investigating itself, the President, or the President's confidants and family**

The traditional purpose of Independent Counsels and Special Prosecutors was to prevent particular "conflicts of interest" where the "Executive Branch" would "investigate its own high-ranking officers," the President, as well as the President's close confidants and family. *Morrison*, 487 U.S. at 677. There would be a conflict in such cases because DOJ is ultimately responsible to the President. In other words, prosecutors outside the usual chain of responsibility, and who enjoyed unusual independence, were needed so that DOJ could avoid *internal* conflicts. This paradigm is consistent with Attorney General Garland's decision to appoint a Special Counsel to investigate President Biden's documents case, as well as the case of Hunter Biden. Smith endorsed this traditional understanding of the purpose of Special Counsels. Smith's District Court brief stated:

> [T]he GAO, "an independent agency within the legislative branch" that serves Congress, *Bowsher v. Merck & Co.*, 460 U.S. 824, 844 (1983), stated that it "agree[d] with the Department that the same statutory authorities that authorize the Attorney General (or Acting Attorney General) to delegate authority to a U.S. Attorney to investigate and

prosecute *high ranking government officials* are 'other law' for the purposes of authorizing the Department to finance the investigation and prosecution from the permanent indefinite appropriation."

Dist.Ct. ECF #374 at 20 (citing GAO, *supra* note 1, at *4) (emphasis added). Smith's brief also relied on *U.S. v. Stone*. 394 F. Supp. 3d 1 (D.D.C. 2019). *Stone* reached the *same* conclusion based on the *same* GAO report. *Id.* at 17, 22. Finally, Smith adopted this view at oral argument. ECF #647 at 60.

In this case, Smith has not been asked to investigate the DOJ, the President, the President's close confidants or his family. Rather, Smith indicted Trump *after* Trump was out of office for more than a year. And the charges in this case relate exclusively to conduct that took place *after* Trump was no longer President. Smith conceded that Section 591's note *only funds* an "independent counsel" prosecuting a "high ranking government official" because the DOJ would otherwise face an *internal* conflict.

Given that Trump was not a government official, "high ranking" or otherwise, at the time he was indicted, and that the alleged conduct took place after he was out of office, the DOJ faces no *internal* conflict. In these

circumstances, the funding mechanism in Section 591's note cannot be used to pay Smith, his employees, and his contractors.

## B. The Special Counsel has waived any opportunity to identify an additional funding source

During oral argument, Smith's counsel assured the District Court that an "alternative source" of funding existed and this source could be produced. ECF #648 at 41, 44. To date, Smith has not referenced any other specific federal statute that could lawfully fund Smith's salary, his staff, his contractors, etc. On appeal, Smith devoted barely one page to the funding issue. Smith-Appellant's Br. at 57.

The Special Counsel had an opportunity to identify additional funding sources during the hearing, and on appeal, but failed to do so. "[B]oth the Government and the defendant in a criminal trial must make choices as the trial progresses." *Ohler v. U.S.*, 529 U.S. 753, 757 (2000). And Smith made his choice. He has thus waived any opportunity to identify an additional funding source beyond Section 591's note.

### III. Smith does not hold a continuous "Officer of the United States" position, and Smith has repeatedly and expressly disclaimed that his position can be construed as an "employee"

Where authorized by statute, the Attorney General is empowered to appoint "inferior" "Officers of the United States." U.S. Const. art. II, §2, cl. 2. And Smith maintains that Attorney General Garland properly appointed him as an inferior Officer of the United States. The Supreme Court's precedents that distinguish between *principal* and *inferior* Officers of the United States are well known. But there is another body of "office"-related law that is less well known, but resolves this case.

Precedents stretching back more than two centuries recognize that not all people in the service of the federal government are "Officers of the United States." *U.S. v. Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823) (Marshall, Circuit Justice). In order for a position to be an "officer of the United States that ... individual *must* occupy a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quoting *U.S. v. Germaine*, 99 U.S. 508, 511 (1879)) (emphasis added). *Must*, not *may*. The position Smith (purportedly) holds does not meet this standard.

Even if Smith's *duties* are regular, his position is not a continuous one, and therefore it lacks *duration*. Because Smith's position lacks

duration, his position cannot be an "office[] of the United States," principal or inferior. Smith is, at most, an employee. And a non-officer employee cannot exercise the sweeping powers of a Senate-confirmed U.S. Attorney.

In the proceedings below, Smith squarely rejected *Amici*'s position: that Smith is an employee. But now, Smith is hinting that he may adopt this argument as a saving construction. Smith cannot do so—he has waived and forfeited this issue.

### A. Under *Buckley* and *Lucia*, only an "Officer of the United States" position, whose duration is continuous, can exercise "significant authority"

Supreme Court precedent imposes two requirements to determine whether a position is an "Officer of the United States." (This question is antecedent to determining whether an "Officer of the United States" is principal or inferior.) First, *Buckley v. Valeo* distinguished between "employees" of the United States and "officers of the United States." 424 U.S. 1, 126 n.162 (1976). The former "are lesser functionaries subordinate to officers of the United States." *Id.* By contrast, only Article II "officers of the United States" can exercise greater powers. The Court explained: "any appointee exercising *significant authority* pursuant to the laws of

the United States *is* an 'Officer of the United States,' and *must*, therefore, be appointed in the manner prescribed by §2, cl. 2, of that Article." *Id.* at 126 (emphases added). *Must*, not *may*. In short, only an "Officer of the United States" can exercise "significant authority." Conversely, a mere "employee" cannot exercise "significant authority."

Second, *Lucia v. SEC* established, following longstanding precedent, that in order for a position to be an "officer of the United States that ... individual *must* occupy a 'continuing' position established by law." 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 511) (emphasis added). Again, *must*, not *may*. And *Lucia* connected a "'continuing'" position and the concept of "'duration.'" *Id.* (quoting *Germaine*, 99 U.S. at 511). Duration, in the constitutional sense, does not simply refer to a substantial period of time. Duration demands continuity from one position's holder to his successor.

*Lucia* also applied *Buckley*'s "significant authority" test. *Id.* at 245. In dissent, Justice Sotomayor characterized *Buckley*'s "significant authority" test and *Germaine*'s "continuing"-position test as "two prerequisites to officer status." *Id.* at 269 (Sotomayor, J., dissenting). If a position is not continuous, it lacks duration. A position that lacks

duration cannot be an "Office[] of the United States." And a position that is not an "Officer of the United States" cannot exercise "significant authority."

## B.  Under *Morrison v. Olson*, Smith's position lacks duration because it is not continuous

*Morrison v. Olson* explained that continuity is not determined solely based on how long a position lasts. For example, under the Ethics in Government Act, there was "no time limit" on the Independent Counsel's position. *Morrison*, 487 U.S. at 672. And Morrison served for more than two years. But that timespan alone, though relevant, did not settle whether the position has a continuous "'duration.'" *Id.* (quoting *Germaine*, 99 U.S. at 511). A position assigned *exclusively* to one person that stretches for several years, and then terminates when the assigned duty is complete, still would not be a *continuous* position. Why? That position lacks duration.

*Morrison* identified three elements to determine whether a position is continuous, and thus has duration:

> There is concededly no time limit on the appointment of a particular [independent] counsel. Nonetheless, the office of independent counsel is "temporary" in the sense that an independent counsel is [1] appointed essentially to accomplish

a single task, and [2] when that task is over the office is terminated, either by the counsel herself or by action of the Special Division. Unlike other prosecutors, [3] appellant has no ongoing responsibilities that extend beyond the accomplishment of the mission that she was appointed for and authorized by the Special Division to undertake.

*Id.* at 672. Smith's position does not satisfy the three-element *Morrison* test.

*First*, Attorney General Garland's order appointing Smith listed a finite set of issues to investigate. Smith was assigned ad hoc to investigate what the Office of Legal Counsel identified as a "single, or particular controversy or case." *Officers of the United States Within the Meaning the Appointments Clause*, 31 O.L.C. 73, 112 (2007). To be sure, the allegations in the order are sprawling, but they can be characterized as a "single task." *Morrison*, 487 U.S. at 672. Morrison, who likewise oversaw a sprawling investigation, had but a "single task" assigned by the Special Division. The retention of Smith, like Morrison, "to accomplish a single task" is inconsistent with a position being continuous.

*Second*, after Smith completes his investigation and any prosecutions he chooses to bring in the scope of his delegated authority,

then his "task is over," and his position is "terminated." *Id.* Smith's position, like Morrison's position, has lasted for several years. But that timespan alone does not determine whether Smith's position is continuous. What matters is that Smith's extant position would not continue beyond Smith's resignation or removal—even if Smith's assigned task remains unfinished.

By contrast, Morrison's Independent Counsel position under the Ethics in Government Act met this second element. That statutory regime created a permanent umbrella structure. 28 U.S.C. §596(b)(l). The statute also recognized that any single independent counsel position would not terminate when there was a vacancy. 28 U.S.C. §593(e). The statutory framework provided for successors if any one independent counsel became vacant by resignation or removal.

Today's Special Counsel regulations provide no mechanism to deal with vacancies. Moreover, today's Special Counsel regulations do not establish any sort of broader office structure that unifies various Special Counsels. To the contrary, each Special Counsel is appointed pursuant to a particular order, without regard to any broader statutory institutional framework. In short, Smith's position is entirely tied to his person and

his continuing in that position. If Smith resigned or were removed, then the position he holds would cease to exist. And all of the lawyers and staff working for Smith would have to put their pens down.

*Third*, Smith has no "ongoing responsibilities that extend beyond the accomplishment of the mission that [he] was appointed for and authorized by the [Attorney General] to undertake." *Morrison*, 487 U.S. at 672. If the defendants were acquitted of all charges, Smith would have nothing more to do.

In sum, Smith's position lacks duration because he does not hold a "continuing position." *Lucia*, 585 U.S. at 245 (quotation marks omitted). And because Smith's position lacks duration, he cannot be an "officer of the United States." He would be, at most, an "employee" of the United States. *Buckley*, 424 U.S. at 126 n.162. And a non-officer employee cannot exercise the "significant authority" of a Senate-confirmed U.S. Attorney. *Id.*

## C. Even if Smith's *duties* are regular, his position is not *continuous*

*Morrison* considered three factors to "establish that [Morrison] is an 'inferior' officer [of the United States] in the constitutional sense."

*Morrison*, 487 U.S. at 672. The three factors he identified were tenure, duties, and duration. *Id.* These factors derive from *U.S. v. Hartwell*, which offered this definition of office: "An office is a public station, or employment, conferred by the appointment of government. The term embraces the ideas of [1] tenure, [2] duration, [3] emolument, and [4] duties." 73 U.S. 385, 393 (1868). The Court applied the *Hartwell* test in *U.S. v. Germaine*, 99 U.S. 508 (1879), and in *Auffmordt v. Hedden*, 137 U.S. 310 (1890).

All four *Hartwell* elements have been repeatedly used to determine whether a position is an "Officer of the United States." But *Lucia* expressly stated that the duration prong, in particular, is mandatory. And *Morrison* provided the test to determine whether a position had the required duration: *Is the position a continuous one?*

Moreover, in the four-element *Hartwell* test, the duration prong is distinct from the duties prong. Duration refers to continuity: *Does the position continue through a vacancy in connection with a resignation or removal?* Duration must be continuous in order for the position to be an "Officer of the United States." By contrast, the duties prong asks: *Are the position's responsibilities regular and ongoing, as opposed to being merely*

*episodic, "intermittent," and "occasional"?* *Germaine*, 99 U.S. at 512.

Smith, however, has conflated the duration element and the duties

element. For example, during oral argument, Smith's counsel stated:

> Then the question becomes one of continuity. And the way the
> courts have talked about this, from *Germaine* and *Hartwell*
> on, are questions of: Is this something that is episodic,
> intermittent, occasional? So, sort of, a doctor that's seeing
> patients on an occasional basis ....

ECF #647 at 155. Smith's counsel erred here by conflating a *continuous*

*duration* with *regular duties*. Duties can be regular, while a position is

not continuous, and thus lacks duration. Conversely a continuous

position with duration can have episodic duties. These two elements are

distinct. The *Lucia* Court, as well as Justice Sotomayor's dissent,

recognized that the duration element is mandatory.

Smith satisfies three of the four *Hartwell* elements. Smith clearly

has *tenure*—he can only be removed for cause. Mr. Smith receives

*emoluments*—albeit, *Amici* contests the lawfulness of this compensation.

And *Amici* acknowledge that Smith's *duties* are regular; they are not

"intermittent and occasional." But even if Smith's position has *regular*

duties, his position is not *continuous. Lucia*, 585 U.S. at 245. And because

Smith's position is not a continuous one, it lacks duration, and therefore,

it is not an "Officer of the United States." As a non-officer, Smith cannot exercise the "significant authority" of a U.S. Attorney.

**D. In the proceedings below, Smith repeatedly and expressly disclaimed that he is an "employee" and he has waived the right to change his position on appeal**

Before the District Court, Smith emphatically stated that he is not an employee, but is an officer of the United States. ECF #374 at 5 n.1; ECF #405 at 4. Smith stated, plainly: "the Tillman Amicus' central contention ... that the Special Counsel is ... an employee ... is wrong." ECF #432 at 1. During oral argument, Smith's counsel described Tillman's position as "not a frivolous [argument], but an argument that finds no support in case law and, thus, [it] didn't warrant a developed substantive response in that context." ECF #648 at 46.

Yet before this Court, Smith seems to be shifting to a saving construction: even if this Court were to find that the Special Counsel is not an "Officer of the United States," Smith may continue his work as a mere "employee" under the supervision of the Attorney General. Contrary to *Buckley*, Smith might try to argue that a mere employee *can* exercise the "significant authority" of a Senate-confirmed U.S. Attorney.

At several points, Smith's brief feints in that direction:

- For the first time on appeal, Smith cites 5 U.S.C. §3101, which empowers the Attorney General to *"employ such number of employees."* Smith-Appellant's Br. at 33 (emphasis added).
- Smith now suggests that the Attorney General "could have hired Smith for some other purpose" under Section 3101, which authorizes "executive agencies to hire *employees*." *Id.* at 27. (emphasis added).
- And most importantly, Smith now argues that the Attorney General may delegate *"significant authority"* through the "creation of a new 'continuing' position, or the assignment of the Attorney General's duties to any 'officer' or '*employee*,' including one *newly hired* for that purpose." *Id.* at 34 (emphases added) (citations omitted).

We see no record of Smith's having made any of these arguments below. Smith now hints that he might just be an employee who was hired for a new role. And he hints that even if he is not an *officer of the United States*, he can, as an *employee*, exercise the "significant authority" of a U.S. Attorney. This position is foreclosed by *Buckley*. And this argument, which Smith deemed borderline-frivolous a few months ago, has been waived and forfeited. *Ohler*, 529 U.S. at 757. Smith cannot adopt on appeal a legal position which he unambiguously rejected before the District Court.

## IV. The issue of whether *Morrison v. Olson* should be overruled has been properly preserved for review by the Supreme Court

During oral argument, counsel for *Amici* "asked to preserve the issue over whether *Morrison* [*v. Olson*] should be overruled." ECF #647 at 112. On rebuttal, Smith's counsel argued that this issue was not "in any way presented." *Id.* at 155. The District Court acknowledged that "the matter [of whether to overrule *Morrison*] was raised at argument by the Landmark Legal *amici.*" *Trump v. U.S.*, 2024 WL 3404555, at *36 n.54 (S.D. Fla. 2024). The Supreme Court has resolved constitutional questions that were raised only by *amici. Mapp v. Ohio*, 367 U.S. 643, 646 n.3 (1961); *Teague v. Lane*, 489 U.S. 288, 300 (1989).

If *Morrison* were to be overruled, the constitutionality of the Reno regulations would be placed in serious jeopardy. And this issue has been fairly presented and preserved by *Amici.*

## CONCLUSION

The judgment below should be affirmed.

Respectfully submitted,


Josh Blackman
Josh Blackman LLC
1303 San Jacinto Street
Houston, TX 77002
Phone: 202-294-9003
josh@joshblackman.com

_/s/ Michael A. Sasso_
Michael A. Sasso
_Counsel of Record_
Sasso & Sasso P.A.
1031 West Morse Boulevard
Suite 120
Winter Park, FL 32789
Phone: 407-644-7161
masasso@sasso-law.com

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Eleventh Circuit Rule 32-4, this brief contains 6,490 words.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in font size 14, Century Schoolbook.

*/s/ Michael A. Sasso*
Michael A. Sasso

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2024, a true and correct copy of the foregoing document was electronically filed through CM/ECF. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

October 1, 2024

> /s/ Michael A. Sasso
> MICHAEL A. SASSO
> Sasso & Sasso P.A.
> 1031 West Morse Boulevard
> Suite 120
> Winter Park, FL 32789
> Phone: 407-644-7161
> masasso@sasso-law.com
>
> Counsel for *Amici*