No. 24-12311

# In the United States Court of Appeals for the Eleventh Circuit

UNITED STATES OF AMERICA,
*Appellant,*

V.

DONALD J. TRUMP, ET AL.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Florida
No. 9:23-cr-80101

**BRIEF OF THE STATES OF FLORIDA, IOWA, ALABAMA, ALASKA, ARKANSAS, IDAHO, INDIANA, KANSAS, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, UTAH, AND WEST VIRGINIA AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

BRENNA BIRD
  *Attorney General of Iowa*

ERIC H. WESSAN
  *Solicitor General*

ASHLEY MOODY
  *Attorney General of Florida*

HENRY C. WHITAKER
  *Solicitor General*
DANIEL W. BELL
  *Chief Deputy Solicitor General*
NATHAN A. FORRESTER
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Assistant Solicitor General*

1305 East Walnut St. 2d Floor
Des Moines, IA 50319
(515) 823-9117
*eric.wessan@ag.iowa.gov*

*Counsel for the State of Iowa*

PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

*Counsel for the State of Florida*

## CERTIFICATE OF INTERESTED PERSONS

The Amici States certify that, to the best of their knowledge, the following is a complete list of interested persons not included in the briefs of the parties and other amici as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1.      Bailey, Andrew

2.      Bell, Daniel

3.      Bird, Brenna

4.      Coleman, Russell

5.      Commonwealth of Kentucky

6.      Drummond, Gentner

7.      Fitch, Lynn

8.      Forrester, Nathan

9.      Griffin, Tim

10.     Hilgers, Michael T.

11.     Jackley, Marty J.

12.     Kobach, Kris

13.     Knudsen, Austin

14.     Labrador, Raúl R.

15.     Marshall, Steve

16. Morrisey, Patrick

17. Monson, Darrick

18. Moody, Ashley

19. Murrill, Liz

20. Reyes, Sean

21. Rokita, Theodore E.

22. Skrmetti, Jonathan

23. State of Alabama

24. State of Alaska

25. State of Arkansas

26. State of Florida

27. State of Idaho

28. State of Indiana

29. State of Iowa

30. State of Kansas

31. State of Louisiana

32. State of Mississippi

33. State of Missouri

34. State of Montana

35. State of Nebraska

36. State of Oklahoma

37. State of South Carolina

38. State of South Dakota

39. State of Tennessee

40. State of Utah

41. State of West Virginia

42. Taylor, Treg

43. Wessan, Eric H.

44. Whitaker, Henry

45. Wilson, Alan

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................ii

STATEMENT OF THE ISSUE ............................................................................ 1

INTEREST OF AMICI CURIAE ......................................................................... 1

SUMMARY OF THE ARGUMENT .................................................................... 2

ARGUMENT .......................................................................................................... 6

I.  THE SPECIAL-COUNSEL REGULATIONS GOVERNING SMITH'S
    POSITION VIOLATE ARTICLE II................................................................. 6

    A.  Article II vests in the President the responsibility to control
        all executive officers either directly or through his principal
        officers. ........................................................................................... 6

    B.  The special-counsel regulations violate Article II by
        restricting the ability of the Attorney General, and thereby
        the President, from controlling the Special Counsel's
        exercise of executive power. ....................................................... 9

II. MORRISON V. OLSON DOES NOT REQUIRE THIS COURT TO RULE
    OTHERWISE. ............................................................................................... 19

CONCLUSION ...................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Agostini v. Felton,*
  521 U.S. 203 (1997) ................................................................. 21
*Bond v. United States,*
  564 U.S. 211 (2011) ................................................................... 2
*Evans v. Stephens,*
  387 F.3d 1220 (11th Cir. 2004) ............................................. 21
*Ex parte Hennen,*
  38 U.S. 230 (1839) ..................................................................... 8
*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ................... 3, 6, 7, 8, 9, 12, 13, 16, 17, 19, 22
*Garza v. Idaho,*
  586 U.S. 232 (2019) ................................................................. 21
*Humphrey's Ex'r v. United States,*
  295 U.S. 602 (1935) ................................................................... 9
*Jefferson County v. Acker,*
  210 F.3d 1317 (11th Cir. 2000) .......................................... 21, 22
*Kansas v. Garcia,*
  589 U.S. 191 (2020) ................................................................. 10
*Morrison v. Olson,*
  487 U.S. 654 (1988) .................. 5, 10, 11, 12, 13, 14, 19, 20, 22
*Myers v. United States,*
  272 U.S. 52 (1926) .......................... 3, 6, 7, 8, 12, 13, 20
*Parsons v. United States,*
  167 U.S. 324 (1897) ............................................................. 4, 8
*Rhodes v. Michigan,*
  10 F.4th 665 (6th Cir. 2021) ................................................. 21
*Seila Law, LLC v. Consumer Fin. Prot. Bureau,*
  591 U.S. 197 (2020) ................. 3, 5, 6, 9, 12, 13, 14, 16, 19, 20, 21, 22
*Trump v. United States,*
  603 U.S. 593 (2024) .......................................................... 8, 9, 17
*United States ex rel. Accardi v. Shaughnessy,*
  347 U.S. 260 (1954) ................................................................. 18
*United States v. Arthrex, Inc.,*
  594 U.S. 1 (2021) ........................................................... 8, 17, 18
*United States v. Nixon,*
  418 U.S. 683 ..................................................................... 17, 18

*United States v. Perkins*,
   116 U.S. 483 (1886)..................................................................20
*Waldman v. Conway*,
   871 F.3d 1283 (11th Cir. 2017)..............................................2, 5
*Wiener v. United States*,
   357 U.S. 349 (1958)...................................................................9

## Statutes & Constitutional Provisions

28 U.S.C. § 508...........................................................................18
28 U.S.C. § 599...........................................................................20
U.S. Const. art. II, § 1..............................................................3, 6
U.S. Const. art. II, § 3..............................................................3, 6

## Regulations

28 C.F.R. § 600.1 .........................................................................4
28 C.F.R. § 600.6 ...........................................................1, 9, 12, 13
28 C.F.R. § 600.7 .......................................................4, 12, 13, 14
Exec. Order No. 13787, 82 Fed. Reg. 16723 (Apr. 5, 2017)...........18

## Other Authorities

1 Annals of Cong. (1789).......................................................3, 7, 8
*Attorney General Announces Special Counsel for Mar-a-Lago and January 6 Investigations*,
   C-Span (Nov. 18, 2022), https://tinyurl.com/mu4w9cw8 ...................4, 15
*Attorney General Merrick Garland Remarks on Reducing Violent Crime*,
   C-Span (June 14, 2023), https://tinyurl.com/4vf57yxr.........................16
Joshua M. Divine, *Statutory Federalism and Criminal Law*,
   106 Va. L. Rev. 127 (2020)...........................................................10
*Justice Dep't Oversight Hearing, Part 2*,
   C-Span (Sept. 20, 2023), https://tinyurl.com/4t989h54 ...................15
Order No. 5559-2022, Appointment of John L. Smith as Special Counsel
   (Nov. 18, 2022), https://www.justice.gov/opa/file/1553901/dl ...........1
*Reimbursing the Attorney's Fees of Current and Former Federal Employees Interviewed as Witnesses in the Mueller Investigation*, 44 Op. O.L.C. __ (Oct. 7, 2020),
   https://tinyurl.com/534yz755 ...........................................11, 14, 19
Robert Jackson, The Federal Prosecutor, Address at the Second Annual Conference
   of United States Attorneys (Apr. 1, 1940) ...................................10

## STATEMENT OF THE ISSUE

Whether the district court properly dismissed the indictment on the grounds that Special Counsel Jack Smith held his position unlawfully.

## INTEREST OF AMICI CURIAE

In November 2022, Attorney General Merrick Garland appointed outside attorney Jack Smith to serve as "Special Counsel for the United States Department of Justice," investing him with "the full power and independent authority to exercise [the] functions of any United States Attorney" to investigate President Trump. Order No. 5559-2022, Appointment of John L. Smith as Special Counsel (Nov. 18, 2022), https://www.justice.gov/opa/file/1553901/dl; 28 C.F.R. § 600.6. Smith wielded that considerable authority to take the unprecedented step of indicting a former President and the principal political rival of the current ruling regime. But unlike a U.S. Attorney, Smith faces next-to-zero presidential accountability. He was not appointed by the President and confirmed by the Senate. Nor is he subject to the plenary supervision of an official who was.

Defendants have well explained why Congress has neither authorized nor funded the Attorney General's unilateral consolidation of such power in a single unaccountable official. Amici curiae States of Florida, Iowa, Alabama, Alaska, Arkansas, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, and West Virginia submit this brief to emphasize an alternative ground for affirmance of the district court's judgment

dismissing the indictment[1]: Smith acted under regulations that authorize the exercise of core executive power unguided by the plenary control of the President or any principal officer accountable to him. Because those regulations violate Article II of the Constitution, Smith's actions under them are invalid.

Amici States have an interest in ensuring that the Executive Branch of our national government exercises its power—especially the power to subject the citizens of those States to criminal prosecution—within constitutional limits. After all, "[s]eparation-of-powers principles" do not just protect "each branch of government from incursion by the others"; they "protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011). Case in point: Smith is currently pursuing arguably the most politically sensitive criminal prosecution in American history—the first prosecution of a former president and current presidential candidate running against the current administration. Amici States have a profound interest in ensuring that those responsible remain democratically accountable to the States' citizens and in checking unprecedented abuses of executive power.

## SUMMARY OF THE ARGUMENT

Article II of the Constitution vests the "the 'executive power'—all of it"—in the President and imposes exclusively on him a duty to "take Care that the Laws be

---

[1] The Court "may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below." *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017).

faithfully executed." *Seila Law, LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). Given the country's size and the breadth of federal law, the President largely exercises that power not directly, but through "subordinate officers" who are ultimately accountable to him. *Id.* at 204.

The Framers understood well that supervising and controlling subordinate executive officers was itself an exercise of executive power belonging ultimately to the President. James Madison, for example, explained that through Article II, "the chain of dependence [would] be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010) (quoting 1 Annals of Cong. 499 (1789)).

That structure makes it imperative for the President to have complete trust and faith in the subordinate officers who execute his authority. For that reason, all branches of government have long accepted that the President had to enjoy—either directly or through principal officers supervised by him—the "unrestricted" authority to control and if necessary, remove, executive officers, regardless of their status as principal or inferior. *Myers v. United States*, 272 U.S. 52, 115, 163 (1926). In other words, by vesting the entire executive power and responsibility in the President, Article II requires executive officers to trace their authority up an unrestricted chain of command that ultimately ends with the President.

Despite Article II's unmistakable text and centuries of historical practice, the Department of Justice has exempted from the constitutionally required chain of command certain federal prosecutors cloaked with "the full power . . . of any United States Attorney" when the Attorney General deems it "in the public interest." 28 C.F.R. §§ 600.1(b), 600.6; *but see Parsons v. United States*, 167 U.S. 324, 327–29 (1897) (analyzing the history of the President's unrestricted constitutional removal authority in concluding that U.S. Attorneys are removable by the President). These so-called "special counsels" do not serve at the pleasure of the Attorney General. They are instead removable only for cause. 28 C.F.R. § 600.7(d). They are also immune from "day-to-day supervision" by anyone at the Department of Justice. *Id.* § 600.7(b). And their decisions cannot be overridden unless the Attorney General, after giving them "great" deference, concludes that a decision was "so inappropriate or unwarranted under established Departmental practices that it should not be pursued" and notifies Congress accordingly. *Id.*

Indeed, the avowed purpose of Special Counsel Smith's appointment was to remove responsibility—and thus political accountability—for the investigations and prosecutions under his purview from the current Administration. The Attorney General appointed Special Counsel Smith after President Trump announced his candidacy for the 2024 election because the Attorney General considered it "in the public interest" for someone "independent" of the Administration to head these criminal proceedings. *Attorney General Announces Special Counsel for Mar-a-Lago and January 6 Investigations*, C-Span (Nov. 18, 2022), https://tinyurl.com/mu4w9cw8. The result: A single executive officer

now unilaterally resolves massively consequential, politically fraught issues like whether to indict a former president and current presidential candidate and what position the United States will take as to whether and to what extent a President enjoys immunity from criminal prosecution. Article II does not give the Attorney General the authority to vest the executive power in Jack Smith.

Nor may the Attorney General take refuge in the Supreme Court's decision in *Morrison v. Olson*, 487 U.S. 654 (1988), which represents one of "two exceptions" the Supreme Court has ever recognized "to the President's unrestricted removal power." *Seila Law*, 591 U.S. at 204. *Morrison* held that *Congress* may insulate certain inferior officers from removal as an incident to its constitutional authority to dictate their manner of appointment. But that ruling in no way suggests that the Attorney General, who has no such authority, may unilaterally do so.

The district court's dismissal of the indictment should be affirmed.[2]

---

[2] Although the district court did not rule on the constitutional issue raised by Amici States, this Court is not barred from doing so. *See Waldman*, 871 F.3d at 1289 ("We may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below."). At minimum, the constitutional issue should inform the Court's interpretation of the statutes that the Special Counsel claims authorize his appointment.

# ARGUMENT

## I. THE SPECIAL-COUNSEL REGULATIONS GOVERNING SMITH'S POSITION VIOLATE ARTICLE II.

### A. Article II vests in the President the responsibility to control all executive officers either directly or through his principal officers.

Article II of the Constitution "vest[s]" "[t]he executive Power . . . in a President" and imposes on him the duty to "faithfully execute[]" "the Laws." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. As the Supreme Court has explained, the upshot is that "[t]he entire 'executive Power' belongs to the President alone." *Seila Law*, 591 U.S. at 213. As a practical matter, the President cannot personally execute all federal laws, so he must employ "the assistance of subordinates." *Myers*, 272 U.S. at 117. But because any power exercised by subordinate executive officials is ultimately the power vested by the Constitution in the President—who is "elected by the entire Nation," *Seila Law*, 591 U.S. at 224—the President must be able to control their exercise of the executive power, including through removing his subordinates at his pleasure. *See Myers*, 272 U.S. at 117.

That unrestricted authority preserves the President's prerogative to employ subordinates in whom he may place his complete trust. In other words, while many government officials may be called upon to assist the President in "faithfully execut[ing]" federal law, "[t]he buck" must "stop[] with the President." *Free Enter. Fund*, 561 U.S. at 493.

That principle is not a recent development in American constitutional understanding. The First Congress recognized that control and removal of executive officers

inhered in the President's exclusive executive power. When considering legislation to create the first executive departments, the First Congress originally drafted a bill that would have specified that department heads were removable by the President. *Myers*, 272 U.S. at 111 (citing 1 Annals of Cong. 370–71 (1789)). Some representatives objected on the grounds that the law would make the President's removal power appear to be granted by Congress, which was inconsistent with their understanding that the Constitution itself granted that power to the President by vesting in him the executive power. *Id.* at 112–13 (citing 1 Annals of Cong. 578–79 (1789)). James Madison explained that "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Free Enter. Fund*, 561 U.S. at 492 (quoting 1 Annals of Cong. 463 (1789)). A majority in both houses ultimately agreed, striking the offending text and adopting in its place a clause that, rather than purporting to *grant* removal authority, "recogniz[ed] and affirm[ed] the unrestricted power of the President to remove." *Myers*, 272 U.S. at 113–15.

That decision "was, and was intended to be, a legislative declaration" of the First Congress's understanding that inherent in the President's exercise of executive power was the power to control, and if necessary, remove, executive officials. *Id.* at 114. And "it was soon accepted as a final decision of the question by all branches of the government." *Id.* at 136. Congress "followed and enforced the legislative decision of 1789 for 74 years" until President Andrew Johnson's controversial impeachment. *Id.* at 145. Attorneys general across administrations often relied on and agreed with the First

Congress's interpretation of the executive power, and the view of every President was "unchanged and uniform." *Id.* at 154, 169. The First Congress's interpretation was also "affirmed by [the Supreme] [C]ourt in unmistakable terms." *Id.* at 148; *see Ex parte Hennen*, 38 U.S. 230, 259 (1839) (affirming that it had "become the settled and well understood construction of the Constitution, that the power of removal was vested in the President alone"); *Parsons*, 167 U.S. at 330 (same and holding that U.S. Attorneys are removable by the President despite being appointed for a fixed term).

The President's unrestricted power of removal is critical to maintaining clear lines of executive-branch accountability. In our constitutional design, the President is the "only person who alone composes a branch of government." *Trump v. United States*, 603 U.S. 593, 610 (2024). All executive officers, superior and inferior, thus exercise not their own, but the President's executive power. *Myers*, 272 U.S. at 161; *see also United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021) ("[T]housands of officers wield executive power on behalf of the President in the name of the United States."). But there always must be a "'clear and effective chain of command' down from the President" such that all executive officers, even "the lowest[,] . . . will depend, as they ought, on the President, and the President on the community." *Arthrex, Inc.*, 594 U.S. at 11 (first quoting *Free Enter. Fund*, 561 U.S. at 498, then quoting 1 Annals of Cong. 499 (1789) (J. Madison)). In other words, when subordinate officers exercise executive power, they exercise that power on behalf of the President and must be accountable to him for it. *See Free Enter. Fund*, 561 U.S. at 496 (explaining that all executive officers must be supervised by the

President or by an officer supervised by the President). For "[w]ithout a clear and effective chain of command, the public cannot determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." *Id.* at 498.

## B. The special-counsel regulations violate Article II by restricting the ability of the Attorney General, and thereby the President, from controlling the Special Counsel's exercise of executive power.

There is no question that Special Counsel Smith wields core executive power. As Smith has acknowledged, the "investigation and prosecution of crimes is a quintessentially executive function." *Trump*, 603 U.S. at 620 (quoting the Special Counsel's brief). It is a part of the executive power vested "solely in the President." *Id.* at 638. That power is thus the opposite of the "quasi legislative" or "quasi judicial" functions that, however dubiously, have at times been deemed permissible to assign to a tenure-protected official appointed by the President with the advice and consent of the Senate. *See Humphrey's Ex'r v. United States*, 295 U.S. 602, 628–30 (1935); *Wiener v. United States*, 357 U.S. 349, 352–56 (1958). And although the Special Counsel's authority is limited to certain subject matters, within those subjects, he exercises "the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney." 28 C.F.R. § 600.6. Thus, under Article II, Special Counsel Smith's authority ultimately belongs to the President. *See Seila Law*, 591 U.S. at 213. Smith exercises that authority simply to assist the President in fulfilling his duty to faithfully execute federal law. *See id.*

The distinctive character of the executive power that the Special Counsel wields confirms the point. Even though, as a constitutional matter, criminal law enforcement is supposed to be "primarily a responsibility of the States," *Kansas v. Garcia*, 589 U.S. 191, 212 (2020), the last century has seen a tremendous expansion of the federal criminal code, *see* Joshua M. Divine, *Statutory Federalism and Criminal Law*, 106 Va. L. Rev. 127, 166–67 (2020). That expansion has brought an equivalent growth of the power wielded by federal prosecutors through their charging discretion. "With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone." *Morrison v. Olson*, 487 U.S. 654, 728 (1988) (Scalia, J., dissenting) (quoting Robert Jackson, The Federal Prosecutor, Address at the Second Annual Conference of United States Attorneys (Apr. 1, 1940)).

That is true of line prosecutors, but all the more so of special counsels acting under the Department's regulations. Typical line prosecutors are at least subject to constraints, both practical and political, that mitigate the potential for abuse. For one, limited resources combined with the breadth of the prosecutor's responsibilities prevent a typical prosecutor from making "even a pretense of reaching every probable violation of federal law." *Id.* at 727. He must by practical necessity devote his attention to the most deserving cases because otherwise they may not be brought. *See id.* at 727–28. For another, the chief prosecutors who typically supervise the exercise of prosecutorial power—U.S. Attorneys and the like—are accountable to the President for the exercise

of their discretion, and the President is accountable to the American people. *Id.* at 728–29.

A special counsel has no such constraints. As the regulations make clear on their face, a special counsel wields the power of a U.S. Attorney, not an assistant. In that regard, a special counsel's charge to investigate a single, specific matter is a vice, not a virtue, as it deprives him of "the perspective that multiple responsibilities provide." *Id.* at 732. By giving the Special Counsel virtually limitless resources to exercise the power of a U.S. Attorney against a small subset of people, the regulations are "designed to heighten, not to check, all of the occupational hazards of the dedicated prosecutor; the danger of too narrow a focus, of the loss of perspective, of preoccupation with the pursuit of one alleged suspect to the exclusion of other interests." *Id.* at 731 (quoting Brief for Edward H. Levi, Griffin B. Bell, and William French Smith as *Amici Curiae*); *see also Reimbursing the Attorney's Fees of Current and Former Federal Employees Interviewed as Witnesses in the Mueller Investigation*, 44 Op. O.L.C. __, at *21–22 (Oct. 7, 2020) ("*Mueller Investigation*"), https://tinyurl.com/534yz755. And on the political front, the regulations' avowed purpose is to insulate the Special Counsel from political accountability.

The Department of Justice has itself recognized that these features heighten the risk that special counsels will abuse the executive power they are given such that people may "reasonably fear[] that the Special Counsel w[ill] 'pick the man and then search the law books to pin some offense on him.'" *Mueller Investigation*, 44 Op. O.L.C. __, at *22 (quoting *Morrison*, 487 U.S. at 728 (Scalia, J., dissenting)) (alterations accepted). The

Special Counsel is thus not a typical prosecutor but a "mini-Executive" holding the keys to significant executive power. *Morrison*, 487 U.S. at 732 (Scalia, J., dissenting). Accordingly, the President must be able to control the Special Counsel's exercise of executive power, either directly or through another officer who serves at the President's complete discretion, like the Attorney General. *See Seila Law*, 591 U.S. at 213 ("[L]esser officers must remain accountable to the President, whose authority they wield."). Yet the Department has by regulation declared the opposite—that a prosecutor charged with exercising the President's core executive power is "independent" of the President or his Attorney General. 28 C.F.R. § 600.6.

To start, the Special Counsel may be "removed from office only by the personal action of the Attorney General" and only for "for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause." 28 C.F.R. § 600.7(d). That for-cause removal restriction shackles the Attorney General's, and thus the President's, ability to control the use of core executive power—indeed, that is its entire purpose. The President, at least through his Attorney General, must possess complete control of decisions about whether, whom, and how to prosecute—regardless of whether such decisions constitute "misconduct" or "good cause."

The Supreme Court has repeatedly held that the Constitution requires the President to exercise plenary control over officers who exercise core executive powers, free of for-cause removal restrictions. *See Seila Law*, 591 U.S. at 224–25; *Free Enter. Fund*, 561 U.S. at 510; *Myers*, 272 U.S. at 176. "[T]he power to remove officers at will and without

cause is a powerful tool for control of an inferior." *Free Enter. Fund*, 561 U.S. at 510. Because an executive officer ultimately need obey "only the authority that can remove him," the President, as "the repository of *all* executive power," "must be able to discharge" subordinate officers for no other reason than their failure to "perform executive functions according to his liking." *Morrison*, 487 U.S. at 726 (Scalia, J., dissenting). The President's inability to do so with the Special Counsel means that the Special Counsel is "exercising . . . [his] own" and not the President's "discretion," contrary to the dictates of Article II. *Myers*, 272 U.S. at 132.

Although the Special Counsel's tenure protection alone renders the regulations unconstitutional, several other features of the special-counsel regulations conspire to "further aggravate[]" the Article II problem by restricting even "indirect methods of Presidential control." *Seila Law*, 591 U.S. at 225–26. To start, everyone at the Department of Justice, including the Attorney General, is prohibited from exercising "day-to-day supervision" over the Special Counsel. 28 C.F.R. § 600.7(b). The Special Counsel is granted discretion over "whether and to what extent" he "consult[s] with" or even "informs" the Attorney General about the investigations and prosecutions he oversees. *Id.* § 600.6. And the Attorney General may not override any investigative or prosecutorial decision made by the Special Counsel unless, after "giv[ing] great weight to the views of the Special Counsel," he determines that the decision "is so inappropriate or unwarranted under established Departmental practices that it should not be pursued." *Id.* § 600.7(b). And even then, the Attorney General must "notify Congress" that he

overruled the Special Counsel. *Id.* The regulations are "acrid with the smell of threat-ened impeachment." *Morrison*, 487 U.S. at 702 (Scalia, J., dissenting). By further restrict-ing whatever modicum of presidential oversight remains after the for-cause removal restriction, the special-counsel regulations "make[] it even more likely that the [Special Counsel] will slip from the Executive's control, and thus from that of the people." *Seila Law*, 591 U.S. at 226.

Were there any doubt, the Department of Justice openly embraces the Special Counsel's independence from the constitutionally required presidential chain of com-mand. According to the Department of Justice's Office of Legal Counsel, the function of the special-counsel regulations is to "provide[] autonomy" and "insulate the Special Counsel from many of the usual mechanisms of control and accountability." *Mueller Investigation*, 44 Op. O.L.C. __, at *18–19. That stands in striking contrast to a typical federal criminal proceeding where the chief prosecutor with principal responsibility for directing the investigation—such as a U.S. Attorney—is answerable either directly to the President or "to the Attorney General, who in turn is directly accountable to the President." *Id.* at *15. That accountability ensures that "the interest of the United States ordinarily can be expected to be represented fully by the federal prosecutor." *Id.* But by the Department's own admission, that is not necessarily the case with a special counsel, who by virtue of his independence from that hierarchy and "charge . . . to fulfill a broad prosecutorial mandate" cannot always be counted on to "adequately represent [every]

interest of the United States." *Id.* at *20. That is precisely why Article II requires executive officers to be accountable in a hierarchy that ultimately leads to the President.

Rather than recognizing Special Counsel Smith's independence from the presidential hierarchy for the constitutional defect it is, Attorney General Garland has touted it as a feature of Smith's appointment. The Attorney General's stated purpose for appointing Special Counsel Smith was to appoint an officer "to *independently* manage [the] investigation[s] and prosecution[s]." *Attorney General Announces Special Counsel for Mar-a-Lago and January 6 Investigations* at 3:13–18, C-Span (Nov. 18, 2022), https://tinyurl.com/mu4w9cw8. He emphasized that Smith would "exercise independent prosecutorial judgment to decide whether charges should be brought." *Id.* at 6:40–47. The Attorney General believed that such "independence" from the presidential chain of command served the "public interest" because Presidents Biden and Trump were opposing candidates in the upcoming presidential election at the time. *Id.* at 3:20–45.

And as Special Counsel Smith proceeded to wield the executive power of the United States to indict a former president for the first time in American history, Attorney General Garland repeatedly disclaimed responsibility under the cover of the special-counsel regulations. When asked by members of the House of Representatives about the involvement of senior executive officers in the decision to indict President Trump, the Attorney General has emphasized his lack of involvement, claiming that "the decision to indict was made by the Special Counsel." *Justice Dep't Oversight Hearing, Part 2* at 14:41–15:20, C-Span (Sept. 20, 2023), https://tinyurl.com/4t989h54. And when asked

by reporters about the Special Counsel's decisions, Attorney General Garland has again fallen back on the Special Counsel's "independence," stating that "any questions about this matter" could be answered only by the Special Counsel's filings. *Attorney General Merrick Garland Remarks on Reducing Violent Crime* at 6:35–7:28, C-Span (June 14, 2023), https://tinyurl.com/4vf57yxr.

Attorney General Garland's ability to use the special-counsel regulations as cover to shirk responsibility for Special Counsel Smith's actions underscores the Article II problem. With the Attorney General effectively removed from the equation, the President is left "[w]ithout the ability to oversee the [Special Counsel], or to attribute the [Special Counsel's actions] to those whom he *can* oversee." *Free Enter. Fund*, 561 U.S. at 496. That "is contrary to Article II's vesting of the executive power in the President" because it prevents the President from being "the judge of the [Special Counsel]'s conduct." *Id.* If he is not ultimately "responsible for the actions of the" Special Counsel, the President cannot fulfill his constitutional duty to "ensure that the laws are faithfully executed." *Id.* at 496–97.

The special-counsel regulations exempt the Special Counsel from the democratic accountability that must attend the exercise of executive power. The Executive Branch is supposed to be "the most democratic and politically accountable" in the federal government because its authority is vested entirely in the President, who is "elected by the entire Nation." *Seila Law*, 591 U.S. at 224. "[A] politically accountable officer must take responsibility" for the exercise of executive power so that the Executive remains

responsive to the people. *Arthrex*, 594 U.S. at 16. By eviscerating the "clear and effective chain of command down from the President, on whom all people vote," the special-counsel regulations unconstitutionally deprive the Special Counsel's actions of "legitimacy and accountability to the public." *Id.* at 11.

That lack of democratic accountability is especially concerning for an executive officer like Special Counsel Smith, charged with making massively consequential and politically fraught decisions like whether to indict a former president and current presidential candidate and what the position of the United States is as to whether and to what extent a former president enjoys immunity from criminal prosecution. *See Trump*, 603 U.S. 593. However much they want to, the President and Attorney General may not "escape responsibility for [those] choices." *Free Enter. Fund*, 561 U.S. at 497.

Finally, these constitutional problems do not disappear simply because regulations rather than a statute remove the Special Counsel from the presidential chain of command. The regulations have "the force of law" and "den[y the Attorney General] the authority to exercise" his supervision and removal authority "even though he . . . could reassert it by amending the regulations." *United States v. Nixon*, 418 U.S. 683, 695–96 (1974). The "theoretical[] possib[ility]" that the Attorney General could reinstate the constitutionally required chain of command is irrelevant when "he has not

done so." *Id.* at 696.[3] As long as the special-counsel regulations "remain[] in force the Executive Branch is bound by [them]." *Id.*; *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954). If anything, the Attorney General's self-interested decision to outsource accountability for especially sensitive prosecutorial decisions by tying himself to the mast of binding special-counsel regulations exacerbates the separation-of-powers problem.

No department head in the Executive Branch has the authority to do what the Attorney General has done in the special-counsel regulations. The Attorney General may no more create a new prosecutorial unit in the Department of Justice and place it under the control of a tenure-protected special counsel than may the Secretary of Defense create a new branch of the military and place it under the control of a tenure-protected branch chief. That would remain true even if the reason the Secretary did so was that the President had a conflict of interest because, for example, his son was a

---

[3] Restoring the chain of command would be neither immediate nor costless. For the President to reassert proper control, he would have to direct the Attorney General, on pain of removal, to rescind the special-counsel regulations—a move sure to invite political controversy and potential reprisal by both Congress and the courts in the likely event of a suit by the deposed special counsel for wrongful removal. And if the Attorney General were to refuse, the President would have to remove him and replace him with another individual whom the President could trust to carry out the directive. That would require either the new acting Attorney General's willingness to go along with the President's order, *see* 28 U.S.C. § 508; Exec. Order No. 13787, § 1, 82 Fed. Reg. 16723 (Apr. 5, 2017), or the expedited appointment of a new Attorney General willing to rescind the regulation *and* able to gain Senate confirmation. Neither is guaranteed. That the President would have to go to such lengths to take back the authority Article II already gives him "is not the solution. It is the problem." *Arthrex*, 594 U.S. at 16.

member of that branch deployed in a combat zone. It makes no difference if the President acquiesced in the relevant regulations at the time they were promulgated. Article II's force "does not depend on the views of individual Presidents" and encroachment on the President's Article II power cannot be sustained simply because the President "approves the encroachment." *Free Enter. Fund*, 561 U.S. at 497. A President is of course free to take a hands-off approach "in his dealings with subordinates," but he may not "bind his successors by diminishing their powers, nor can he escape responsibility for his choices by pretending that they are not his own." *Id.* The Attorney General cannot do so either.

## II. *MORRISON V. OLSON* DOES NOT REQUIRE THIS COURT TO RULE OTHERWISE.

Despite the extensive history of the President's "unrestricted removal power" in furtherance of his exclusive power to "oversee[ ] and control[] those who execute the laws," the Supreme Court has recognized "only two exceptions" to that principle. *Seila Law*, 591 U.S. at 204, 213. In *Humphrey's Executor*, the Court upheld for-cause removal restrictions for multi-member agency heads created by Congress to perform quasi-legislative or quasi-adjudicative functions. *Seila Law*, 591 U.S. at 204. More to the point here, in *Morrison*, the Court upheld the for-cause removal and other restrictions of the now-defunct Independent Counsel Act, *see* 487 U.S. at 685–96, restrictions that the special-counsel regulations are designed to mirror, *see Mueller Investigation*, 44 Op. O.L.C. __, at *3.

Whatever its vitality given the Supreme Court's more recent Article II cases, *Morrison*—a case about *Congress's* power to remove an inferior executive officer from the presidential chain of command—does not bear on whether the *Department of Justice* may do so with one of its own officers by regulation. The *Morrison* principle originated in *United States v. Perkins*, 116 U.S. 483 (1886). *See Morrison*, 487 U.S. at 689 n.27 (citing *Perkins*); *Seila Law*, 591 U.S. at 204 (citing *Perkins* and *Morrison* as standing for the same "exception[] to the President's unrestricted removal power"). *Perkins* held that Congress, when exercising its authority under the Appointment Clause's Excepting Clause to displace the constitutional default of appointment by the President with the advice and consent of the Senate, could as an incident to that authority regulate the removal of "officers so appointed." *Morrison*, 487 U.S. at 689 n.27 (quoting *Perkins*, 116 U.S. at 485).

If the authority to shield inferior officers from accountability in the Article II hierarchy is simply an incident to Congress's authority to dictate their manner of appointment, then that authority necessarily belongs only to Congress. But "so long as Congress does not exercise that power, the power of removal must remain where the Constitution places it, with the President." *Myers*, 272 U.S. at 161. The Attorney General has no authority to dictate the manner of appointment of inferior officers. Here, even if Congress authorized the Attorney General to appoint special counsels, it has not granted them tenure protection by statute. Indeed, Congress declined to renew the Independent Counsel Act in 1999, *see* 28 U.S.C. § 599, which would have continued by

statute the regime that the Department now tries to continue by regulation. The Department of Justice cannot invoke the *congressional* power recognized in *Morrison* to accomplish the restrictions on presidential oversight that Congress decided to abandon.

At a minimum, this Court is under no obligation to extend *Morrison's* discredited rationale to this new context. The authority of the Attorney General to remove one of his chief prosecutors from the constitutional chain of presidential oversight was simply not at issue in *Morrison*. This Court of course must faithfully follow all "direct[ly] applica[ble]" Supreme Court precedents that have not been overruled by that Court. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). But there is "a difference between following a precedent and extending a precedent." *Jefferson County v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000). When "a gravely wounded Supreme Court decision" addresses a distinct issue, "it cannot be said that decision 'directly controls'" the issue now presented. *Id.* For that reason, this Court has a "duty . . . to apply the Constitution as it is written," *Evans v. Stephens*, 387 F.3d 1220, 1227 (11th Cir. 2004) (en banc), and when an older Supreme Court decision "diverge[s]" from the Constitution's "original meaning," the Court "'should tread carefully' before extending [it] to new contexts," *Rhodes v. Michigan*, 10 F.4th 665, 692 (6th Cir. 2021) (Thapar, J., dissenting in part) (quoting *Garza v. Idaho*, 586 U.S. 232, 259 (2019) (Thomas, J., dissenting)). The Supreme Court itself has acknowledged that there are "compelling reasons not to extend" *Morrison* to "novel context[s]." *Seila Law*, 591 U.S. at 204. This Court is "not obligated to extend by even

a micron a Supreme Court decision which that Court itself has discredited." *Jefferson County*, 210 F.3d at 1320.

*Morrison*'s rationale has been thoroughly repudiated. The Court in *Morrison* determined that the for-cause removal restriction enjoyed by the independent counsel did not "impermissibly undermine[]" the President's power to supervise the execution of the laws because the ability to remove for cause gives the President a "substantial ability to ensure that the laws are 'faithfully executed' by an independent counsel." 487 U.S. at 695–96. That conclusion has since been rejected by *Free Enterprise Fund* and *Seila Law*. *See* 561 U.S. at 496; 591 U.S. at 213. And *Morrison* relied extensively on *Humphrey's Executor* in reaching its conclusion, 487 U.S. at 686–89, a decision that the Supreme Court has since "repudiated almost every aspect of," *Seila Law*, 591 U.S. at 239 (Thomas, J., concurring in part and dissenting in part). As explained above, *Morrison* is inconsistent with the historical understanding, tracing back to the very First Congress, that inherent in Article II's vesting of the executive power in the President is the authority to control, and if necessary, remove subordinate executive officials at will. *Morrison* is on life support. Although the Supreme Court must be the one pull the plug, this Court is under no obligation to resuscitate it.

## CONCLUSION

This Court should affirm the district court's judgment.

Dated: November 1, 2024

Respectfully submitted,

BRENNA BIRD
  *Attorney General of Iowa*

ASHLEY MOODY
  *Attorney General of Florida*

*/s/ Eric H. Wessan*
ERIC H. WESSAN
  *Solicitor General*

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER
  *Solicitor General*
DANIEL W. BELL
  *Chief Deputy Solicitor General*
NATHAN A. FORRESTER
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Assistant Solicitor General*
Office of the Attorney General

1305 East Walnut St.
Des Moines, IA 50309
(515) 823-9117
*eric.wessan@ag.iowa.gov*

The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

*Counsel for the State of Iowa*

*Counsel for the State of Florida*

# ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of Alabama*

TREG TAYLOR
*Attorney General of Alaska*

TIM GRIFFIN
*Attorney General of Arkansas*

RAÚL R. LABRADOR
*Attorney General of Idaho*

THEODORE E. ROKITA
*Attorney General of Indiana*

KRIS KOBACH
*Attorney General of Kansas*

RUSSELL COLEMAN
*Attorney General of Kentucky*

LIZ MURRILL
*Attorney General of Louisiana*

LYNN FITCH
*Attorney General of Mississippi*

ANDREW BAILEY
*Attorney General of Missouri*

AUSTIN KNUDSEN
*Attorney General of Montana*

MICHAEL T. HILGERS
*Attorney General of Nebraska*

GENTNER DRUMMOND
*Attorney General of Oklahoma*

ALAN WILSON
*Attorney General of South Carolina*

MARTY J. JACKLEY
*Attorney General of South Dakota*

JONATHAN SKRMETTI
*Attorney General of Tennessee*

SEAN REYES
*Attorney General of Utah*

PATRICK MORRISEY
*Attorney General of West Virginia*

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limits of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,746 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Henry C. Whitaker*
Solicitor General of Florida

**CERTIFICATE OF SERVICE**

I certify that on November 1, 2024, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Henry C. Whitaker*
Solicitor General of Florida