No. 24-12311-J

# In the United States Court of Appeals for the Eleventh Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

DONALD J. TRUMP, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Florida
District Court No. 9:23-CR-80101-AMC-1 (Cannon, J.)

## BRIEF OF THE STATE OF TEXAS AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

LANORA C. PETTIT
Principal Deputy Solicitor General

Counsel for the State of Texas

*United States v. Trump, et al., No. 24-12311-J*

## Certificate of Interested Persons

Undersigned counsel certifies that, to the best of his knowledge, the following is a complete list of interested persons not included in the briefs of the parties and other amici as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1. Aaron L. Nielson

2. Ken Paxton

3. Lanora C. Pettit

4. The State of Texas

5. Brent Webster

/s/ Aaron L. Nielson

Aaron L. Nielson
*Counsel of Record for*
*Amicus Curiae the State of Texas*

# Table of Contents

Page

Certificate of Interested Persons ........................................................ C-1

Table of Authorities ............................................................................ ii

Interests of Amicus Curiae ................................................................. 1

Introduction and Summary of Argument ............................................ 2

Argument............................................................................................. 3

    I.   Congress is Responsible for Structuring the Executive Branch. ................. 3

    II.  No Statute Authorizes this Purported Appointment. ................................. 9

    III. Constitutional Avoidance Further Defeats this Appointment. ................. 14

        A.  Appellant's theory invites a constitutional violation. ......................... 15

        B.  Constitutional avoidance requires affirmance. ................................... 21

Conclusion.......................................................................................... 22

Certificate of Compliance .................................................................. 23

Certificate of Service.......................................................................... 24

# Table of Authorities

**Cases:**

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) ................................................................ 17

*Alfaro v. Comm'r of Internal Revenue*,
    349 F.3d 225 (5th Cir. 2003) ................................................ 15

*Barnhart v. Peabody Coal Co.*,
    537 U.S. 149 (2003) ................................................................ 12

*Biden v. Nebraska*,
    143 S.Ct. 2355 (2023) .......................................................... 8, 9

*Bond v. United States*,
    564 U.S. 211 (2011) ............................................................. 1, 2

*Campbell v. Univ. City Devel. Ptnrs. Ltd.*,
    72 F.4th 1245 (11th Cir. 2023) .......................................... 11

Clinton v. City of New York,
    524 U.S. 417 (1998) ................................................................ 6

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
    575 U.S. 43 (2015) .................................................................. 17

*Edmond v. United States*,
    520 U.S. 651 (1987) .............................................................. 15

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988) .............................................................. 15

*FEC v. Cruz*,
    596 U.S. 289 (2022) .......................................................... 2, 10

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ................................................................ 5

*Gundy v. United States*,
    588 U.S. 128 (2019) ................................................ 16, 18, 22

*Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*,
    71 F.4th 59 (D.C. Cir. 2023) ................................................ 9

*Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*,
    448 U.S. 607 (1980) .............................................................. 22

*INS v. St. Cyr*,
    533 U.S. 289 (2001) .............................................................. 15

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394 (1928)................................................................................ 17

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022),
    *aff'd on other grounds*, 144 S.Ct. 2117 (2024)............................2, 15, 17, 18, 19, 21

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018)................................................................................ 22

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ............................................................................ 2, 10

*Loving v. United States*,
    517 U.S. 748 (1996) ............................................................................... 16

*Lucia v. SEC*,
    585 U.S. 237 (2018).............................................................................4, 20

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise*, Inc.,
    501 U.S. 252 (1991) ................................................................................. 1

*Mistretta v. United States*,
    488 U.S. 361 (1989)........................................................................... 16, 21

*Morrison v. Olson*,
    487 U.S. 654 (1988) ....................................................................... 3, 7, 18, 19

*NLRB v. SW Gen., Inc.*,
    580 U.S. 288 (2017) ............................................................................... 19

*Oregon v. Ice*,
    555 U.S. 160 (2009) ................................................................................. 3

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935)................................................................................ 17

*Paul v. United States*,
    140 S.Ct. 342 (2019) ............................................................................... 18

*Printz v. United States*,
    521 U.S. 898 (1997),............................................................................... 18

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ............................................................................... 14

*Seila L. LLC v. CFPB*,
    591 U.S. 197 (2020)..............................................................................3, 6

*In re Shek*,
    947 F.3d 770 (11th Cir. 2020)..................................................................... 11

*Texas v. United States*,
 809 F.3d 134 (5th Cir. 2015),
 *aff'd by an equally divided Court*, 579 U.S. 547 (2016) .......................................1

*Trump v. United States*,
 144 S.Ct. 2312 (2024) ........................................................... 4, 11, 13

*United States v. Giordano*,
 416 U.S. 505 (1974) ....................................................................12, 13

*United States v. Hansen*,
 599 U.S. 762 (2023) .................................................................. 22

*United States v. Lopez*,
 514 U.S. 549 (1995) ...................................................................... 2

*United States v. Mastrangelo*,
 733 F.2d 793 (11th Cir. 1984)..................................................................7

*United States v. Nixon*,
 418 U.S. 683 (1974) ................................................................. 14

*United States v. Prueitt*,
 540 F.2d 995 (9th Cir. 1976)................................................................ 11

United States v. Sineneng-Smith,
 590 U.S. 371 (2020) .................................................................. 14

*United States v. Sklaroff*,
 552 F.2d 1156 (5th Cir. 1977)............................................................... 11

*Util. Air Regul. Grp. v. EPA*,
 573 U.S. 302 (2014)..................................................................10

*Wayman v. Southard*,
 23 U.S. (10 Wheat.) 1 (1825) .......................................................... 16

*West Virginia v. EPA*,
 597 U.S. 697 (2022) .................................................................. 10

*Whitman v. Am. Trucking Ass'ns*,
 531 U.S. 457 (2001) .................................................................. 9

*Zadvydas v. Davis*,
 533 U.S. 678 (2001).................................................................. 15

**Constitutional Provisions, Statutes, and Regulations:**

U.S. Const. art. I:

 §1................................................................................. 16

 §8, cl. 1 ........................................................................ 4

U.S. Const. art. II:

§1, cl. 1 ................................................................. 3

§2, cl. 2 ................................................. 4, 19, 20

§3 .......................................................................... 3

18 U.S.C.:

§2516(1) ............................................................... 8

§3742(b) ............................................................... 8

§4122(a) ............................................................. 12

28 U.S.C.:

§49 ..................................................................... 19

§504 ..................................................................... 7

§504a ................................................................... 7

§505 ..................................................................... 7

§506 ..................................................................... 7

§509 ............................. 10, 11, 12, 13, 19, 21

§510 ............................... 10, 12, 13, 19, 21

§515 ..................................... 10, 19, 21

§515(a) ............................................................. 11

§517 ..................................................................... 8

§518(b) ................................................................. 8

§526(a) ................................................................. 8

§533 ..................................... 10, 13, 14, 19, 21

§533(1) ............................................................... 13

§533(4) ............................................................... 13

§541 ................................................................... 14

§541(a) ......................................................... 7, 14

§542(a) ......................................................... 7, 20

§543 ..................................................................... 7

§593(b) ............................................................. 19

§594(a) ............................................................. 18

§594(e) ............................................................. 19

28 C.F.R. §600.6 ............................................... 10

**Other Authorities:**

1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834) ...........................................5

3 Joseph Story, Commentaries on the Constitution of the United States  (1833) .....3

Akhil Reed Amar, America's Constitution: A Biography 197 (2005).......................3

An Act for Establishing an Executive Department, to be denominated the
    Department of Foreign Affairs, Jul. 27, 1789, ch. 4, 1 Stat. 28 ..........................5

An Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870) ........... 6

*The Federalist* (Clinton Rossiter ed., 1961)......................................3, 4, 7, 16, 17, 20

Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490 (2021)................ 17

Jennifer Mascott, *Who Are "Officers of the United States"?*,
    70 Stan. L. Rev. 443 (2018) ........................................................................ 4, 5

John Adams, Thoughts on Government (1776) ..................................................... 2

John Locke, The Second Treatise of Civil Government and a Letter
    Concerning Toleration (1690).................................................................16, 17

John Manning, *Lawmaking Made Easy*, 10 Green Bag 2d 202 (2007)..................... 17

Judiciary Act of 1789, ch. 20, 1 Stat. 73............................................................. 6

Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*,
    65 Ala. L. Rev. 1205 (2014) ..................................................................... 6

Off. of the Att'y Gen., "Appointment of John L. Smith as Special Counsel,"
    Order No. 5559–2022 (Nov. 18, 2022)........................................................10

*Offices of the United States Attorneys*, U.S. Dep't of Just.,
    https://perma.cc/W9ZT-SXRJ ................................................................. 6

The Declaration of Independence (U.S. 1776) ......................................................5

### Interests of Amicus Curiae

States often have the best vantage point from which to safeguard "the public interest in protecting separation of powers by curtailing unlawful executive action." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. 547 (2016) (per curiam). The State of Texas regularly files amicus briefs to vindicate that public interest with the "ultimate purpose" of "protect[ing] the liberty and security of the governed," *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991), from the threat of "arbitrary power," *Bond v. United States*, 564 U.S. 211, 222 (2011). This case directly implicates the States' fundamental interest in preventing unlawful federal action because the U.S. Department of Justice claims that the U.S. Attorney General—acting without any statutory guidance from Congress—may empower a private individual to spend tens of millions of dollars to enforce federal criminal laws. This is a question that directly impacts the States and every citizen in them.

Furthermore, although Texas agrees with the brief of Amici States Florida and Iowa, Texas offers the Court a separate reason why the Attorney General cannot empower a private person to exercise such awesome authority: constitutional avoidance. Texas is within the U.S. Court of Appeals for Fifth Circuit, which has held that Congress must provide meaningful guidance when empowering federal agencies to choose between two available enforcement paths. No such guidance exists here, even under Appellant's own theory of the relevant federal statutes. Constitutional avoidance thus requires the Court to construe those statutes narrowly.

## Introduction and Summary of Argument

"[T]he very definition of a Republic, is 'an Empire of Laws, and not of men.'" John Adams, *Thoughts on Government* (1776). This principle motivates the vertical separation-of-powers: Congress lacks the States' "broad authority to enact legislation for the public good—what [courts] have often called a 'police power.'" *Bond*, 572 U.S. at 854 (quoting *United States v. Lopez*, 514 U.S. 549, 567 (1995)). The same principle, however, also runs through the horizonal separation-of-powers: A federal agency or statutory officer "'literally has no power to act' … unless and until Congress" confers power to do so. *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

Here, a private individual has spent more than a year and well over $30 million that Congress appropriated for the Department of Justice to investigate a former President of the United States based on a permission slip from the Attorney General. Under our Constitution, however, the tools by which, and personnel by whom, federal law may be enforced is a task that "We the People" delegated to *Congress*—not the Attorney General or any other agent of the Executive Branch. *Jarkesy v. SEC*, 34 F.4th 446, 459-63 (5th Cir. 2022), *aff'd on other grounds*, 144 S.Ct. 2117 (2024). For the reasons set forth by the district court, Congress has not authorized—let alone clearly—the Attorney General to make the appointment at issue here. But even if Congress had done so, that supposed authorization would fail for the constitutional reasons identified by the Fifth Circuit's *Jarkesy* decision, as well as the authorities the Fifth Circuit cited. Constitutional avoidance thus provides yet another reason for this Court to affirm.

2

# ARGUMENT

## I. Congress is Responsible for Structuring the Executive Branch.

Although the Bill of Rights helps protect the liberty of the People, the Framers also understood that "mere parchment" is not enough. *The Federalist* No. 73, at 441 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Accordingly, rather than simply relying on a list of rights, the Framers created the separation of powers "as the absolutely central guarantee of a just Government." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting). Nowhere is that "central guarantee," *id.*, more foundational than "the administration of the[] criminal justice system[]," which "lies at the core" of sovereignty, *Oregon v. Ice*, 555 U.S. 160, 170 (2009).

**A.**  Article II vests "[t]he executive Power," U.S. Const. art. II, §1, cl. 1, in a single executive—the President—who is compelled to "take Care that the Laws be faithfully executed," *id.* art. II, §3. This vesting of authority makes "emphatically clear from start to finish" that "the president would be personally responsible for his branch." Akhil Reed Amar, *America's Constitution: A Biography* 197 (2005). The Framers demanded "unity in the Federal Executive" to guarantee "both vigor and accountability," *Printz v. United States*, 521 U.S. 898, 922 (1997), as well as "[d]ecision, activity, secre[c]y, and d[i]spatch," 3 Joseph Story, *Commentaries on the Constitution of the United States* §1414, at 283 (1833).

The Constitution, however, also provides important checks on the President's power. Relevant here, the Constitution "give[s] Congress broad authority to establish and organize the Executive Branch." *Seila L. LLC v. CFPB*, 591 U.S. 197, 266 (2020) (Kagan, J., concurring in judgment in part and dissenting in part). Although

Article II of the Constitution speaks to the appointment of inferior officers by "Heads of Departments," nowhere does the Constitution create any such departments. U.S. Const. art. II, §2, cl. 2. Thus, "[a]lthough the Constitution contemplates" federal departments and officers, "it clearly requires that those offices 'shall be established by Law,'" meaning "an office that Congress creates 'by statute.'" *Trump v. United States*, 144 S.Ct. 2312, 2348 (2024) (Thomas, J., concurring) (first quoting U.S. Const. art. II, §2, cl.2; then quoting *Lucia v. SEC*, 585 U.S. 237, 254 (2018)). And the Constitution further requires those departments be funded by law, affording to Congress the "Power to lay and collect Taxes … to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, §8, cl. 1. Congress's "power over the purse" serves as "the most complete and effectual weapon with which any constitution can arm" a government "for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." *The Federalist* No. 58, *supra*, at 357 (James Madison).

The Framers' decision to vest in Congress alone the power to create and fund executive offices was no accident. "The limitation on the President's power to create offices grew out of the Founders' experience with the English monarchy," in which "[t]he King could wield significant power by both creating and filling offices as he saw fit"—thus allowing the Crown to "create a multitude of offices and then fill them with his supporters." *Trump*, 144 S.Ct. at 2349 (Thomas, J., concurring) (citing, *inter alia*, Jennifer Mascott, *Who Are "Officers of the United States"*?, 70 Stan. L. Rev. 443, 492 (2018)). Abuses of this power so enraged the Colonists that they included the King's creation of a "multitude of New Offices" in the Declaration of

4

Independence itself. *Id.* (quoting The Declaration of Independence para. 12 (U.S. 1776)).

Congress has long been jealous of its authority to create, structure, fund, and oversee federal departments. For example, in connection with the famous Decision of 1789, the First Congress determined not just that the Department of Foreign Affairs would be headed by a Secretary, *see* An Act for Establishing an Executive Department, to be denominated the Department of Foreign Affairs, Jul. 27, 1789, ch. 4, 1 Stat. 28 §1, but also resolved that "[h]e shall receive the applications of all foreigners relative to his department," and "the books, records, and other papers of the United States, that relate to this department, [should] be committed to his custody," *id.* §1 n.(a); *see also id.* §4 ("[T]he Secretary for the Department of Foreign Affairs, to be appointed in consequence of this act, shall forthwith after his appointment, be entitled to have the custody and charge of all records, books and papers in the office …."). Especially relevant here, Congress also determined that "there shall be in the said department, an inferior officer, to be appointed by the said principal officer," who would "be called the chief Clerk in the Department of Foreign Affairs" who, during the Secretary's "vacancy," would "have the charge and custody of all records, books and papers appertaining to the said department." *Id.* §2.

Early Congresses demonstrated that once an office is created, the President's authority includes "the power of appointing, overseeing, and controlling those who execute the laws." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting 1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834) (remarks of James Madison)). And the President's authority to control the Executive Branch

includes a measure of power to oversee how officers spend funds appropriated by Congress, *see, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 465-68 (1998) (Scalia, J., concurring in part) (collecting examples), as well as a plenary power to remove officers at will, *see, e.g.*, *Seila L.*, 591 U.S. at 213-15. After all, "[t]he text and structure of Article II provide the President with the power to control subordinates within the executive branch." Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1215 (2014). But constitutional text, structure, and history also show that before that the President can exercise such power, Congress must first create and fund the relevant federal offices.

**B.** By any measure, it is extraordinary to suppose that Congress empowered the Attorney General to appoint a private attorney to lead (rather than simply assist) a significant multi-district investigation and prosecution on behalf of the United States. It is even more extraordinary to suppose that Congress would allow the Attorney General to do this for one of the most high-profile and expensive prosecutions imaginable: The unprecedented prosecution of a former President of the United States. Because the claimed power is extraordinary, Congress must speak clearly before courts can conclude that the Attorney General is authorized to wield it.

That conclusion is underscored by constitutional practice. Congress created the Department of Justice, *see* An Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870), the Office of Attorney General, *see* Judiciary Act of 1789, ch. 20, §35, 1 Stat. 73, 92-93, and the offices of the "93 United States Attorneys [who] work to enforce federal laws throughout the country," *Offices of the United States Attorneys*, U.S. Dep't of Just., https://perma.cc/W9ZT-SXRJ. Congress also sets the

Department of Justice's budget, *see, e.g.*, *Morrison*, 487 U.S. at 714 (Scalia, J., dissenting), and can oversee how federal law is enforced "subject only to constitutional limitations," *United States v. Mastrangelo*, 733 F.2d 793, 800 (11th Cir. 1984).

Congress also has refused to entrust the Attorney General with authority to select attorneys who exercise significant leadership authority within the Department of Justice. By statute, "[t]he President shall appoint, by and with the advice and consent of the Senate, 11 Assistant Attorneys General, who shall assist the Attorney General in the performance of his duties." 28 U.S.C. §506. And also by statute, "[t]he President shall appoint, by and with the advice and consent of the Senate, a United States attorney for each judicial district." *Id.* §541(a). Indeed, the Attorney General cannot even personally appoint his most senior associates—the Deputy Attorney General, Associate Attorney General, and Solicitor General—each of whom also requires presidential nomination and senatorial confirmation. *See id.* §§504, 504a, 505. The Attorney General, of course, may appoint "*assistant* United States attorneys," *id.* §542(a), and "special attorneys," but only "to *assist* United States attorneys when the public interest so requires," *id.* §543 (emphases added).

Congress's refusal to permit even the President of the United States to unilaterally select the most powerful prosecutors cannot be brushed aside. It is a manifestation of Congress's constitutional power to prevent the President from appointing officers "possessing the necessary insignificance and pliancy to render them the obsequious instruments of his pleasure." *The Federalist* No. 76, *supra*, at 456 (Alexander Hamilton). Congress, in other words, has determined that selecting the highest-ranking prosecutors such as those with authority similar to U.S. Attorneys' is simply

too important to leave to the Executive Branch alone; the Senate—a deliberative body representing a broader and different set of interests—must also play a role.

Consistent with Congress's constitutional power to decide what tools and personnel are available to the Executive Branch, even the Attorney General's authority is defined by Congress. Congress, for example, has *permitted* the Attorney General to "personally conduct and argue any case in a court of the United States in which the United States is interested," and has also *permitted* him to "direct the Solicitor General or any officer of the Department of Justice to do so," 28 U.S.C. §518(b); *see also id.* §517 (authorizing Attorney General to send "[t]he Solicitor General, or any officer of the Department of Justice" to "attend to the interests of the United States"). Congress too has determined that the Attorney General cannot "investigate the official acts" of U.S. Attorneys without statutory permission. *Id.* §526(a). And Appellant's own brief shows that when Congress wishes to empower non-Senate-confirmed officers to make critical prosecutorial decisions, Congress says so clearly. *See* Appellant.Br.38-39 (citing 18 U.S.C. §§2516(1), 3742(b)).

Such specific oversight by Congress of the tools and personnel available to enforce our nation's criminal laws—to say nothing of congressional primacy over the nation's purse—is irreconcilable with the notion that Congress offhandedly would allow the Attorney General to create a new federal office exercising significant multi-district prosecutorial power, appoint a private person of the Attorney General's choosing to that office, and then fund a multi-million-dollar effort to investigate and prosecute a former President. As Justice Barrett has explained, in considering a delegation's scope, courts must not lose sight of "context." *Biden v. Nebraska,* 143 S.Ct.

2355, 2379 (2023) (Barrett, J., concurring). Where an agency claims broad power of the sort that "common sense" suggests requires specificity from Congress, that agency must do more than point to general statutory authorization. *Id.* After all, "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 67-68 (D.C. Cir. 2023) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)); *see also id.* (explaining why this principle applies to both major and non-major questions).

Here, the "regulatory scheme," *id.*, is one in which Congress has repeatedly required Senate confirmation for U.S. Attorneys and other lawyers who exercise the most significant prosecutorial authority. The question therefore is whether Congress has clearly authorized the Attorney General to create an office that in key respects is more powerful than even a U.S. Attorney, unilaterally appoint a private person to that office, and fund the office indefinitely. As explained below, the answer is a resounding "no." Although Congress has authorized the Attorney General to retain other attorneys to assist prosecutors within the Department of Justice, Congress has never authorized—let alone clearly—the Attorney General to unilaterally empower a private attorney to exercise extraordinary prosecutorial authority.

## II. No Statute Authorizes this Purported Appointment.

The Department of Justice cannot point to authority allowing the Attorney General to alter "fundamental details" of the "scheme" created by Congress, *Whitman*, 531 U.S. at 468, much less can it point to "'clear congressional authorization' for the

power it claims," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Attorney General Garland purported to appoint Jack Smith as a special prosecutor with "the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney," 28 C.F.R. §600.6, under four statutes: "28 U.S.C. §§ 509, 510, 515, 533." Off. of the Att'y Gen., "Appointment of John L. Smith as Special Counsel," Order No. 5559–2022 (Nov. 18, 2022). None, however, is on point.

**A.**  Start with §515, upon which Appellant primarily relies (*e.g.*, at 1, 4, 9, 10, 20-22), which provides:

> (a) The Attorney General or any other officer of the Department of Justice, *or any attorney specially appointed by the Attorney General under law*, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.
>
> (b) Each attorney specially retained under authority of the Department of Justice shall be commissioned as special assistant to the Attorney General or special attorney, and shall take the oath required by law. Foreign counsel employed in special cases are not required to take the oath. The Attorney General shall fix the annual salary of a special assistant or special attorney.

28 U.S.C. §515 (emphasis added).

Consistent with the principle that a federal agency or statutory officer "'literally has no power to act' … unless and until Congress" confers power to do so, *Cruz*, 596 U.S. at 301 (quoting *La. Pub. Serv. Comm'n*, 476 U.S. at 374), this statute merely empowers the Attorney General to delegate certain tasks to federal officers and

employee, *accord United States v. Sklaroff*, 552 F.2d 1156, 1160-61 (5th Cir. 1977) (applying §515(a) where "[t]he Department of Justice hired Steinberg as an attorney" five years earlier); *United States v. Prueitt*, 540 F.2d 995, 999-1000 (9th Cir. 1976) (citing §515(a) as the source of authority for "an attorney for the Department of Justice, Narcotic and Dangerous Drug Section" to obtain an indictment). This reading is confirmed by Congress's decision to limit the Attorney General's authority to directing "any other officer of the Department of Justice," 28 U.S.C. §515(a)—a phrase that obviously does not apply to a private attorney.

To be sure, §515(a) authorizes the Attorney General to direct "any attorney specially appointed by the Attorney General *under law*." *Id.* (emphasis added). But this language "suggest[s] that such an attorney's office must have already been created"—or otherwise authorized—"by some other law," *Trump*, 144 S.Ct. at 2350-51 (Thomas, J., concurring). Ordinary rules of interpretation "oblige[]" this Court, "whenever possible, to disfavor an interpretation when that interpretation would render a clause, sentence, or word … superfluous, void, or insignificant." *Campbell v. Univ. City Devel. Ptnrs. Ltd.*, 72 F.4th 1245, 1256 (11th Cir. 2023) (quoting *In re Shek*, 947 F.3d 770, 777 (11th Cir. 2020)). If §515(a) itself was sufficient to appoint a special counsel, the phrase "under law" would be entirely unnecessary.

**B.** None of the other three statutes upon which the Attorney General relied provides the necessary "law" under which Mr. Smith could be appointed.

Section 509 states that "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General except the functions" vested in the Department's

11

administrative-law judges or Federal Prison Industries, Inc. (as well as its officers and board). 28 U.S.C. §509. "[D]eriving from the Reorganization Acts of 1949 and 1950," however, this provision merely "vests all functions of the Department of Justice, with some exceptions, in the Attorney General rather than the Department of Justice." *United States v. Giordano*, 416 U.S. 505, 513 (1974). It says nothing about the power to appoint private citizens as federal prosecutors, let alone extraordinarily powerful federal prosecutors with broad authority to conduct unprecedented prosecutions across multiple districts. Even viewed generously in Appellant's favor, §509 does not speak to the *scope* of the power at issue—just who wields it.

If anything, §509 shows that the Attorney General exceeded his authority by making this appointment. Section 509 confirms that Congress knows how to write with specificity. Thus, for example, although the Attorney General has general control over what the Department does, he cannot interfere with Federal Prison Industries, Inc.'s decisions regarding (among other things) "to what extent industrial operations shall be carried on in Federal penal and correctional institutions" for use by other federal agencies. 18 U.S.C. §4122(a). Because Congress knows how to write with specificity, the fact that §509 does not authorize appointments speaks volumes. *See, e.g.*, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).

For its part, §510 states that "[t]he Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General." 28 U.S.C. §510. The limited nature of §509 "mak[es] essential the provision for delegation appearing in 28 U.S.C. §510." *Giordano,*

416 U.S. at 513. For purposes here, however, §510 is most noteworthy for what it is not: An authorization for the Attorney General to delegate the awesome power to lead prosecution of federal crimes to someone *outside* the Department of Justice. Just as §509 says nothing about the scope of the Attorney General's power, §510 merely allows the Attorney General to assign portions of his power to his subordinates. Neither provision, however, remotely creates an appointment power. To the contrary, the Attorney General may assign functions only to "any *other* officer, employee, or agency of the Department of Justice." 28 U.S.C. §510 (emphasis added).

Finally, §533 allows the Attorney General to appoint officials "to detect and prosecute crimes against the United States." *Id.* §533(1). Yet this statute focuses on investigations. *See, e.g.*, *Trump*, 144 S.Ct. at 2351 (Thomas, J., concurring). Section 533 empowers the Attorney General to appoint officials "to conduct such other investigations regarding official matters under the control of the Department of Justice," 28 U.S.C. §533(4), and reserves "the authority of [other] departments and agencies to investigate crimes against the United States" within their respective jurisdictions, *id.* §533. "Regardless, this provision would be a curious place for Congress to hide the creation of an office for a Special Counsel. It is placed in a chapter concerning the Federal Bureau of Investigation, not the separate chapters concerning U.S. Attorneys or the now-lapsed Independent Counsel." *Trump*, 144 S.Ct. at 2351 (Thomas, J., concurring) (citations omitted).

And putting all of that aside, §533 does not authorize the Attorney General to empower a private individual to act with more authority in key respects than a U.S. Attorney. Congress insists that those who exercise the most significant prosecutorial

13

authority must be nominated by the President and confirmed by the Senate. *See* 28 U.S.C. §541(a). The Attorney General cannot evade Congress's specific process for empowering the most significant prosecutors by relying on the general language of §533. "It is a commonplace of statutory construction that the specific governs the general. That is particularly true where … Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (cleaned up). The Court should not adopt a reading that would allow the Attorney General to bypass the Senate's role simply by using §533 rather than §541.

* * *

In sum, whether taken together or separately, none of the statutes upon which Appellant relies supports this appointment. Nor does *United States v. Nixon*, 418 U.S. 683 (1974). As the district court explained, the Supreme Court certainly did not make a *holding* with respect to this issue. The Supreme Court respects the party-presentation principle. *See, e.g.*, *United States v. Sineneng-Smith*, 590 U.S. 371, 375-79 (2020). The Court accordingly should affirm based on the plain language of the statutes here, which would vindicate Congress's constitutional power to structure and fund the Department of Justice.

## III. Constitutional Avoidance Further Defeats this Appointment.

Even if Appellant's reading of the relevant statutes had merit, this Court should still affirm the district court. "[W]hen a particular interpretation of a statute invokes the outer limits of Congress' power," courts "expect a clear indication that congress

intended that result." *INS v. St. Cyr*, 533 U.S. 289, 299 (2001) (citing *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). Yet here, allowing the Attorney General to rely on the above discussed statutes to appoint Mr. Smith would invite the constitutional violation identified by the Fifth Circuit in *Jarkesy*.[1] Even apart from the fact that the Court should be "chary to create a circuit split," *Alfaro v. Comm'r of Internal Revenue*, 349 F.3d 225, 229 (5th Cir. 2003), "it is a cardinal principle of statutory interpretation" that courts will exhaust all "fairly possible" interpretations to *avoid*—not *create*—a constitutional problem, *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). Affirming the district court would avoid a constitutional violation.

## A.  Appellant's theory invites a constitutional violation.

Under Appellant's reading of the statutes, the Attorney General has broad authority to decide whether to prosecute using (i) offices created by Congress (with officers nominated by the President and confirmed by the Senate), or (ii) private individuals selected by the Attorney General. Yet nothing in Appellant's cited statutes

---

[1] Texas also agrees with Appellees (at 60-63) that Mr. Smith's appointment violates the Appointments Clause because he is acting as a principal officer—a point that is true whatever his relationship may be with the Attorney General. *See, e.g.*, *Edmond v. United States*, 520 U.S. 651, 667-68 (1987) (Souter, J., concurring in part and in the judgment) (explaining that "[h]aving a superior officer is necessary for inferior officer status, but not sufficient to establish it" and identifying the "Solicitor General of the United States" as an example). As that issue has, however, been explored by Appellees, Texas will not burden the Court by repeating those arguments here. Instead, it offers this brief to explain an additional reason the Court should accept the district court's view of the relevant statutes.

provides *any* guidance as to which path the Attorney General should take. This prompts a significant constitutional objection to Appellant's reading.

1.    "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). Because "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States," U.S. Const. art. I, § 1, "the lawmaking function belongs to Congress and may not be conveyed to another branch or entity," *Loving v. United States*, 517 U.S. 748, 758 (1996) (citation omitted). Thus, the Constitution assigns Congress alone the power to "prescrib[e] the rules by which the duties and rights of every citizen are to be regulated." *Gundy v. United States*, 588 U.S. 128, 153 (2019) (Gorsuch, J., dissenting) (quoting *The Federalist* No. 78, *supra*, at 465 (Alexander Hamilton)).

Inherent in the principle that Congress makes the law is the rule that Congress cannot give away its power. *See, e.g.*, *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825). As John Locke explained, "being but a delegated Power from the People," a legislature "cannot transfer the Power of Making Laws to any other hands." John Locke, *The Second Treatise of Civil Government and a Letter Concerning Toleration* §141, at 71 (1690) (quoted in *Gundy*, 588 U.S. at 153-54 (Gorsuch, J., dissenting)). That is because "when the people have said we will submit to rules, and be governed by laws made by such men, and in such forms, nobody else can say other men shall make laws for them; nor can the people be bound by any laws but such as are enacted by those whom they have chosen and authorised to make laws for them." *Id.* Put another way, "'We the People' are the fountainhead of all government

power," and have "[t]hrough the Constitution … delegated some of that power to the federal government." *Jarkesy*, 34 F.4th at 459. And "the positive Grant conveyed" the power "only to make Laws, not Legislators." Locke, *supra* at 71; *see also* Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490, 1518 (2021).

The "principle that Congress cannot delegate away its vested powers exists to protect liberty." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 61 (2015) (Alito, J., concurring). Because the "Constitution, by careful design, prescribes a process for making law, and within that process there are many accountability checkpoints," it "would dash the whole scheme if Congress could give its power away to an entity that is not constrained by those checkpoints." *Id.* (citing John Manning, *Lawmaking Made Easy*, 10 Green Bag 2d 202 (2007)). This insight is "in keeping with the Founding principles that (1) men are not angels, and (2) '[a]mbition must be made to counteract ambition.'" *Jarkesy*, 34 F.4th at 459 (quoting *The Federalist* No. 51, *supra*, at 322 (James Madison)); *see also The Federalist* No. 47, *supra*, at 301 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands … may justly be pronounced the very definition of tyranny.").

**2.** Although the Supreme Court has relied on these foundational constitutional principles as a basis to invalidate agency action, *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), the "intelligible principle" standard that the Supreme Court uses to determine whether Congress has provided sufficient instruction, *see, e.g.*, *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928), is ill-defined. At least five members of the Supreme Court thus have signaled openness to reconsidering that standard.

*See Gundy*, 588 U.S. at 148-49 (Alito, J., concurring); *id.* at 162-66 (Gorsuch, J., dissenting joined by Roberts, C.J. and Thomas, J.); *Paul v. United States*, 140 S.Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting the denial of certiorari).

Appellant's theory, however, fails even under the intelligible-principle standard. It is plain on the face of the cited statutes that Congress did not provide an intelligible principle to guide the Attorney General's (supposed) discretion with respect to whether to appoint a private attorney to exercise extraordinary prosecutorial power on behalf of the United States. The Fifth Circuit, moreover, has already held that Congress must not only set the rules governing private citizens but also the rules to determine by *whom* and *how* those rules will be enforced. *Jarkesy,* 34 F.4th at 449, 461. In *Jarkesy*, the Fifth Circuit held that "'the mode of determining' which cases are assigned to administrative tribunals" and which should be prosecuted in Article III courts requires meaningful direction from Congress. *Id.* (citation omitted). After all, "[t]he power to decide which defendants should receive certain legal processes … and which should not" is a legislative "power that Congress uniquely possess." *Id.* at 461-62.

The type of unbridled authority in *Jarkesy*—under which an agency could freely decide whether to proceed through administrative or Article III tribunals—stands in stark contrast with the carefully reticulated scheme in *Morrison*, 487 U.S. at 660-65. That statute empowered an independent counsel with "full power and independent authority to exercise all investigative and prosecutorial and powers of the Department of Justice." 28 U.S.C. §594(a) (1982 ed.). Especially relevant here, it also provided detailed rules regarding how and when such a counsel could be appointed—

18

including a requirement that the Attorney General "report to a special court … created by the Act, 'for the purposes of appointing independent counsels.'" *Morrison*, 487 U.S. at 661 (quoting 28 U.S.C. §49 (1982 ed.)). That court was to "define that independent counsel's prosecutorial jurisdiction," 28 U.S.C. §593(b), beyond which the counsel could not accept referrals even from the Attorney General, *id.* §594(e). There were also statutory provisions "gover[ing] the length of an independent counsel's tenure in office," his ability to hire employees, and the nature of his relationship with the Department of Justice. *Morrison*, 487 U.S. at 662-63.

**3.**   Even assuming the Attorney General may by statute appoint a private person to exercise extraordinary prosecutorial power on behalf of the United States, nothing in §§509, 510, 515 and 533 provides any direction about whether to do so, let alone under what conditions. Instead, he would have "unfettered authority" to appoint a private citizen to enforce federal criminal laws. *Jarkesy*, 34 F.4th at 459. The Attorney General thus would decide for a particular category of cases whether an attorney with extraordinary prosecutorial authority is confirmed by the Senate.

The Constitution, however, entrusts that question to Congress—not the Executive Branch. *See* U.S. Const. art. II, §2, cl. 2; *cf. Jarkesy*, 34 F.4th at 462 (distinguishing powers of Congress and the Executive Branch). The Constitution does so, moreover, for an important reason: to safeguard "liberty." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 317 (2017) (Thomas, J., concurring). The Court "cannot cast aside the separation of powers and the Appointments Clause's important check on executive power for the sake of administrative convenience or efficiency." *Id.* Appellant's sweeping view of the Attorney General's authority therefore cannot be squared with

19

a fair reading of the statutes for the reasons discussed by the district court, or—in any event—with fundamental aspects of our Constitution for the reasons discussed by the Fifth Circuit.

And make no mistake: Placing extraordinary prosecutorial power in someone who is not already a federal officer is a momentous decision. The constitutional default for appointments is that *any* officer of the United States—principal or inferior—must be nominated by the President and confirmed by the Senate. *See* U.S. Const. art. II, §2, cl. 2. The Constitution only allows a departure from that constitutional default for "inferior Officers," and even then *only* if Congress "by law" chooses through bi-cameralism and presentment to vest their appointment "in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* In other words, the Constitution does not lightly assume that even the President can appoint other officers without "the Advice and Consent of the Senate." *Id*. This structural feature of the Constitution empowers Congress to help prevent the Executive Branch "from betraying a spirit of favoritism, or an unbecoming pursuit of popularity …." *The Federalist* No. 76, *supra*, at 456 (Alexander Hamilton). As relevant here, while Congress has given the Attorney General authority to retain lawyers to help assist officers discharge their duties, *see, e.g.*, 28 U.S.C. §542(a), it is something else entirely for the Attorney General—with no direction from Congress—to grant a private person "significant authority pursuant to the laws of the United States," *Lucia*, 585 U.S. at 245 (citation omitted), much less more power than Congress has entrusted to a Senate-confirmed U.S. Attorney.

Accordingly, before Congress can delegate to the Attorney General the discretionary authority to empower a private person to wield such extraordinary (and core) executive power, it must at least provide meaningful guidance about when such an appointment is appropriate. Congress also must provide some relevant direction about the conditions under which such a private person can operate. And Congress also must make clear that the Department of Justice may expend funds on the office, and for how long. Any theory that the Attorney General can decide such foundational questions without any guidance from Congress runs headlong into the Fifth Circuit's *Jarkesy* decision and the fundamental principles upon which it rests.

### B.  Constitutional avoidance requires affirmance.

To be clear, it is *not* Texas's position that §§509, 510, 515 and 533 are unconstitutional. Far from it. As discussed above, they serve a modest but important purpose by allowing the Attorney General to delegate to his federal subordinates the authority to perform duties that Congress has imposed on him by law. Instead, it is Texas's position that Congress—at a minimum—must provide meaningful direction before the Attorney General can appoint a private individual to wield extraordinary prosecutorial authority. Because these statutes do not provide such guidance, Appellant's interpretation cannot be reconciled with *Jarkesy*.

As the Supreme Court has explained, "application of the nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." *Mistretta*, 488 U.S. at 373 n.7; *see also, e.g.,*

*Gundy*, 588 U.S. at 135; *Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*, 448 U.S. 607, 646 (1980) (plurality op.). Even without constitutional avoidance, the district court's interpretation is correct. But if nothing else, the district court's reading is "at least fairly possible." *United States v. Hansen*, 599 U.S. 762, 781 (2023) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)). Rather than adopting Appellant's position, which would sideline the Senate and cause "legislation and the Constitution [to] brush up against each other," the Court instead should "seek harmony," *id.*, by holding that the Attorney General cannot make such appointments unless Congress provides clear authorization and constitutionally sufficient guidance.

## Conclusion

The Court should affirm the judgment below.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Aaron L. Nielson
Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Lanora C. Pettit
Principal Deputy Solicitor General

Counsel for the State of Texas

22

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Rules 32(a)(7)(B)(i) and 29(a)(f) of the Federal Rules of Appellate Procedure because it contains 6,087 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF SERVICE

I certify that on November 1, 2024, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ Aaron L. Nielson

AARON L. NIELSON