No. 24-12311-J

In the
# United States Court of Appeals
For the Eleventh Circuit

UNITED STATES OF AMERICA,
Appellant,

v.

DONALD J. TRUMP, WALTINE NAUTA,
and CARLOS DE OLIVEIRA
Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
District Court No. 9:23-CR-80101-AMC-1 (Cannon, J.)

**REPLY BRIEF FOR THE UNITED STATES**

J.P. COONEY
Deputy Special Counsel

JAY I. BRATT
MICHAEL R. DREEBEN
RAYMOND N. HULSER
Counselors to the Special Counsel

JACK SMITH
Special Counsel

DAVID V. HARBACH II
JOHN M. PELLETTIERI
CECIL W. VANDEVENDER
JAMES I. PEARCE
Assistant Special Counsels
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. B-206
Washington, D.C. 20530

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1 and 26.1-2, the undersigned hereby certifies that the following is a list of persons and entities who have an interest in the outcome of this case:

1. Advance Publications, Inc.

2. Alonso, Cristina

3. America First Legal Foundation

4. America First Policy Institute

5. America's Future

6. American Broadcasting Companies, Inc., d/b/a ABC News

7. American Center for Law and Justice

8. Ayer, Donald

9. Bell, Daniel W.

10. Berry, Michael

11. Bird, Brenna

12. Blackman, Joshua

13. Blanche, Todd

14. Bloomberg, L.P.

15. Bondi, Pamela J.

16. Boos, Michael

17. Bove, Emil

18. Bowman, Chad

19. Bratt, Jay

20. Cable News Network, Inc.

21. Calabresi, Steven

22. Caldera, Louis

23. Cannon, Hon. Aileen

24. Cate, Matthew

25. CBS Broadcasting, Inc. o/b/o CBS News

26. Citizens for Responsibility and Ethics in Washington

27. Citizens United

28. Citizens United Foundation

29. CMG Media Corporation

30. Coleman, Russell

31. Coleman, Tom

32. Commonwealth of Kentucky

33. Conway, George

34. Conservative Legal Defense and Education Fund

35. Cooney, J.P.

36. Cox Enterprises, Inc. (COX) d/b/a The Atlanta Journal-Constitution

37. Cynkar, Robert J.

38. Dadan, Sasha

39. De Oliveira, Carlos

40. Dow Jones & Company, Inc., publisher of The Wall Street Journal

41. Dreeben, Michael

42. Drummond, Gentner

43. Edelstein, Julie

44. Ekonomou, Andrew J.

45. Fields, Lazaro

46. Fitzgerald, Patrick

47. Forrester, Nathan A.

48. Fort Myers Broadcasting Company

49. Gerson, Stuart

50. Gertner, Nancy

51. Gillers, Stephen

52. Goodman, Hon. Jonathan

53. Gray Media Group, Inc. (GTN)

54. Griffin, Tim

55. Guardian News & Media Limited

56. Gun Owners Foundation

57. Gun Owners of America

58. Gun Owners of California

59. Harbach, David

60. Heigis, Eric

61. Henneke, Robert

62. Hilgers, Michael T.

63. Hirsch, Steven A.

64. Hulser, Raymond

65. Insider, Inc.

66. Irving, John

67. Jackley, Marty J.

68. Jorjani, Daniel H.

69. Kise, Christopher

70. Klukowski, Kenneth A.

71. Knudsen, Austin

72. Kobach, Kris

73. Kozinski, Alex

74. Labrador, Raúl R.

75. Lacovara, Philip Allen

76.  Landmark Legal Foundation

77.  Lawson, Gary

78.  Los Angeles Times Communications LLC, publisher of The Los Angeles Times

79.  Marshall, Steve

80.  Maynard, Hon. Shaniek Mills

81.  McKay, John

82.  McNamara, Anne

83.  McSweeney, Patrick M.

84.  Meese, Edwin

85.  Miller, Justin A.

86.  Miller, Matthew

87.  Mishkin, Maxwell

88.  Moelker, Nathan J.

89.  Moody, Ashley

90.  Monson, Darrick W.

91.  Morgan, Jeremiah L.

92.  Morrisey, Patrick

93.  Mukasey, Hon. Michael B.

94.  Murrell, Larry Donald

95.  National Cable Satellite Corporation d/b/a C-SPAN

96.   National Public Radio, Inc.

97.   Nauta, Waltine

98.   NBCUniversal Media, LLC d/b/a NBC News, a subsidiary of Comcast Corporation (CMCSA)

99.   Nielson, Aaron L.

100.  Olson, William J.

101.  One Nation Under God Foundation

102.  Orlando Sentinel Media Group, publisher of the Orlando Sentinel

103.  Paxton, Ken

104.  Pearce, James

105.  Pellettieri, John

106.  Pettit, Lanora C.

107.  POLITICO LLC

108.  Potter, Trevor

109.  Public Advocate of the United States

110.  Radio Television Digital News Association

111.  Raul, Alan Charles

112.  Ray, Robert W.

113.  Reinhart, Hon. Bruce E.

114.  Reuters News & Media, Inc.

115.  Reyes, Sean

116. Rokita, Theodore E.

117. Roth, Stuart J.

118. Russell, Lauren

119. Salario, Samuel

120. Sample, James J.

121. Sasso, Michael

122. Schaerr, Gene

123. Sekulow, Jay Alan

124. Sekulow, Jordan

125. Seligman, Matthew

126. Sisney, Benjamin P.

127. Skrmetti, Jonathan

128. Smith, Abbe

129. Smith, Fern

130. Smith, Jack

131. State Democracy Defenders Action

132. State of Alabama

133. State of Alaska

134. State of Arkansas

135. State of Florida

136. State of Idaho

137. State of Indiana

138. State of Iowa

139. State of Kansas

140. State of Louisiana

141. State of Mississippi

142. State of Missouri

143. State of Montana

144. State of Nebraska

145. State of Oklahoma

146. State of South Carolina

147. State of South Dakota

148. State of Tennessee

149. State of Texas

150. State of Utah

151. State of West Virginia

152. Steinman, Jessica Hart

153. Sun-Sentinel Company, LLC, publisher of the South Florida Sun Sentinel

154. TEGNA, Inc. (TGNA)

155. Telemundo Network Group, LLC d/b/a Noticias Telemundo

156. Texas Public Policy Foundation

157. Thakur, Michael

158. The Associated Press

159. The E.W. Scripps Company (SSP)

160. The McClatchy Company, LLC (MNI) d/b/a the Miami Herald

161. The New York Times Company (NYT)

162. The Palm Beach Post and USA TODAY, publications operated by subsidiaries of Gannett Co., Inc. (GCI)

163. Thompson, Larry

164. Tillman, Seth Barrett

165. Tobin, Charles

166. Torres, Hon. Edwin

167. Treg, Taylor

168. Trent, Edward H.

169. Tribe, Laurence

170. Troye, Olivia

171. Trump, Donald J.

172. Trusty, James

173. Twardy, Stanley

174. United States of America

175. Univision Networks & Studios, Inc.

176. U.S. Constitutional Rights Legal Defense Fund

177. VanDevender, Cecil

178. Webster, Brent

179. Weiss, Stephen

180. Weld, William

181. Weldon, Chance

182. Wessan, Eric H.

183. Wharton, Kendra

184. Whitaker, Henry C.

185. Whitaker, Matthew

186. Whitman, Christine Todd

187. Wilson, Alan

188. Woodward, Stanley

189. WP Company LLC d/b/a The Washington Post

190. WPLG, Inc.

Respectfully submitted,

JACK SMITH
Special Counsel

By:   /s/ James I. Pearce
JAMES I. PEARCE
Assistant Special Counsel
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................... C-1

TABLE OF CONTENTS ................................................................i

TABLE OF AUTHORITIES ........................................................ ii

INTRODUCTION .................................................................... 1

ARGUMENT ......................................................................... 2

    I.    The Attorney General Has the Statutory Authority to Appoint the Special Counsel ........................................ 2

        A.    *Nixon* Controls ................................................... 2

        B.    Multiple Statutes Authorized the Appointment Here .......... 3

            1.    Section 515 ............................................... 3

            2.    Section 533 ................................................ 10

            3.    Sections 509 and 510 ............................. 11

        C.    History Confirms the Validity of the Appointment Here ............................................................... 15

        D.    No Clear-Statement Rule Applies Here ........................ 24

    II.    The Special Counsel Is Not a Principal Officer ......................... 26

    III.    The Special Counsel's Funding Does Not Violate the Appropriations Clause ............................................... 29

CONCLUSION ..................................................................... 30

CERTIFICATE OF COMPLIANCE .............................................. 31

CERTIFICATE OF SERVICE ..................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Armstrong v. Bush*,
   924 F.2d 282 (D.C. Cir. 1991) ................................................................ 24

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023) ......................................................................... 25

*Burnap v. United States*,
   252 U.S. 512 (1920) ............................................................................. 4

*Edmond v. United States*,
   520 U.S. 651 (1997) ........................................................... 25, 26, 27, 28

*Fleming v. Mohawk Wrecking & Lumber Co.*,
   331 U.S. 111 (1947) ............................................................................ 17

*In re Grand Jury Investigation*,
   315 F. Supp. 3d 602 (D.D.C. 2018) ................................................. 4, 9, 28

*In re Grand Jury Investigation*,
   916 F.3d 1047 (D.C. Cir. 2019) ........................................................ 2, 27

*In re Persico*,
   522 F.2d 41 (2d Cir. 1975) ................................................................... 20

*In re Sealed Case*,
   829 F.2d 50 (D.C. Cir. 1987) ................................................................. 2

*Jones v. Hendrix*,
   599 U.S. 465 (2023) ............................................................................ 25

*Kucana v. Holder*,
   558 U.S. 233 (2010) ............................................................................ 26

*Loughrin v. United States*,
   573 U.S. 351 (2014) ............................................................................. 8

*Lucia v. SEC*,
    585 U.S. 237 (2018) ............................................................... 13

*Morrison v. Olson*,
    487 U.S. 654 (1988) ............................................................... 28

*Myers v. United States*,
    272 U.S. 52 (1926) ................................................................. 28

*Rodriguez v. SSA*,
    118 F.4th 1302 (11th Cir. 2024) .....................................27, 28

*Stanley v. City of Sanford*,
    83 F.4th 1333 (11th Cir. 2023) ............................................... 1

*Trump v. United States*,
    603 U.S. 593 (2024) ............................................................... 13

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021) ................................................................... 28

*United States v. Bass*,
    404 U.S. 336 (1971) ............................................................... 24

*United States v. Concord Mgmt. & Consulting LLC*,
    317 F. Supp. 3d 598 (D.D.C. 2018) ........................................ 2

*United States v. Fortuna*,
    No. 12-cr-636, 2013 WL 1737215 (D.N.J. Apr. 22, 2013) ........ 11

*United States v. Hasan*,
    846 F. Supp. 2d 541 (E.D. Va. 2012), *aff'd*, 718 F.3d 338 (4th Cir. 2013) ..................................................................................... 11

*United States v. Hawthorne*,
    449 F. Supp. 1048 (S.D. Cal. 1978) ........................................ 9

*United States v. Hilario*,
    218 F.3d 19 (1st Cir. 2000) .................................................... 27

*United States v. Janssen*,
    73 M.J. 221 (C.A.A.F. 2014) ................................................... 12

*United States v. Mitchell*,
    377 F. Supp. 1326 (D.D.C. 1974) ......................................... 12

*United States v. Nixon*,
    418 U.S. 683 (1974) ................................................... 1, 2, 3, 12

*United States v. Plesinski*,
    912 F.2d 1033 (9th Cir. 1990) ................................................. 9

*United States v. Rosenthal*,
    121 F. 862 (C.C. S.D.N.Y. 1903) .......................................... 20

*United States v. Smith*,
    962 F.3d 755 (4th Cir. 2020) ............................................ 14, 15

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ................................................................ 3

## Statutes, Rules, and Constitutional Provisions

U.S. Const. art II, § 2, cl. 2 .......................................... 13, 25

5 U.S.C. § 296 (1946 ed.) ................................................... 5

5 U.S.C. § 298 (1946 ed.) ................................................... 5

5 U.S.C. § 301 ................................................................... 13

5 U.S.C. § 312 (1946 ed.) ................................................... 4

5 U.S.C. § 315 (1934 ed.) ................................................... 7

5 U.S.C. § 3101 ................................................................ 10

28 U.S.C. § 503 ................................................................. 7

28 U.S.C. § 503 (1952 ed.) ................................................. 7

28 U.S.C. § 504 (1952 ed.) ................................................. 7

28 U.S.C. § 509 .................................................................. 1, 11, 28

28 U.S.C. § 510 .................................................................. 1, 11, 28

28 U.S.C. § 515 ................................................................... 1, 7, 28

28 U.S.C. § 516 ........................................................................ 28

28 U.S.C. § 518 ........................................................................ 28

28 U.S.C. § 519 ........................................................................ 28

28 U.S.C. § 533 ..................................................................... 1, 10

28 U.S.C. § 544 .......................................................................... 8

28 U.S.C. § 548 ....................................................................... 7, 8

42 U.S.C. § 902 ........................................................................ 28

28 C.F.R. § 0.13 ......................................................................... 8

Ethics in Government Act of 1978, Pub. L. No. 95-521, 92 Stat. 1824 .......... 23

**Historical Statutes**

Act of Apr. 17, 1930, Pub. L. No. 71-133, ch. 174, 46 Stat. 170 ...................... 7

An Act Concerning the Attorney-General and the Attorneys and
    Marshals of the Several Districts, ch. 37, 12 Stat. 285, 285 (1861) .............. 4

An Act to Establish the Department of Justice, ch. 150, § 17, 16 Stat.
    162, 164 (1870) .............................................................. 6, 7, 13

Pub. L. No. 61-5, 36 Stat. 11 (1909) ........................................... 7

Pub. L. No. 64-169, 39 Stat. 412 (1916) ........................................ 7

Pub. L. No. 68-11, 43 Stat. 5 (1924) ........................................... 21

Rev. Stat. § 363 ........................................................................ 4

## Congressional Materials

44 Cong. Rec. 4472, 4539-47 (1909) ............................................................ 18

44 Cong. Rec. 4541 (1909) .......................................................................... 19

44 Cong. Rec. 4544 (1909) ..................................................................... 18, 19

62 Cong. Rec. 1308 (1924) .......................................................................... 22

62 Cong. Rec. 1538 (1924) .......................................................................... 22

119 Cong. Rec. 34791 (1973) ................................................................. 22, 23

Cong. Globe, 41st Cong., 2d Sess. 3037 (Apr. 27, 1870) ............................... 6

H.R. Rep. No. 59-2901 (1906) ..................................................................... 20

S. Rep. No. 59-3835 (1906) ..................................................................... 8, 20

S. Rep. No. 89-1380 (1966) ........................................................................... 5

S. Rep. No. 93-595 (1973) ..................................................................... 22, 23

S. Rep. No. 93-596 (1973) .......................................................................... 23

S. Rep. No. 95-170 (1977) ..................................................................... 23, 24

*Compensation of Special Attorneys in Star-Route Cases*, S. Ex. Doc. No. 48-156 (1884) ............................................................................................ 17

*Letter from the Postmaster-General in Response to a Senate Resolution of February 4, 1904, Transmitting a Report Relating to the Investigation of the Post-Office Department*, S. Doc. No. 58-151 (1904) ..................................... 17

*Testimony Relating to Expenditures in the Department of Justice, the Star Route Cases*, H. Misc. Doc. No. 48-38, Part 2 (1884) ......................................... 16

*The Future of the Independent Counsel Act: Hearings Before the Senate Comm. on Governmental Affairs*, S. Hrg. No. 106-131 (1999) .................................. 24

## Other Authorities

17 Op. Att'y Gen. 504 (1883) ......................................................................... 4

21 Op. Att'y Gen. 355 (1896) ......................................................................... 4

38 Fed. Reg. 12,917 (May 17, 1973) ........................................................... 13

64 Fed. Reg. 37,038 (July 9, 1999) ............................................................. 13

1870 Att'y Gen. Ann. Rep. .......................................................................... 13

*Attorney Holmes Closes His Argument*, Washington Times (Feb. 26, 1904) ........ 17

*Black's Law Dictionary* (12th ed. 2024) ..................................................... 4

Brett M. Kavanaugh, *The President and the Independent Counsel*, 86 Geo. L.J. 2133 (1998) .................................................................................... 15

Eric. F. Goldman, *Charles J. Bonaparte, Patrician Reformer, His Earlier Career* (1943) ............................................................................................ 17

GAO, *Special Counsel and Permanent Indefinite Appropriation*, B-302582, 2004 WL 2213560 (Comp. Gen. Sept. 30, 2004) ..................................... 29

Letter from Attorney General Knox to President Theodore Roosevelt, Dec. 2, 1903 .................................................................................... 18

Lewis W. Gould, *The Presidency of Theodore Roosevelt* (1991) ...................... 18

Lincoln Steffens, *The Taming of the West, Pt. II*, in The American Magazine, vol. 64 (Oct. 1907) ................................................................. 18, 19

Shawn Francis Peters, *When Bad Men Combine: The Star Route Scandal and the Twilight of Gilded Age Politics* (2023) ................................................. 16

*To Prosecute Postal Cases*, N.Y. Times (June 24, 1903) ............................... 17

*Tyner and Barrett Go Free*, N.Y. Times (May 26, 1904) ............................... 17

# INTRODUCTION

Defendants[1] and their amici[2] provide no viable defense of the district court's determination that the Attorney General lacked authority to appoint the Special Counsel. The Supreme Court held more than 50 years ago that Congress vested the Attorney General with the power to appoint special prosecutors like the Special Counsel, *see United States v. Nixon*, 418 U.S. 683, 694 (1974), and the text, context, and history of the four statutes the Supreme Court identified (28 U.S.C. §§ 509, 510, 515, 533), as well as the long history of special-counsel appointments, confirm that *Nixon* was correct. Defendants' principal-officer and Appropriations-Clause arguments are likewise flawed under binding precedent, settled practice, and common sense.

---

[1] The government has moved to dismiss this appeal as to Donald Trump. If granted, defendant Trump will not appear in the caption in future filings in this case.

[2] Because this Court will not typically consider arguments raised only by amici, *see Stanley v. City of Sanford*, 83 F.4th 1333, 1344 (11th Cir. 2023), the government does not address such arguments here given space constraints.

## ARGUMENT

### I. The Attorney General Has the Statutory Authority to Appoint the Special Counsel

#### A. *Nixon* Controls

In *United States v. Nixon*, 418 U.S. 683, 694 (1974), the Supreme Court held that Congress—in 28 U.S.C. §§ 509, 510, 515, and 533—vested the Attorney General with the authority to appoint an independent prosecutor like the Special Counsel. As every court to confront the issue before this case correctly determined, the Supreme Court's statutory determination was necessary to its conclusion that a justiciable case or controversy existed and therefore binds lower courts. *See In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019); *In re Sealed Case*, 829 F.2d 50, 55 & n.30 (D.C. Cir. 1987); *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 623 (D.D.C. 2018).

Defendants' attempt to avoid *Nixon*'s controlling holding is unavailing. Defendants contend (Br.52-54) that the mere existence of regulations delegating authority to the special prosecutor in *Nixon* was sufficient to establish a justiciable controversy, but both the existence *and* validity of those regulations were necessary to create a justiciable controversy. Thus, the statutory determination that Congress authorized the Attorney General to appoint and delegate prosecutorial authority to the special prosecutor was an essential component of the Court's ruling on justiciability. Defendants also embrace

(Br.54-56) the district court's conclusion that the Supreme Court simply assumed the Attorney General had authority to appoint the Special Prosecutor. But the Court stated without qualification that, in 28 U.S.C. §§ 509, 510, 515, and 533, Congress "vested in [the Attorney General] the power to appoint subordinate officers to assist him in the discharge of his duties," and "[a]cting pursuant to those statutes, the Attorney General has delegated the authority to represent the United States in these particular matters to a Special Prosecutor." 418 U.S. at 694. The Court did not "assume[]" anything "*sub silentio*," Br.55 (quotation omitted), or treat anything as "an undecided antecedent proposition," Br.54 (quotation omitted). It instead "expressly address[ed]" a legal question necessary to resolve justiciability, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990), establishing a binding holding.

## B.    Multiple Statutes Authorized the Appointment Here

As *Nixon* recognized, four statutes authorized the Attorney General to appoint the Special Counsel.

### 1.    Section 515

Section 515 and its predecessors have enabled the Attorney General to appoint special attorneys for more than 150 years. Gov.Br.20-29. Defendants nevertheless contend (Br.14-28) that Section 515 does not vest the Attorney General with the power to appoint a special counsel; that such appointment

power must come from "some *other*" statute; and that the only such statute under current law is Section 543, which authorizes the Attorney General to appoint Special Assistant U.S. Attorneys (SAUSAs). It follows, defendants maintain, that because the Special Counsel is not a SAUSA, his appointment was invalid. Those claims contradict text, history, and precedent.

a. Defendants wrongly claim (Br.18) that Section 515(b) is "[n]ot [a] [s]ource [o]f [a]ppointment [p]ower." They emphasize (Br.18-19) that the word "appoint" is "[c]onspicuously absent" from the statute (quotation omitted). But Congress need not use the word "appoint" to give the Attorney General appointment authority. *See* Gov.Br.40-41. Instead, "[t]he term 'employ' is used as the equivalent of appoint," *Burnap v. United States*, 252 U.S. 512, 515 (1920); *see* 21 Op. Att'y Gen. 355, 356 (1896) (similar); 17 Op. Att'y Gen. 504, 506 (1883) (similar), and the same is true of its near-synonym, "retain," *see Black's Law Dictionary* (12th ed. 2024) ("Retain"); *In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 654 (D.D.C. 2018).[3] Section 515(a) thus uses "any attorney

---

[3] Defendants' theory hinges on the claim that "specially retained" has always referred to attorneys appointed under some *other* statute, and specifically to attorneys appointed under the 1861 Act, as codified by Section 363 of the Revised Statutes. *See* An Act Concerning the Attorney-General and the Attorneys and Marshals of the Several Districts (1861 Act), ch. 37, 12 Stat. 285, 285 (1861); Rev. Stat. § 363. But "appoint" was also absent from that statute, which used "employ and retain." *Id.*; *see also* 5 U.S.C. § 312 (1946 ed.).

specially *appointed*" to refer to the attorneys "specially *retained*" under Section 515(b), as statutory history confirms: from 1870 until 1948, Section 515(b)'s predecessors were styled as "appointment" provisions and described specially retaining an attorney as an "appointment," *see* Gov.Br.23-25, with the terminological change a matter of style not substance, *see* S. Rep. No. 89-1380, at 205 (1966).

Defendants contend (Br.19-21) that "specially *retained*" suggests an appointment that has already occurred. They do not defend the district court's view, Dkt. 672 at 27, that the statute's use of "the past participle tense" is "significant in evaluating" its meaning, conceding (Br.21) that the phrase takes its meaning from context. But that context shows that Section 515(b) does not refer to an already-completed appointment, as it provides that the special counsel "*shall be* commissioned" and "*shall take* the oath," and that the Attorney General "*shall* fix [his] annual salary," steps that would make little sense for an already-completed appointment. *See* Gov.Br.26.

---

"[A]ppoint" was likewise absent from 5 U.S.C. §§ 296 and 298 (1946 ed.), two other statutes that defendants characterize (Br.23-27) as appointment provisions to which 5 U.S.C. § 315 pointed. Thus, under defendants' own reasoning, the absence of "appoint" does not disqualify a statute as a source of appointment authority.

Finally, defendants contend (Br.20-22) that "under authority of the Department of Justice" in Section 515(b) must refer to "some *other* source" of appointment authority to avoid superfluity. But that phrase, when enacted, corresponded with a prohibition on other department heads "employ[ing] attorneys or counsel at the expense of the United States," requiring them to "call upon the Department of Justice." An Act to Establish the Department of Justice, ch. 150, § 17, 16 Stat. 162, 164 (1870) (DOJ Act). The Attorney General then decided whether to appoint special counsel, with any appointment "under the authority of the Department of Justice," not the authority of another department. *Id.*, 16 Stat. at 165; *see* Cong. Globe, 41st Cong., 2d Sess. 3037 (Apr. 27, 1870) (explaining that the Attorney General would be "chargeable" with "any error . . . committed"). The phrase clarifies the Department whose authority governs the appointment; it does not refer to an appointment authority extrinsic to the DOJ Act.

b. Defendants' related claim (Br.7, 14-24) that the only "other source" (emphasis omitted) to which Section 515 refers under current law is 28 U.S.C. § 543, governing the appointment of SAUSAs, illustrates their argument's flaws. Originally, the DOJ Act authorized specially retained attorneys to serve "as a special assistant to the Attorney-General, or to some one of the district attorneys, as the nature of the appointment may require." DOJ Act § 17. A 1930 Act

expanded that list of options, *see* Act of Apr. 17, 1930, Pub. L. No. 71-133, ch. 174, 46 Stat. 170, so that a specially retained attorney could also be commissioned "as a special attorney," 5 U.S.C. § 315 (1934 ed.). In 1948, the language authorizing special assistants to the (now-renamed) U.S. Attorneys was moved to 28 U.S.C. § 503 (and later to 28 U.S.C. § 548), with the "other parts of said section 315, relating to special assistants to the Attorney General," remaining "in title 5," *see* 28 U.S.C. §§ 503-504 (1952 ed.) (reviser's note). These remaining provisions authorized the Attorney General to appoint "special assistant[s] to the Attorney General" and "special attorney[s]," 28 U.S.C. § 515(b), which both—contrary to defendants' erroneous claim (Br.22) that the government does not rely on the term "special assistant"—aptly describe the Special Counsel.

Defendants insist, however, that powers long exercised by Attorneys General do not exist. In their telling (Br.23-27), a "special assistant to the Attorney General" merely refers to a now-extinct species of special counsel appointed to prosecute customs and postal cases, under 5 U.S.C. §§ 296 and 298. But those provisions postdated the 1870 DOJ Act, *see* Pub. L. No. 61-5, § 30, 36 Stat. 11, 108 (1909); Pub. L. No. 64-169, ch. 261, 39 Stat. 412, 413 (1916), so Section 17 could not have referred to them. Defendants also maintain (Br.22-23) that "special attorney" means precisely the same as its neighbor, an assistant

to "one of the district attorneys."  Defendants' reading thus contravenes the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute."  *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quotation omitted).

Defendants' reading would also render other statutes superfluous.  If "[t]he term 'special attorney,' as used in § 515(b) is a specific reference to 28 U.S.C. § 543," and Section 515(b) exists merely to ensure that SAUSAs appointed under Section 543 swear an oath and receive a fixed salary, Br.22, 26, it would make redundant nearby provisions that address those very requirements.  *See* 28 U.S.C. §§ 544 (oath), 548 (salary).

Finally, defendants' reading would undermine Section 515(a).  By empowering the Attorney General to authorize "any attorney specially appointed by the Attorney General under law" to "conduct any kind of legal proceeding," including "grand jury proceedings," it ensured that he could appoint "special counsel to act independently of the United States attorney, particularly in criminal matters."  S. Rep. No. 59-3835 (1906).  Section 515(a) is also used to authorize Main Justice trial attorneys to conduct grand-jury investigations in the various districts.  *See* 28 C.F.R. § 0.13.  By contrast, Assistant U.S. Attorneys, including SAUSAs, do not rely on Section 515(a), because they do not need Attorney-General authorization to appear before

grand juries in their home districts. *See United States v. Hawthorne,* 449 F. Supp. 1048, 1053 (S.D. Cal. 1978). If, as defendants contend (Br.14-15), the term "attorney specially appointed by the Attorney General under law" refers solely to SAUSAs, it would mean that the statute applies only to attorneys for whom it is superfluous, while being inapplicable to the attorneys who have long relied on it to carry out the Department's functions.

Defendants' effort to treat a SAUSA appointment under Section 543 as a prerequisite to Section 515's applicability would distort the statutory scheme. Sections 515 and 543 (and their predecessors) have always been "'separate and distinct statutory bases for the Attorney General, as head of the Department of Justice, to appoint attorneys to assist either himself or a United States attorney.'" *In re Grand Jury Investigation*, 315 F. Supp. 3d at 616 (quoting *Hawthorne*, 449 F. Supp. at 1052). "Congress did not intend that § 515 would affect the separate statutory basis, § 543, upon which attorneys are appointed to assist United States attorneys, and thus it did not contemplate that the phrase 'any attorney appointed by the Attorney General under law' in § 515 would apply to attorneys appointed pursuant to § 543." *Hawthorne*, 449 F. Supp. at 1055; *accord United States v. Plesinski*, 912 F.2d 1033, 1037 n.5 (9th Cir. 1990).

### 2. Section 533

The statute that allows the Attorney General to "appoint officials . . . to detect and prosecute crimes," 28 U.S.C. § 533(1), independently authorized the Special Counsel's appointment. Defendants' argument (Br.28-30) that "official" in Section 533 refers only to nonofficer employees needlessly creates superfluity. Whereas interpreting "official" in Section 533 as an umbrella term that encompasses both "officers" and "employees" gives it independent meaning, *see* Gov.Br.30-31, defendants' interpretation, like the district court's, requires reading "official" to mean only "employee" and thus "overlook[ing]" Congress's "choice of a different word," Br.29. And if defendants were correct that "official" in Section 533 applies only to employees, Congress would have had no reason to vest the Attorney General with the power to "appoint," because he already has the power to "employ such number of employees" as he deems appropriate, 5 U.S.C. § 3101.

Defendants focus (Br.31-32, 35-36) on Section 533's title, its placement within Title 28, and government sources (such as the FBI website) that acknowledge that Section 533 applies to the FBI. Even if favoring a statute's title and placement (or government websites discussing it) over its text did not contravene statutory interpretation principles, *see* Gov.Br.32-33, defendants' argument establishes only the uncontested point that Section 533 permits

appointment of FBI officials. But nothing in Section 533's text limits it to the FBI, as courts have recognized. *See United States v. Hasan,* 846 F. Supp. 2d 541, 546 n.7 (E.D. Va. 2012), *aff'd,* 718 F.3d 338 (4th Cir. 2013); *United States v. Fortuna,* No. 12-cr-636, 2013 WL 1737215, at *2 n.8 (D.N.J. Apr. 22, 2013).

The statutory history on which defendants rely (Br.32-35) undercuts their argument. The 1871 appropriation empowering the Attorney General to expend resources to detect and *prosecute* crimes—which defendants identify as a precursor to Section 533(1), *see* Br.32-33—demonstrates that Congress vested the Attorney General with the power to appoint and fund prosecutors shortly after it established the Department of Justice in 1870, more than 50 years before the FBI's creation. That history underscores that Section 533 has long enabled the Attorney General to appoint non-FBI officials to detect and prosecute federal crimes—precisely the role the Special Counsel plays.

### 3. Sections 509 and 510

Congress also authorized the Attorney General to appoint the Special Counsel through two provisions that vest in him the functions of the Department of Justice and the power to delegate those functions. *See* 28 U.S.C §§ 509, 510. In defending (Br.36-37) the district court's view that Section 510 applies only to existing officers and employees, defendants fail to engage with the statute's text and purpose, which contemplate the Attorney General "mak[ing] such

provisions as he considers appropriate" to "authoriz[e]" any officer or employee, including those he has appointed or employed for that very reason, to carry out "any" of his functions. *See* Gov.Br.34-35. Defendants' related claim (Br.37) that the Attorney General could not have hired the Special Counsel as an employee under 5 U.S.C. § 3101 before "elevat[ing] him to inferior officer status" is irrelevant but fails in any event. As longstanding practice attests, the Attorney General's authority to appoint a special counsel arises directly under Sections 509 and 510, with no need to resort to Title 5. *See, e.g.*, *Nixon*, 418 U.S. at 694; *United States v. Mitchell*, 377 F. Supp. 1326, 1329 n.7 (D.D.C. 1974).[4] But even under Title 5, the Attorney General's authority to hire employees, § 3101, encompasses the power to hire an "officer" in the first instance, *see* § 2105(a) (defining "employee" to include "an officer").

Defendants supply no compelling response to the long history showing that Attorneys General have relied on Sections 509 and 510 to appoint officers

---

[4] Defendants' reliance (Br.37-38) on *United States v. Janssen*, 73 M.J. 221 (C.A.A.F. 2014), which involved a challenge to the appointment of a military judge on the Air Force Court of Criminal Appeals, is misplaced. The Air Force did not argue that the "general grant of authority to the Secretary [of Defense] in 10 U.S.C. § 113—the Defense Department's analogue to Sections 509 and 510, *see* Gov.Br.39-40—supported the appointment there, so the court had no occasion to consider, and did not consider, the type of argument advanced here. *See* 73 M.J. at 224 n.8.

like the Special Counsel.[5]  *See* Br.38-40.  Although the DOJ Act indeed sought to limit "outside work," Br.38, it simultaneously authorized the Attorney General to staff the newly created Department of Justice, delegate the Department's work to its personnel, and, when necessary, appoint special assistants to himself or the district attorneys.  DOJ Act, §§ 14, 17; *see also* 1870 Att'y Gen. Ann. Rep. 3 (noting that "the practice of retaining special counsel" was "allowed" by "the seventeenth section of the [DOJ] Act").  That Congress occasionally creates units with the Department, *see* Br.39 (Bureau of Narcotics and Dangerous Drugs); Gov.Br.36 (National Security Division), does not undercut the Attorney General's authority to take such action himself, *see* Gov.Br.36-37.

---

[5] Defendants suggest that Congress had to provide for both the appointment of an "officer" and "the creation of an office for a Special Counsel."  Br.30 (quoting *Trump v. United States*, 603 U.S. 593, 649 (2024) (Thomas, J., concurring)).  But the Appointments Clause refers only to "Officers."  U.S. Const. art II, § 2, cl. 2.  And when Congress vests in a department head the power to appoint an officer who holds a continuing position and exercises significant responsibility under federal law, *see Lucia v. SEC*, 585 U.S. 237, 245 (2018), that law satisfies any requirement that Congress establish an "office" by Law.  Separately, Congress has empowered the Attorney General (and other department heads) to "prescribe regulations for the government of his department" and "the distribution and performance of its business," 5 U.S.C. § 301, a power the Attorney General has long used to create offices within the Department of Justice, *see, e.g.*, 38 Fed. Reg. 12,917 (May 17, 1973) (creating the office of the U.S. Marshals Service); Gov.Br.36-37 (providing other examples), including the Office of Special Counsel, 64 Fed. Reg. 37,038 (July 9, 1999).

Finally, defendants argue (Br.40-44) that congressional "silence" and "acquiescence . . . through inaction" do not support the Attorney General's power under Sections 509 and 510 to appoint inferior officers like the Special Counsel. That argument ignores the uniform agreement across the branches about the Attorney General's appointment powers under Sections 509 and 510. Congress has passed legislation premised upon and thus endorsing officers and offices solely appointed or created by the Attorney General, Gov.Br.37-39, and conditioned Elliot Richardson's confirmation as Attorney General during Watergate on his appointment of a Special Prosecutor, *infra* at 22-23. The Attorney General—like other department heads, *see* Gov.Br.39-40—has relied on Congress's broad grant of power to staff and operate his department for more than 150 years. And until this case, courts, including the Supreme Court in *Nixon*, had uniformly upheld the Attorney General's appointment of special prosecutors like the Special Counsel. *See* Gov.Br.16-17. The contrary view adopted by the district court and defendants would mean that "Congress has gotten the Appointments Clause quite wrong" for more than 150 years, and "clear Supreme Court precedent, scores of federal laws, and hundreds of past executive branch designations would all have to fall." *United States v. Smith*, 962 F.3d 755, 765 (4th Cir. 2020).

## C. History Confirms the Validity of the Appointment Here

"The Supreme Court has often stressed that when it comes to cases involving structural constitutional provisions like the Appointments Clause, history matters." *Smith*, 962 F.3d at 765 (citing cases). Here, that history "points in one direction," *id.*, establishing a "deeply rooted tradition of appointing an outside prosecutor to run particular federal investigations," Brett M. Kavanaugh, *The President and the Independent Counsel*, 86 Geo. L.J. 2133, 2142-43 (1998), with explicit congressional approval. Defendants' contrary view rests on an inaccurate historical narrative (Br.42-51) in which prior special counsels were mere subordinates to U.S. Attorneys and Congress has silently acquiesced in a purported usurpation of its power.

1. In the decades following enactment of the DOJ Act in 1870, Attorneys General often appointed special counsels from outside the Department to direct the investigation and prosecution of high-profile cases, independent from the local U.S. Attorney. Four examples illustrate the point.[6]

a. *Star Route Cases.* In 1881, an investigation into bribery in the Post Office Department developed into a scandal known as the Star Route cases. *See*

---

[6] Numerous cases involving special-counsel appointments, *see* Gov.Br.45 n.16, which defendants entirely fail to address, demonstrate that these four examples are not exhaustive.

*generally* Shawn Francis Peters, *When Bad Men Combine: The Star Route Scandal and the Twilight of Gilded Age Politics* (2023). Recognizing their high profile and national character, the local U.S. Attorney, George Corkhill, asked the Attorney General to "designate some lawyer as special counsel for the Government in these cases, who shall have the management and control of them." *Testimony Relating to Expenditures in the Department of Justice, the Star Route Cases*, H. Misc. Doc. No. 48-38, Part 2, at 915 (1884) (*Star Route Testimony*). The Attorney General obliged, appointing William Cook, an attorney in private practice. *Id.* at 94. After Cook's appointment, Corkhill acknowledged in court "that he had nothing whatever to do with [the cases]," *id.* at 101-02; *see* Peters, *supra*, at 53 (discussing report that Corkhill "'ha[d] been relieved of the duty of prosecuting the alleged Star Route conspirators.'"). Cook "never had any consultations with [Corkhill]" from his "first connection with the cases until it ceased," having been instructed not to do so. *Star Route Testimony* at 100-02. Cook later ceded his role to other special counsels appointed by the Attorney General, *see id.* at 110-11, 595, 887-88, who prosecuted the case through trial without the U.S. Attorney's involvement. Congress was aware of these special-prosecutor appointments and never suggested that the Attorney General exceeded his authority—to the contrary, it held hearings to determine appropriate compensation, *see Compensation of Special Attorneys in Star-Route Cases*, S. Ex.

16

Doc. No. 48-156 (1884), effectively ratifying the appointments, *see Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 116 (1947).

b. *Postal Fraud* (Br. 45-46). An investigation into fraud at the Post Office Department in 1903 revealed the need for "legal proceedings," and "[o]wing to the importance of the case it was deemed advisable that special counsel should be employed." *Letter from the Postmaster-General in Response to a Senate Resolution of February 4, 1904, Transmitting a Report Relating to the Investigation of the Post-Office Department*, S. Doc. No. 58-151, at 5-6 (1904). The Attorney General appointed two attorneys from private practice, Charles Bonaparte and Holmes Conrad, as "special assistants to the Attorney-General." *Id.* at 354; *see To Prosecute Postal Cases*, N.Y. Times (June 24, 1903) (explaining that "[f]ollowing the precedent in the Star Route trials the Government has secured special counsel," and Bonaparte and Conrad "have been retained to take charge"). Bonaparte and Conrad obtained indictments and led prosecutions in multiple districts. *See, e.g.*, *Attorney Holmes Closes His Argument*, Washington Times (Feb. 26, 1904); *Tyner and Barrett Go Free*, N.Y. Times (May 26, 1904); Eric. F. Goldman, *Charles J. Bonaparte, Patrician Reformer, His Earlier Career* 50-66 (1943). They were not merely appointed "special counsel to assist ongoing matters led by a U.S. Attorney." Br.46.

c. *Oregon Land Fraud* (Br.46-47). Around the same time, "prominent" public officials "conspired with mining and lumber companies to obtain large tracts of forest land in Oregon and California by fraudulent means." Lewis W. Gould, *The Presidency of Theodore Roosevelt* 112 (1991). The Attorney General appointed Francis Heney, then in private practice, "as special assistant to myself to take charge of the prosecution of the land fraud cases in Oregon." Letter from Attorney General Knox to President Theodore Roosevelt, Dec. 2, 1903. When the U.S. Attorney in Oregon tried to sideline Heney as a mere assistant, the Attorney General confirmed that Heney was "to be in full charge." Gov.Br.54; *see* Lincoln Steffens, *The Taming of the West, Pt. II*, in The American Magazine, vol. 64, at 587 (Oct. 1907). Heney served as a special assistant to the Attorney General to spearhead multiple prosecutions in Oregon and the District of Columbia, including of a sitting U.S. Senator, two Congressmen, and the U.S. Attorney himself. *See* 44 Cong. Rec. 4544 (1909). Defendants are therefore wrong to claim (Br.46) that Heney was appointed merely as the equivalent of a SAUSA under 28 U.S.C. § 543. And Congress, again, did not merely silently acquiesce in his appointment; it held hearings to determine his compensation. 44 Cong. Rec. 4472, 4539-47 (1909).

Defendants are also wrong to claim (Br.46) that Heney's appointment is distinguishable because Heney "was not an outside attorney like Smith," since

"Heney had worn several hats at DOJ." In fact, Heney had not held any position in the Department before his appointment. *See* Steffens, *supra*, at 586.[7] Regardless, defendants' argument lays bare a fundamental misunderstanding underlying their repeated assertion (Br.6, 12, 17, 24, 40) that Special Counsel Smith is "a private citizen." The Special Counsel is a sworn officer in the Department of Justice, exercising delegated authority under the direction and control of the Attorney General. Defendants' complaint that the Special Counsel worked outside the Department before his appointment does not differentiate him from anyone else at DOJ. And they fail to explain why there would be any distinction—much less one of constitutional significance— between the appointment of a person who was hired into the Department one day and made special counsel the next (which they do not contend is impermissible) and the appointment of a special counsel without such brief intervening delay.

d. *Silk Importation Fraud* (Br.47). In 1902, the Attorney General appointed Wickham Smith, a private lawyer, as "a Special Assistant to the Attorney General to investigate and report concerning alleged fraudulent importations of

---

[7] Defendants' error stems from misconstruing a Congressman's statement, *see* 44 Cong. Rec. 4541 (1909), but a letter from the Attorney General shows that Heney was a "special assistant to the Attorney-General," *id.* at 4544, not a Senate-confirmed Assistant Attorney General (Br.46).

Japanese silks" and to "conduct such civil and criminal proceedings as may result therefrom." *United States v. Rosenthal*, 121 F. 862, 862 (C.C. S.D.N.Y. 1903). Smith's investigation resulted in an indictment. *Id.* at 865. The district court quashed the indictment, concluding that Smith lacked authority to conduct grand-jury proceedings, *id.* at 866-69, reasoning that "[o]nly the United States Attorney for the district or one of his assistants . . . could present a matter to a grand jury," *In re Persico*, 522 F.2d 41, 59 (2d Cir. 1975) (discussing *Rosenthal*). In doing so, the court determined that Smith was not appointed as an assistant to the district attorney under Revised Statute § 363 (the successor to the 1861 Act and predecessor to Section 543), finding that he had instead been appointed under Revised Statute § 366 (the predecessor to Section 515(b)). *Rosenthal*, 121 F. at 866-69.

In response, Congress enacted what is now Section 515(a). Gov.Br.44-45. Defendants contend that legislative history shows that the statute was only "directed at 'any attorney specially employed' by the AG 'to assist district attorneys.'" Br.17 (quoting H.R. Rep. No. 59-2901 (1906)). But the Senate Report recognized that "[i]t is frequently desirable and even necessary" for the Attorney General to appoint special counsel to play an array of roles, including "to act independently of the United States attorney, particularly in criminal matters." S. Rep. No. 59-3835.

2.  Defendants also highlight (Br.8, 43, 48-50) two points in history—the Teapot Dome scandal and the post-Watergate legislation—when Congress created statutory special counsels.  But those examples show that Congress understood that it had vested the Attorney General with the power to appoint special counsels and opted to legislate when the Attorney General refused to exercise his appointment power (Teapot Dome) or to supplement that appointment power (post-Watergate).

a.  *Teapot Dome.*  In response to a scandal over oil leases, known as Teapot Dome, Congress passed a joint resolution in 1924 providing that the President is "authorized and directed to appoint, by and with the advice and consent of the Senate, special counsel who shall have charge and control of the prosecution of [the Teapot Dome] litigation, anything in the statutes touching the powers of the Attorney General of the Department of Justice to the contrary notwithstanding."  Pub. L. No. 68-11, ch. 16, 43 Stat. 5, 6 (1924).  Defendants assert (Br.43) that this legislation "would have been largely duplicative" if the Attorney General already had the power to appoint special counsel.  But Congress passed the resolution because the Attorney General had *refused to exercise* his appointment power, despite a Senate investigation disclosing misconduct.  One Senator who supported the legislation explained before its enactment that "[i]f the Attorney General wants to act, he does not have to wait

until we suggest it" because the power "to act or appoint some special counsel to act . . . is in his hands now." 62 Cong. Rec. 1308 (1924) (statement of Sen. Caraway). Congress thus legislated because it wanted to *depart* from the status quo in which the Attorney General appoints a special counsel directly, due to the "widespread suspicion throughout the country directed against the Attorney General." 62 Cong. Rec. 1538 (1924).

b. *Watergate.* Following the Watergate break-in and resulting cover-up, the public feared that the Department's investigation had been inadequate. *See* S. Rep. No. 93-595, at 13 (1973). The Senate began considering legislation "[i]nspired by the Teapot Dome approach," authorizing the appointment of a special counsel outside of the Executive Branch. *Id.* at 13-14. When Elliot Richardson was nominated as Attorney General, however, President Nixon assured the Senate that Richardson would have authority "'to name a special supervising prosecutor for matters arising out of the case.'" 119 Cong. Rec. 34791 (1973). Richardson promised "that, if confirmed, he as Attorney General would appoint such a special supervising prosecutor"; that "the Special Prosecutor would have 'full authority for investigating and prosecuting offenses against the United States arising out of'" the Watergate break-in; and that the Special Prosecutor would be given "'the greatest degree of independence that is consistent with the Attorney General's statutory accountability for all matters

falling within the jurisdiction of the Department of Justice." *Id.* Far from merely acquiescing in a Special-Prosecutor appointment, the Senate conditioned Richardson's confirmation on those sworn representations. *Id.*

Following the Saturday Night Massacre, the Senate Judiciary Committee held hearings on "Cox's dismissal and on proposals for a statutory Special Prosecutor," including a bill creating a statutory Special Prosecutor appointed by the U.S. District Court for the District of Columbia. S. Rep. No. 93-595 at 2, 8 (discussing S. 2642). Those hearings focused on the Appointments Clause and the separation of powers: Committee members agreed that the Special Prosecutor would be an inferior officer, but disagreed over whether it would violate the separation of powers to vest his appointment in the courts, rather than in the Attorney General. *Compare* S. Rep. No. 93-595, at 35-40 (majority report) *with* S. Rep. No. 93-596, at 6-11 (1973) (minority report). Ultimately, Congress deferred legislation and relied on Executive-Branch assurances that a special counsel appointed by the Attorney General would have sufficient independence. *See* S. Rep. No. 95-170, at 2 (1977).

Congress later passed the Ethics in Government Act of 1978, Pub. L. No. 95-521, § 601, 92 Stat. 1824, 1867, which reflected the view that while the Attorney General had the *authority* to appoint a special counsel, it was "not sufficient to rely" on his discretion to do so, particularly when "the Attorney

General or the President has a conflict of interest or the appearance thereof." S. Rep. No. 95-170, at 6. But nothing in the Act purported to limit or revoke the Attorney General's authority to appoint a special counsel directly, and Attorneys General continued to make such appointments while the Act was in effect. *See* Gov.Br.49; Dkt. 640 at 4 (providing examples). Congress's decision to let the Act expire therefore returned "to the pre-Watergate system" in which "[t]he Attorney General has the statutory authority to appoint special counsel." *The Future of the Independent Counsel Act: Hearings Before the Senate Comm. on Governmental Affairs*, S. Hrg. No. 106-131, at 4 (1999); *see* Gov.Br.49-50. And in the quarter-century since the Act's expiration, Attorneys General have continued to appoint special counsels with congressional awareness and approval. *See* Gov.Br.51.

### D.    No Clear-Statement Rule Applies Here

Defendants ask (Br.11-12) this Court to fashion a novel clear-statement rule for statutes authorizing the Attorney General to appoint inferior officers. Despite judicial decisions recognizing clear-statement principles since before *Nixon*, *see Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (citing *United States v. Bass*, 404 U.S. 336, 349 (1971)), they cite no support for applying them in this context, instead relying on decisions applying the major-questions doctrine, which has been invoked when an agency exercises novel powers of

"vast economic and political significance." Br.11 (quotation omitted). But the appointment of a special counsel is a well-established feature of the Attorney General's management of the Department of Justice, and defendants do not identify any "historically or constitutionally grounded norm[]" that would be unsettled by sustaining his reliance on these statutes. *See Jones v. Hendrix*, 599 U.S. 465, 492 (2023). To the contrary, text, history, and settled practice support the appointment, undercutting any need for heightened clarity.

Defendants' clear-statement gloss also undermines constitutional norms. It would require courts to "'load[] the dice'" by preferring that inferior officers be appointed by presidential appointment and Senate confirmation, even when "the best interpretation of the text" is that Congress vested the appointment power in a Department head. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring). But the Appointments Clause explicitly grants discretion to Congress to "vest the Appointment of such inferior Officers, *as they think proper* . . . in the Heads of Departments," U.S. Const. art II, § 2, cl. 2 (emphasis added), based on Congress's assessment of "administrative convenience," *Edmond v. United States*, 520 U.S. 651, 660 (1997). A judicially imposed "clarity tax" that overrides congressional intent would usurp Congress's constitutional prerogatives. *Nebraska*, 143 S. Ct. at 2377 (Barrett, J., concurring)

Defendants' disruptive approach enjoys no support in any Supreme Court decision. In *Edmond*, for example, the Court relied on the "plain language" of one provision to hold that it conferred the power to appoint military judges, and on text, context, history, and constitutional-avoidance principles to hold that another did not. 520 U.S. at 656-658. The Court gave no hint of any clear-statement rule even though the statute there did not "specifically mention" the judges. *Id.* at 656. *Kucana v. Holder*, 558 U.S. 233 (2010), is even farther afield. Whereas *Kucana* applied a clear-statement principle before "plac[ing] in executive hands authority to remove cases from the Judiciary's domain," *id.* at 237, defendants' clear-statement principle would limit executive authority to designate executive officers to carry out executive functions—all under statutes whose natural reading favors authorizing the Attorney General to act. Such an approach would thwart, not promote, structural constitutional principles.[8]

## II. The Special Counsel Is Not a Principal Officer

Defendants' argument (Br.61-63) that the Special Counsel is a principal officer who should have been nominated by the President and confirmed by the Senate lacks merit. Like U.S. Attorneys, the Special Counsel is an inferior

---

[8] Regardless, Sections 515 and 533 would pass any text-based clear-statement test for the reasons stated above, and Sections 509 and 510, interpreted in historical context, are equally plain.

officer under the Appointments Clause because he is subject to direction and supervision by a presidentially appointed and Senate-confirmed officer—the Attorney General—and therefore was constitutionally appointed by the head of a department. *See In re Grand Jury Investigation*, 916 F.3d at 1052-53 (special counsel); *United States v. Hilario*, 218 F.3d 19, 25-26 (1st Cir. 2000) (U.S. Attorney).

In *Edmond*, the Supreme Court held that it is "evident that 'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." 520 U.S. at 663. This Court recently relied on *Edmond* to conclude that members of the Social Security Administration's (SSA) Appeals Council are inferior officers because "[t]he work of the Appeals Council and its members is supervised by the Commissioner, who is appointed by the President and confirmed by the Senate." *Rodriguez v. SSA*, 118 F.4th 1302, 1312 (11th Cir. 2024). *Rodriguez* rejected the argument that regulations limiting supervision of the Appeals Council transformed its members into principal officers. The Court explained that although the Appeals Council could render binding decisions by regulation, "agency regulations are not the same as statutes, and delegated administrative authority is not the same as statutory restriction." *Id.* at 1313. By statute, the SSA's Commissioner is "still ultimately 'responsible for the

exercise of all powers and the discharge of all duties of the [SSA]' and retains 'authority and control over all personnel and activities thereof.'" *Id.* (quoting 42 U.S.C. § 902(a)(4)). "The regulatory restriction on further agency review, derived from the Commissioner's own authority—distinct from statutory restrictions imposed by Congress . . .—does not convert the Appeals Council members into principal officers under the Constitution." *Id.*

*Rodriguez*'s analysis controls. By statute, the Attorney General retains plenary control over all officers of the Department of Justice. *See* 28 U.S.C. §§ 509, 510, 515, 516, 518, 519. The Attorney General thus has unfettered authority to "direct[] and supervise[]," the Special Counsel, *Edmond*, 520 U.S. at 663, who lacks power to render a final decision on behalf of the Executive Branch without review and control by a superior, *United States v. Arthrex, Inc.*, 594 U.S. 1, 13-23 (2021). And as with most officers he has appointed, the Attorney General has authority to remove the Special Counsel, who enjoys no statutory insulation from removal. *See Myers v. United States*, 272 U.S. 52, 119 (1926). Accordingly, the Special Counsel is an inferior, not a principal, officer.[9]

---

[9] The Special Counsel is also an inferior officer under the analysis in *Morrison v. Olson*, 487 U.S. 654 (1988)*. See In re Grand Jury Investigation*, 315 F. Supp. 3d at 640-44.

## III. The Special Counsel's Funding Does Not Violate the Appropriations Clause

Beyond echoing the district court's flawed analysis that the permanent indefinite appropriation was unavailable to fund the Special Counsel because he was improperly appointed, *see* Gov.Br.57, defendants also argue (Br.64-65) that the Special Counsel is insufficiently "independent" to qualify as an "[i]ndependent [c]ounsel" under the appropriation. That is incorrect. *See* Dkt. 374 at 17. And the Government Accountability Office (GAO) source that the defendants cite (Br.65) undermines their argument. *See* GAO, *Special Counsel and Permanent Indefinite Appropriation*, B-302582, 2004 WL 2213560, at *4 (Comp. Gen. Sept. 30, 2004) ("[W]e have not objected to the use of the permanent indefinite appropriation to fund the expenses of regulatory independent counsels appointed from outside the government pursuant to such authority."); *see also United States v. Trump*, No. 23-cr-257, ECF No. 277 at 6-7 (D.D.C.) (filed Oct. 31, 2024) (providing examples of GAO audit and approval of prior regulatory special counsels).

# CONCLUSION

The Court should reverse.

Respectfully submitted,

J.P. COONEY
Deputy Special Counsel

JACK SMITH
Special Counsel

JAY I. BRATT
MICHAEL R. DREEBEN
RAYMOND N. HULSER
Counselors to the Special Counsel

DAVID V. HARBACH II
JOHN M. PELLETTIERI
CECIL W. VANDEVENDER
/S/ JAMES I. PEARCE
Assistant Special Counsels
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. B-206
Washington, D.C. 20530

November 26, 2024

## CERTIFICATE OF COMPLIANCE

1.  This brief contains 6,498 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced, 14-point serif typeface using Microsoft Office Word 2017.

/s/ James I. Pearce
James I. Pearce
Assistant Special Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on November 26, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I further certify that appellees' counsel are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ James I. Pearce
James I. Pearce
Assistant Special Counsel