In the United States Court of Appeals
for the Eleventh Circuit
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

WALTINE NAUTA and
CARLOS DE OLIVEIRA,

Defendants-Appellees.
_____

**EMERGENCY MOTION FOR INJUNCTION
WITH RELIEF REQUESTED BY JANUARY 10, 2025**
_____

John S. Irving, IV
E&W LAW, LLC

Larry Donald Murrell, Jr.
L.D. MURRELL, P.A.

Counsel for Defendant
Carlos De Oliveira

Stanley E. Woodward, Jr.
BRAND WOODWARD LAW, LP

Richard C. Klugh
KLUGH WILSON, LLC

Counsel for Defendant
Waltine Nauta

***United States v. Waltine Nauta, et al.*, Case No. 24-12311-J**

Appellees file this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Advance Publications, Inc.

Alonso, Cristina

America First Legal Foundation

American Broadcasting Companies, Inc., d/b/a ABC News

Ayer, Donald

Blackman, Joshua

Blanche, Todd

Bloomberg, L.P.

Bove, Emil

Bowman, Chad

Bratt, Jay

Cable News Network, Inc.

Calabresi, Steven

Caldera, Louis

Cannon, Hon. Aileen

Cate, Matthew

CBS Broadcasting, Inc. o/b/o CBS News

Citizens for Responsibility and Ethics in Washington

Citizens United

Citizens United Foundation

CMG Media Corporation

Coleman, Tom

Conway, George

Cooney, J.P.

Couzo, Amber Aurora

Cox Enterprises, Inc. (COX) d/b/a The Atlanta Journal-Constitution

Dadan, Sasha

De Oliveira, Carlos

Dow Jones & Company, Inc., publisher of The Wall Street Journal

Dreeben, Michael

Edelstein, Julie

Fields, Lazaro

Fitzgerald, Patrick

Fort Myers Broadcasting Company

Fugate, Rachel Elise

Garland, Merrick B.

Gerson, Stuart

Gertner, Nancy

Gilbert, Karen E.

Gillers, Stephen

Goodman, Hon. Jonathan

Gray Media Group, Inc. (GTN)

Guardian News & Media Limited

Harbach, David

Hirsch, Steven A.

Hulser, Raymond

Insider, Inc.

Irving, John

Kise, Christopher

Klugh, Richard C.

Lacovara, Philip Allen

Landmark Legal Foundation

Lawson, Gary

Los Angeles Times Communications LLC, publisher of The Los

Angeles Times

Maynard, Hon. Shaniek Mills

McElroy, Dana Jane

McKay, John

McNamara, Anne

Meese, Edwin

Mishkin, Maxwell

Mukasey, Hon. Michael B.

Murrell, Larry Donald

National Cable Satellite Corporation d/b/a C-SPAN

National Public Radio, Inc.

Nauta, Waltine

NBCUniversal Media, LLC d/b/a NBC News, a subsidiary of
     Comcast Corporation (CMCSA)

Orlando Sentinel Media Group, publisher of the Orlando Sentinel

Pearce, James

Pellettieri, John

Politico LLC

Potter, Trevor

Radio Television Digital News Association

Raskin, David

Raul, Alan Charles

Reeder, L. Martin Jr.

Reinhart, Hon. Bruce E.

Reuters News & Media, Inc.

Reynolds, Brett

Russell, Lauren

Salario, Samuel

Sample, James J.

Sasso, Michael

Schaerr, Gene

Seligman, Matthew A.

Smith, Abbe

Smith, Fern

Smith, Jack

State Democracy Defenders Action

Sun-Sentinel Company, LLC, publisher of the South Florida Sun Sentinel

TEGNA, Inc. (TGNA)

Telemundo Network Group, LLC d/b/a Noticias Telemundo

Thakur, Michael

The Associated Press

The E.W. Scripps Company (SSP)

The McClatchy Company, LLC (MNI) d/b/a the Miami Herald

The New York Times Company (NYT)

The Palm Beach Post and USA TODAY, publications operated by

subsidiaries of Gannett Co., Inc. (GCI)

Thompson, Larry

Tillman, Seth Barrett

Tobin, Charles

Torres, Hon. Edwin

Trent, Edward H.

Tribe, Laurence

Troye, Olivia

Trump, President Donald J.

Trusty, James

Twardy, Stanley

United States of America

Univision Networks & Studios, Inc.

# INTRODUCTION

Defendants-Appellees Waltine Nauta and Carlos De Oliveira (the "Defendants") respectfully move for relief from actions that Appellant's counsel, Special Counsel Smith, has advised are being taken to complete and disseminate (first within the Justice Department and then to the public) a report of allegations and accusations the Special Counsel has gathered in the underlying prosecution, dismissal of which is the subject of the Special Counsel's appeal. From initial review of the material at issue, it is readily apparent that the Special Counsel seeks by way of a premature "Final Report" under 28 C.F.R. §608(c) to cause public injury to the Defendants as well as a former party to this case, President-elect Donald J. Trump. The Special Counsel, despite the continued pendency of this case and the looming potential of a jury trial in the Defendants' case, intends to issue the highly prejudicial Final Report, which Attorney General Garland is certain to make immediately public. The Final Report promises to be a one-sided, slanted report that serves a singular purpose: attempting to convince the public that everyone Smith charged is guilty of the charged crimes. But Nauta's and De Oliveira's criminal cases are not over; this appeal is still pending and, so long as it is, there remains the threat of future criminal proceedings—criminal proceedings the Final Report will prejudice. This Court can, and should, intervene to protect the Defendants' constitutional rights.

That is especially so since the prejudice stems from the unconstitutionally funded acts of an unconstitutionally appointed individual whose authority stems

from unlawful regulations. While those matters are at issue in this appeal, Defendants are likely to succeed on the merits. Moreover, the Final Report is also inconsistent with other constitutional, statutory, and regulatory provisions which provide an independent basis for the relief Defendants' request.

Thus, Defendants move under Rule 8 of the Federal Rules of Appellate Procedure for this Court to protect the integrity of these proceedings by enjoining the United States, Attorney General Garland, the Department of Justice ("DOJ"), Smith, and all their officers, agents, and employees (together, the "Government") from issuing the Final Report during the pendency of this appeal and, if the Court reverses the district court, for a reasonable time thereafter for Defendants to seek relief from the appropriate court. This is an emergency request. The Special Counsel has stated that absent court intervention by January 10 at 10:00 a.m., Attorney General Garland may release the Report, the Special Counsel having agreed to withhold dissemination of the Report to the Attorney General only until January 7 at 1:00 p.m. *See* DE:680 (attached as Exhibit A). As set out below, there is every reason to believe that the Government will issue the Final Report within the next three days.

Defendants have also moved for the same relief in the district court.[1] DE:679. If the district court does not take action on Defendants' emergency request within 24

---

[1] On the morning of January 7, 2025, President Trump will file a motion in the District Court to intervene or, in the alternative, participate as amicus curiae, in order to present arguments that he is uniquely positioned to address as a former and soon-

hours, Defendants will notify the Court. Relatedly, under *United States v. Ellsworth*, 814 F.2d 613, 614 (11th Cir. 1987), this Court may now relinquish jurisdiction to the district court so that further proceedings may take place in the interest of judicial economy and to avoid the duplication of judicial effort. Hence, Defendants further move to remand to the district court for consideration of whether the disqualified Special Counsel may lawfully transmit the Final Report—and, if so, what material in the Final Report must be protected, at the very least while the criminal case is pending. Defendants' requested ruling date is January 10, 2025, to prevent irreparable harm from the anticipated action by the disqualified Special Counsel. Defendants moved quickly to file this motion as soon as they learned of the contents of the Final Report.

## FACTUAL BACKGROUND

I.     **Smith's unconstitutional appointment and funding.**

On November 18, 2022, Attorney General Garland issued Order No. 5559-2022, appointing Smith, "an attorney from outside the United States Government, to serve as Special Counsel . . . ." DE:672:6–7. The Special Counsel Regulations, codified at 28 C.F.R. §§600.1–600.10, provide for his appointment, authority, and oversight. *See* Office of Special Counsel, 64 Fed.Reg. 37,038 (July 9, 1999). "Smith was not nominated by the President or confirmed by the President." DE:672:7.

---

to-be President, familiar with the pernicious consequences of lawfare perpetrated by Smith, his Office, and others at DOJ.

Instead, the Appointment Order points to 28 U.S.C. §§509, 510, 515, 533. *Id.* He has been funded by the Indefinite Appropriation: "a permanent indefinite appropriation … established within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. §591, et. seq. [now expired] or other law." *Id.* (quoting 101 Stat. 1329).

Defendants moved to dismiss based on "the unlawful appointment of Special Counsel Jack Smith, in violation of the Appointments Clause and the Appropriations Clause." DE:326:1; *see* DE:672:5 n.1. On July 15, 2024, the Court ruled in Defendants' favor. DE:672.

On July 17, 2024, Smith appealed. DE:673. On November 25, 2024, Smith asked this Court to dismiss "the appeal in this case as to defendant Trump." Doc. 79. The Court granted Smith's request. *See* Doc. 81-2. The appeal as to Nauta and De Oliveira continues. On December 30, 2024, the Special Counsel moved to withdraw from the appeal in favor of the U.S. Attorney for the Southern District of Florida. *See* Docs. 83, 84.

## II. The imminent Final Report.

### A. Smith's preparation of the Final Report.

On January 2, 2024, Defendants' counsel were advised that: (1) Defendants' counsel would only be permitted to access a draft of the Report in Washington, D.C. between January 3–6, 2025—that is, for only two business days; (2) they would only

be permitted to take handwritten notes during the review; and (3) any comments or objections to the draft would have to be submitted by January 6, 2025 at 2 p.m.

Counsel has reviewed the draft Final Report, which presents a one-sided narrative arguing that Nauta and De Oliveira committed the crimes charged in this appeal, and which attempts to expand the facts of the case as charged to further the dismissed prosecution in a manner highly and unfairly prejudicial to the Defendants. The Report's manifest purpose is to convince the public the individuals the Special Counsel charged did indeed commit crimes. *See* Exhibit B (Letter by Counsel for President Trump to the Department of Justice Dated January 6, 2025).

**B.      Garland is almost certain to release the Final Report to the public.**

The Final Report will go to Garland, who can authorize its public release. *See* 28 C.F.R. §600.9(e). There is every reason to believe he will do so—quickly. First, he "has opted to release the reports from two other special counsels whose investigations concluded during his tenure." https://www.foxnews.com/politics/jack-smith-submit-trump-findings-doj-before-leaving-what-happens-next (Dec. 7, 2024), Garland has said he is "committed to making as much of the Special Counsel's report public as possible." Letter from Merrick B. Garland, Att'y Gen. (Feb. 7, 2024), https://www.justice.gov/sco-hur/media/1337886/dl?inline. Moreover, Garland released those reports quickly. To illustrate, "Hur provided Garland his report on February 5, 2024, and Garland made it public as soon as the White House finished its privilege review" three days later.

Letter from Merrick B. Garland, Att'y Gen. (Feb. 8, 2024), https://www.justice.gov/storage/20240208aggarlandletter.pdf.

The review deadline Smith's team gave Defendants' attorneys is therefore a good estimate of how fast the Final Report will be made public. As with the Hur report, resolution of those objections will likely be immediately followed by public release of the Final Report.

## ARGUMENT

**I. The Final Report threatens the integrity of future potential proceedings.**

### A. The Court can prevent prejudice to the proceedings in this case and can protect Defendants' rights.

The requested injunction is necessary to preserve the *status quo* by preventing publication of the Final Report. That Report's one-sided descriptions of the events charged in the indictment is highly prejudicial to Defendants, and thus threatens the integrity of potential future proceedings.[2]

The Final Report contains evidence that has been subject to litigation in this matter related to privilege, the Fourth Amendment, and other constitutional rights over which the district court had exercised jurisdiction; it also contains reference to grand jury materials and evidence that the defense anticipates will be deemed inadmissible at trial. Due process requirements justify blocking release of

---

[2] Defendants firmly believe this Court will affirm the Dismissal Order, but must protect their interests in the integrity of this and any future proceedings.

investigative materials during a pending criminal proceeding. The planned release of the Final Report contravenes those requirements and will cause irreversible prejudice.

"The very wo[r]d 'trial' connotes decisions on the evidence and arguments properly advanced in open court"—not in the court of public opinion, where strict rules enacted to protect constitutional rights do not apply. *Bridges v. State of Cal.*, 314 U.S. 252, 270 (1941). "Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Id*. The Supreme Court has insisted that "no one be punished for a crime without 'a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power.'" *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966). Smith's planned release of the Final Report seeks to engender the prejudice, passion, and excitement that the court system insulates against. His anticipated actions reflect an unlawful exercise of power that he no longer possesses and should not have had in the first instance based on the unconstitutional nature of his appointment.

This Court's Local Rules contemplate the Court's taking action to protect public disclosure of legally protected interests. *See* 11th Cir. R. 25-26(a)(3) ("When any paper filed with the court, including motions and briefs, contains . . . information the public disclosure of which would violate legally protected interests, the court on motion of a party or on its own motion, may without prior notice take appropriate

action"). Here, Smith seeks to release information to the public not via a court filing, but via transmission to the Attorney General who is anticipated to quickly publicize the Report. Public disclosure violates legally protected interests, most significantly the remaining defendants' Fifth Amendment due process right to a fair trial. Public disclosure also violates longstanding common-law-derived rules governing grand jury secrecy. *See, e.g., Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979) (Supreme Court "consistently ha[s] recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings").

The All Writs Act authorizes "all writs necessary or appropriate in aid of [its] respective jurisdiction[] and agreeable to the usages and principles of law." 28 U.S.C. §1651(a). Where the Court has jurisdiction over a proceeding, it can issue orders necessary "to protect that proceeding, order, or judgment from some threat to its integrity." *Rohe v. Wells Fargo Bank, N.A.*, 988 F.3d 1256, 1266 (11th Cir. 2021). It also allows courts to safeguard "potential future proceedings." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004). This is a flexible power; it allows courts to maintain the *status quo* if providing future relief "would otherwise be virtually impossible." *FTC v. Dean Foods Co.*, 384 U.S. 597, 604, 605 (1966) (enjoining agency action). When there is a risk that "prejudicial publicity" will infect the minds of jurors, "courts must take strong measures to ensure that the

balance is never weighed against the accused." *Sheppard*, 384 U.S. at 350 (noting in 1966 the "pervasiveness of modern communications"). Publicity must yield to due process, and it certainly must yield here, where the person seeking to drum up the publicity is no longer legally entitled to access case materials or to work on the case.

The Final Report threatens the integrity of the current appeal and any potential future appeal if there is a reversal. It is an attempt to litigate the criminal liability of Defendants in the public sphere, thus undermining the judicial process that is currently ongoing in this appeal and, potentially, after a remand. The requested order here is thus well within the Court's authority "to protect the integrity of the criminal justice process." *United States v. Trump*, 88 F.4th 990, 1003 (D.C. Cir. 2023).

**B.    Publication of the Final Report threatens the integrity of these proceedings and Defendants' rights.**

"[T]he primary constitutional duty of the Judicial Branch [is] to do justice in criminal prosecutions … ." *United States v. Nixon*, 418 U.S. 683, 707 (1974). "Accordingly, courts must take steps to protect the integrity of the criminal justice process." *Trump*, 88 F.4th at 1003. "Due process demands that 'the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.'" *Id.* at 1004 (quoting *Sheppard*, 384 U.S. at 351 (quoting another source)). Courts have a duty to "'prevent the prejudice' to the trial process 'at its inception,'" *id.* (quoting

*Sheppard*, 384 U.S. at 363))—a duty this Court can fulfill through the requested relief.

Smith, Garland, and the DOJ are "officers of the court, ... [and] have a fiduciary responsibility not to engage in public debate that will rebound to the detriment of the accused or that will obstruct the fair administration of justice.'" *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1074 (1991) (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 601 n.27 (1976) (Brennan, J., concurring in judgment)). Their speech therefore can—and here should—be "extremely circumscribed." *Id.* at 1071. Defendants must show "good cause" for the relief. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37 (1984) (involving a protective order).

The Final Report will be widely and publicly disseminated. The news media is rife with reports about the release of the Final Report, and media reporting on this case and Smith's investigation has been so ubiquitous as to warrant judicial notice. And there are ongoing proceedings: this appeal and potential future proceedings in the district court, which are pending.

Publication of the Final Report thus threatens immense prejudice to those proceedings. It is an extensive, one-sided narrative arguing that the conduct alleged in the superseding indictment is criminal. The issue is compounded by the inflammatory way the Report discusses Nauta's and De Oliveira's former co-defendant, President Trump. Throughout this litigation, the Government has tied

Nauta and De Oliveira to President Trump, such as calling them "Co-Conspirators" in the indictment. DE 85:4. Thus, even if the Final Report focuses on President Trump, the effect will be to inculpate Nauta and De Oliveira before the public. Lastly, the Final Report contains evidence that has not been made public and is not or may not be admissible, that was the subject of grand jury proceedings, and that may violate one or more privileges.

The Final Report is so egregious that its dissemination during these proceedings is inappropriate under any standard. *See Trump*, 88 F.4th at 1007. Here, the wide-ranging, far-reaching, and immensely biased publication of the Government's views on this prosecution presents "a significant imminent threat to the administration of criminal justice" by litigating Defendants' guilt in public. *Id.* at 1008. Indeed, the prosecution's making "evidence available to the news media which was never offered in the trial" is partly why the trial in *Sheppard* was constitutionally offensive. 384 U.S. at 360.

Nor would any more limited restrictions be as effective. Redacting Defendants' names, for example, will not be enough. *See Gray v. Maryland*, 523 U.S. 185, 192 (1998). Nor is it enough to redact direct quotes from the grand jury transcripts, while leaving in place reference to evidence obtained via a grand jury subpoena, as Smith has proposed to do. Notably, Smith does not have the final say on redactions and never proposed a court-supervised process through which defense

could assert privilege over any specific material in the Report, or argue that any material in the Report should be blocked from release. This rushed attempt to get the Report to the press without any regard for court rules, prior orders, and constitutional safeguards reflects crude political strategy on the part of the disqualified Special Counsel.

This request is narrowly tailored to the Final Report, and thus to information that Smith gathered through his investigative authority. This limitation is similar to the protective order at issue in *Rhinehart*; it limits dissemination of "information obtained through the use of" a process like the discovery process. 467 U.S. at 33. The request is temporally limited (to the extent that courts find Smith may lawfully release any investigative information derived from his unlawful appointment), as it is focused on addressing "the potential prejudice" to future proceedings. *Trump*, 88 F.4th at 1007. Indeed, it is no more onerous than what the Special Counsel Regulations require: that the Special Counsel prepare his Final Report "[a]t the conclusion of [his] work." 28 C.F.R. §600.8(c). The Special Counsel improperly passed along his work to a local office; it thus cannot be deemed "concluded" for purposes of the federal regulation.

In sum, the planned release of the Final Report reflects an attempt to publicly try Defendants, and to tarnish their reputation, outside the confines of *any* adversarial process, much less a meaningful one, and outside of constitutionally based

limitations governing introduction of evidence at a criminal trial. That is a due process violation as well as a threat "to obstruct or prejudice the due administration of justice by interfering with a fair trial" and appeal. *In re Sawyer*, 360 U.S. 622, 647 (1959) (Stewart, J., concurring in judgment). There is simply no future remedy available that will be in any way effective in reversing the widespread prejudice that will result if the Final Report is released to the public. "[T]he cure lies in those remedial measures that will prevent the prejudice at its inception." *Sheppard*, 384 U.S. at 363. It is in just such cases that this Court may exercise its writ authority. *Dean Foods Co.*, 384 U.S. at 605.

## II.    The Government cannot lawfully issue the Final Report.

Also justifying relief are the unconstitutional appointment and funding of Smith, as well as independent constitutional, statutory, and regulatory limits that the Report's issuance violates. "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

### A.    The Final Report cannot be produced by an unconstitutionally appointed and funded Special Counsel.

The question whether Smith was lawfully appointed is very much a live issue in this Court, and an issue on which the district court has already entered an order disqualifying Smith. Pending the outcome of this appeal, Smith is bound by that order. He therefore acts outside of the limits of his authority—and as the district

13

court found, no such authority exists—in attempting to produce and to release the Final Report.

The matters at issue in this appeal—the constitutionality of Smith's appointment and his funding—are also justifications for enjoining the Government from issuing the Final Report. Because briefing on those issues has concluded, Defendants incorporate the analyses in their briefs. *See* Doc. 42, at 10–65.[3] As a result of those constitutional defects, the Government cannot release the Final Report, for several reasons.

A precondition to publication of the Final Report is for Smith to "provide" it to the Attorney General. 28 C.F.R. §600.8(c). Smith cannot do that because he was not constitutionally appointed. The Appointment Order is unlawful. It purports to appoint, via Garland's direction, an officer of the United States without statutory authority. "An agency … literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 302 (2022) (quotations omitted). Once the district court entered its order, the Appointment Order became and is still void. Smith therefore *cannot*

---

[3] At a minimum, because the district court agreed with Defendants on those constitutional issues, Defendants have established "a reasonable probability of success upon the merits." *Bures v. Houston Symphony Soc'y*, 503 F.2d 842, 844 (5th Cir. 1974); *see* 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.3 (Sept. 17, 2024 update) (noting "the most common" formulation for this standard is "a reasonable probability of success").

be deemed Special Counsel. He cannot use the information he has unlawfully acquired to write the Final Report or claim the authority, under 28 C.F.R. §600.8(c), to write the Report.

Precluding publication of the Final Report is also warranted because the proper remedy for "a 'Government actor's exercise of power'" "is invalidation of the *ultra vires* action." DE:672:82 (quoting *Collins v. Yellen*, 594 U.S. 220, 258 (2021)). Smith's creation of the Final Report, just as much as this prosecution, will flow "from his defective appointment" and is, therefore, an "unlawful exercise[] of executive power." DE:672:83–84. Indeed, the Final Report must explain "the prosecution or declination decisions reached by the Special Counsel." 28 C.F.R. §600.8(c). Such decisions are "the special province of the Executive Branch," *Trump v. United States*, 603 U.S. 593, 620 (2024) (quotations omitted), of which Smith, as an unconstitutionally appointed prosecutor, is not a part.

To prepare the Final Report, Smith used authority granted to him under the Appointment Order. *See* 28 C.F.R. §§600.4(a), 600.6. Because he had no right to do so, his actions in gathering that information are *ultra vires* and void and there is nothing for Smith to report. Making matters worse, Smith's more recent preparation of the Final Report—*since he was disqualified from the case*—reflects his continuing in his role as special prosecutor in direct defiance of the district court's decision. Preparation of the Final Report reveals that Smith has ignored the district court's

ruling and proceeded to review protected investigative materials as if he were still part of the case.

Blocking preparation and release of a Final Report is also warranted because the Special Counsel Regulations, which gave Garland the purported authority to appoint Smith as "an outside Special Counsel ... ." 28 C.F.R. §600.1(b), are also unlawful. The Special Counsel Regulations claim as authority 5 U.S.C. §301 and 28 U.S.C. §§509, 510, and 515–19, *see* 64 Fed. Reg. 37,042, but as the district court found, these statutes do not authorize the Regulations. 28 U.S.C. §§509, 510, and 515, do not authorize the Special Counsel Regulations. *See* DE:672:23–41. Because the Regulations were unauthorized by statute, they are thus void. *See*, *e.g.*, *Cruz*, 596 U.S. at 302. Any actions Smith takes pursuant to those Regulations—including creating and transmitting the Final Report—is also void and *ultra vires*.

"[F]or many of the same reasons" that Congress has not authorized Smith's appointment, it "has not authorized the appropriation of money to be drawn for the expenses of his office." DE:672:4. "The Appropriations Clause dictates that '[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.'" *Id.* at 86 (quoting U.S. CONST. Art. I, §9, cl. 7). "This 'straightforward and explicit command … means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" *Id.* (quoting *OPM v. Richmond*, 496 U.S. 414, 424 (1990)).

From the start, Smith has been funded by the Indefinite Appropriation, which—as relevant here—authorizes the expenditure of public funds by Smith only if he is "appointed pursuant to … *other law*."  101 Stat. 1329.  As with the phrase "by Law" in the Appointments Clause, the phrase "other law" means *statutory* law— and the only law cited are the statutes listed in the Appointment Order.  *See* DE:672:87 ("Both sides agree that 'other law' … is the collection of statutes cited in the Appointment Order.").  Smith was not constitutionally appointed, and he thus cannot be funded by the Indefinite Appropriation.

Any funds spent preparing the Final Report represent a misuse of public funds. "When Congress has enacted a legislative restriction" like the limitations in the Indefinite Appropriation, federal courts can, and should, "enjoin DOJ from *spending funds*" in violation of those restrictions.  *McIntosh*, 833 F.3d at 1172 (discussing a limit on the use of funds for criminal prosecutions); *see Gen. Land Office v. Biden*, 722 F. Supp. 3d 710, 743, 745 (S.D. Tex. 2024) (enjoining the government from spending funds for items outside the scope of the appropriation).

**B.  Issuing the Final Report would violate the Presidential Transition Act, the Executive Vesting Clause, and the Special Counsel Regulations.**

Smith's planned issuance of the Final Report also is in violation of various constitutional, statutory, and regulatory laws.

<u>Presidential Records Act & Executive Vesting Clause:</u>  There is every indication that Garland will issue the Final Report during the Presidential transition.

That violates the Presidential Transition Act, *see* 3 U.S.C. §102 note, and the imminent vesting of the Executive power in President Trump on January 20, 2025, *see* U.S. CONST. art. II, §1, cl. 1.

The Presidential Transition Act's purpose is "to promote the orderly transfer of the executive power in connection with the expiration of the term of office of a President and the inauguration of a new President." 3 U.S.C. §102 note (§2 of the Act). "Any disruption" of the transition "could produce results detrimental to the safety and well-being of the United States and its people." *Id.* And thus "all officers of the Government" are "to avoid or minimize disruptions that might be occasioned by the transfer of the executive power, and otherwise to promote orderly transitions in the office of President." *Id.*

Disruption constitutes a constitutional problem because "[t]he transition period insures that the candidate will be able to perform effectively the important functions of his or her new office as expeditiously as possible." Definition of Candidate Under 18 U.S.C. §207(j), 24 Op. O.L.C. 288, 292 (2000). It follows that a disruption during this time will disrupt the President-elect's ability to govern once he takes office. For example, like an indictment, the Final Report threatens "public stigma and opprobrium" and so could "compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs." A Sitting President's Amenability to Indictment and Criminal

Prosecution, 24 Op. O.L.C. 222, 246 (2000). That is a burden on the President's constitutional responsibilities, and so why "a proper balancing of constitutional interests … dictates" that the Final Report should not issue at this time. *Id.* at 249; *see id.* at 249–51 (discussing why that is so). And because the Final Report threatens that balance, it is inconsistent with the Presidential Transition Act.

<u>Special Counsel Regulations:</u>  Issuing the Final Report is also inconsistent with the Special Counsel Regulations. Under 28 C.F.R. §600.8—which binds Smith, *see* DE:672:8 (citing the Appointment Order)—the Final Report is provided only "[a]t the *conclusion* of the Special Counsel's work." §600.8(c) (emphasis added). But Smith's work has *not* concluded. This appeal continues and may lead to further trial court proceedings. Smith and his team have sought to withdraw from the appeal. But that is a transparent attempt to manufacture a "conclusion" to Smith's work without actually concluding it. The ordinary meaning of "conclusion" is "[t]he close or last part; the end or finish." *Conclusion*, AM. HERITAGE DICTIONARY (5th ed. 2022), https://ahdictionary.com/word/search.html?q=conclusion. Until the prosecution of Nauta and De Oliveira ends, Smith's work has not concluded.

## C. The equities justify relief.

The Final Report threatens to irreparably harm Defendants by prejudicing this appeal and potential future criminal proceedings in this case—to the point of impairing their due process rights. The Supreme Court has made clear that "the cure lies in remedial measures that will prevent the prejudice at the outset." *Sheppard*,

384 U.S. at 363. The injury to Defendants' reputation from the one-sided Final Report also constitutes irreparable harm. *See Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1297 (11th Cir. 2024) (discussing business reputation).

By contrast, the public interest justifies relief—both in terms of ensuring a fair trial, *see Gentile*, 501 U.S. at 1075, in maintaining a smooth transition process, *see* 3 U.S.C. §102 note (§2 of the Presidential Transition Act), and in "the correct application of the law," *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022). And because the public interest lies in providing the requested relief, there is no "harm to the opposing party;" as "[t]hese factors merge with the Government as the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). There will be no harm to any other parties if relief is granted, but substantial harm to the defendants if relief is withheld. For the reasons stated above, the defendants are likely to prevail on both the merits of this motion and the merits of the pending appeal. The arguments above regarding due process interests, irreversible prejudice, and the ultra vires nature of the Government's proposed actions establish "a reasonable probability of success upon the merits" of this motion, *Bures v. Houston Symphony Soc'y*, 503 F.2d 842, 844 (5th Cir. 1974); *see also* 11A Charles Alan Wright et al., *Federal Practice and Procedure* §2948.3 (Sept. 17, 2024 update) (noting "the most common" formulation for this standard is "a reasonable probability of success")—warranting its treatment as an emergency motion under 11th Cir. R. 27-1(12)(b)(2).

Undersigned counsel conferred telephonically and via electronic correspondence with opposing counsel prior to the filing of this motion. To date, the Government has not consented to the relief requested by the motion. The Government advises that it considers the meet and confer process to be ongoing. However, Defense Counsel requested a reasonable opportunity for the Court to consider the relief requested in the instant motion before the Final Report was transmitted to Attorney General Garland, and the Government was unwilling to commit to the same. The Government advised that it would connect with Defense Counsel tomorrow, that it was skeptical of any authority of the Court to bar the transmission of the Final Report to Attorney General Garland, and that it could make no representation about the amount of time between the next conferral between Defense Counsel and the Government and when the Final Report would be transmitted to Attorney General Garland. Accordingly, because of the emergency nature and substantial importance of the matter, the issues are ripe for resolution. To the extent that the Government amends its position upon further review and consideration, Defendants will immediately advise the Court.

## CONCLUSION

For those reasons, Defendants respectfully request that the Court enter an order precluding the United States and its officers and agents, including but not limited to Smith and members of the Special Counsel's team, Garland, and the DOJ from issuing the Final Report until appellate proceedings are concluded and, if the

Court reverses the district court, for a reasonable time thereafter for Defendants to seek similar relief. Based on the time-sensitive nature of this matter, relief is requested by January 10, 2025.

<div align="center">Respectfully submitted,</div>

/
/s/ Stanley E. Woodward, Jr.
Stanley E. Woodward, Jr
BRAND WOODWARD LAW, LP
400 Fifth Street NW, Ste 350
Washington, DC 20001
(202) 996-7447 (telephone)
stanley@brandwoodwardlaw.com

/s/ John S. Irving, IV
John S. Irving,
E&W LAW, LLC
1455 Pennsylvania Ave NW, Ste 400
Washington, DC 20004
(301) 807-5670
john.irving@earthandwatergroup.com

/s/ Richard C. Klugh
Richard C. Klugh
KLUGH WILSON, LLC
40 N.W. 3rd Street, PH1
Miami, FL 33128
(305) 536-1191 (telephone)
klughlaw@gmail.com

/s/ Larry Donald Murrell, Jr.
Larry Donald Murrell, Jr.
L.D. MURRELL, P.A.
400 Executive Center Drive, Ste 201
West Palm Beach, FL 33401
(561) 686-2700 (telephone)
ldmpa@bellsouth.net

Counsel for Defendant Waltine Nauta

Counsel for Defendant Carlos De Oliveira

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion contains 5,194 words and complies with the typeface and type-style requirement of Fed. R. App. P. 32(a)(5) and (6) because it was prepared in a WordPerfect proportionally spaced Times New Roman 14-point font.

/s/ Richard C. Klugh
Richard C. Klugh, Esq.

# Exhibit A

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.

**WALTINE NAUTA and
CARLOS DE OLIVEIRA,**

      Defendants.

_____/

**GOVERNMENT'S NOTICE IN RESPONSE TO DEFENDANT'S EMERGENCY
MOTION**

Defendants Waltine Nauta and Carlos De Oliveira have filed an Emergency Motion to Preclude the Government from Issuing a Purported Special Counsel Report Contravening This Court's Dismissal Order and Prejudicing Defendants' Pretrial Rights.  ECF No. 679 (Motion).  The Government files this notice to apprise the Court of the following.

The Special Counsel's Office is working to finalize a two-volume confidential report to the Attorney General explaining the Special Counsel's prosecution decisions.   *See* 28 C.F.R. § 600.8(c).  The Attorney General will decide whether any portion of the report should be released to the public.  *See* 28 C.F.R. § 600.9(c).  One volume of the report pertains to this case.  The Attorney General has not yet determined how to handle the report volume pertaining to this case, about which the parties were conferring at the time the defendants filed the Motion, but the Department can commit that the Attorney General will not release that volume to the public, if he does at all, before Friday, January 10, 2025, at 10:00 a.m.   The Special Counsel will not transmit

Exhibit A

that volume to the Attorney General before 1:00 p.m. on January 7, 2025.  The Government will

file a response to the defendants' Motion no later than January 7, 2025, at 7:00 p.m.


             Respectfully submitted,

             JACK SMITH
             Special Counsel
             N.Y. Bar No. 2678084

             BRIAN M. BOYNTON
             Principal Deputy Assistant Attorney General
             Civil Division


By:    /s/ *James I. Pearce*
             James I. Pearce
             Assistant Special Counsel
             Special Bar ID #A5503077

January 7, 2025

Exhibit A

**CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which in turn serves counsel of record via transmission of Notices of Electronic Filing.

/s/ *James I. Pearce*
James I. Pearce

Exhibit A

# Exhibit B



**TODD BLANCHE**
ToddBlanche@blanchelaw.com
(212) 716-1250

January 6, 2025

<u>Via Email</u>
The Honorable Merrick Garland
Attorney General of the United States
c/o Brad Weinsheimer
Associate Deputy Attorney General

   **Re: Draft "Final Report" By Jack Smith**

Dear Attorney General Garland:

   We write on behalf of President Trump to demand that Smith terminate all efforts toward the preparation and release of this report (the "Draft Report").[1]

   As you know, Courts in Florida and the District of Columbia have now dismissed both of Jack Smith's failed cases against President Trump. Rather than acknowledging, as he must, President Trump's complete exoneration, Smith now seeks to disseminate an extrajudicial "Final Report" to perpetuate his false and discredited accusations. Consistent with the bad-faith crusade that Smith executed on behalf of the Biden-Harris Administration from the moment he was appointed, we were only permitted to review the Draft Report in person in the District of Columbia, including prohibitions on the use of any outside electronic devices in the room where the Draft Report was made available. Smith's team likewise demanded, in advance of any review, that we delete prior discovery productions, preventing us from reviewing any of those underlying documents cited in the Draft Report. Nevertheless, it is clear, as has been the case with so many of the other actions of Smith and his staff, that the Draft Report merely continues Smith's politically-motivated attack, and that his continued preparation of the Report and efforts to release it would be both imprudent and unlawful.

   First, Smith lacks authority under our Constitution to issue a report because he was not validly appointed, and the plain terms of the permanent indefinite appropriation that he has pillaged for more than $20 million clearly do not apply to his politically-motivated work. The preparation and release of a report, therefore, would extend and perpetuate Smith's violations of the Appointments Clause and the Appropriations Clause.

   Second, the Draft Report violates fundamental norms regarding the presumption of innocence, including with respect to third parties unnecessarily impugned by Smith's false claims. Releasing the report to the public without significant redactions (that would render its release meaningless) would violate prohibitions on extrajudicial statements by prosecutors and Rule 6(e). This is particularly problematic with respect to ongoing proceedings relating to Waltine Nauta and Carlos De Oliveira, as well as others who Smith and his staff falsely characterize as co-conspirators in the Draft Report.

---

[1] Should these demands be improperly rejected, contrary to law, we respectfully request that this letter be appended to and addressed in any report by Smith that is issued to the public.

Exhibit B

Third, preparing a report and releasing it to the public would violate the Presidential Transition Act and the Presidential immunity doctrine. The Act prohibits *all* officers and those acting as such, including the Attorney General and Smith, at least in his own view of himself, from interfering with the ongoing transition process. Presidential immunity, which Smith conceded required pre-inauguration dismissal of his prosecutions, likewise prohibits criminal processes, including disclosures of any prosecutorial reports or statements, that would exacerbate stigma and public opprobrium surrounding the Chief Executive and otherwise divert from the time and attention that is necessary to complete the transition and run the County. Accordingly, releasing a report regarding Smith's failed and abandoned election-interference efforts would violate the Act and Presidential immunity.

Finally, the release of any confidential report prepared by this out-of-control private citizen unconstitutionally posing as a prosecutor would be nothing more than a lawless political stunt, designed to politically harm President Trump and justify the huge sums of taxpayer money Smith unconstitutionally spent on his failed and dismissed cases. Under such circumstances, releasing Smith's report is obviously not in the public interest—particularly in light of President Trump's commanding victory in the election and the sensitive nature of the ongoing transition process.

Accordingly, because Smith has proposed an unlawful course of action, you must countermand his plan and remove him promptly. If Smith is not removed, then the handling of his report should be deferred to President Trump's incoming attorney general, consistent with the expressed will of the People. Finally, should you disagree with the positions set forth below, we respectfully request notice of that decision prior to the unlawful release of any report so that we can pursue injunctive and other relief to protect the rights of President Trump, others unfairly implicated by Smith's work, and the people of this great Nation who elected President Trump to run the government and put an end to the weaponization of the justice system.

## I. Background

You are no doubt familiar with the history of the unethical election-interference and lawfare by the Special Counsel's Office, as you have publicly commented on some of those efforts while they were ongoing. This letter concerns Smith's most recent improper activities.

During the week of December 9, 2024, we learned from members of the media that Smith was preparing a report, which would include a purported analysis relating to classified information at issue in the dismissed Florida prosecution. We were surprised to learn of such a plan because, among other reasons, Smith had insisted up to that point that his work was not concluded, Smith and his Office refused to disclose details regarding this alleged analysis prior to the dismissal of his Florida prosecution against President Trump, and the Biden-Harris Administration has suggested that they wish to facilitate an orderly and collegial transition process.

On December 11, 2024, we contacted a supervisor with the Special Counsel's Office to express concerns about reports we were hearing from the press. We asked whether the Office was preparing a report and, if so, whether we would be allowed to review it prior to completion. Initially, Smith's position was that: (1) we would only be permitted to access a draft of the report in Washington, D.C. between December 23 and December 29, 2024, the week of Christmas; (2) we would only be permitted to take handwritten notes during our review; and (3) any comments or objections to the draft would have to be

submitted in writing by the close of business on December 29, 2024. Aside from all counsel living outside D.C. and planning on spending time with family that week, as Smith and his team knew, Smith's proposal afforded zero opportunity for President Trump to assist counsel in reviewing and preparing any response to the report, given the irrational conditions imposed. Apparently working under a self-imposed deadline, Smith's team informed us, implausibly, that permitting defense review of Smith's unlawful Draft Report during the first week of January 2025 would be "too late to allow us to complete our work." Subsequently Smith walked back those now clearly false claims and permitted defense counsel to review the two-volume Draft Report in a conference room at Smith's office between January 3 and January 6, 2025, without allowing counsel to access the Internet or use their own electronic devices while in the room with supposedly sensitive documents that the press has known about for weeks by virtue of Smith's leaks.

## II.   Preparation And Release Of A Report Would Violate Existing Law

Preparation and public release of a report by Smith would violate the Constitution and existing law, including the Appropriations and Appointments Clauses, the Special Counsel Regulations, the Presidential Transition Act, and the Presidential immunity doctrine. Collectively, these considerations distinguish the circumstances surrounding the release of reports by prior Special Counsels. Here, release of an unlawful report would *not* "comply with applicable legal restrictions" or "be in the public interest." 28 C.F.R. § 600.9(c); *see also id.* § 600.7(a) ("A Special Counsel shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice."). Therefore, you must countermand Smith's proposed course of action, *id.* § 600.7(b), and he should be removed for "dereliction of duty" and "good cause," § 600.7(d).

Smith was not validly appointed, and Congress did not provide funding for his improper mission. No statute authorized you to deploy a private attorney against President Trump and others, and Smith functioned as a principal officer acting without the necessary Senate confirmation. In addition, the DOJ permanent indefinite appropriation Smith relied upon was—and still is—inapplicable. The only judge to have examined the particulars of Smith's appointment reached these conclusions in an extremely thorough and well-reasoned opinion. *See generally United States v. Trump*, 2024 WL 3404555, at *46 (S.D. Fla. July 15, 2024). On appeal, Smith's prosecutors failed to identify any meritorious reason for questioning Judge Cannon's treatment of these issues, and then abandoned the appeal as to President Trump. Therefore, Smith lacks authority to issue a report regarding his activities while masquerading as a prosecutor, and his Office lacks authority to expend any public funds in furtherance of preparing or issuing such a report. Indeed, because Smith abandoned the 11th Circuit appeal as to President Trump, Judge Cannon's decision is a final judgment with issue-preclusive effect on these issues. *See, e.g., Bravo-Fernandez v. United States*, 580 U.S. 5, 7-8 (2016) (cleaned up) ("In criminal prosecutions, as in civil litigation, the issue-preclusion principle means that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."); *Bobby v. Bies*, 556 U.S. 825, 834 (2009) (same).

Preparation and release of a report would also be improper under the Special Counsel Regulations. Those Regulations only call for "Closing documentation," in the form of a "confidential report," to be prepared "[a]t the *conclusion* of the Special Counsel's work." 28 C.F.R. § 600.8(c) (emphasis added). In light of the violations of the Appointments Clause and the Appropriations Clause, Smith has no lawful "work" to conclude. Moreover, by Smith's own repeated admission, Smith has not concluded his mission.

Rather, Presidential immunity based on the national mandate arising from President Trump's overwhelming victory in the election has made it impossible for Smith to proceed, and rightly so.

Smith's representations in the District of Columbia regarding his dismissed prosecution of President Trump reinforce these points and make clear that no "Closing documentation" is warranted. 28 C.F.R. § 600.8(c). Smith wrongly relied on the claim that Presidential immunity is "temporary," which is not the case, to ask that the charges against President Trump only be dismissed "without prejudice."[2] The plain implication of Smith's position, which Judge Chutkan adopted, is that he does not believe his work targeting President Trump has reached its "conclusion." 28 C.F.R. § 600.8(c). Thus, taking a contrary position in order to justify preparation of one last long-winded, inaccurate, and unlawful smear of the President-elect and others would violate the Special Counsel Regulations.

Public release of a report by Smith would also disrupt the ongoing transition process and violate the Presidential Transition Act. "[T]he orderly transfer of the executive power is one of the most important public objectives in a democratic society. The transition period insures that the candidate will be able to perform effectively the important functions of his or her new office as expeditiously as possible." Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *Definition of "Candidate" Under 18 U.S.C. §207(j)*, 2000 WL 33716979, at *4 (Nov. 6, 2000) (cleaned up). "One of the top priorities of any presidential administration is to protect the country from foreign and domestic threats. While a challenge at all times, the country is especially vulnerable during the time of presidential transitions . . . ."[3] Thus, the transition process is "an integral part of the presidential administration," in the "national interest," and part of President Trump's "public function," as he prepares to govern. Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *Reimbursing Transition-Related Expenses Incurred Before The Administrator Of General Services Ascertained Who Were The Apparent Successful Candidates For The Office Of President And Vice President*, 2001 WL 34058234, at *3 (Jan. 17, 2001).

Congress passed the Presidential Transition Act to protect these critical functions. The purpose of the Act is "to promote the orderly transfer of the executive power in connection with the expiration of the term of office of a President and the inauguration of a new President." 3 U.S.C. § 102 note, § 2. "Any disruption" of the transition "could produce results detrimental to the safety and well-being of the United States and its people." *Id.* Consequently, under the Act, "all officers of the Government"—including the Attorney General and, according to his claims, Smith—are required to "conduct the affairs of the Government for which they exercise responsibility and authority" in a manner that "promote[s] orderly transitions in the office of President." *Id.* This includes, *inter alia*, "tak[ing] appropriate lawful steps to avoid or minimize disruptions that might be occasioned by the transfer of the executive power." *Id.*

Creating and releasing a prejudicial report to the public would violate these commands by giving rise to a media storm of false and unfair criticism that President Trump would be required to address while preparing to assume his Article II responsibilities. Equally problematic and inappropriate are the draft's

[2] ECF No. 281 at 6, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Nov. 25, 2024).

[3] Center for Presidential Transition, *Presidential Transitions are a Perilous Moment for National Security* (Aug. 16, 2023), https://presidentialtransition.org/reports-publications/presidential-transitions-are-a-perilous-moment-for-national-security.

baseless attacks on other anticipated members of President Trump's incoming administration, which are an obvious effort to interfere with upcoming confirmation hearings, and Smith's pathetically transparent tirade about good-faith efforts by X to protect civil liberties, which in a myriad other contexts you have claimed are paramount.

A one-sided, improper report by Smith, particularly if publicly released, would also violate the Presidential immunity principles that Smith has conceded foreclose him from proceeding against President Trump. Indeed, footnote 1 of "Volume 1" of the Draft Report concedes that Smith has brazenly included "conduct for which the Supreme Court later held [President] Trump to be immune from prosecution," and subsequently further highlights the incredible hubris that has clouded the judgment of Smith and his staff from the outset by falsely claiming that the Supreme Court's decision is ambiguous with respect to holdings and reasoning that Smith simply does not like. Based on guidance from OLC—which Smith's staff subsequently informed us that the Office improperly failed to document in any way, in violation of, *inter alia*, DOJ policy regarding the handling of exculpatory information—Smith has acknowledged that Presidential immunity is "categorical," and that it applies while President Trump is the President-elect prior to his inauguration.[4] A public report by Smith would unnecessarily and unjustly add to the inappropriate "peculiar public opprobrium" that has resulted from Smith's unlawful activities thus far. *Trump v. United States*, 603 U.S. 593, 613 (2024). OLC explained previously that such "public stigma and opprobrium" could "compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs." Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 2000 WL 33711291, at *19 (Oct. 16, 2000). "[T]he stigma arising . . . from the need to respond to such charges through the judicial process would seriously interfere with [the President's] ability to carry out his constitutionally assigned functions." *Id.* at *22. The release of a report would also pose an unconstitutional risk of diverting President Trump's "*personal* time and energy, and [would] inevitably entail a considerable if not overwhelming degree of mental preoccupation." *Id.* at *25 (emphasis in original). A "single prosecutor" such as Smith should not, and must not, be afforded "the practical power to interfere with the ability of a popularly elected President to carry out his constitutional functions." *Id.* at *19. "The Framers' design of the Presidency did not envision such counterproductive burdens on the vigor and energy of the Executive." *Trump*, 603 U.S. at 614 (cleaned up).

In sum, the same legal principles and logic that required Smith to dismiss his prosecutions of President Trump require that his activities be terminated without further action. Preparation and release of "Closing documentation" would violate the Constitution and existing law, harm the activities of the transition, and weaken the federal government that you have sworn an oath to support. The collective application of these circumstances make this situation entirely unlike any prior Special Counsel report. Preparation and release of a report is therefore not "in the public interest." 28 C.F.R. § 600.9(c). To the contrary, the course of action Smith proposes would further solidify the well-founded perception of partisanship created by Smith's violation of DOJ policies in connection with decisions based on his ultimately failed attempt to influence the outcome of the 2024 Presidential election. For all of these reasons, you must countermand Smith's proposed course of action, remove him, and stop the preparation and/or dissemination of the Draft Report.

---

[4] ECF No. 281 at 6, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Nov. 25, 2024) ("[T]he Department's position is that the Constitution requires that this case be dismissed before the defendant is inaugurated.").

### III.    Smith's Report Violates The Presumption of Innocence

The presumption of innocence is "the undoubted law, axiomatic and elementary." *Coffin v. United States*, 156 U.S. 432, 453 (1895). It is "vital and fundamental" to our Constitutional system, *id.* at 460, and "its enforcement lies at the foundation of the administration of our criminal law," *id.* at 453; *see also Cool v. United States*, 409 U.S. 100, 104 (1972) (holding violation of defendant's "constitutionally rooted presumption of innocence" required reversal).

"The presumption serves as a reminder to the jury that the prosecution has the burden of proving every element of the offense beyond a reasonable doubt," *United States v. Starks*, 34 F.4th 1142, 1158 (10th Cir. 2022), and thus, may be "extinguished only upon the *jury's* determination that guilt has been established beyond a reasonable doubt," *Mahorney v. Wallman*, 917 F.2d 469, 471 n.2 (10th Cir. 1990) (emphasis in original) (collecting cases).

Consistent with *these* bedrock principles, the Justice Manual prohibits prosecutors from publicly declaring a defendant's guilt prior to a jury verdict, or otherwise disseminating statements inconsistent with the presumption of innocence. Justice Manual §§ 1-7.500; 1-7.600; 28 C.F.R. § 600.7(a) ("A Special Counsel shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice."). Rather, prosecutors must limit their statements to "[t]he substance of the charge, as contained in the complaint, indictment, information, or other public documents" and any "release issued before a finding of guilt should state that the charge is merely an accusation, and the defendant is presumed innocent until proven guilty." Justice Manual § 1-7.500. Moreover, "DOJ personnel should refrain from disclosing" *inter alia,* "[a]ny opinion as to [a] defendant's guilt" or any other "[o]bservations about a defendant's or party's character" "except as appropriate *in the proceeding or in an announcement after a finding of guilt.*" Justice Manual § 1-7.610 (emphasis added).

These restrictions ensure that the Department's statements do not "prejudice the rights of a defendant; or unfairly damage the reputation of a person." Justice Manual § 1-7.100; *see also* 32 C.F.R. § 776.47 ("Except for statements that are necessary to inform the public of the nature and extent of the trial counsel's actions and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused."); D.C. Bar Rule 3.8 (same).

The Draft Report violates every one of these core requirements. Despite Smith's decision to dismiss his cases against President Trump, and his complete failure to obtain a "*jury's* determination that guilt has been established beyond a reasonable doubt," *Mahorney*, 917 F.2d at 471 n.2 (emphasis in original), his Draft Report repeatedly, and falsely, claims that President Trump, Carlos De Oliveria, Waltine Nauta, and others have committed crimes and otherwise engaged in purported "criminal conduct." For example, Volume I of the Draft Report falsely asserts, without any jury determination, that President Trump and others "engaged in an unprecedented criminal effort," was "the head of the criminal conspiracies," and harbored a "criminal design." Draft Report, Vol. I at 2, 68, 69. These false accusations of criminality, which Smith again utterly failed to prove in Court, repeat throughout Volume I. *See, e.g.*, *id.* at 3, 52, 60, 64, 67, 88, 108. Likewise, Volume II asserts, without any supporting verdict, "that Mr. Trump violated multiple federal criminal laws," and that he and others engaged in "criminal conduct." Vol. II at 60, 88; *see also, e.g., id.* at 89, 121. Moreover, the Draft Report makes these allegations despite

the ongoing prosecutions of DeOliveira and Nauta, which would cause gravely unconstitutional prejudice if released.

Neither the Constitution nor applicable regulations or ethical rules allow Smith to make public, extrajudicial claims that purport to reflect conclusive determinations of guilt backed by the imprimatur of DOJ. It is the role of the jury, not the Special Counsel, to weigh the facts and determine guilt. Other Special Counsels have recognized this foundational fact. For example, Special Counsel Hur carefully cabined his observations to what some "jurors could," "might," "may well," or, at most, "would likely" conclude. *See, e.g., Hur Report* at 4, 5, 9, 10, 204, 206-211, 214, 216, 218, 220, 233, 235, 240-42, 246-47. At all points, Hur's focus was on whether "jurors assessing Mr. Biden's guilt and intent w[ould] be persuaded," *id.* at 241, and not on the Special Counsel's unilateral views or opinions regarding Biden's obvious guilt.

Likewise, Special Counsel Mueller expressly declined to "apply an approach" to his report "that could potentially result in a judgment that the President committed crimes," where, as here, "no charges c[ould] be brought." *Mueller Report*, Vol. II at 2. In Special Counsel Mueller's view, "[f]airness concerns counseled against" any kind of public accusation because:

> [t]he ordinary means for an individual to respond to an accusation is through a speedy and public trial, with all the procedural protections that surround a criminal case. An individual who believes he was wrongly accused can use that process to seek to clear his name. In contrast, a prosecutor's judgment that crimes were committed, but that no charges will be brought, affords no such adversarial opportunity for public name-clearing before an impartial adjudicator.

*Id.* Moreover, Special Counsel Mueller warned that a public disclosure of a prosecutor's unilateral judgment would only heighten these dangers. *Id.* ("[T]he possibility of the report's public disclosure and the absence of a neutral adjudicatory forum to review its findings counseled against potentially determining 'that the person's conduct constitutes a federal offense.' Justice Manual § 9-27.220."). For these reasons, Special Counsel Mueller's report "did not draw ultimate conclusions about the President's conduct," *id.* at 182, but "[i]nstead for each of the relevant actions investigated, . . . set[] out evidence on both sides of the question. . . ." Ltr. from Attorney General William Barr at 3 (Mar. 24, 2019).

To the extent Special Counsel Smith possesses any authority to draft a report (and he does not) he should have applied the same principles as Special Counsels Hur and Mueller, which the Constitution, the Justice Manual, and applicable regulations and ethical rules all require. That is—providing a dispassionate description of the relevant facts, free of any gratuitous commentary regarding President Trump's conduct, let alone direct accusations of guilt. Smith failed to do so. Instead, he chose to construct the Draft Report as a partisan weapon, designed to "unfairly damage the reputation" of President Trump, Justice Manual § 1-7.100, in a manner calculated to "heighten[] public condemnation," 32 C.F.R. § 776.47, while providing "no . . . adversarial opportunity for public name-clearing before an impartial adjudicator," *Mueller Report*, Vol. II at 2. Accordingly, the Department should not, under any circumstances, permit Smith to complete or submit the Draft Report in this form or otherwise disseminate it to the public.

#### IV.    Preparation And Release Of A Report Would Serve No Valid Purpose

There are many practical and prudential reasons to obey the law here.  Preparation and release of a report by Smith would not "be in the public interest."  28 C.F.R. § 600.9(c).

In 2023, Smith and his Office levied extremely serious, and entirely false, allegations against President Trump in two separate cases.  Smith has now been forced by the rule of law to dismiss both of those cases.  It would be highly improper and contrary to the public interest—as well as inconsistent with the reconciliation and public healing process that is necessary following divisive and unconstitutional actions by Smith—to allow him to create and disseminate yet another document recycling politically motived and inaccurate claims that the law has forced him to abandon.   Indeed, "no legitimate governmental interest is served by an official public smear of an individual when that individual has not been provided a forum in which to vindicate his rights." *In re Smith*, 656 F.2d 1101, 1106 (5th Cir. 1981). Smith lacks the credibility that is necessary for such a report to be reliable or valuable to anyone, as his biased and unlawful approach to these cases has been widely-criticized and discredited from the outset.[5] Quite appropriately, he is the subject of an ongoing investigation by the Office of Professional Responsibility, further diminishing any value from a report.[6]  Smith's unlawful plan would reinforce the "likely prospect of an Executive Branch that cannibalizes itself, with each successive President free to prosecute his predecessors, yet unable to boldly and fearlessly carry out his duties for fear that he may be next." *Trump*, 603 U.S. at 640.  "The enfeebling of the Presidency and our Government that would result from such a cycle of factional strife is exactly what the Framers intended to avoid." *Id.*

At 1999 hearings relating to the Independent Counsel Act, Ted Olson argued that "the final report . . . has turned into an excuse to file long exhaustive expositions which rationalize the investigation," as well as "offer opinions regarding and/or pronounce judgments on the individuals investigated, and generally make the Independent Counsel look good."[7]  Attorney General Janet Reno pointed out, more succinctly, that "the price of the final report is often too high."[8]  Deputy Attorney General Eric Holder

---

[5] WSJ Editorial Board, *Jack Smith Loses in the People's Court*, WSJ (Nov. 7, 2024, 5:52 PM), https://www.wsj.com/opinion/donald-trump-prosecutions-jack-smith-fani-willis-alvin-bragg-juan-merchan-1c68f640; Jonathan Turley, *Opinion: Donald Trump just won the greatest jury verdict in American history*, The Hill (Nov. 6, 2024, 10:56 AM), https://thehill.com/opinion/campaign/4976533-trump-prosecutions-lawfare-end; Elie Honig, *So What Happens With All the Cases Against Trump Now?*, N.Y. Mag. (Nov. 8, 2024), https://nymag.com/intelligencer/article/what-will-happen-with-the-charges-against-trump.html.

[6] Letter from Chairman Jim Jordan to Jeffrey Ragsdale, DOJ OPR (Dec. 4, 2024) https://www.scribd.com/document/800789357/Judiciary-to-DOJ?secret_password=vphCtDdh3lHj7mTM5Ib8.

[7] *The Future of the Independent Counsel Act: Hearings before the S. Comm. on Governmental Affairs*, 106th Cong. 231 (1999) (prepared statement of Theodore B. Olson).

[8] *The Future of the Independent Counsel Act: Hearings before the S. Comm. on Governmental Affairs*, 106th Cong. 252 (1999) (prepared statement of Attorney General Janet Reno).

Exhibit B

added: "the reporting requirement goes directly against most traditions and practices of law enforcement and American ideals."[9]  Based on this feedback, Congress permitted the Independent Counsel Act to expire, and DOJ promulgated a reporting regulation that was much more restrictive than its statutory predecessor.[10]

For the quarter century that DOJ has operated under these Regulations, DOJ has not released a single Special Counsel report concerning any individual who has mounted a successful defense in court, as President Trump has done with respect to Presidential immunity.  For good reason: the Special Counsel Regulations state that the purpose of a report is to "explain[] the prosecution or declination decisions."  28 C.F.R. § 600.8(c).  When filing and resolving a case in Court, that information, together with the defense's responses, becomes part of the public record.  An additional, one-sided report, would only sow confusion and undermine the judicial process.

Here, Smith has explained himself, and sought unsuccessfully to justify his actions, *ad nauseum*.  This has included routinely leaking sensitive details regarding the actions of Smith's Office to the media in violation of DOJ policy.  In October 2024, it was leaked that Smith planned to "pursue his two cases against Mr. Trump for as long as he has the legal authority to do so—including during the period between Election Day and the inauguration, when Mr. Trump, if he prevails, would be president-elect."[11]  A similar July 2024 report cited "a person familiar with Mr. Smith's thinking."[12]  As another example, we first learned from the media, rather than Smith's Office, that they were considering dismissing the prosecutions of President Trump.[13]  And we learned for the first time via private outreach from media sources, rather than Smith's Office, that Smith is working on a report.

---

[9] *Reauthorization of the Independent Counsel Statute, Part I: Hearings Before the H. Comm. on the Judiciary*, 106th Cong. 86 (1999) (prepared statement of Deputy Attorney General Eric Holder )

[10] *Compare* 28 U.S.C. § 594(h)(1)(B) (calling for a "final report . . . setting forth fully and completely a description of the work of the independent counsel, including the disposition of all cases brought"), *with* 28 C.F.R. § 600.8(c) (calling for "a confidential report explaining the prosecution or declination decisions reached by the Special Counsel").

[11] Maggie Haberman et al., *Trump Says He'll Fire Jack Smith, Special Counsel Who Indicted Him, if He Wins Again*, N.Y. Times (Oct. 24, 2024), https://www.nytimes.com/2024/10/24/us/politics/trump-jack-smith.html.

[12] Alan Feuer, *Special Counsel Is Said to Be Planning to Pursue Trump Cases Past the Election*, N.Y. Times (July 2, 2024), https://www.nytimes.com/2024/07/02/us/politics/jack-smith-trump-charges.html.

[13] Pierre Thomas et al., *Special counsel Jack Smith expected to wind down Trump prosecutions: Sources*, ABC News (Nov. 6, 2024, 3:26 PM), https://abcnews.go.com/Politics/special-counsel-jack-smith-expected-to-wind-trump-prosecutions/story?id=115571646; Devlin Barrett, *Jack Smith Assesses How to Wind Down Trump's Federal Cases, Official Says*, N.Y. Times (Nov. 6, 2024), https://www.nytimes.com/2024/11/06/us/politics/doj-trump-federal-cases.html.

In addition to the leaks, Smith filed four gratuitous speaking indictments, held a lawless press conference before the national media, and filed hundreds of pages of briefing in two district courts, two Courts of Appeals, and the Supreme Court. Smith's inappropriate 165-page "Motion For Immunity Determinations," accompanied by a 1,885-page "Appendix," is an especially egregious example of Smith's proclivity to seize all available opportunities to issue lengthy diatribes attacking President Trump based on Smith's biased view of the law and evidence.[14] Smith insisted on the filing, which even Judge Chutkan characterized as "atypical,"[15] to further publicize his narrative in the lead-up to the Presidential election. Smith's tome was not responsive to a defense motion, had no basis in the Federal Rules of Criminal Procedure, and violated DOJ's election-interference policies and practices. *See, e.g.*, Justice Manual § 9-85.500.[16] Having previously insisted on highly restrictive protective orders that prevented dissemination of discovery, based in part on histrionic, unsupported claims about witness identities, Smith abandoned those arguments and released the contents of protected reports, grand jury material, and accounts from thinly-veiled witnesses whom the media immediately identified.

Under these circumstances, there is no legitimate need for an additional "report" to "explain [Smith's] prosecution or declination decisions." 28 C.F.R. § 600.8(c). His baseless rationales for prosecution are already fully public. So too is the selective description that his Office prepared of the legal basis for the motions to dismiss, which Smith's Office caused OLC not to further memorialize in violation of the *Brady* doctrine and DOJ policy. Moreover, the Draft Report goes far beyond merely explaining Smith's "prosecution or declination decisions," deviating instead into extensive and irrelevant discussions on purported "litigation issues," including post-indictment immunity litigation and Smith's violation of the Department's political non-interference policies. *See* Draft Report Vol. I at 107-37. Although Smith may wish to air his baseless and politically motivated grievances regarding the Constitutional importance of immunity, and otherwise provide feeble and transparent excuses for his plainly political motivations, that is not the purpose of a Special Counsel report under 28 C.F.R. § 600.8(c). A report must simply "explain[]" a Special Counsel's "prosecution or declination decisions" and nothing more. The Draft Report violates this core principle.

The issuance of such a report, in violation of the Constitution, the Transition Act, Presidential immunity, and DOJ's own regulations, would exacerbate the irreparable damage that Smith has already inflicted on DOJ's reputation for non-partisanship through his repeated violations of DOJ policies about election interference. As we noted one year ago in opposing Smith's failed attempt to obtain certiorari before judgment on Presidential immunity, which the Supreme Court rejected, Smith's actions "create[] the compelling appearance of a partisan motivation: To ensure that President Trump . . . will face a months-long criminal trial at the height of his presidential campaign." Br. in Opp. to Pet'n for Writ of

---

[14] ECF No. 252, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Oct. 2, 2024).

[15] ECF No. 243 at 2, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Sept. 24, 2024).

[16] *See also* A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election, U.S. Dep't of Justice Office of Inspector General (June 2018) at 18 ("[I]n general, the practice has been not to take actions that might have an impact on an election, even if it's not an election case or something like that."), *available at* https://s3.documentcloud.org/documents/4515884/DOJ-OIG-2016-Election-Final-Report.pdf.

Certiorari Before Judgment in *United States v. Trump*, No. 23-624, at 21 (filed Dec. 20, 2024). Smith's nakedly partisan, election-interference motivation was obvious to commentators across the political spectrum. *See id.* (citing many sources). "[T]he best traditions of the U.S. Department of Justice … call for prosecutors to *avoid* the appearance of election interference in the prosecution of political candidates." *Id.* at 23 (emphasis in original). "[F]ederal prosecutors . . . may never make a decision regarding an investigation or prosecution, or select the timing of investigative steps or criminal charges, for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party." *Id.* (citing Justice Manual § 9-27.260). Smith's latest illegal plan to launch yet another partisan attack against President Trump, De Oliveira, and Nauta will have the same injurious effect on DOJ's reputation if not stopped in its tracks.

Further, preparing and releasing a report would be improper for the additional reason that Smith has relied on numerous legal theories that are unprecedented and incorrect as a matter of law. Many of those issues were the subject of ongoing litigation at the time Smith dismissed the cases. To name a few, these issues include the lack of statutory authority for Smith's appointment; Smith's reliance on official-acts allegations in both cases in violation of the Presidential immunity doctrine[17]; Smith's unlawful theory under 18 U.S.C. § 1512(c)(2) in violation of *Fischer v. United States*, 603 U.S. 480 (2024); equal protection violations, based on selective and vindictive prosecution theories[18]; the unprecedented and unlawful raid at Mar-a-Lago; and violations of the Presidential Records Act and NARA's longstanding practices under that Act.[19] There were also numerous discovery disputes in both cases, including unresolved motions in the Southern District of Florida regarding *Brady* obligations, the scope of the prosecution team, and Intelligence Community holdings, which further call into question the reliability of Smith's theories.[20] Smith's Draft Report presents a selective and inaccurate response to only some of these issues, and then proceeds as if his theories are well-founded and undisputed. Nothing could be further from the truth.

Finally, given the status of Smith and his team as the inauguration approaches, using additional taxpayer resources to prepare, review, and disseminate a report is not a legitimate use of taxpayer funds— even if there were a valid appropriation here, which there is not. "The Special Counsel's office has spent tens of millions of dollars since November 2022, all drawn unconstitutionally from the Indefinite Appropriation." *United States v. Trump*, 2024 WL 3404555, at *46 (S.D. Fla. July 15, 2024). For the period preceding March 31, 2024, Smith's Office had used $20 million from a permanent indefinite appropriation and an additional $16 million from other unspecified "DOJ components."[21] The costs of Smith's activities since March 2024 have not yet been released. It is clear, however, that the total figure

---

[17] ECF No. 324, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[18] ECF No. 328, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[19] ECF No. 327, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[20] ECF No. 262, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Jan. 16, 2024).

[21] Special Counsel's Office, DOJ, Statements of Expenditures, https://www.justice.gov/sco-smith.

will greatly exceed—by an extraordinarily wide margin—what all of this lawfare was actually worth to the public, the operations of the government, and the Country as a whole.

\*     \*     \*

Smith's proposed plan for releasing a report is unlawful, undertaken in bad faith, and contrary to the public interest.  Smith's conduct also raises grave concerns under Article II because it unlawfully encroaches on the Executive authority of the incoming Administration of President Trump to resolve the issues surrounding Smith's Office in accordance with President Trump's commanding national mandate from the voters.  The time has come to put an end to this weaponization of the justice system and move forward constructively.  No report should be prepared or released, and Smith should be removed, including for even suggesting that course of action given his obvious political motivations and desire to lawlessly undermine the transition.  If you elect to proceed with Smith's plan, we again respectfully request (1) notice of such decision prior to any publication of the Draft Report, allowing us to take appropriate legal action, and (2) that this letter and Smith's meritless responses to the legal arguments set forth herein be incorporated into the Report.

Respectfully Submitted,

/s/ Todd Blanche / Emil Bove
Todd Blanche
Emil Bove
Blanche Law PLLC

/s/ John Lauro / Gregory Singer
John Lauro
Gregory Singer
Lauro & Singer

*Attorneys for President Donald J. Trump*

Cc:     Jack Smith, Special Counsel
        JP Cooney, Deputy Special Counsel
        (Via Email)

Exhibit B